UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:23-CR-20271-DSL

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) VOLUME VI - A.M.SESSION |
| | ) PAGES:  1 - 98 |
| | ) |
| | ) |
| VS. | ) DATE OF PROCEEDINGS: |
| | ) MAY 14, 2025 |
| | ) |
| BRETT BLACKMAN, | ) COURTROOM #12-3 |
| GARY COX, | ) WILKIE D. FERGUSON, JR. |
| | ) U.S. COURTHOUSE |
| _____DEFENDANTS._____ | ) |

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE DAVID LEIBOWITZ,
UNITED STATES DISTRICT JUDGE,
AT 400 NORTH MIAMI AVENUE,
MIAMI, FLORIDA  33128.

<u>APPEARANCES</u>

FOR THE GOVERNMENT:        DARREN C. HALVERSON, ESQ.,
                          JENNIFER BURNS, ESQ.
                          U. S. DEPARTMENT OF JUSTICE
                          BOND BUILDING, 8TH FLOOR
                          1400 NEW YORK AVENUE, N.W.
                          WASHINGTON, DC 20005

FOR THE DEFENDANT         BRIAN T. RAFFERTY, ESQ.
BRETT BLACKMAN:           RAFFERTY LAW
                          1575 JOHNSON ROAD, N.E.
                          ATLANTA, GA 30306

*Stenographically Reported By:*
*Quanincia S. Hill, RPR*
*Federal Official Court Reporter*
*400 North Miami Avenue*
*Miami, Florida  33128*

*Office No.:  (305)523-3634  E-mail: Quanincia_hill@flsd.uscourts.gov*

<u>APPEARANCES-CONTD.</u>

FOR THE DEFENDANT          G.P. DELLA FERA, ESQ.
GARY COX:                  10800 BISCAYNE BOULEVARD
                           SUITE 520
                           MIAMI, FLORIDA 33161-7400

                           HECTOR L. FLORES, ESQ.
                           BARZEE FLORES, P.A.
                           COURTHOUSE CENTER, PENTHOUSE 1
                           40 NW THIRD STREET
                           MIAMI, FLORIDA 33128

*Stenographically Reported By:*
*Quanincia S. Hill, RPR*
*Federal Official Court Reporter*
*400 North Miami Avenue*
*Miami, Florida  33128*

*Office No.:  (305)523-3634  E-mail: Quanincia_hill@flsd.uscourts.gov*

**<u>INDEX TO WITNESSES</u>**

| <u>Witness</u> | <u>Page</u> |
|---|---|
| TONI DE LANOY | |
| Continued Direct Examination by AUSA Burns | 22 |

- - -

**INDEX TO EXHIBITS**

| Government's Exhibit | Description | Page |
|---|---|---|
| 604 | 2018 Healthsplash Sales by Customer Summary. | 26 |
| 626 | Proposed DMERx Exam Workflow Modification PowerPoint. | 26 |
| 627 | Proposed New Exam Process. | 26 |
| 634 | Compendium of e-mails from C.T. to Blackman Attaching Healthsplash Dashboards. | 26 |
| 1023 | 2016.08.11 e-mail from Cox to K.B. et al. Re Feedback so Far. | 26 |
| 1025 | 2016.08.12 e-mail from Hitt to Cox, T.D.L., et al re Feedback so Far. | 26 |
| 1052 | 2016.10.19 e-mail from Blackman to Cox, T.D.L., P.T. re Issue. | 26 |
| 1112 | 2017.07.18 e-mail from Barth to T.D.L., Blackman, and G.S. re Final  Contracts. | 26 |
| 1159 | 2018.01.25 e-mail from Cox to M.R. et al. Re CO-B15 Urgent!!! | 27 |
| 1170 | 2018.02.01 e-mail from T.D.L. to G.S. et al. Re Healthsplash - Corrective Action. | 27 |
| 1186 | 2018.05.24 e-mail from L.J. to G.S. and T.D.L. re DR Question. | 27 |
| 1196 | 2018.07.05 e-mail from G.S. to J.L. and T.D.L. re Integrated Support Plus. | 27 |
| 1221 | 2017.07.24 e-mail from Barth to T.D.L, Blackman, Schreck, et al re Healthplash Contracts. | 27 |

```
1243      SKYPE message.                              42

1244      SKYPE message.                              42

1245      SKYPE message.                              42
```

(Proceedings commencing at 8:33 a.m.)

**THE COURTROOM DEPUTY:**  Calling the matter of the *United States versus Brett Blackman and Gary Cox.*  Case number 23-criminal-20271.

Counsel, please announce your appearances for the record, beginning with the government.

**AUSA HALVERSON:**  Good morning, Your Honor.  Darren Halverson and Jennifer Burns for the United States.  And with us at counsel's table is Special Agent Orlando Buissereth.

**AUSA BURNS:**  Good morning, Your Honor.

**ATTORNEY RAFFERTY:**  Good morning, Your Honor.  Brian Rafferty on behalf of Brett Blackman.

**THE COURT:**  Mr. Rafferty and Mr. Blackman, good morning.

**ATTORNEY DELLA FERA:**  Good morning, Your Honor.  Jimmy Della Fera and Hector Flores on behalf of Gary Cox, who's present in open court.

**THE COURT:**  Mr. Cox, Counsel, good morning.  Nice to see everyone.

Let me take up a couple of things that we started discussing yesterday.  And one of the them, there's been some filings by the parties overnight.

Let me take the -- let me take the *Brady*, *Giglio*, *Triumph Capital* issue first.

The Court has carefully reviewed the *Triumph Capital*

case at *544 F.3d 149*.  That case is not on all fours with this situation, not even close actually.  It does not support Mr. Rafferty's proposition, with due respect.

In that case, that was a case where it is clear from the opinion that, after trial, the defense came into possession of material where the defendant clearly made statements to an attorney and there was an agent report of those statements. The trial court in the post trial motion ruled that, even though that was true, and even though the government contended that they did not possess the notes, even still, the trial court said it did not grant a new trial on the basis of a *Brady* motion, principally because the statements of the witness were not inconsistent with pretrial and trial testimony.  And the Second Circuit respectfully disagreed with that for reasons I won't belabor.

We don't have that here.  In the first instance, and perhaps the dispositive point is that what we have here is, through testimony, cross-examination, testimony adduced on cross-examination, the witness stated the pre-plea posture of his case, the pre- cooperation posture of his case and what his recollection was of what was done during the pre-plea when he was still maintaining that he was not guilty of anything.  And his attorneys were negotiating with the government.

What came out of that was, as is commonly the case, was that his counsel was defending him in making the case to the

government.  And what came out through Mr. Rafferty's cross-examination was that as part of that, there was negotiation and a PowerPoint presentation by counsel, which I think it is more than fair to state was making arguments that he was not guilty.  That's what was coming out of that testimony.

First, there is nothing in that evidence, nothing, and the government stood up yesterday, that it does not even believe it has the PowerPoint.  But there is nothing in that evidence that there is any note, any recorded statement, anything that was ever in the possession of the government at all.

Now, in an abundance of caution, I directed the government yesterday that they're going to investigate that, let's call it PowerPoint and negotiation period, see if they have anything.  And I made that point yesterday in an abundance of caution because if there was anything that they had that went at all to the core defense here, which is characterized from the very first moment and throughout the early days of the case as, we are a web platform, we are not the players involved in Medicare submissions.  We are a, if you will, a neutral platform that the players interact with.  They are responsible, the players, for their conduct, not the website platform.

If there's anything in the possession of the government about website platforms, about what Mr. Karlick -- because it's

Mr. Karlick's testimony -- about Mr. Mr. Karlick interfacing at all with such platforms, DMERx, HealthSplash, or the defendants, in an abundance of caution, even if it was a -- a slide of a PowerPoint from an attorney, even if it was privileged at the time I said yesterday and I maintain today, that's a different kettle of fish, we're not going to get near the line, even if the government did nothing wrong.

But the government has maintained that it doesn't have, it doesn't believe that it has such a note or PowerPoint slide from anyone.  So they're going to check to make sure.

But that's the first point is that this is not *Triumph Capital* because, so far, there is nothing in the trial, there is nothing that has come out that indicates at all that the government has ever had any note, recording, of any kind of what came out yesterday.

That's a critical point.  That's very different than *Triumph Capital* where it is clear that it came from the witness, there was an agent note of the witness.  And then the government in *Triumph Capital* essentially relied on, even if it was in an agent note, there was nothing inconsistent.

That's not where we are at all.  The government, so far, has maintained that every agent note has been turned over and that it has nothing, and we're doing everything in an abundance of caution and we'll continue to do that.

And I'll ask Mr. Halverson his best projection of when

he'll have that report for the Court so that he can put it on the record.

**AUSA BURNS:**  Your Honor, we did make some inquiries last night and I can provide an update if it would be helpful.

**THE COURT:**  Sure.  Sure.

**AUSA BURNS:**  We reached out, both to our colleagues as well as counsel for Mr. Karlick, to try to have everybody go back.  You know, these presentations were made five, six years ago.  So it's a bit of a memory jog.

We spoke with our colleague who was present at one of two presentations and she does not have a copy of a PowerPoint, does not recall receiving one.  Searched her files.  There's nothing there.

Mr. Karlick's counsel also believed that if one was shown, it certainly was not provided to the government and nobody recalls any agents being present to have taken any notes.

As to the substance, the discussions are really more along the lines of mitigating the responsibility of Mr. Karlick and his codefendants, and nothing about DMERx, Mr. Blackman or Mr. Cox was discussed in that -- in those presentations.

**THE COURT:**  Okay.  Well, I thank Ms. Burns.  And that's helpful in that.  That representation, the Court accepts.  And let me state it very clearly:  There is nothing in yesterday's testimony that, and nothing in the case that has been brought

to the attention of the Court, by Mr. Rafferty's excellent counsel or otherwise, that dislodges the government's representations in the case about providing all notes.  And now Ms. Burns' representations regarding PowerPoint presentation. So that is dispositive.  There is no indication from the testimony yesterday that the government has something, had something and didn't turn it over.  And that's critical.  And I appreciate the government's representation.

Let me say one last point so that the record is abundantly clear:  What we're left with is, again, through able cross-examination, is that Mr. Rafferty was able to bring out, regardless of the existence of any notes, of any prior recordings or anything in the possession of the government, a line of inquiry that he was perfectly able and it was his right to try to adduce, which is that before he pled guilty in any way and was only charged, he thought, this witness thought and asserted that he was not guilty for a period of time.

As I stated yesterday, there is arguably an amount of that that if there would have been an objection, I would have sustained because while it is true that Mr. Rafferty should be allowed to explain who is in front of the jury, it is simply -- it is for the 401, 402 and 403 analysis, in this Court's view, that adducing that, at an early point in the case, a defendant pled not guilty can be borderline misleading if carried to too far of an extent.  I don't believe it was to too far an extent

in this case.  And I want to assert, again, that Mr. Rafferty didn't do anything wrong and the government didn't object.

But what we're therefore left with is that Mr. Rafferty was able to adduce on cross-examination, in quotes, additional inconsistency, if you will, that in many cases is not inconsistency at all.  Pleading not guilty at an early stage of the case and having your attorneys fight for you and then later coming to a realization that you will accept responsibility and even try to cooperate with the government is fair.  But it is not in any way *Giglio* or exculpating of the defendants or *Giglio* and impeaching of the witness.  It is simply not.

It's fair that it was brought out.  But for all those reasons, there is no -- Mr. Rafferty has made a request for *Brady*, *Giglio* information to be provided along the lines of a PowerPoint deck.  The government has made its representation, the Court accepts it, and there there's no evidence in the case that dislodges or rebuts the government's representation.

So on those points, both the government's representation, which is dispositive of the *Brady*, *Giglio* request, and secondly and a bit long-windedly, I'll admit, I wanted to make a full record because what we're left with on the second point is that all we have is the exploration of Mr. Karlick's full process, including the parts before which he pled guilty and cooperated.  There is nothing *Brady* or *Giglio* about that because it was brought forth from the stand

apparently for the first time for the purposes of a recorded note or record.

So with that, I've made my record.  The request of Mr. Rafferty has been answered by the government and we'll go from there.

The second point that was raised by the parties are these videos.  And I appreciate the hustle of both parties.  I have at Docket Entry 219, the government's view of the admissibility of certain video evidence ostensively through Witness De Lanoy.  And then I also have, although it doesn't have a docket number yet, I have Mr. Rafferty's supplemental motion in limine to introduce training or tutorial videos, those same videos, and I'm sure Mr. Rafferty will put that on the docket whenever he can take a breathe at a date soon.

So a couple of things here, and obviously, Mr. Della Fera, I'm going to -- I'm just going to get your affirmative confirmation, you join in this motion, correct?

**ATTORNEY DELLA FERA:**  Yes, sir, Your Honor.  I do join in the --

**THE COURT:**  So it's construed for both defendants.

Let me say a couple of things.  It's narrowed a bit.  It's narrowed a bit because now we're only talking about Exhibits A3 through A10 and A12, which are the, I'm going to call it, the De Lanoy narrated videos.  Mr. Rafferty does not even argue in his motion for what has -- what I'm going to

characterize as the Cox narrated videos, or what has been characterized by the government as the other narrator or the Kennedy narrated videos.  So I'm only considering what's in front of me, which is A3 through A10 and A12, which are the De Lanoy videos.

The others are not even being argued for and, quite rightly, because at least as ostensively to be admitted from this witness, Ms. De Lanoy, they couldn't possibly come in. The Cox videos are not statements of a party opponent at all. And so those are quite simple to keep out.

And secondly, the Kennedy videos, she's not on the stand, and they're not before me, and they're not argued to be admitted.

That leaves the De Lanoy videos.

The De Lanoy videos, it's pretty simple for now, which is both sides, all sides are totally free to ask this witness about those videos, what she knows, what she did, what she recalls about their making, about their -- were they shoved in a drawer or were they available to everybody, were they sent out to specific people, or were they just placed on a Vimeo website and everything in between.

Everybody's going to get to ask those questions about the video and the answers to those questions will go some distance towards addressing the only two grounds that were put forth by the parties in their motions.  The first is:  Are they

business record exceptions to the hearsay rule; and second, and I'm going to characterize it broadly for Mr. Rafferty and Mr. Della Fera:  Are they impeachment evidence?  Are they extrinsic evidence of impeachment?  That's what we're going to get into.  All sides are going to get into that, and then, you know, when everyone feels like we've done that -- I mean, obviously, we're fortunate because the government doesn't want them in, which means that they will explore that with the witness, but they would never then offer or seek an in limine at that moment which means that then we will have Mr. Rafferty and Mr. Della Fera be able to explore that.  And then, before they rest, their cross will definitely have argument about whether the videos can then come in or not come in, based on everything that we've done, and I'll be taking careful notes and I'm sure the parties will as well.

Let me state very clearly so that everybody has fair targets to shoot at:  I'm skeptical about this being a business record.  But all sides can explore that.  You explored the law last night of the business record exception.  And this witness can be asked about anything that goes to the foundation of the business record exception.

And then for the purposes of impeachment, it depends on what the witness' memory, answer and content about these videos is, about whether these do, in fact, impeach her or not.  And I say that because, and this is why I want to be careful, I don't

know what those videos even say.  I haven't reviewed them.  And so it is important that the exhibit numbers and the specific videos be highlighted by exhibit number and dealt with precisely so I can then rule.

I wanted to say all of that not because these attorneys don't understand it, but because I wanted the record to be clear for them and so that they can examine the witness appropriately.

Finally, I read the *United States versus Calle* case, which Mr. Rafferty cited, at 822 F.2d 1016, Eleventh Circuit, 1987 and that's important.  And let me state very clearly: Mr. Rafferty is right about this much, at least.  This is not a 608 case, a Rule 608 case.  This is not about prior conduct of the witness and seeking extrinsic evidence to impeach her prior conduct.  This is the conduct of the case.  This is she is inside of the business during the period of the charged conduct and videos were -- and both sides do not dispute this -- made by her in some way, at least as a narrator.

So to that extent, this is about impeachment of a witness about a material issue if these videos, through testimony, through evidence, can be shown not to have been shoved in a drawer, not to have been disconnected from the case.

And finally, whether she's being impeached at all, whether she -- what her testimony yesterday and her testimony

today says in relation to these videos and how these videos may or may not impeach her.  That's what we're going to have argument about from counsel after all of the testimony is laid by the witness.

So I made a meal of that too, a bit long-winded too.  But I wanted to say it because -- in that level of detail -- because we're going to do it all through the witness in testimony.  We will have a break at some point where we will have argument about the videos.  And then we will -- and then I'll be able to rule with the benefit of counsel's representations.

Anything on either issue that I raised this morning that counsel wishes to add?

Mr. Rafferty?

**ATTORNEY RAFFERTY:**  Just briefly, Judge.

On the second issue relating to the videos, that was actually filed since the Court took the bench.  My brief is actually now at Docket Entry 220.  So just for the purposes of the record, the motion that you just referenced --

**THE COURT:**  Terrific.

**ATTORNEY RAFFERTY:**  -- that I filed is Docket Entry 220.

And then, secondarily, just as a housekeeping matter, I do have the videos on a separate jump drive.  If the Court wants to look at them at a break or something like that.  I've

given copies to the government.

**THE COURT:**  Yeah.  That's great.  That's great on both counts, Mr. Rafferty.  If you would hand those up to my deputy. I'll have a chance at a break to at least skim them.

**ATTORNEY RAFFERTY:**  They're marked, Your Honor, in the drive according to the numbers that I referenced in the brief, you'll see A3 or whatever the numbers are.

**THE COURT:**  Yep.  Okay.  Well, and Docket Entry 220 is exactly what I was referring to.  So they're both on the docket now.

Anything else, Counsel?

**ATTORNEY RAFFERTY:**  Not from me, Your Honor.

**THE COURT:**  Thank you.

**ATTORNEY DELLA FERA:**  No, Your Honor.

**THE COURT:**  Anything from the Government?

**AUSA BURNS:**  No, Your Honor.  Thank you.

**THE COURT:**  I'll see you all in about 28 minutes.
Thanks very much.

**THE COURT SECURITY OFFICER:**  All rise.

(Recess from 8:59 a.m. until 9:37 a.m.)

(Proceedings resuming at 9:37 a.m.)

**THE COURT:**  Okay.  Just before we bring out the jury, I just want to state for the record, it reconfirms and actually makes me feel even more strongly about what I said this morning, I have reviewed A3 through A10 and A12.  I think the

phrase is is that a video is worth ten minutes of Judge Leibowitz on the bench.  A video -- these are tutorial videos. And depending on what the witness says about how they were created, when they were created, what they were -- what was done with them, I was skeptical at first because I misapprehended the nature of the videos.  These may very well be business records.

So both grounds are available to be explored.

Let me say very clearly, though, what is clear to me because this was brought up late, either side is going to need to put headphones on the witness and go one by one and do it that way.  And they should be just referenced by, you know, the video marked as A3 and not characterized in any way, and then let her, with a question of, what is this, she will characterize it.  So just be very careful because they are allowed to be called videos.  But other than that, they should not be characterized because they can be, to my eye, blank, which is more like what a juror is.  They can by characterized in different ways.  And depending on how they were used, depending on when they were used, how often they were made available to participants who used the site.  So I caution the attorneys.

Let me finally say, to preserve the jury's time, because some of them are -- I basically played them back to back to back.  Some of them are quite short.  Some of them were

a little longer, and I just played 80 percent of it.

To preserve the jury's time, I would play enough of it to see if and when she can recall it and pronounce upon it and characterize it. If they're then admitted, you can then go into extreme detail by counter. I can see that there are slides that each side may want to highlight in testimony. But I just caution the parties because if, on foundation, this is going to take an hour, we'll do it outside of the presence of the jury.

And so I just wanted to say all that. It's fair game. The videos are fair game to be asked about for foundational purposes by all sides. But if we start to be watching the jury fall asleep because a witness has headphones on, we'll just take it up at a break or at lunch or at the end of the day.

Yes, sir.

**ATTORNEY RAFFERTY:** Just a couple things, Judge.

I just realized the jump drive I gave the Court is my only copy. And to play them for Ms. De Lanoy --

**THE COURT:** I'm going to hand it back to my deputy to give to you.

**ATTORNEY RAFFERTY:** Second, I do have a pair of Bluetooth headphones. I only have one pair. I've given electronic versions of these. I don't think the government can listen to this as Ms. De Lanoy is listening to them because they don't have headphones.

THE COURT:  No, that's okay.  And they have them and they have them by exhibit number, as long as you are specific to the exhibit number or the counter as you go.  That's fine.

And I want to be clear:  I am open-minded to both sides.  It really does matter what the witness says in response to the foundational questions.

Let me finally say, it's kind of interesting that when Mr. Rafferty hands up videos, it almost -- it just concretizes the issue much better than even the very best briefs, which is that it's hard to see how this impeaches her, whereas, it's the flip of what I said this morning.  It concretizes business record a little better, depending on the answer to questions, but it's hard to see, and I'll let the parties get at it and then argue it after you lay all the foundation on both prongs, business record and impeachment.  But it's hard to see how it impeaches her testimony.  But maybe -- maybe you'll disabuse me of that as well.

So I've made my record.  It's fair game.  Let's bring in the jury.

Thanks very much.  And you can get your witness.  Thank you.

THE COURT SECURITY OFFICER:  All rise for the jury.

(Jury convened at 9:43 a.m.)

THE COURT:  Good morning, everybody.  Please be seated.

I hope everyone had a nice night.  Let me assure that

when we start at ten minutes after I say we're going to start, it is for the benefit of you.  It is to make sure the day is efficient.

Thank you for your punctuality.  We're going to continue with our direct examination of this witness.

Ms. Burns.

**AUSA BURNS:**  Thank you, Your Honor.

**TONI DE LANOY,**

having been previously duly sworn, was examined and testified further as follows:

**CONTINUED DIRECT EXAMINATION**

**BY AUSA BURNS:**

Q.   Good morning, Ms. De Lanoy.

A.   Good morning.

Q.   I want to start today just to -- sorry.  I want to go back over a couple things that we talked about yesterday.

A.   Okay.

Q.   Now, you testified that you had pled guilty to a conspiracy charge and you identified the people that you conspired with.

Do you remember that?

A.   Yes.

Q.   Can you tell the jury what you did that made you guilty of this crime?

A.   So at my work for DMERx, HealthSplash, I was involved in connecting marketers and DMEs as well as helping with the

documentation itself.

Q. And we talked a little bit about the size of the company of DMERx. When you were working there, approximately how many employees were there?

A. It grew a little bit over time. So I'd say, you know, anywhere from eight to 15, may be a little bit more.

Q. And where were you located when you were working there?

A. I worked remotely from home.

Q. Okay. Where were the other employees?

A. In various locations across the U.S.

Q. Okay. How regularly did you all interact?

A. Very regularly. There was meetings throughout the week. Once a week, there was typically a company-wide meeting and then we had meetings for various reasons and we spoke and had Zoom calls.

Q. And who attended the company-wide meeting?

A. That would be the entire executive team and all other employees.

Q. Did that include Mr. Blackman and Mr. Cox?

A. Yes.

Q. And yesterday, we discussed a little bit about National Center for Pain. Do you have any sense of how much money they were making monthly?

A. I don't know. But I know that they did marketing for at least one of the largest clients that DMERx had.

Q.   And which client was that?

A.   Empire Kronos.

Q.   Do you know whether that business grew over time?

A.   I don't really know their numbers.  I know they have large numbers.

Q.   You also testified yesterday about a new software being developed at DMERx.  Do you recall that?

A.   Yes.

Q.   And did you have any involvement with that software?

A.   Very little.  There was a lot of frustration around that software.  Brett Blackman was using a gentleman by the name of Ron Sloop to develop that software.  And Mr. Sloop didn't have any experience with healthcare.  And there were several of us that had experience in different components and we wanted to be more involved in the development of that.  But we were not.

Q.   Were you ever involved in presenting that software?

A.   So we were at a trade show in December of 2018. And Roxy Murray and I were at that trade show, along with Brett Blackman, and Brett had computers set up.  And he told us to show people the software.  And we were supposed to act like the software existed, and it did not.

Q.   So what were you showing people then?

A.   It was a dummy version of some future software.

Q.   And did you, in fact, make those representations to people?

A.   No.

Q.   But to be clear, Mr. Blackman wanted you to do so?

A.   Yes.

Q.   Yesterday, we also -- we showed you Government's Exhibit 156, which was the image of the triangle with the different parts that all use the portal?

A.   Yes.

Q.   And you just mentioned that part of what you pled guilty to was making connections between those different users of the portal?

A.   Yes.

Q.   Who else, if anyone at DMERx, made those connections between the marketers, the suppliers and the telemedicine companies?

A.   Greg Schreck, Brett Blackman, Gary Cox.

Q.   And how do you know that?

A.   We were all -- we are all involved in business outreach and on-boarding of new clients.

     AUSA BURNS:   Your Honor, at this time, I have a list of exhibits I'd like to read into the record.  These have been shown to counsel and agreed upon.

     THE COURT:   Sure.

     AUSA BURNS:   Okay.  At this time, the government offers Government's Exhibit 626, 627, 604, 634, 1023, 1025, 1052, 1112, 1159, 1170, 1186, 1196, 1221 and 1025.

     THE COURT:   Mr. Rafferty, any objection?

**ATTORNEY RAFFERTY:**  No objection, Your Honor.

**THE COURT:**  Mr. Della Fera?

**ATTORNEY FLORES:**  No, Your Honor.

**THE COURT:**  No objection, Mr. Flores?

**ATTORNEY FLORES:**  No, Your Honor.

**THE COURT:**  All right.  Those exhibits are received. You can publish as you wish.

**AUSA BURNS:**  Thank you, Your Honor.

(Government's Exhibit 626 was admitted into the record.)

(Government's Exhibit 627 was admitted into the record.)

(Government's Exhibit 604 was admitted into the record.)

(Government's Exhibit 634 was admitted into the record.)

(Government's Exhibit 1023 was admitted into the record.)

(Government's Exhibit 1025 was admitted into the record.)

(Government's Exhibit 1052 was admitted into the record.)

(Government's Exhibit 1112 was admitted into the record.)

(Government's Exhibit 1159 was admitted into the record.)

(Government's Exhibit 1170 was admitted into the record.)

(Government's Exhibit 1186 was admitted into the record.)

(Government's Exhibit 1196 was admitted into the record.)

(Government's Exhibit 1221 was admitted into the record.)

Q.   (By AUSA Burns)  Ms. De Lanoy, did there come a time where you ever discussed changes to the workflow process at DMERx?

A.   Yes.

Q.   When was that, approximately?

A.   It was an ongoing discussion.  It wasn't something that was suddenly at one point in time.  It was something that I was working on and trying to develop for an extended period over 2017 to as late at 2019.

Q.   Did you prepare any documents or materials in connection with your efforts?

A.   I did.

Q.   What did you prepare?

A.   Among other things, a PowerPoint presentation.

     **AUSA BURNS:**  Ms. Braga, can we pull up Government's Exhibit 626, which was just admitted.

Q.   (By AUSA Burns) Ms. De Lanoy, do you recognize this document?

A.   Yes.  I do.  This is my PowerPoint.

Q.   Okay.  And who -- did you present this to anybody?

A.   Yes.

Q.   Who did you present it to?

A.   I presented it to several people, including Brett Blackman, Lana Hitt, and others.

Q.   Okay.  So this first page here, what is the cover page about?

A.   So it's just an overview of the contents of the PowerPoint and, you know, the title, which is, Proposed DMERx Exam Workflow Modifications.  And I was outlining issues with our current workflow.  My proposed workflow overview and new statuses we would have available on the software, the benefits to clients as well as some of their feedback and the benefits to us as a company.

Q.   Let's walk through it.

     **AUSA BURNS:**  Can we go to the next page please, Ms. Braga.

Q.   (By AUSA Burns)  And this says here at the top:  Problems with the current workflow.  What do you mean by the current workflow?

A.   The way our software currently functioned.

Q.   And what do you identify here as the top, the first

problem?

A.   The heading is:  Limited HCPCS code Selection, so HCPCS codes are billing codes that are assigned to different medical equipment, right?  So there are many HCPCS codes out there. And when it came to orthotics, you know, we had back, knee, ankle, wrist, shoulder.  I might be missing something there. But all of those items had various different HCPCS codes.  And we limited the HCPCS codes that were available on our software dramatically.

Q.   And when you say "we limited," who do you mean?

A.   I mean the owners of our company limited.  So basically when DME on-boarded, a durable medical equipment company on-boarded onto our software, they were given a handful of codes that could be made available to the doctor when they completed the exam.  And they had to select at least two.

Q.   Okay.  So the DME company was choosing the codes that then the doctor could base their prescription on?

A.   That's correct.

Q.   Okay.  And what were the problems that you were identifying her here?

A.   Well, first was supplier frustration with the lack of codes, and also the length of time that it took to add new codes to exams.  And as well as it restricted our marketability within, what I would call, standard healthcare settings.

Q.   Okay.  And what do you differentiating standard healthcare

from?

A.   I'm saying, basically, you know, I wanted to be able to expand into urgent care, hospitals, primary care physician offices.  And our codes limited that marketability.

Q.   So this work flow, who is it targeted toward, what types of providers?

A.   Can you rephrase that question?

Q.   Sure.  So from my understanding, you're saying this was not really something you thought would be workable for like a brick-and-mortar type of healthcare practice.

Who -- what type of medical provider would this work for better?

A.   So the exam worked mostly for telehealths.

Q.   And you say your potential liability from criteria-based exam and limited choice.  What do you mean by that?

A.   My concern was, you know, we would end up becoming liable for something like what's going on today.

Q.   And the next topic then is, Forced Supplier and Clinician Product Selection.

What does that mean?

A.   I'm just looking at it real fast.

Q.   Sure.  Take your time?

A.   Sorry.  Okay.  So basically, what I mean by that is, again, we go back to the limited HCPCS code selection.  So if a supplier wanted to use a HCPCS code that wasn't available on

our platform, they could not do that.  And the clinician was actually limited to whatever code the DME supplier selected when they on-boarded.

Q.   And you talk here about a need to police compliance and educate our clients.  What does that mean?

A.   Yes.  Well, we definitely had instances come up where we were aware of people using our addendum process in a way to ask for inappropriate changes to exam documentation or there were concerns over other people logging into a medical doctor's user profile.

**AUSA BURNS:**  Ms. Braga, let's go to the next page, please.

Q.   (By AUSA Burns) And what does this diagram depict, Ms. De Lanoy?

A.   So this was my proposal for how the workflow that I was proposing would work.

Q.   Okay.  And how is it -- can you tell the jury how it was different from what was happening at the time?

A.   Sure.  So the current way that our exam workflow worked was the doctor would be presented with a static exam form for that orthotic type based on the DME 's choice of HCPCS code.  And this would change all that.

So I wanted to work more like in a brick-and- mortar setting, right?  So typically, when we go to the doctor, if the doctor determines that you need, say, an orthotic brace, he's

going to use a prescription pad, write down knee brace, right? And then send chart notes, medical records, to the durable medical equipment company, along with that prescription, the DME would then review those medical records and determine based on medical necessity requirements what that patient qualified for and needed.

So where our current workflow restricted the doctor's ability to just write back brace and let the DME use the knowledge that they had based on medical necessity requirements, this would open that up.

So this workflow, the exam encounter would be completed. The doctor would be able to prescribe or not, you know, just in general knee brace, we'll say.  And then that documentation will be submitted to the supplier to review.  The supplier would then have available all of the HCPCS codes that were available for that item.  They would select the appropriate one after reviewing the chart notes, the medical records, submit it back over to the doctor for final review and his signature or her signature.

**AUSA BURNS:**  Ms. Braga, can be go to the next page, please.

Q.   (By AUSA Burns) What is depicted here, Ms. De Lanoy?

A.   This is a depiction of the two new statuses that I was proposing we add.  So prior to this proposed workflow, we had pending and process and completed, this would add now the

supplier review status as well as the DWO pending status.

Q.   Let me back you up for a minute.  It says DMERx here sort of at the top.  Is this what the DMERx portal looked like?

A.   Yes.

Q.   And on the top right, it says Jim Clinician, is that who was signed in as?

A.   Yes.  It was just a dummy account that we used.

Q.   Okay.  Who would see this type of screen?

A.   This type of screen, you know, a clinician could see, I believe a DME could see as well, and a medical professional.

Q.   And how did -- how did those users you just mentioned access DMERx?

A.   They logged into their account.

Q.   Okay.  And who provided the log-in info?

A.   They signed up and then they would establish their log-in info.

            **AUSA BURNS:**  You can go to the next page, Ms. Braga.

Q.   (By AUSA Burns) And what is this page?

A.   This was, again, going over some supplier benefits.  So the first part is -- it would help limit audit rate.  So at that point in time, DME suppliers were dealing with, again, limited HCPCS code availability.  And those HCPCS codes that were available, most of them had very high reimbursement rates.  And they had something called overutilization that would get flagged by Medicare.  And so the goal was to limit the audit

rate by making all of the HCPCS codes available so that DMEs were pigeonholed into having to select from these highly audited HCPCS codes.

Q.   And the other title talks about some of the things you've said already, reducing frustration.  The third one down is, Incoming compliant DMERxes.  What does that mean?

A.   So again, my goal was to increase utilization in standard healthcare settings and brick and mortar settings like urgent cares, ERs, primary care physician facilities.  So this new model would open us up to be able to onboard many different types of users across the medical industry.

Q.   And when you say compliance DMERx, what does that actually mean?

A.   Well, to me, it meant that there wouldn't be kickbacks involves, right?  The doctors that would be evaluating the patients would actually be billing Medicare or their insurance company for the visit, right?  That was -- it would -- it would ensure that there's -- I don't know ensure.  But it should ensure that there's not kickbacks going on because it's being handled the way normal healthcare is being handled.

        **AUSA BURNS:**  Ms. Braga, if we can please go next to page 8.

Q.   (By AUSA Burns) So we just looked at supplier benefit.  And this is now clinician and clinician group benefits.  What were the issues that you had seen from their perspective?

A.   So with clinicians, it's always been frustrating and a pain point for them dealing with durable medical equipment orders. Because, well, clinicians are trained on diagnostics.  Durable medical equipment companies are trained on medical necessity requirements for specific items.  So this would reduce that frustration because if a doctor selects a code that requires a recent injury or surgery and there's no documentation of that recent injury or surgery, that causes the DME to reach back out to them.  There's a lot of back and forth.  And it causes frustration when they could be moving onto patient care for others.

So handling it with this new work, proposed workflow, it would have allowed them to write a generic prescription and just one time the DME could assess it, send back the documentation to the doctor, sign off, and done.

**AUSA BURNS:**   And Ms. Braga, if we could turn now to page 10.

Q.   (By AUSA Burns) What's depicted here, Ms. De Lanoy?

A.   So this was me showing our current model and pricing because we were charging $5 and I was proposing a little bit different pricing model as well.  So it shows our current --

Q.   Let me pause you for one second.  Was your pricing model more or less than $5?

A.   So I was proposing less on one -- I was proposing zero to the clinicians and $10 to the DMEs.

Q.   Why zero to the clinicians?

A.   Because I felt like they should have free access to this tool because it would help everyone.

Q.   So I interrupted you.  Can you explain what these two sort of images are showing us?

A.   Sure.  So the first one shows, you know, our current revenue streams or users, which is marketers and DME suppliers. And the other one showed that if we created this new model, we would have access to things like urgent cares, house calls, orthopedic surgeons, primary care physicians, and more.

Q.   And you stated when we started looking at this document, that you discussed this and presented it to Brett Blackman?

A.   Yes.

Q.   When was that?

A.   I don't remember the exact date we had talked about it. But I want to say it was sometime in 2018, early 2018.  And it was a meeting that was put together and Lana Hitt arranged for that.

Q.   And who is Lana Hitt?

A.   Lana Hitt, she had several different titles.  But basically she was Brett's administrative assistant.  I think it's a much different title than that.  But she worked with him, was his right hand.

Q.   Okay.  And was this in-person meeting?

A.   No.  It was virtual.

Q.   And what was Mr. Blackman's response to this proposal?

A.   Mr. Blackman was in a parking lot at the time of the meeting.  So I did present this virtually with a screen share that he was running into a meeting.  And, you know, I never really got total buy-in.

Q.   Can you just repeat that?

A.   I don't think I ever really got total buy-in from him.

Q.   Okay.

A.   I was told -- I was told that it would have to wait for the new platform.  Everything always had to wait for the new platform.

Q.   And that was something that was said by Mr. Blackman?

A.   Yes.

Q.   Did you show to this Mr. Blackman this one time or other times?

A.   I talked to him about it other times.  He definitely had it in an e-mail.  So...

Q.   And did you discuss this document and what you're proposing with Gary Cox?

A.   I don't recall.

Q.   Were these changes ever implemented during your time at DMERx?

A.   No.

        **AUSA BURNS:**  We can take that down, Ms. Braga, thank you.

Q.   (By AUSA Burns) You've testified about the fact that you were working on a face-to-face model?

A.   Yes.

Q.   In connection with that, did you ever seek any legal advice?

A.   Yes.

Q.   Who did you seek legal advice from?

A.   I spoke with Denise Leard at Brown & Fortunato.

Q.   And how were you connected with Ms. Leard?

A.   So Brett Blackman had told me early on that he had retained Brown & Fortunato and they were attorneys.  And I asked if I could get a written opinion.  I asked Brett if I could get a written opinion from Denise Leard on the face-to-face model.

Q.   And did you, in fact, get an opinion letter from Ms. Leard?

A.   Yes, I did.

Q.   And that was limited to the face-to-face model that you've been talking about; is that correct?

A.   That's correct.

Q.   So I think that's -- you may have said it.  Id Mr. Blackman know you were consulting Ms. Leard?

A.   Yes.

Q.   And how did Ms. Leard communicate this opinion to you?

A.   We had telephone calls and e-mails.

Q.   And did she ultimately give you a written work product or just a conversation?

A.   She gave me a written opinion.

Q.   And other than the face-to-face model, did you discuss anything else about DMERx with Ms. Leard?

A.   Yes.

Q.   What did you discuss?

A.   At one point during our conversation, she told me that she had been meeting with Mr. Blackman and that she was confused by some of the things that he had said.

**ATTORNEY RAFFERTY:**  Your Honor, I'm going to object at this time on the grounds of hearsay.

**THE COURT:**  I'm sorry.  What's the ground?

**ATTORNEY RAFFERTY:**  Hearsay, Your Honor.

**THE COURT:**  One moment.  Sustained.

Q.   (By AUSA Burns)  Ms. De Lanoy, were you aware of anyone else at DMERx seeking legal advice from Ms. Leard?

A.   From Brown & Fortunato, yes.  From Ms. Leard, I'm not sure.

Q.   Did you talk to Mr. Blackman about any advice that he had received from Ms. Leard?

A.   From Brown & Fortunato.

Q.   And what did Mr. Blackman tell you about advice he had received?

A.   So Mr. Blackman told me he had spent a few weeks at Brown & Fortunato's office going over our entire model.  And he told me that, you know, that they said everything was good and that they were going to be giving a written opinion.

Q.   And did you ever see this written opinion?

A.   No.

Q.   Did you ask for it?

A.   Yes.  And prior to that, at one point, Brett had told me we had it.  And then I believed that.  And then years -- a year and a half or so later, I had a user of our software that was asking for it.

Q.   Asking for the letter?

A.   Asking for the written opinion, yes.

Q.   And what did you believe this written opinion said about the model?

A.   I believed that the written opinion said that our business model was compliant.

Q.   And when you were asked by -- I think did you say it was a supplier or customer?

A.   It was -- his name was Richard Pellegrino.  I'm not sure what user type he was.

Q.   When this person asked for the opinion letter, what did you do?

A.   I reached out to Lana Hitt.

Q.   And what happened next?

A.   She said we didn't have it.

Q.   And do you remember how you communicated with Ms. Hitt?

A.   I'm not -- I think some through writing and some on the phone.

**AUSA BURNS:** Ms. Braga, if we could pull up just for the witness Government's Exhibit 1243.

Q.   (By AUSA Burns) And while we do that, Ms. De Lanoy, it's clear that you're upset.  Can you tell the jury while you're feeling upset at this point?

A.   Because I believed we had the written opinion because he told me we did.

Q.   Who told you?

A.   Brett.

Q.   All right.  Let's look at Government's Exhibit 1243.  Do you recognize this, Ms. De Lanoy?

A.   As soon as I can see it clearly.  Sorry.

Q.   Okay.

A.   Yes.

Q.   And Ms. -- and what do you recognize it to be?

A.   This is --

Q.   Just generally?

A.   It's a SKYPE message.

Q.   With who?

A.   Lana Hitt.

**AUSA BURNS:** And Ms. Braga, can you please pull up 1244 please for identification only.

Q.   (By AUSA Burns) And do you recognize this document?

A.   Yes.

Q.   And what generally is this?

A.   A SKYPE message.

**AUSA BURNS:**  And Ms. Braga, now, 1245, please.

Q.   (By AUSA Burns) You recognize this document?

A.   Yes.  It's also a SKYPE message.

Q.   And would -- thank you.

**AUSA BURNS:**  Your Honor, at this time, government offers Government's Exhibits 1243, 1244 and 1245.

**THE COURT:**  Mr. Rafferty?

**ATTORNEY RAFFERTY:**  No objection.

**THE COURT:**  Mr. Della Fera?

**ATTORNEY DELLA FERA:**  No objection, Your Honor.

**THE COURT:**  1243, 1244 and 1245 are received.

**AUSA BURNS:**  Thank you, Your Honor.  May we publish?

**THE COURT:**  Yes.

(Government's Exhibit 1243 was admitted into the record.)

(Government's Exhibit 1244 was admitted into the record.)

(Government's Exhibit 1245 was admitted into the record.)

**AUSA BURNS:**  Ms. Braga, let's go back to 1243, please.

Q.   (By AUSA Burns) And Ms. De Lanoy, I believe the chat starts on the top right.  Is the blue bubble you?

A.   Yes.

Q.   And then what are you asking?

A.   I was asking for the opinion letter from Brown & Fortunato.

Q.   And what's Ms. Hitt's response?

A.   She said:  I don't think we ever got it from them.

Q.   Okay.  And what did she offer to do?

A.   She offered to look into it.

Q.   Okay.  And then did you express to her why you were looking for it?

A.   I did.  I said I have an attorney of a DME that's wanting to work with us and asking for the opinion letter.

Q.   And then you asked:  Do we have one from Randy?  Who's Randy?

A.   So Randy was the counsel for our company after Brown & Fortunato was no longer engaged.

Q.   Do you know Randy's last name?

A.   Schultz.

Q.   Schultz, s-c-h-u-l-t-z.

     Okay.  And what does Ms. Hitt respond again?

A.   She said:  Okay.  I don't have an opinion letter but I do have something that Randy sent to Brett from the OIG.

Q.   What do you think OIG to be?

A.   Office of Inspector General.

Q.   From which department?  Which government agency?

A.   Health and Human Services.

     **AUSA BURNS:**  Can we go to 1244, please.

Q.   (By AUSA Burns) All right.  So it starts -- well, you

comment:  It sounds interesting.

And then you go on, you ask:  My question would be in lieu of an opinion letter, do you have recommendation providing -- for providing information to the attorney to make him comfortable?

And then you say:  I don't know why I thought we had a written opinion.

Q.   Do you recall why you thought you had a written opinion?

A.   Because Brett told me in September of 2016 that we did.

Q.   Was that one time or more than one time that he told you that you have that opinion letter?

A.   I recall that specific time.

Q.   Okay.  And Ms. Hitt responds:  It's a good idea to talk with Randy.

Did you, in fact, follow up with Mr. Schultz?

A.   I believe I tried.  I believe I talked to him.  And I don't -- I don't recall at this moment.

Q.   Okay.  Do you know when Mr. Schultz starting working with DMERx?

A.   I'm not sure exactly.  I would say sometime in late 2017 or late 20 -- summer of 2017, maybe.

Q.   Why do you have that specific memory?

A.   That's when HealthSplash was purchasing DMERx and we had the summer retreat.  And I think that it was around that time.

Q.   Where was that retreat held?

A.   That retreat was held I believe at Brett's lake house.  It was up around Brett's residence.  Might have been at his residence or lake house.

Q.   And just to clarify, you said there was a time when there was a change from Brown & Fortunato to Mr. Schultz being the -- representing HealthSplash and DMERx?

A.   Yes.

     **AUSA BURNS:**  And if we can just go to 1245, please, Ms. Braga.

Q.   (By AUSA Burns) And this first message, this was on January 29, 2018.  And I apologize to Ms. Hitt [sic] for the length of the message.  Can you summarize this for the jury what the top message is there.

A.   Sure.  Sure.  Give me one second to read it.

Q.   Sure.

A.   So I mentioned that there was a lot of activity with Randy last week.  He was busy.  And I stated that I spoke with him before everything transpired about the opinion letter.  And he had given me a price for that opinion.  And he said that he was more than happy to speak with the DME's attorney about HealthSplash.

Q.   Okay.  And how much did he say it would cost?

A.   $20,000.

Q.   And what did Ms. Hitt respond to that?

A.   She said that she sent an e-mail to Randy for Brett that

morning about getting the opinion letter.  And then she said Brett's not going to pay 20K for it because we should have already received it.

**AUSA BURNS:**  Okay.  We can take that down.

Q.  (By AUSA Burns) During your time at DMERx, did you speak with any other attorneys or any other law firms?

A.  Other than Brown & Fortunato and Randy Schultz?

Q.  Uh-huh.

A.  At this moment, I don't recall.

Q.  Okay.  Did Mr. Blackman talk to you about the fact that he was engaging lawyers and having these -- having discussions with them about the business model?

A.  He did talk to me about engaging Brown & Fortunato about the business model.  I don't remember him specifically talking to me about Randy.

Q.  And did Mr. Cox talk to you about engaging lawyers to be used in connection with DMERx?

A.  He was on some of the calls where Brett had -- when we had the meeting and Brett would mention discussions with Brown & Fortunato.

Q.  Shifting gears a bit here.  While you were working at DMERx, did you make any videos?

A.  Yes.

Q.  What were they?

A.  They were training videos and overview videos on how to use

the software, what different things on the software were.

Q.   And who were you seeking to train with these videos?

A.   The different user types.  So clinicians, clinician groups, DMEs.

Q.   And did you make these on your own initiative or were you directed to make them?

A.   I started to make them on my own.  Garry had a couple of videos that he had already made.  And I was in my push for on-boarding house call practices.  And I wanted some other videos out there for that purpose.

Q.   Do you recall when you made these videos?

A.   I think it's -- I think it spanned most of my time there. There were gaps in between.  But I would say from 2016 or '17 through January of 2019.

Q.   And approximately, how many did you make?

A.   Six, eight, somewhere in there.

Q.   Okay.  And do you know where these videos were maintained?

A.   So depending on the type of video it was, it would be on the log-in page of the user interface for, you know, the clinician or whoever it was that logged in, so on DMERx's website.  And they were also housed on Vimeo.

Q.   Vimeo.  So were they accessible to people DMERx since they were on Vimeo?

A.   They were publicly.

Q.   These videos that you made, were they distributed to the

different users of DMERx, to your knowledge?

A.   I know that I sent out a few training videos.  I'm sure that others did as well because I was asked to do trainings of clinician regularly and I didn't have enough time to do that. So Greg Schreck would send them out.  I know that Greg would send them out to people.

Q.   Who else would do the trainings of clinicians?

A.   Greg Schreck asked me to train clinicians, and I believe that there were times that Gary Cox did as well.

Q.   And what was the purpose of that training?

A.   To educate them on how to use the software.

Q.   And were these clinicians in the, as you said, sort of the traditional medical space or were they telemedicine companies?

A.   These were telehealth.

Q.   Okay.  So turning -- I just want to focus back on these videos for a moment.  Who decided on the content?

A.   I created the content.

Q.   Okay.  Did you consult with anybody about what it would say?

A.   I shared them with everyone to get feedback once they were done.

Q.   Okay.  And was the information that you conveyed in them fully accurate?

A.   Because I was focussed on face-to-face and because of my ethical concerns with telehealth as well as the concern over

the way the doctors were getting paid, I always showed the face-to-face orthotics exam.  I never showed the telehealth orthotic exam.  And I was reluctant say the word telehealth.  I don't believe I ever said that word in any of those videos.

Q.   Did you talk with anyone about the fact that you were not using the word telehealth or being specific about it?

A.   In those videos, I don't recall saying that.

Q.   I'm sorry.  Not in the videos.  Did you talk with anyone at DMERx about the fact that you did not specify that these were telehealth consults?

A.   I believe that, you know, I was always expressing my concern over the telehealth model.  And I'm quite certain I mentioned that to at least Greg Schreck.

Q.   These concerns that you had, you know, you have told us that you talked to people inside of DMERx about these concerns.

A.   Yes.

Q.   Did you raise your concerns with anybody else, outside of DMERx?

A.   Yes.  You know, when I was promoting -- telehealth had become so systemically used in the durable medical equipment place.  So I had been trying to build the face-to-face model for a period of time.  And even when I would talk to DMEs that were using telehealth, whether using the DMERx platform or otherwise, I expressed my concerns over telehealth and the way the doctors were being paid and how the patients were being

evaluated.

Q.   And you've testified that your concerns, in part, with that was this was an illegal transaction with the doctors; is that right?

A.   Yes.

Q.   Did you make any reports to any law enforcement agencies about what was happening at DMERx?

A.   Unfortunately not.

Q.   And you continued to work there despite these concerns that you've described in your testimony and that you've raised internally?

A.   Yes.

Q.   Why didn't you make any complaints?

A.   Basically sound like an excuse, I had a lot going on in my life.

Q.   Sorry.  Just getting to my next page here.

You touched a little bit before on audits, and those were audits that were conducted by Medicare or CMS?

A.   Yes.

Q.   Were there discussions at DMERx about whether and how to avoid an audit?

A.   There were some e-mails.

**AUSA BURNS:**  Okay.  Ms. Braga, if we could now show Government's Exhibit 1025, which is in evidence.

Q.   (By AUSA Burns) Do you recognize this document, Ms. De

Lanoy?

A.   Yes.

Q.   Okay.  And what is it?

A.   This is an e-mail from Lana Hitt talking about someone had removed bilateral, which would mean both sides, as an option for shoulders because it is a trigger for an audit.

          **AUSA BURNS:**  And if we could go to the bottom page.

Q.   (By AUSA Burns) There is an e-mail from Paul Toman.  What was his role?

A.   As to the shoulder -- I'm sorry.  Can you ask that question again?

Q.   Sure.  What was Paul Toman's role?

A.   So he was CTO, chief technology officer.

Q.   And what is he saying here?

A.   He said:  As to the shoulder, we earlier had the bilateral shoulder pain option but removed it due to a Medicare issue.

Q.   Okay.  And then Ms. Hitt responds to -- or the next response in the chain is actually from Mr. Cox.  And what does he say?

A.   He said:  Let me go to compliance on this, and that he'd copied Joyce and will have her review it.

Q.   And did DMERx have a compliance department?

A.   Yes.

Q.   Who was it?

A.   Joyce Cox was the head of compliance.

Q.   And --

A.   And there were -- there was also Julie Lafon and Melissa.

Q.   Do you recall Melissa's last name?

A.   Normally.

Q.   And what was their function as a compliance department at DMERx?

A.   To try to ensure that our customers were conducting business competently and making sure that we were complaint.

Q.   Okay.  And here, Gary copies Joyce for her review, when Lana says she had removed bilateral as an option for shoulder because it would trigger an audit, who's the she that Lana's referring to, if you know?

A.   I'm not sure.

Q.   Do you understand what you mean by being a trigger for audit?

A.   Yes.  So it means that if you were prescribing two shoulder braces, that that would cause Medicare to audit the DME.

Q.   Okay.  And what are the consequences of an audit?

A.   They're serious.  So it depends on the type of audit and what transpires, but typically, they will pull patient files, determine what percentage of those patients did not fit medical necessity requirements.  And that can impact your entire year's billing and you could end up having to pay back.  Whatever the percentage was that did not satisfy medical necessity requirements on that small sampling, that can apply towards all

of it and it can even lead to criminal charges.

Q.   And this language about removing an option, where would this option be found?

A.   Within the clinician's exam.

Q.   Okay.  In the -- what you were talking about before of the limited options that were available?

A.   This would actually be in the exam itself.  So the doctor would not have the choice to prescribe bilaterally.

Q.   Even if the doctor thought it was necessary.  It wouldn't be available to them.  Is that what that means?

A.   Correct.

**AUSA BURNS:**  If you can take that down, Ms. Braga.

If we could now also show Government's Exhibit 1023, which is in evidence.

Q.   (By AUSA Burns) And you recognize this document?

A.   Yes.

Q.   Okay.  And what is this?

A.   This is when we were testing the new face-to-face exam module.

Q.   And what do you mean, testing it?

A.   So anytime there was a new exam module built or modified, everyone on the team would log in to one of those, quote, dummy profiles, and test it to make sure that it was functioning properly.

Q.   And this top e-mail here is from Gary Cox?

A.   Yes.

Q.   And to Kelley Bugler, Brandon Blackman, Lana Hitt, Paul Toman, and yourself.

Why those individuals?

A.   We were all involved in testing this particular exam change.

Q.   Okay.  And Mr. Cox writes here:  Due to PME requirements, what is PME?

A.   PME is PME Home Health.

Q.   And who owns that company?

A.   Gary Cox, Joyce Cox and, at the time, I believe Brett Blackman.

Q.   It goes on to say:  It was determined that it would not be practical for a patient to have both a left and right shoulder brace, especially an airplane brace.  I would suggest discussing with Lana and Joyce whether or not a bilateral shoulder is acceptable.  Joyce that it is a red flag to Medicare.

Do you recall this being raised at the time?

A.   Yes.

Q.   And what was the response?  Were any actions taken?

A.   There was -- shoulders were not available bilaterally.

Q.   And what does it mean to be a red flag to Medicare?

A.   It means that there's some suspicious activity.

Q.   And in your time at DMERx, did you want to avoid suspicious

activity?

A.   Absolutely.  Yes.

          **AUSA BURNS:**  We can take that down, Ms. Braga.  Thank you.

Q.   (By AUSA Burns) You were talking about the clinician notes. Is that like an encounter note?

A.   So the clinician notes, yes, they would be, what is known as chart notes or medical records.

Q.   Okay.  And who complete the chart notes?

A.   The doctor, the doctor's supposed to complete the chart notes.  However, there was access to different sections of the encounter.  So other clinical staff other than the MD had access to the subjective portion, which would, you know, maybe be asking questions like:  How did you injure yourself?  Right. And then the doctor was supposed to have access only to -- the doctor was the only one who was supposed to have access to the objective exams, which would be the actual testing that was needed.

Q.   And did there come a time that there was a discussion about what should be listed as the type of encounter on these notes?

A.   Yes.

Q.   What was the discussion?

A.   It was regarding whether telemed or telehealth should be listed on the exam type, on the final documentation that was printed.

**AUSA BURNS:**  Ms. Braga, can we pull up Government's Exhibit 1052, which is in evidence, please.

Q.   (By AUSA Burns) Okay.  If we can -- the first e-mail of October 19, 2016, is from Gary Cox?

A.   Yes.

Q.   Okay.  And he indicates here, he got a call from Chris Cirri.  Do you know Chris Cirri?

A.   Yes.  He was a client of our software.

Q.   Which part of the triangle was he a client?

A.   I believe DME.

Q.   Okay.  Call from Chris Cirri regarding another issue that's problematical for them.  Mr. Cox goes on to say, Medicare busts their chops over telemed encounters and the new information that indicates the patient has chosen a telemed encounter shows up on the final exam documents that apparently will raise a red flag for CMS in an audit and auditors then scrutinize the documents more intensive.

I am sure this will start becoming problematical for PME and others as well.

Chris is asking if the telemed encounter preference can be omitted from the final documents.

Do you recall this e-mail from that time?

A.   Yes.

Q.   Okay.  And who -- what is the response above at the top?

A.   The response is from Brett Blackman.  And he said that:  I

don't know.  We put that on there.  An evaluation is an evaluation.  So I would say yes.  Change it to say evaluation.

Q.   Removing telemedicine then, would that reduce Medicare's attention to these orders?

A.   It would reduce their attention to these orders.  It's dishonest.  One way, there were two different versions of the exam.  One was a face-to-face exam.  One was a telemed exam.  And by removing the word telemed, that's deceitful.

Q.   Deceitful to who?

A.   To Medicare.

Q.   And who made that decision?

A.   Brett Blackman.

Q.   And was this change made?

A.   Yes.

Q.   And how was it made?  Who would have implemented it?

A.   Paul Toman.

Q.   Do you know whether after this date in October of 2016, the encounter would ever say telemedicine?

A.   It never said telemedicine.

Q.   We talked a little bit about the compliance department, and I think sometimes there were issues that came up with providers.

     Do you recall that?

A.   Yes.

Q.   Okay.  Do you recall whether there was concerns raised

about a specific telemed company and provider?

A.   Yes.

Q.   Who was that?

A.   Jean Wilson, Advantage Choice.

Q.   And what was the issue that was raised?

A.   There were physicians, doctors, that had someone reaching out to them from Advantage Choice requesting their log-in information to get into their DMERx account in order to supposedly review their documents.  And it became more serious than that.

Q.   How so?

A.   Jean Wilson was completing exams on the part of others.

Q.   And how do you know that?

A.   Through conversations and documentation.

        **AUSA BURNS:**  Ms. Braga, if we could please pull up Government's Exhibit 1159 that's in evidence.

Q.   (By AUSA Burns) And take a minute.  The top e-mail is sent to you.  Let me just verify.  Did you use the e-mail address toni.delanoy@healthsplash.com?

A.   I did.

Q.   And what's the date of this e-mail?

A.   January 25, 2018.

Q.   Okay.  And who's it from?

A.   It is from Gary Cox.

Q.   And he sends this to Julie Lafon who you mentioned, Joyce

Cox and Greg Schreck, as well as Melissa Richardson. Is this the Melissa you were referring to earlier?

A. Yes.

Q. And he indicated Sam Friedman copied me on this. Do you know Sam Friedman?

A. Yes.

Q. Who is Sam Friedman?

A. It's Sam Friedman. Sam Friedman had a company SKF, I believe it is. And he was a marketer.

**AUSA BURNS:** Could we go down to the bottom e-mail, Ms. Braga, please.

Q. (By AUSA Burns) So this is the e-mail from Sam Friedman, and he's sending it to Reinaldo Wilson.

Do you know who that is?

A. Reinaldo was Jean Wilson's husband and a coowner of Advantage Choice.

Q. And in this e-mail, Sam Friedman is letting Reinaldo know that they have an issue. They got a note from their primary DME client that they called Medicare on some denied payments on order. And they were told by Medicare directly that Jean has been flagged for Medicare fraud and will be under investigation for signing so many Rxs.

What does that mean, for signing so many Rxs?

A. So every time a doctor orders an item, their NPI number, their number with Medicare is associated with that order. And

so when she's, quote, signing the Rxs, they're referring to orders that were submitted to Medicare.

Q.   And what is the issue with signing so many?

A.   If you're -- basically, you know, a doctor can see or evaluate so many patients in a day.  There's a threshold at some point where you're doing way more than what would be possible to complete in a day.

Q.   And this is where Mr. Cox had said Mr. Freedman copied him on it, but I don't see that here.  But Mr. Cox forwarded that along to the compliance team and yourself; is that right?

A.   Yes.

AUSA BURNS:   Now, can we turn to Government's Exhibit 1170 that's in evidence.

Q.   (By AUSA Burns) And do you recognize this e-mail?

A.   Yes, I do.

Q.   And the title of it is:  HealthSplash Corrective Action, ACC.  What is ACC?

A.   Advantage Choice.

Q.   That's the company that the Wilsons owned?

A.   Yes.

Q.   And what is the corrective action?

A.   So corrective action is normally when there's been some type of wrongdoing that's occurred and you're implementing changes to ensure that doesn't happen again.

AUSA BURNS:   If we can actually go to the third page,

Ms. Braga, so we can see the start of this chain.

Q.   (By AUSA Burns) This is an e-mail dated February 1, 2016, from Randal Schultz.  This is the attorney we talked about before?

A.   Yes.

Q.   Sending it to Mr. Schreck.  And here, he's indicating that he's making some changes to the plan of action -- plan of correction, excuse me; is that right?

A.   Yes.  Yes.

     **AUSA BURNS:**  Okay.  And if we can go to the next e-mail, please.

Q.   (By AUSA Burns) So Greg forwards this on to the compliance team?

A.   Yes.

     **AUSA BURNS:**  And then if we could look at the next response, please.  And Ms. Braga, if you can do the side by side or just flip to the first page so we can see who this is from.  Sorry about that.

Q.   (By AUSA Burns) Okay.  So it starts on the bottom of page 1.  Who's this e-mail from?

A.   Joyce.  Joyce Cox.

Q.   Okay.  And then she goes on to state the reason for the corrective action.  And what was it?

A.   She said that the nurse practitioner, the NP or nurse practitioner, referencing Jean Wilson, was trying to get the

sign-in credentials from another provider for her to check out the information regarding the patients for Advantage Choice. Joyce said this is illegal for HIPAA reasons.  If Advantage Choice wants to continue using HealthSplash, they will have to do the corrective action but Jean is out.

Q.   What did she mean by Jean is out?  What is your understanding?

A.   Jean Wilson would no longer have access to DMERx.

Q.   Okay.  And she goes on to say later:  I think we inactivate Jean completely with no date span of her correcting her action.

A.   Correct.

Q.   Okay.  And if we go back to the first page, Joyce continues on with more thoughts on this.

     And then ultimately, the e-mail from you at the top there.

A.   Correct.

Q.   What was your response to this situation?

A.   I told Joyce that I agreed with everything she said and that Jean needed to be removed, and that I believe that someone had discussed two-step verification process for logging into our system and that I felt like that was something we seriously needed to consider.

Q.   And what would a two-step verification process look like?

A.   It would be something like what we're familiar with these days where you go to log-in and a code is sent to your phone to ensure that it's you that's logging in.

Q.   Was a two-step verification process ever implemented?

A.   No.

Q.   Do you know why not?

A.   It was waiting for the new software.

Q.   So to your knowledge, who made the decision then not to implement it?

A.   Brett Blackman.

Q.   And other than these e-mails, were there meetings or discussions about this corrective action plan and the situation with Jean Wilson?

A.   Yes.  There were.

Q.   Who was present for these discussions?

A.   Joyce Cox, Julie Cox, Melissa Richardson, Greg Schreck, and myself.

Q.   And were there actually any consequences for ACC?

A.   I don't believe they were removed.

Q.   Do you know whether Jean Wilson was allowed to use the platform after that?

A.   It's my understanding she was not.

Q.   Did issues like this come up with other providers using the platform?

A.   There was another.  Yes.

Q.   Who was that?

A.   Royal Physician Network.

Q.   And what happened there?

A.   It's a similar situation.  We were receiving word that --

ATTORNEY RAFFERTY:  Your Honor, may I approach?

THE COURT:  You want a side bar?

ATTORNEY RAFFERTY:  Yes, Your Honor.

THE COURT:  Stretch break.  Ladies and gentlemen.  First one of the day.  We'll see you in a couple of minutes.

(Whereupon, the following proceedings were had at side bar outside the hearing of the jury and may not be reflective of the full scope of the bench conference.)

THE COURT:  All right.  Mr. Rafferty.

ATTORNEY RAFFERTY:  Thank you, Your Honor.  This is Brian Rafferty.

Your Honor, I represented the principal of Royal Physician Network in the criminal case that was brought against her.  I have concerns about a conflict at this point because I know information about her and what happened.  I wasn't aware that the government was going actually to bring up Royal Physician Network.  I actually represented two folks associated with that company.  And so I'm concerned about my ability to sort of cross-examine this witness about Royal Physician Network if she continues.

I would just ask if the government could just move on from this subject.  I don't think it's material to her testimony.

THE COURT:  I very much appreciate your coming forward,

and I will confess I don't understand even the back story because it's been so little from this witness. So...

**ATTORNEY RAFFERTY:** I can provide more information if the Court would desire.

**THE COURT:** Before you do, because you obviously -- you have concerns with privilege and prior representation. Can the government fill me in on what we're doing?

**AUSA BURNS:** Yeah. And, Your Honor, this is Jennifer Burns. I can limit it to just, you know, the point I want to make is that there's multiple providers that there are issues with that the compliance department addressed it. I don't need to -- we can instruct the witness not to go into the name.

**THE COURT:** Well, when you say multiple providers --

**AUSA BURNS:** Just those two.

**THE COURT:** So what are the two? Can you state them?

**AUSA BURNS:** Jean Wilson and Royal Physician.

**THE COURT:** So, can you cross her on Jean Wilson?

**ATTORNEY RAFFERTY:** Of course. I intended to cross her on Jean Wilson.

**THE COURT:** Now, Royal Physician, if it was left right now, as, you know, left by the side of the road, how does that prejudice the government?

**AUSA BURNS:** I think the number of times this issue comes up and the response of DMERx, whether it was sufficient or not, is important here, particularly if defense counsel has

made clear they're going to be asserting defense of good faith, you know, and showing their compliance efforts.

So I think the government is entitled to probe whether those compliance efforts were actually very robust.

**THE COURT:** So if I understand, and maybe I don't, and both sides can correct me, this is testimony that when DMERx is receiving indications of problems from these -- from Wilson and Royal Physicians, how they react --

**AUSA BURNS:** Right.

**THE COURT:** -- to those problem what you need to get into?

**AUSA BURNS:** Exactly.

**THE COURT:** And Mr. Rafferty, you're concerned now that if they get into how they reacted to problems raised by Royal Physicians, you have a problem, why?

**ATTORNEY RAFFERTY:** Just to be clear, Your Honor, I represented Charlene Frame. Charlene Frame was the principal of Royal Physicians Network. The allegations, she was prosecuted out of the Southern District of Georgia, the Savannah division. She has been a cooperating witness with the government on multiple occasions. I actually spoke with her two weeks ago. She testified in a trial in the Middle District of Louisiana. I participated in proffer sessions with her with the government.

Royal Physicians Network was alleged through Charlene

Frame to be participating in the submission of fraudulent claims to Medicare.  And so her responses, what she indicated, I'm sort of handcuffed from my ability to ask questions about what Ms. Frame might have been telling Ms. De Lanoy or anybody else because what I know about what was going on with Ms. Frame is privileged.  And I'm not really in a position to ask questions about that.

And it prejudices Mr. Blackman, my ability to explore on cross.

**THE COURT:**  And you just realized this now?

**ATTORNEY RAFFERTY:**  Yes, Your Honor.  There wasn't -- I had no idea they were going to ask about Charlene.  I knew all about Jean Wilson.  I have no problem.  I was prepared to cross on Jean Wilson.  I had no idea about this.

**THE COURT:**  Okay.  So, for now, and I'm not saying that the government can't revisit it at the break or later, but for now, we're going to leave Royal Physicians entirely on the side of the road to be able to have the trial continue.

I will allow all sides to take it up, think about it.  Maybe there was a third entity that had these problems that the government wants time to substitute in, you know, a third or a fourth entity.  But for now, to preserve the integrity of the trial, to preserve the integrity of the cross-examination which is coming, we're going to leave Royal Physicians completely at the side of the road.

I, again, I will allow the government to make its proffer, make its case as to, you know, they're going to have to weigh -- you're going to have to weigh what you want to do, why you want to do it. I certainly accept the representation of Mr. Rafferty and that he cannot, even though he realized it minutes ago, he cannot -- he is proffering to this Court that he cannot properly cross-examine this witness on, let's just call it, the Royal Physician reaction area. That's what he has said. That's what I have summarized it as.

We'll leave it to the side for now.

**ATTORNEY RAFFERTY:** And if I can just follow up, Judge.

You know, there was a similar issue that came up in the course and I turned to Ms. Burns and Mr. Halverson. There was a witness that was originally on the government's witness list, Dr. John Agbi. I represented Dr. John Agbi. As soon as I got the government's witness list last summer, I notified the government, I told them about my conflict and the government removed him from the witness list.

So I'm not dropping this at the last minute.

**THE COURT:** No. No one's accusing you of that, Ms. Burns is not accusing you of that. This Court is not accusing you of that. This is a witness that walked into a name that you then asked for a side bar.

**ATTORNEY RAFFERTY:** Thanks.

**THE COURT:** That's all that happened.

Let's continue.  How much more have you got?

**AUSA BURNS:**  About a half-hour.  I'm just a little concerned, Your Honor, because I don't want the witness to unintentionally bring up Royal Physician, like if I ask question about, you know, when you looked at volume generally and this is a concern.  And if she circles back to it.

**THE COURT:**  If she brings up, I would call it general volume --

**AUSA BURNS:**  Yes.

**THE COURT:**  -- numbers, that's fine.

**AUSA BURNS:**  Right.

**THE COURT:**  But if she walks into anything that is Royal Physicians or the name of the person --

**ATTORNEY RAFFERTY:**  Charlene Frame, F-r-a-m-e.

**THE COURT:**  -- you'll stop her.

**AUSA BURNS:**  And we'll want to instruct her.

**ATTORNEY RAFFERTY:**  Judge, out of an abundance of caution, given how much more we have in this case to come and how much we have already dont and how much effort it took to get this trial where we are, I would respectfully ask the Court to excuse the jury and let the witness be instructed not to bring up Ms. Frame.

**AUSA BURNS:**  The government concurs.  I'm just so worried that she may on her own.

**THE COURT:**  I'll do that right now.  I'll give them an

early break.  And I'm just going to instruct her that in any response to any question from any counsel, if a truthful response requires her to reference the name Royal Physicians, that she's to indicate I can't answer that and she is not to reference Royal Physicians.

Is that acceptable?

**ATTORNEY DELLA FERA:**  Yes.

**AUSA HALVERSON:**  Your Honor, I would point out, and I'm sorry to cross-talk.  We do have some exhibits that I think may have Royal Physicians' name and Royal Physicians on it.

**THE COURT:**  So you're going to have to -- to use the topical term, you're going to have to conclave and decide how much of your case, if you want to excise it.

**AUSA HALVERSON:**  I don't think we referenced it other than it's on it.  I do have an exhibit, like a summary of all the companies that essentially used DMERx.

**THE COURT:**  But depending on what it says, what Mr. Rafferty is saying is that he is handcuffed, depending on what it says.  Maybe there are some documents that he is not handcuffed.  You need to show them those documents specifically so that you can make that record, which we'll do at a break.

But let me excuse them now and I'll give that instruction and then -- and then you're going to do the very best you can, Ms. Burns, to do the rest of your direct steering away from it.

**AUSA BURNS:** Yep.

**THE COURT:** Thank you, Counsel.

(Whereupon, the following proceedings resumed in open court.)

**THE COURT:** Ladies and gentlemen, it's going to take a little bit longer. So I'm going to give you an early break. We're going to take a break. We're going to let the jury wait in the jury room where it's more comfortable and there's more coffee. We'll see you in a few minutes.

Thanks very much, ladies and gentlemen.

**THE COURT SECURITY OFFICER:** All rise for the jury.

(Jury recessed at 10:53 a.m.)

**THE COURT:** Everyone else may be seated. You, as well, can be seated, and we need to take a five-minute break for the court reporter.

So Ms. De Lanoy, it's come to the Court's attention that in the course of your examination, questions were asked about -- and responses were requested from you about an entity called Royal Physicians Network. Is that the name of the entity?

You didn't do anything wrong. You just were asked questions and you gave answers.

It's come to the attention of the Court that, for reasons that don't concern you, that is an area, anything involving Royal Physicians Network is something we don't want

to get into in this case, for again, nothing you did wrong. But the parties don't want to get into right now.

So what I'm going to instruct you is we're going to continue the examination. I excused the jury so that I could do this in a comfortable setting for you and not quickly and off at a whispering side bar. We're going to continue the examination, direct examination and cross-examination. The parties are going to do their very best to ask you no questions that a truthful answer to which would require you to reference Royal Physicians Network. Anything involving them like what Ms. Burns was asking you before the break. We're going to -- the counsel, they're professional and excellent, and they're going to try to stay away from it.

However, I just wanted to instruct you that human beings are human beings, even attorneys. So if they ask you any questions, a truthful answer to which would require you, because you're under oath and you need to tell the truth, to reference Royal Physicians Network or people at Royal Physicians Network, anything like that that would involve, in a truthful answer, referencing Royal Physicians Network, all you need to say to Ms. Burns or to Mr. Rafferty or to Mr. Flores, if their questions require it is, I don't think I can answer that. And if you say that, I will know that you're not trying to duck the question. You're just doing what I asked. And if you say that, that's totally fine and I'll take it up with them

later.

That's your way of saying I can't answer that, not because I don't want to but because I've been instructed by the judge not to reference any answer that may bring up Royal Physicians Network or the people there.

Okay.

**THE WITNESS:**  I understand, Your Honor.

**THE COURT:**  Thank you very much.

Counsel, anything else you want me to do?

**ATTORNEY RAFFERTY:**  Not at this time, Your Honor.

**THE COURT:**  Mr. Flores?

**ATTORNEY FLORES:**  No, Your Honor.

**THE COURT:**  Ms. Burns?

**AUSA BURNS:**  No, Your Honor.  Thank you.

**THE COURT:**  Okay.  Thank you very much.  We're going to take a five-minute break for the reporter and then we're going to bring out the jury.  Thank you, Counsel.

You can take a break in the hallway, ma'am.  See you in five minutes.

**THE COURT SECURITY OFFICER:**  All rise.

(Recess from 10:57 a.m. until 11:09 a.m.)

(Proceedings resuming at 11:09 a.m.)

**THE COURT:**  Ready, kids?

**ATTORNEY RAFFERTY:**  Your Honor --

**THE COURT:**  Okay.  Back on the record.

You guys worked anything out at the break, or are we still in the same conundrum?

**ATTORNEY RAFFERTY:**  Your Honor, I have discussed with the government and I've discussed with my cocounsel -- codefendant's counsel, and I've discussed with Mr. Blackman.  I have some pretty grave concerns.  And it's my fault.  The government did give me these exhibits.  I did not notice Royal Physicians Network was on those exhibits.  I was not aware that this was going to come up.

As I mentioned at side bar, I've represented Charlene Frame for in excess now of probably five years.  I've prepped her multiple times with the fraud section.  She's testified twice on behalf of the government.  I spoke with her two weeks in connection with a case, or maybe three weeks, with, I think her name was Kelly Walters from the fraud section.

I've never disclosed to Mr. Blackman that I've represented him.  I didn't realize that this was coming up.  And I've advised him about his rights to have conflict-free counsel.

And I see -- again, I apologize -- I see that there are now sort of collateral problems raise by this because many of the summary charts and many of the other documents that are going to come, and the government has revealed to me that there's some additional testimony from Mr. Schreck that is expected to touch on Royal Physician Network.

And I just have real concerns about my ability to sort of properly advocate on behalf of Mr. Blackman, in light of some of the things I learned from the Government and what I probably should have resolved before. So...

**THE COURT:** So I'm going to let Mr. Halverson have his say, but just so that I'm clear and just so that the record's clear, and do not take this in any way, Mr. Rafferty, as my somehow doubting you in any way.

I accept everything that you're saying. But I'd just like to understand, as best as you can say, if you represent somebody, yes, they tell you privileged things. I understand that. But in the circumstance that you're describing, where this person has said those things, many of them, in open court as a government witness, I just want to get a sense from you, as best you can tell me in a concrete way, as to the nature of the handcuffing, some might hear what you say and say, well, this is a person that just has deep knowledge of the industry, of the various parts of it, including that someone that he's represented has told him all about it and stated it in open court.

So I just want to make sure, and it's not because I'm doubting you in any way, what is the nature of the handcuffing here?

**ATTORNEY RAFFERTY:** Well, a couple things, Your Honor.

Obviously, similar to Mr. Karlick, I spent quite a bit

of time with Ms. Frame.  I made a number of presentations and discussions on her behalf with the prosecutors in the Southern District of Georgia.  I actually represented her romantic partner, made presentations on her behalf to avoid being charged and, in fact, succeeded in that respect.

So there are certain things that I know from my conversations with Ms. Frame that may not necessarily be consistent with what her testimony is now.

And I just sort of feel like, Your Honor --

**THE COURT:**  I guess to my question is, and maybe I just have the law wrong.  Maybe I have it wrong, which is, I hear that, Mr. Rafferty.  But isn't the test, what stops you from crossing her?  The fact that you know how Royal Physicians works and what they did, and I'm going to say it for you, that one of their members was guilty as sin, and turned state's evidence.  So far that could all be true.  And, the way I said it, would not stop you from laying into her, this witness and others, about how this website reacted when Royal Physician said, you know, we're having a problem.

So I guess, and again, I don't want to be misconstrued.  It's that I don't know.  And I'm hearing this for the first time.  I don't hear a handcuffing yet.  I hear a guy knows a lot about this industry and let's call it points of the triangle of the government's exhibit.

But I don't yet hear you saying, Judge, here's what I

would want to ask her that I can't ask her without violating privilege.  And that's what I think you said at side bar and what I think the test is.

Maybe it's hard to do right now in open court without violating privilege.  And I respect you, Mr. Rafferty, I'm not going to make you say anything that would ever come close to violating privilege.  Ever.  But I'm just having a hard time -- you know, when I represented -- when I was in Ms. Burns' chair, there were people all over an industry like this that represented multiple parts of it.  And then they went to trial on some of the parts of it.  And that's -- that's the only thing I'm getting at, Mr. Rafferty.

If you can give me some clarification or expansion of that.

**ATTORNEY RAFFERTY:**  Your Honor, it's difficult for me to sort of provide a response to that without talking about what I think might well end up being privileged communications that belong to Ms. Frame.

**THE COURT:**  Okay.

**ATTORNEY RAFFERTY:**  But I can -- at side bar, I can talk through some of those issues outside the presence of the government.

**THE COURT:**  Yeah.  I think we'll have to do that just to make a record, because I take very seriously, and I think Mr. Halverson is going to stand up and tell me in a moment that

the government cannot put all this to the side, right, Mr. Halverson?

**AUSA HALVERSON:**  Right.  Your Honor, there are a couple of different problems.  I don't think they are as big a problems as this one particular issue with this witness.  But I do think we're planning to present financial summaries, for instance.  Those summaries are based in a very small part on some of the money that Royal Physicians paid.  We'd also present some testimony that Royal Physicians Network was a telemedicine company that used the DMERx platform.  That would be -- I think Mr. Schreck would be testifying about that potentially.

**THE COURT:**  So let's take those two.  Let's take those two for a second.

And again, counsel can disabuse me.  I don't see how those two things that you just stated, Mr. Halverson, handcuff Mr. Rafferty in any way.

You know, monies that an entity paid to this website, even if he represents the principal, that's not privileged. That's not privileged information at all.  Mr. Rafferty actually would be able to dissect on cross-examination the nature of those payments if you showed it in a single line, right, in a way that not only doesn't divulge privilege, it benefits his client because maybe he can get to the decimal point.  All right.  So that's one example.

Your second example as well, Mr. Halverson.  I don't see either of those being -- putting Mr. Rafferty in a position where he is handcuffed on cross, Mr. Rafferty, with either of those two, or with another one, you know, maybe Mr. Halverson hasn't said it.  But I don't see so far -- I get the witness.  I get the witness that if the witness on her, what did we do when Royal Physicians complained and Mr. Rafferty says, and you can tell me privately, I can't cross her on that because I actually know things that are privileged.  That I kind of get for this witness.

But summary witness on money, and what was your second example?

**AUSA HALVERSON:**  It was another cooperating witness -- well, let me lay out two other things.  Because I don't want to have to bring up something later after you've already made a decision.

So I know Ms. Burns was planning to go through an exhibit.  It's already in evidence now.  I believe it's 637.  Sorry, 634, which is a compilation of HealthSplash dashboard e-mails.  These are e-mails essentially summarizing the performance of the company HealthSplash to all the employees, including the defendants.  And attached to those e-mails is a spreadsheet that summarizes the top 15 performers, the top 15 payers to HealthSplash.  Often Royal Physicians Network was one of those top 15.

And one thing that Ms. Burns was planning to ask Ms. De Lanoy, and I was also planning to go through this with Mr. Schreck, was the volume numbers that were reflected, the volume of orders, the volumes of payments, quantities like that are summarized in those slides.  So that's one category.

**THE COURT:**  I totally get that.  And again, I would say the same reaction.  That's no -- that is akin to a hedge fund paid hundreds of millions of dollars to a website firm, a consulting firm.  And wouldn't you know it, the government has an investigation into the consulting firm and its clients for insider trading.  The fact that at an insider trading trial, there would be a record that says, oh, that hedge fund over there, they made tens of millions of dollars to that website, that would not stop the attorney from crossing that agent that puts in those money records.

So you got any others, Mr. Halverson?

**AUSA HALVERSON:**  Essentially, that information also has been brought into summary slides, which I've already discussed. And then Mr. Schreck would also testify that he knew that Royal Physicians Network was one of the telemedicine companies that was using the platforms to sign doctor orders.

**THE COURT:**  So I think the best course of action, because of what I understand Mr. Rafferty's position might be here, and what he, therefore, may request, I think the better part of valor, is I think I'm going to instruct my deputy to

just tell the jury that they're going to go to lunch now, with consent of counsel, unless you want me to bring them out here to say, go to lunch, I'm just going to tell my deputy to tell them lunch break until 1:00.

And what you all can do for the next hundred minutes or so is aggregate this evidence. Make sure that Mr. Rafferty has full understanding of it. And then when we get back in about 90 or a hundred minutes, I need to know, Mr. Rafferty, and if it has to be at side bar, it will be at side bar, I'm going to need to understand, with great specificity, as to very clearly why you can't cross, why you can't defend, because some of this, I'm not saying you're wrong, sir, but some of this, I see no issue with, at least as summarized by the government. Maybe there's something I'm missing. Maybe there's a piece of it that is so sensitive to the government's case that maybe when you make that record, it will put it in a different light. But I think that's the better part of valor.

Any objection to telling the jury to have an early lunch so that all counsel -- and obviously, Mr. Della Fera should be privy to the summary of the government's evidence regarding Royal Physicians. He can be privy to that. But obviously, I understand that Mr. Rafferty may need to proffer all by himself. And that's allowed with respect to privileged matters.

Is that all right, Mr. Rafferty? Anything else you

would suggest?

**ATTORNEY RAFFERTY:**  No, Your Honor.  No objection.

**THE COURT:**  Okay.  Mr. Della Fera, Mr. Flores?

**ATTORNEY FLORES:**  No objection, Your Honor.

**THE COURT:**  Okay.  So we're just going to tell the jury that they're free to go to lunch and that we will resume at 1:00.  I will see you all probably at quarter to one.

One last thing, and it may be academic because we may not get over this hump.  But if we do, so that the parties are aware, with respect to the tutorial videos, given her answers to Ms. Burns, I think that business record is nearly there.

Mr. Rafferty, Mr. Della Fera can put the actual exhibits in front of her.  But given a couple of her answers to those questions, I think, so that everyone's aware, I think those are likely to come in once she does a little bit of work on A3 through A10 and A12.

So I just wanted to give the parties the view on that.  I'll even ask the government.  Government still standing on objecting to the business record exception in light of her answers?

**AUSA HALVERSON:**  Yes, Your Honor, I think because she said that she viewed them as inaccurate based on the way -- she made them as inaccurate videos essentially knowing that she was making them for the use of telemedicine doctors.  But she was making them specifically with language for the face-to-face

module that she had worked on.

**THE COURT:**  Yeah.

**AUSA HALVERSON:**  So the fact is they're not accurate records.  They're made as false records.

**THE COURT:**  Yeah.  I appreciate that the government's still standing on it.  I think that if that is the basis, it is very likely to be overruled because the trustworthiness prong of 803.6, the government is contending that the whole thing is a sham.  And so all of it would either be, on that view, not trustworthy or, frankly, not for the truth.  And that's not this Court's view of 803.6.

What she said is, is that those tutorials was actually on the log-in page of the site and they were made during '16 through '19.  And they are, therefore, a record of how you go through and use the site, at least some of them actually are, that I've reviewed, are how the site and the forms on the site changed over time.

So I think what needs to be done -- so -- and by the way, in the course of her role as vice president and regular practice, which the government's case in *Hawkins* and in *Freedman*, is really a very big touchtone.  It is clear from her answer and the circumstantial evidence that -- of her answer, that it was clearly made in the course of the business and the regular practice of the business to have these things available for people to use the site.

The fact that the government, as they are free to do and have done a little bit on direct and are free to do on redirect, may say, well, it was all garbage, right, you left this out, right, this is a big omission, right, you're free to do that. But that doesn't change that it is a business record for the purpose of the business.

I'll make one last point, and this goes to *Jacoby*, which is cited by Mr. Rafferty, it's clearly a record of a data compilation of how to manipulate and use the site. That's what it is. And then the regular practice during the course of, I gave a record on, on the trustworthiness prong, let me finally say that it was certainly given reliability and an indicia of trustworthiness by its users to some extent because they're filling in the bubbles.

Now, I get it, there's a slide there where Mr. Rafferty's going to highlight that the doctors are testing that it was real and the government's going to dispute that and call that garbage. But that is not the trustworthiness of 803.6. The trustworthiness of 803.6 is it was clearly relied on by the business and it was relied on by the participant of the business.

So for all those reasons, I want to state she's got to do a little bit of work on the actual exhibits because A3, A10 and A12 were not put in front of her yet.

But assuming that she says, yeah, those are what I was

talking about '16 to '19, I think we're there.

I'll see everybody at a quarter to one.

Thank you, Counsel.

**AUSA BURNS:** Your Honor, the witness is out in the hallway. Can --

**THE COURT:** You can let her take a break until 1:00.

**THE COURT SECURITY OFFICER:** All rise.

(Proceedings recessed at 11:28 a.m. to resume at 1:00 p.m.)

(Whereupon, this concludes the morning portion of the proceedings, afternoon portion to resume with Sharon Velazco.)

### C E R T I F I C A T E

I certify that the foregoing pages represent a true and correct transcript of the official electronic sound recording as provided to me by the U.S. District Court, Southern District of Florida, as taken on the date and time previously stated in the above matter.

I certify that the foregoing pages represent a true and correct transcript of the above-styled proceedings as reported on the date, time, and location listed.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was reported, and further that I am not financially nor otherwise interested in the outcome of the above-entitled matter.


/s/Quanincia S. Hill, RPR
Quanincia S. Hill, RPR, CRR
Official Court Reporter
Southern District of Florida

| | | | | |
|---|---|---|---|---|
| **$** | **2016** [5] - 44:9, 47:13, 56:4, 57:17, 61:2 | **80** [1] - 20:1 | 60:16 | **allegations** [1] - 66:18 |

**$**

**$10** [1] - 35:25
**$20,000** [1] - 45:23

**'**

**'16** [2] - 83:13, 85:1
**'17** [1] - 47:13
**'19** [2] - 83:14, 85:1

**1**

**1** [2] - 61:2, 61:20
**10** [1] - 35:17
**1016** [1] - 16:10
**1023** [4] - 4:10, 25:23, 26:17, 53:13
**1025** [5] - 4:11, 25:23, 25:24, 26:19, 50:24
**1052** [4] - 4:13, 25:23, 26:21, 56:2
**10:53** [1] - 71:12
**10:57** [1] - 73:21
**1112** [3] - 4:15, 25:24, 26:23
**1159** [4] - 4:16, 25:24, 27:1, 58:16
**1170** [4] - 4:18, 25:24, 27:3, 60:13
**1186** [3] - 4:20, 25:24, 27:5
**1196** [3] - 4:21, 25:24, 27:7
**11:09** [2] - 73:21, 73:22
**11:28** [1] - 85:8
**1221** [3] - 4:23, 25:24, 27:9
**1243** [7] - 5:1, 41:2, 41:10, 42:7, 42:12, 42:15, 42:21
**1244** [6] - 5:2, 41:21, 42:7, 42:12, 42:17, 43:24
**1245** [6] - 5:3, 42:2, 42:7, 42:12, 42:19, 45:8
**149** [1] - 7:1
**15** [4] - 23:6, 79:23, 79:25
**156** [1] - 25:4
**19** [1] - 56:4
**1987** [1] - 16:11
**1:00** [4] - 81:4, 82:7, 85:6, 85:8

**2**

**20** [1] - 44:21

**2016** [5] - 44:9, 47:13, 56:4, 57:17, 61:2
**2016.08.11** [1] - 4:10
**2016.08.12** [1] - 4:11
**2016.10.19** [1] - 4:13
**2017** [3] - 27:18, 44:20, 44:21
**2017.07.18** [1] - 4:15
**2017.07.24** [1] - 4:23
**2018** [6] - 4:4, 24:17, 36:16, 45:11, 58:22
**2018.01.25** [1] - 4:16
**2018.02.01** [1] - 4:18
**2018.05.24** [1] - 4:20
**2018.07.05** [1] - 4:21
**2019** [2] - 27:18, 47:14
**20K** [1] - 46:2
**219** [1] - 13:8
**22** [1] - 3:4
**220** [3] - 17:18, 17:22, 18:8
**23-criminal-20271** [1] - 6:4
**25** [1] - 58:22
**26** [8] - 4:4, 4:5, 4:7, 4:8, 4:10, 4:11, 4:13, 4:15
**27** [5] - 4:16, 4:18, 4:20, 4:21, 4:23
**28** [1] - 18:17
**29** [1] - 45:11

**4**

**401** [1] - 11:22
**402** [1] - 11:22
**403** [1] - 11:22
**42** [3] - 5:1, 5:2, 5:3

**5**

**5** [2] - 35:20, 35:23
**544** [1] - 7:1

**6**

**604** [3] - 4:4, 25:23, 26:13
**608** [2] - 16:13
**626** [4] - 4:5, 25:23, 26:9, 27:25
**627** [3] - 4:7, 25:23, 26:11
**634** [4] - 4:8, 25:23, 26:15, 79:19
**637** [1] - 79:18

**8**

**8** [1] - 34:22

**80** [1] - 20:1
**803.6** [4] - 83:8, 83:11, 84:19
**822** [1] - 16:10
**8:33** [1] - 6:1
**8:59** [1] - 18:20

**9**

**90** [1] - 81:8
**9:37** [2] - 18:20, 18:21
**9:43** [1] - 21:23

**A**

**a.m** [10] - 6:1, 18:20, 18:21, 21:23, 71:12, 73:21, 73:22, 85:8
**A10** [5] - 13:23, 14:4, 18:25, 82:16, 84:23
**A12** [5] - 13:23, 14:4, 18:25, 82:16, 84:24
**A3** [7] - 13:23, 14:4, 18:7, 18:25, 19:13, 82:16, 84:23
**ability** [5] - 32:8, 64:19, 67:3, 67:8, 75:1
**able** [11] - 11:10, 11:11, 11:14, 12:4, 15:11, 17:10, 30:2, 32:12, 34:10, 67:18, 78:21
**absolutely** [1] - 55:2
**abundance** [5] - 8:13, 8:16, 9:3, 9:24, 69:17
**abundantly** [1] - 11:10
**academic** [1] - 82:8
**ACC** [3] - 60:17, 63:15
**accept** [3] - 12:8, 68:4, 75:9
**acceptable** [2] - 54:17, 70:6
**accepts** [2] - 10:23, 12:16
**access** [8] - 33:12, 36:2, 36:9, 55:11, 55:13, 55:15, 55:16, 62:8
**accessible** [1] - 47:22
**according** [1] - 18:6
**account** [3] - 33:7, 33:13, 58:8
**accurate** [2] - 48:23, 83:3
**accusing** [3] - 68:20, 68:21
**act** [1] - 24:20
**Action** [2] - 4:19,

60:16
**action** [8] - 60:21, 60:22, 61:7, 61:23, 62:5, 62:10, 63:9, 80:22
**actions** [1] - 54:21
**activity** [3] - 45:16, 54:24, 55:1
**actual** [3] - 55:17, 82:12, 84:23
**add** [4] - 17:13, 29:22, 32:24, 32:25
**addendum** [1] - 31:7
**additional** [2] - 12:4, 74:24
**address** [1] - 58:18
**addressed** [1] - 65:11
**addressing** [1] - 14:24
**adduce** [2] - 11:15, 12:4
**adduced** [1] - 7:18
**adducing** [1] - 11:23
**administrative** [1] - 36:21
**admissibility** [1] - 13:9
**admit** [1] - 12:20
**admitted** [20] - 14:7, 14:13, 20:4, 26:9, 26:11, 26:13, 26:15, 26:17, 26:19, 26:21, 26:23, 27:1, 27:3, 27:5, 27:7, 27:9, 27:25, 42:15, 42:17, 42:19
**advantage** [1] - 60:18
**Advantage** [5] - 58:4, 58:7, 59:16, 62:2, 62:3
**advice** [5] - 38:5, 38:7, 39:15, 39:17, 39:20
**advised** [1] - 74:18
**advocate** [1] - 75:2
**afternoon** [1] - 85:11
**Agbi** [2] - 68:15
**agencies** [1] - 50:6
**agency** [1] - 43:22
**Agent** [1] - 6:9
**agent** [5] - 7:7, 9:18, 9:20, 9:22, 80:14
**agents** [1] - 10:16
**aggregate** [1] - 81:6
**ago** [3] - 10:9, 66:22, 68:6
**agreed** [2] - 25:20, 62:17
**airplane** [1] - 54:15
**akin** [1] - 80:7
**al** [5] - 4:10, 4:12, 4:17, 4:18, 4:23

**allegations** [1] - 66:18
**alleged** [1] - 66:25
**allow** [2] - 67:19, 68:1
**allowed** [5] - 11:21, 19:16, 35:13, 63:17, 81:23
**almost** [1] - 21:8
**amount** [1] - 11:18
**analysis** [1] - 11:22
**ankle** [1] - 29:6
**announce** [1] - 6:5
**answer** [11] - 15:23, 21:12, 70:4, 72:9, 72:16, 72:20, 72:22, 73:2, 73:4, 83:22
**answered** [1] - 13:4
**answers** [5] - 14:23, 71:22, 82:10, 82:13, 82:20
**anytime** [1] - 53:21
**apologize** [2] - 45:11, 74:20
**appearances** [1] - 6:5
**apply** [1] - 52:25
**appreciate** [4] - 11:8, 13:7, 64:25, 83:5
**approach** [1] - 64:2
**appropriate** [1] - 32:16
**appropriately** [1] - 16:8
**area** [2] - 68:8, 71:24
**arguably** [1] - 11:18
**argue** [2] - 13:25, 21:14
**argued** [2] - 14:6, 14:12
**argument** [3] - 15:12, 17:3, 17:9
**arguments** [1] - 8:4
**arranged** [1] - 36:17
**asleep** [1] - 20:13
**assert** [1] - 12:1
**asserted** [1] - 11:17
**asserting** [1] - 66:1
**assess** [1] - 35:14
**assigned** [1] - 29:3
**assistant** [1] - 36:21
**associated** [2] - 59:25, 64:18
**assuming** [1] - 84:25
**assure** [1] - 21:25
**attached** [1] - 79:22
**Attaching** [1] - 4:8
**attended** [1] - 23:16
**attention** [5] - 11:1, 57:4, 57:5, 71:16, 71:23
**ATTORNEY** [38] -

6:11, 6:15, 13:18, 17:15, 17:21, 18:5, 18:12, 18:14, 20:16, 20:21, 26:1, 26:3, 26:5, 39:9, 39:12, 42:9, 42:11, 64:2, 64:4, 64:11, 65:3, 65:18, 66:16, 67:11, 68:11, 68:24, 69:14, 69:17, 70:7, 73:10, 73:12, 73:24, 74:3, 75:24, 77:15, 77:20, 82:2, 82:4

**attorney** [7] - 7:7, 9:4, 43:8, 44:4, 45:20, 61:3, 80:14

**attorneys** [7] - 7:23, 12:7, 16:5, 19:22, 38:11, 46:6, 72:15

**audit** [10] - 33:20, 33:25, 50:21, 51:6, 52:11, 52:15, 52:17, 52:18, 52:19, 56:16

**audited** [1] - 34:3

**auditors** [1] - 56:16

**audits** [2] - 50:17, 50:18

**AUSA** [88] - 3:4, 6:7, 6:10, 10:3, 10:6, 18:16, 22:7, 22:12, 25:18, 25:22, 26:8, 27:11, 27:24, 28:1, 28:19, 28:21, 31:11, 31:13, 32:20, 32:22, 33:17, 33:18, 34:21, 34:23, 35:16, 35:18, 37:24, 38:1, 39:14, 41:1, 41:3, 41:21, 41:23, 42:2, 42:3, 42:6, 42:13, 42:21, 42:22, 43:24, 43:25, 45:8, 45:10, 46:4, 46:5, 50:23, 50:25, 51:7, 51:8, 53:12, 53:15, 55:3, 55:5, 56:1, 56:3, 58:15, 58:17, 59:10, 59:12, 60:12, 60:14, 60:25, 61:2, 61:10, 61:12, 61:15, 61:19, 65:8, 65:14, 65:16, 65:23, 66:9, 66:12, 69:2, 69:9, 69:11, 69:16, 69:23, 70:8, 70:14, 71:1, 73:14, 78:3, 79:13, 80:17, 82:21, 83:3, 85:4

**availability** [1] - 33:22

**available** [15] - 14:19, 19:8, 19:21, 28:15,

29:8, 29:14, 30:25, 32:15, 32:16, 33:23, 34:1, 53:6, 53:10, 54:22, 83:24

**avoid** [3] - 50:21, 54:25, 76:4

**aware** [6] - 31:7, 39:14, 64:16, 74:8, 82:10, 82:14

## B

**B15** [1] - 4:17

**bar** [9] - 64:3, 64:8, 68:23, 72:6, 74:10, 77:2, 77:20, 81:9

**Barth** [2] - 4:15, 4:23

**base** [1] - 29:17

**based** [7] - 15:13, 30:14, 31:21, 32:4, 32:9, 78:7, 82:22

**basis** [2] - 7:11, 83:6

**became** [1] - 58:9

**become** [1] - 49:20

**becoming** [2] - 30:16, 56:18

**beginning** [1] - 6:6

**behalf** [6] - 6:12, 6:16, 74:13, 75:2, 76:2, 76:4

**beings** [2] - 72:15

**belabor** [1] - 7:15

**belong** [1] - 77:18

**bench** [3] - 17:17, 19:2, 64:9

**benefit** [3] - 17:10, 22:2, 34:23

**benefits** [5] - 28:15, 28:16, 33:19, 34:24, 78:24

**best** [7] - 9:25, 21:9, 70:24, 72:8, 75:10, 75:15, 80:22

**better** [5] - 21:9, 21:12, 30:12, 80:24, 81:17

**between** [4] - 14:21, 25:8, 25:12, 47:13

**big** [3] - 78:4, 83:21, 84:4

**bilateral** [4] - 51:5, 51:15, 52:10, 54:16

**bilaterally** [2] - 53:8, 54:22

**billing** [3] - 29:3, 34:16, 52:23

**bit** [18] - 10:9, 12:20, 13:21, 13:22, 17:5, 23:2, 23:5, 23:6, 23:21, 35:20, 46:21,

50:17, 57:20, 71:6, 75:25, 82:15, 84:2, 84:23

**blackman** [13] - 10:20, 23:19, 25:1, 37:2, 37:12, 37:14, 38:19, 39:7, 39:17, 39:20, 39:22, 46:10, 67:8

**Blackman** [21] - 4:8, 4:13, 4:15, 4:23, 6:3, 6:12, 6:13, 24:11, 24:19, 25:14, 28:7, 36:12, 38:10, 54:2, 54:12, 56:25, 57:12, 63:7, 74:5, 74:16, 75:2

**Blackman's** [1] - 37:1

**blank** [1] - 19:17

**blue** [1] - 42:23

**Bluetooth** [1] - 20:22

**boarded** [3] - 29:12, 29:13, 31:3

**boarding** [2] - 25:17, 47:9

**borderline** [1] - 11:24

**bottom** [3] - 51:7, 59:10, 61:19

**brace** [6] - 31:25, 32:1, 32:8, 32:13, 54:15

**braces** [1] - 52:17

**Brady** [5] - 6:23, 7:11, 12:14, 12:19, 12:24

**Braga** [21] - 27:24, 28:20, 31:11, 32:20, 33:17, 34:21, 35:16, 37:24, 41:1, 41:21, 42:2, 42:21, 45:9, 50:23, 53:12, 55:3, 56:1, 58:15, 59:11, 61:1, 61:16

**Brandon** [1] - 54:2

**break** [17] - 17:8, 17:25, 18:4, 20:14, 64:5, 67:16, 70:1, 70:21, 71:6, 71:7, 71:14, 72:11, 73:16, 73:18, 74:1, 81:4, 85:6

**breathe** [1] - 13:14

**Brett** [21] - 6:3, 6:12, 24:11, 24:18, 24:19, 25:14, 28:7, 36:12, 38:10, 38:12, 40:4, 41:9, 43:19, 44:9, 45:25, 46:18, 46:19, 54:11, 56:25, 57:12, 63:7

**Brett's** [4] - 36:21, 45:1, 45:2, 46:2

**Brian** [2] - 6:11, 64:12

**brick** [3] - 30:10, 31:23, 34:8

**brick-and** [1] - 31:23

**brick-and-mortar** [1] - 30:10

**brief** [2] - 17:17, 18:6

**briefly** [1] - 17:15

**briefs** [1] - 21:9

**bring** [10] - 11:11, 18:22, 21:18, 64:17, 69:4, 69:22, 73:4, 73:17, 79:15, 81:2

**brings** [1] - 69:7

**broadly** [1] - 15:2

**brought** [6] - 10:25, 12:12, 12:25, 19:10, 64:14, 80:18

**Brown** [11] - 38:8, 38:11, 39:16, 39:19, 39:22, 43:1, 43:12, 45:5, 46:7, 46:13, 46:19

**bubble** [1] - 42:23

**bubbles** [1] - 84:14

**Bugler** [1] - 54:2

**build** [1] - 49:21

**built** [1] - 53:21

**burns** [11] - 10:22, 22:6, 68:13, 68:21, 70:24, 72:11, 72:21, 73:13, 79:17, 80:1, 82:11

**Burns** [31] - 3:4, 6:8, 27:11, 28:1, 28:21, 31:13, 32:22, 33:18, 34:23, 35:18, 38:1, 39:14, 41:3, 41:23, 42:3, 42:22, 43:25, 45:10, 46:5, 50:25, 51:8, 53:15, 55:5, 56:3, 58:17, 59:12, 60:14, 61:2, 61:12, 61:19, 65:9

**BURNS** [51] - 6:10, 10:3, 10:6, 18:16, 22:7, 22:12, 25:18, 25:22, 26:8, 27:24, 28:19, 31:11, 32:20, 33:17, 34:21, 35:16, 37:24, 41:1, 41:21, 42:2, 42:6, 42:13, 42:21, 43:24, 45:8, 46:4, 50:23, 51:7, 53:12, 55:3, 56:1, 58:15, 59:10, 60:12, 60:25, 61:10, 61:15, 65:8, 65:14, 65:16, 65:23, 66:9, 66:12,

69:2, 69:9, 69:11, 69:16, 69:23, 71:1, 73:14, 85:4

**burns'** [2] - 11:4, 77:8

**business** [22] - 15:1, 15:17, 15:19, 15:21, 16:16, 19:7, 21:11, 21:15, 24:3, 25:16, 40:12, 46:12, 46:14, 52:8, 82:11, 82:19, 83:23, 83:24, 84:5, 84:6, 84:20, 84:21

**busts** [1] - 56:12

**busy** [1] - 45:17

**buy** [2] - 37:5, 37:7

**buy-in** [2] - 37:5, 37:7

**BY** [1] - 22:12

## C

**C.T** [1] - 4:8

**Calle** [1] - 16:9

**cannot** [4] - 68:5, 68:6, 68:7, 78:1

**Capital** [5] - 6:24, 6:25, 9:12, 9:17, 9:19

**care** [5] - 30:3, 34:9, 35:10, 36:10

**careful** [3] - 15:14, 15:25, 19:15

**carefully** [1] - 6:25

**cares** [2] - 34:9, 36:9

**carried** [1] - 11:24

**case** [29] - 6:3, 7:1, 7:4, 7:20, 7:24, 7:25, 8:20, 10:25, 11:3, 11:23, 12:1, 12:7, 12:16, 16:9, 16:13, 16:15, 16:23, 64:14, 68:2, 69:18, 70:13, 72:1, 74:14, 81:15, 83:20

**cases** [1] - 12:5

**category** [1] - 80:5

**causes** [2] - 35:8, 35:9

**caution** [7] - 8:13, 8:17, 9:3, 9:24, 19:21, 20:7, 69:18

**Center** [1] - 23:22

**certain** [3] - 13:9, 49:12, 76:6

**certainly** [3] - 10:15, 68:4, 84:12

**chain** [2] - 51:18, 61:1

**chair** [1] - 77:8

**chance** [1] - 18:4

**change** [6] - 31:22, 45:5, 54:6, 57:2, 57:13, 84:5

**changed** [1] - 83:17
**changes** [5] - 27:12, 31:8, 37:21, 60:24, 61:7
**characterize** [4] - 14:1, 15:2, 19:15, 20:4
**characterized** [5] - 8:18, 14:2, 19:13, 19:17, 19:18
**charge** [1] - 22:19
**charged** [3] - 11:16, 16:16, 76:5
**charges** [1] - 53:1
**charging** [1] - 35:20
**Charlene** [6] - 66:17, 66:25, 67:12, 69:14, 74:10
**chart** [5] - 32:2, 32:17, 55:8, 55:9, 55:10
**charts** [1] - 74:22
**chat** [1] - 42:22
**check** [2] - 9:10, 62:1
**chief** [1] - 51:13
**choice** [3] - 30:15, 31:21, 53:8
**Choice** [6] - 58:4, 58:7, 59:16, 60:18, 62:2, 62:4
**choosing** [1] - 29:16
**chops** [1] - 56:13
**chosen** [1] - 56:14
**Chris** [4] - 56:6, 56:7, 56:11, 56:20
**circles** [1] - 69:6
**Circuit** [2] - 7:14, 16:10
**circumstance** [1] - 75:12
**circumstantial** [1] - 83:22
**Cirri** [3] - 56:7, 56:11
**cited** [2] - 16:10, 84:8
**claims** [1] - 67:2
**clarification** [1] - 77:13
**clarify** [1] - 45:4
**clear** [13] - 7:4, 9:17, 11:10, 16:7, 19:9, 21:4, 25:1, 41:4, 66:1, 66:16, 75:6, 75:7, 83:21
**clearly** [10] - 7:6, 10:24, 15:16, 16:11, 19:9, 41:12, 81:10, 83:23, 84:8, 84:19
**client** [5] - 24:1, 56:8, 56:9, 59:19, 78:24
**clients** [5] - 23:25, 25:17, 28:16, 31:5,

80:10
**clinical** [1] - 55:12
**Clinician** [2] - 30:18, 33:5
**clinician** [9] - 31:1, 33:9, 34:24, 47:3, 47:20, 48:4, 55:5, 55:7
**clinician's** [1] - 53:4
**clinicians** [8] - 35:1, 35:3, 35:25, 36:1, 47:3, 48:7, 48:8, 48:12
**close** [2] - 7:2, 77:6
**CMS** [2] - 50:18, 56:16
**CO** [1] - 4:17
**CO-B15** [1] - 4:17
**cocounsel** [1] - 74:4
**code** [8] - 29:2, 30:24, 30:25, 31:2, 31:21, 33:22, 35:6, 62:24
**codefendant's** [1] - 74:5
**codefendants** [1] - 10:20
**codes** [14] - 29:3, 29:4, 29:7, 29:8, 29:14, 29:16, 29:22, 29:23, 30:4, 32:15, 33:22, 34:1, 34:3
**coffee** [1] - 71:9
**collateral** [1] - 74:21
**colleague** [1] - 10:10
**colleagues** [1] - 10:6
**comfortable** [3] - 44:5, 71:8, 72:5
**coming** [5] - 8:5, 12:8, 64:25, 67:24, 74:17
**commencing** [1] - 6:1
**comment** [1] - 44:1
**commonly** [1] - 7:24
**communicate** [1] - 38:22
**communicated** [1] - 40:23
**communications** [1] - 77:17
**companies** [5] - 25:13, 35:4, 48:13, 70:16, 80:20
**company** [17] - 23:2, 23:13, 23:16, 28:17, 29:11, 29:12, 29:16, 32:3, 34:17, 43:12, 54:10, 58:1, 59:8, 60:19, 64:19, 78:10, 79:21
**company-wide** [2] - 23:13, 23:16
**Compendium** [1] - 4:8

**competently** [1] - 52:8
**compilation** [2] - 79:19, 84:9
**complained** [1] - 79:7
**complaint** [1] - 52:8
**complaints** [1] - 50:13
**complete** [3] - 55:9, 55:10, 60:7
**completed** [3] - 29:15, 32:11, 32:25
**completely** [2] - 62:10, 67:24
**completing** [1] - 58:12
**compliance** [12] - 31:4, 34:12, 51:20, 51:22, 51:25, 52:5, 57:20, 60:10, 61:12, 65:11, 66:2, 66:4
**compliant** [2] - 34:6, 40:13
**components** [1] - 24:14
**computers** [1] - 24:19
**concern** [5] - 30:16, 48:25, 49:12, 69:6, 71:24
**concerned** [3] - 64:19, 66:13, 69:3
**concerns** [13] - 31:9, 48:25, 49:14, 49:15, 49:17, 49:24, 50:2, 50:9, 57:25, 64:15, 65:6, 74:6, 75:1
**conclave** [1] - 70:12
**concludes** [1] - 85:10
**concrete** [1] - 75:15
**concretizes** [2] - 21:8, 21:11
**concurs** [1] - 69:23
**conduct** [5] - 8:23, 16:13, 16:15, 16:16
**conducted** [1] - 50:18
**conducting** [1] - 52:7
**conference** [1] - 64:9
**confess** [1] - 65:1
**confirmation** [1] - 13:17
**conflict** [3] - 64:15, 68:17, 74:18
**conflict-free** [1] - 74:18
**confused** [1] - 39:7
**connected** [1] - 38:9
**connecting** [1] - 22:25
**connection** [4] - 27:19, 38:4, 46:17, 74:14
**connections** [2] - 25:8, 25:11
**consent** [1] - 81:2

**consequences** [2] - 52:18, 63:15
**consider** [1] - 62:21
**considering** [1] - 14:3
**consistent** [1] - 76:8
**conspiracy** [1] - 22:18
**conspired** [1] - 22:19
**construed** [1] - 13:20
**consult** [1] - 48:18
**consulting** [3] - 38:20, 80:9, 80:10
**consults** [1] - 49:10
**contended** [1] - 7:9
**contending** [1] - 83:8
**content** [3] - 15:23, 48:16, 48:17
**contents** [1] - 28:11
**continue** [7] - 9:24, 22:5, 62:4, 67:18, 69:1, 72:4, 72:6
**CONTINUED** [1] - 22:11
**continued** [2] - 3:4, 50:9
**continues** [2] - 62:12, 64:21
**Contracts** [2] - 4:15, 4:24
**conundrum** [1] - 74:2
**convened** [1] - 21:23
**conversation** [2] - 38:25, 39:6
**conversations** [2] - 58:14, 76:7
**conveyed** [1] - 48:22
**cooperate** [1] - 12:9
**cooperated** [1] - 12:24
**cooperating** [2] - 66:20, 79:13
**cooperation** [1] - 7:20
**coowner** [1] - 59:15
**copied** [3] - 51:21, 59:4, 60:8
**copies** [2] - 18:1, 52:9
**copy** [2] - 10:11, 20:18
**core** [1] - 8:18
**correct** [8] - 13:17, 29:18, 38:17, 38:18, 53:11, 62:11, 62:15, 66:6
**correcting** [1] - 62:10
**correction** [1] - 61:8
**Corrective** [2] - 4:19, 60:16
**corrective** [5] - 60:21, 60:22, 61:23, 62:5, 63:9
**cost** [1] - 45:22
**Counsel** [5] - 6:18, 18:11, 71:2, 73:17,

85:3
**counsel** [19] - 6:5, 7:25, 8:3, 10:7, 10:14, 11:2, 17:3, 17:13, 25:20, 43:12, 65:25, 70:2, 72:12, 73:9, 74:5, 74:19, 78:15, 81:2, 81:19
**counsel's** [2] - 6:9, 17:10
**counter** [2] - 20:5, 21:3
**counts** [1] - 18:3
**couple** [10] - 6:20, 13:15, 13:21, 20:16, 22:16, 47:7, 64:6, 75:24, 78:3, 82:13
**course** [7] - 65:18, 68:13, 71:17, 80:22, 83:19, 83:23, 84:10
**COURT** [75] - 6:13, 6:18, 10:5, 10:22, 13:20, 17:20, 18:2, 18:8, 18:13, 18:15, 18:17, 18:19, 18:22, 20:19, 21:1, 21:22, 21:24, 25:21, 25:25, 26:2, 26:4, 26:6, 39:11, 39:13, 42:8, 42:10, 42:12, 42:14, 64:3, 64:5, 64:10, 64:25, 65:5, 65:13, 65:15, 65:17, 65:20, 66:5, 66:10, 66:13, 67:10, 67:15, 68:20, 68:25, 69:7, 69:10, 69:12, 69:15, 69:25, 70:11, 70:17, 71:2, 71:5, 71:11, 71:13, 73:8, 73:11, 73:13, 73:15, 73:20, 73:23, 73:25, 75:5, 76:10, 77:19, 77:23, 78:13, 80:6, 80:22, 82:3, 82:5, 83:2, 83:5, 85:6, 85:7
**court** [8] - 6:17, 7:8, 7:11, 71:4, 71:15, 75:13, 75:20, 77:4
**Court** [13] - 6:25, 10:1, 10:23, 11:1, 12:16, 17:17, 17:24, 20:17, 65:4, 68:6, 68:21, 69:20, 71:23
**Court's** [3] - 11:22, 71:16, 83:11
**COURTROOM** [1] - 6:2
**cover** [1] - 28:9
**Cox** [29] - 4:10, 4:11,

4:13, 4:16, 6:3, 6:16, 6:18, 14:1, 14:9, 23:19, 25:14, 37:19, 46:16, 48:9, 51:18, 51:25, 53:25, 54:7, 54:11, 56:4, 56:12, 58:24, 59:1, 60:8, 60:9, 61:21, 63:13
**cox** [1] - 10:21
**created** [4] - 19:4, 36:8, 48:17
**credentials** [1] - 62:1
**crime** [1] - 22:23
**criminal** [2] - 53:1, 64:14
**criteria** [1] - 30:14
**criteria-based** [1] - 30:14
**critical** [2] - 9:16, 11:7
**cross** [19] - 7:18, 7:19, 8:2, 11:11, 12:4, 15:12, 64:20, 65:17, 65:18, 67:9, 67:13, 67:23, 68:7, 70:9, 72:7, 78:21, 79:3, 79:8, 81:11
**cross-examination** [8] - 7:18, 7:19, 8:2, 11:11, 12:4, 67:23, 72:7, 78:21
**cross-examine** [2] - 64:20, 68:7
**cross-talk** [1] - 70:9
**crossing** [2] - 76:13, 80:14
**CTO** [1] - 51:13
**current** [8] - 28:14, 28:22, 31:19, 32:7, 35:19, 35:21, 36:6
**customer** [1] - 40:15
**Customer** [1] - 4:4
**customers** [1] - 52:7

## D

**Darren** [1] - 6:7
**dashboard** [1] - 79:19
**Dashboards** [1] - 4:9
**data** [1] - 84:8
**date** [5] - 13:14, 36:15, 57:17, 58:21, 62:10
**dated** [1] - 61:2
**days** [2] - 8:19, 62:24
**DE** [2] - 3:3, 22:8
**De** [22] - 13:10, 13:24, 14:4, 14:8, 14:14, 14:15, 20:18, 20:24, 22:13, 27:11, 28:1, 31:13, 32:22, 35:18, 39:14, 41:3, 41:11,

42:22, 50:25, 67:4, 71:16, 80:1
**dealing** [2] - 33:21, 35:2
**dealt** [1] - 16:3
**deceitful** [2] - 57:8, 57:9
**December** [1] - 24:17
**decide** [1] - 70:12
**decided** [1] - 48:16
**decimal** [1] - 78:24
**decision** [3] - 57:11, 63:5, 79:16
**deck** [1] - 12:15
**deep** [1] - 75:17
**defend** [1] - 81:11
**defendant** [2] - 7:6, 11:23
**defendants** [4] - 9:3, 12:10, 13:20, 79:22
**defending** [1] - 7:25
**defense** [4] - 7:5, 8:18, 65:25, 66:1
**definitely** [3] - 15:12, 31:6, 37:16
**DELLA** [5] - 6:15, 13:18, 18:14, 42:11, 70:7
**Della** [9] - 6:16, 13:15, 15:3, 15:11, 26:2, 42:10, 81:19, 82:3, 82:12
**denied** [1] - 59:19
**Denise** [2] - 38:8, 38:13
**department** [5] - 43:22, 51:22, 52:5, 57:20, 65:11
**depict** [1] - 31:13
**depicted** [2] - 32:22, 35:18
**depiction** [1] - 32:23
**deputy** [4] - 18:3, 20:19, 80:25, 81:3
**DEPUTY** [1] - 6:2
**described** [1] - 50:10
**describing** [1] - 75:12
**Description** [1] - 4:3
**desire** [1] - 65:4
**despite** [1] - 50:9
**detail** [2] - 17:6, 20:5
**determine** [2] - 32:4, 52:21
**determined** [1] - 54:13
**determines** [1] - 31:25
**develop** [2] - 24:12, 27:17
**developed** [1] - 24:7
**development** [1] - 24:15

**diagnostics** [1] - 35:3
**diagram** [1] - 31:13
**different** [20] - 9:6, 9:16, 19:19, 24:14, 25:5, 25:8, 29:3, 29:7, 31:18, 34:10, 35:21, 36:20, 36:22, 47:1, 47:3, 48:1, 55:11, 57:6, 78:4, 81:16
**differentiating** [1] - 29:25
**difficult** [1] - 77:15
**Direct** [1] - 3:4
**direct** [4] - 22:5, 70:24, 72:7, 84:2
**DIRECT** [1] - 22:11
**directed** [2] - 8:13, 47:6
**directly** [1] - 59:20
**disabuse** [2] - 21:16, 78:15
**disagreed** [1] - 7:14
**disclosed** [1] - 74:16
**disconnected** [1] - 16:22
**discuss** [3] - 37:18, 39:2, 39:5
**discussed** [9] - 10:21, 23:21, 27:12, 36:12, 62:19, 74:3, 74:4, 74:5, 80:18
**discussing** [2] - 6:21, 54:16
**discussion** [3] - 27:15, 55:19, 55:22
**discussions** [7] - 10:18, 46:11, 46:19, 50:20, 63:9, 63:12, 76:2
**dishonest** [1] - 57:6
**dislodges** [2] - 11:2, 12:17
**dispositive** [3] - 7:17, 11:5, 12:19
**dispute** [2] - 16:17, 84:17
**dissect** [1] - 78:21
**distance** [1] - 14:24
**distributed** [1] - 47:25
**District** [3] - 66:19, 66:22, 76:3
**division** [1] - 66:20
**divulge** [1] - 78:23
**DME** [15] - 29:12, 29:16, 31:2, 31:21, 32:4, 32:8, 33:10, 33:21, 35:8, 35:14, 36:7, 43:8, 52:17, 56:10, 59:19

**DME's** [1] - 45:20
**DMERx** [40] - 4:5, 9:2, 10:20, 22:24, 23:3, 23:25, 24:7, 25:11, 27:12, 28:12, 33:2, 33:3, 33:12, 34:12, 37:22, 39:3, 39:15, 44:19, 44:23, 45:6, 46:5, 46:17, 46:22, 47:22, 48:1, 49:9, 49:15, 49:18, 49:23, 50:7, 50:20, 51:22, 52:6, 54:25, 58:8, 62:8, 65:24, 66:6, 70:16, 78:10
**DMERx's** [1] - 47:20
**DMERxes** [1] - 34:6
**DMEs** [5] - 22:25, 34:1, 35:25, 47:4, 49:22
**Docket** [4] - 13:8, 17:18, 17:21, 18:8
**docket** [3] - 13:11, 13:14, 18:9
**doctor** [17] - 29:14, 29:17, 31:20, 31:24, 31:25, 32:12, 32:18, 35:6, 35:15, 53:7, 53:9, 55:10, 55:15, 55:16, 59:24, 60:4, 80:21
**doctor's** [3] - 31:9, 32:7, 55:10
**doctors** [7] - 34:15, 49:1, 49:25, 50:3, 58:6, 82:24, 84:16
**document** [7] - 28:2, 36:11, 37:18, 41:23, 42:3, 50:25, 53:15
**documentation** [7] - 23:1, 31:8, 32:13, 35:7, 35:15, 55:24, 58:14
**documents** [8] - 27:19, 56:15, 56:17, 56:21, 58:9, 70:19, 70:20, 74:22
**dollars** [2] - 80:8, 80:13
**done** [8] - 7:21, 15:6, 15:14, 19:5, 35:15, 48:21, 83:18, 84:2
**doubting** [2] - 75:8, 75:22
**down** [7] - 32:1, 34:5, 37:24, 46:4, 53:12, 55:3, 59:10
**Dr** [2] - 68:15
**DR** [1] - 4:20
**dramatically** [1] - 29:9

**drawer** [2] - 14:19, 16:22
**drive** [3] - 17:24, 18:6, 20:17
**dropping** [1] - 68:19
**duck** [1] - 72:24
**due** [3] - 7:3, 51:16, 54:7
**duly** [1] - 22:9
**dummy** [3] - 24:23, 33:7, 53:22
**durable** [5] - 29:12, 32:2, 35:2, 35:3, 49:20
**during** [7] - 7:21, 16:16, 37:21, 39:6, 46:5, 83:13, 84:10
**DWO** [1] - 33:1

## E

**e-mail** [27] - 4:10, 4:11, 4:13, 4:15, 4:16, 4:18, 4:20, 4:21, 4:23, 37:17, 45:25, 51:4, 51:8, 53:25, 56:3, 56:22, 58:17, 58:18, 58:21, 59:10, 59:12, 59:17, 60:14, 61:2, 61:11, 61:20, 62:14
**e-mails** [7] - 4:8, 38:23, 50:22, 63:8, 79:20, 79:22
**early** [8] - 8:19, 11:23, 12:6, 36:16, 38:10, 70:1, 71:6, 81:18
**educate** [2] - 31:5, 48:11
**efficient** [1] - 22:3
**effort** [1] - 69:19
**efforts** [3] - 27:20, 66:2, 66:4
**eight** [2] - 23:6, 47:16
**either** [5] - 17:12, 19:10, 79:2, 79:3, 83:9
**electronic** [1] - 20:23
**Eleventh** [1] - 16:10
**empire** [1] - 24:2
**employees** [4] - 23:4, 23:9, 23:18, 79:21
**encounter** [7] - 32:11, 55:6, 55:12, 55:20, 56:14, 56:20, 57:18
**encounters** [1] - 56:13
**end** [4] - 20:14, 30:16, 52:23, 77:17
**enforcement** [1] - 50:6
**engaged** [1] - 43:13

**engaging** [3] - 46:11, 46:13, 46:16
**ensure** [6] - 34:18, 34:19, 52:7, 60:24, 62:25
**entire** [3] - 23:17, 39:23, 52:22
**entirely** [1] - 67:17
**entitled** [1] - 66:3
**entity** [5] - 67:20, 67:22, 71:18, 71:20, 78:18
**Entry** [4] - 13:8, 17:18, 17:21, 18:8
**equipment** [6] - 29:4, 29:12, 32:3, 35:2, 35:4, 49:20
**ERs** [1] - 34:9
**especially** [1] - 54:15
**essentially** [5] - 9:19, 70:16, 79:20, 80:17, 82:23
**establish** [1] - 33:15
**et** [5] - 4:10, 4:12, 4:16, 4:18, 4:23
**ethical** [1] - 48:25
**evaluate** [1] - 60:5
**evaluated** [1] - 50:1
**evaluating** [1] - 34:15
**evaluation** [3] - 57:1, 57:2
**evidence** [18] - 8:7, 8:10, 12:16, 13:9, 15:3, 15:4, 16:14, 16:21, 50:24, 53:14, 56:2, 58:16, 60:13, 76:16, 79:18, 81:6, 81:20, 83:22
**exact** [1] - 36:15
**exactly** [3] - 18:9, 44:20, 66:12
**Exam** [3] - 4:5, 4:7, 28:12
**exam** [19] - 29:15, 30:13, 30:15, 31:8, 31:19, 31:20, 32:11, 49:2, 49:3, 53:4, 53:7, 53:18, 53:21, 54:5, 55:24, 56:15, 57:7
**EXAMINATION** [1] - 22:11
**Examination** [1] - 3:4
**examination** [13] - 7:18, 7:19, 8:2, 11:11, 12:4, 22:5, 67:23, 71:17, 72:4, 72:7, 78:21
**examine** [3] - 16:7, 64:20, 68:7

**examined** [1] - 22:9
**example** [3] - 78:25, 79:1, 79:12
**exams** [3] - 29:23, 55:17, 58:12
**excellent** [2] - 11:1, 72:12
**exception** [3] - 15:19, 15:21, 82:19
**exceptions** [1] - 15:1
**excess** [1] - 74:11
**excise** [1] - 70:13
**exculpating** [1] - 12:10
**excuse** [4] - 50:14, 61:8, 69:21, 70:22
**excused** [1] - 72:4
**executive** [1] - 23:17
**exhibit** [7] - 16:2, 16:3, 21:2, 21:3, 70:15, 76:24, 79:18
**Exhibit** [27] - 4:3, 25:4, 25:23, 26:9, 26:11, 26:13, 26:15, 26:17, 26:19, 26:21, 26:23, 27:1, 27:3, 27:5, 27:7, 27:9, 27:25, 41:2, 41:10, 42:15, 42:17, 42:19, 50:24, 53:13, 56:2, 58:16, 60:13
**exhibits** [7] - 25:19, 26:6, 70:9, 74:7, 74:8, 82:13, 84:23
**EXHIBITS** [1] - 4:1
**Exhibits** [2] - 13:23, 42:7
**existed** [1] - 24:21
**existence** [1] - 11:12
**expand** [1] - 30:3
**expansion** [1] - 77:13
**expected** [1] - 74:25
**experience** [2] - 24:13, 24:14
**explain** [2] - 11:21, 36:4
**exploration** [1] - 12:22
**explore** [4] - 15:8, 15:11, 15:18, 67:8
**explored** [2] - 15:18, 19:8
**express** [1] - 43:6
**expressed** [1] - 49:24
**expressing** [1] - 49:11
**extended** [1] - 27:17
**extent** [4] - 11:25, 16:19, 84:13
**extreme** [1] - 20:5
**extrinsic** [2] - 15:4, 16:14

**eye** [1] - 19:17

**F**

**F-r-a-m-e** [1] - 69:14
**F.2d** [1] - 16:10
**F.3d** [1] - 7:1
**face** [20] - 38:2, 38:13, 38:16, 39:2, 48:24, 49:2, 49:21, 53:18, 57:7, 82:25
**face-to-face** [10] - 38:2, 38:13, 38:16, 39:2, 48:24, 49:2, 49:21, 53:18, 57:7, 82:25
**facilities** [1] - 34:9
**fact** [13] - 15:24, 24:24, 38:1, 38:14, 44:15, 46:10, 49:5, 49:9, 76:5, 76:13, 80:11, 83:3, 84:1
**fair** [7] - 8:4, 12:9, 12:12, 15:16, 20:10, 20:11, 21:18
**faith** [1] - 66:1
**fall** [1] - 20:13
**false** [1] - 83:4
**familiar** [1] - 62:23
**far** [6] - 9:12, 9:22, 11:25, 76:16, 79:5
**Far** [2] - 4:10, 4:12
**fast** [1] - 30:21
**fault** [1] - 74:6
**February** [1] - 61:2
**Feedback** [2] - 4:10, 4:12
**feedback** [2] - 28:16, 48:20
**felt** [2] - 36:2, 62:20
**FERA** [5] - 6:15, 13:18, 18:14, 42:11, 70:7
**Fera** [9] - 6:16, 13:16, 15:3, 15:11, 26:2, 42:10, 81:19, 82:3, 82:12
**few** [3] - 39:22, 48:2, 71:9
**fight** [1] - 12:7
**filed** [2] - 17:17, 17:21
**files** [2] - 10:12, 52:20
**filings** [1] - 6:22
**fill** [1] - 65:7
**filling** [1] - 84:14
**Final** [1] - 4:15
**final** [4] - 32:18, 55:24, 56:15, 56:21
**finally** [5] - 16:9, 16:24, 19:23, 21:7,

84:11
**financial** [1] - 78:6
**fine** [3] - 21:3, 69:10, 72:25
**firm** [3] - 80:8, 80:9, 80:10
**firms** [1] - 46:6
**first** [19] - 6:24, 7:16, 8:7, 8:19, 9:11, 13:1, 14:25, 19:5, 28:9, 28:25, 29:21, 33:20, 36:6, 45:10, 56:3, 61:17, 62:12, 64:6, 76:21
**fish** [1] - 9:6
**fit** [1] - 52:21
**five** [5] - 10:8, 71:14, 73:16, 73:19, 74:11
**five-minute** [2] - 71:14, 73:16
**flag** [3] - 54:17, 54:23, 56:16
**flagged** [2] - 33:25, 59:21
**flip** [2] - 21:11, 61:17
**FLORES** [4] - 26:3, 26:5, 73:12, 82:4
**Flores** [5] - 6:16, 26:4, 72:21, 73:11, 82:3
**flow** [1] - 30:5
**focus** [1] - 48:15
**focussed** [1] - 48:24
**folks** [1] - 64:18
**follow** [2] - 44:15, 68:11
**following** [2] - 64:7, 71:3
**follows** [1] - 22:10
**forced** [1] - 30:18
**form** [1] - 31:20
**forms** [1] - 83:16
**forth** [3] - 12:25, 14:25, 35:9
**fortunate** [1] - 15:7
**Fortunato** [10] - 38:8, 38:11, 39:16, 39:19, 43:1, 43:13, 45:5, 46:7, 46:13, 46:20
**Fortunato's** [1] - 39:23
**forward** [1] - 64:25
**forwarded** [1] - 60:9
**forwards** [1] - 61:12
**foundation** [3] - 15:20, 20:7, 21:14
**foundational** [2] - 20:11, 21:6
**fours** [1] - 7:1
**fourth** [1] - 67:22
**Frame** [6] - 66:17,

67:1, 69:14, 69:22, 74:11
**frame** [5] - 67:4, 67:5, 76:1, 76:7, 77:18
**frankly** [1] - 83:10
**fraud** [3] - 59:21, 74:12, 74:15
**fraudulent** [1] - 67:1
**free** [7] - 14:16, 36:2, 74:18, 82:6, 84:1, 84:2, 84:4
**freedman** [1] - 60:8
**Freedman** [1] - 83:21
**Friedman** [7] - 59:4, 59:5, 59:7, 59:8, 59:12, 59:17
**front** [4] - 11:21, 14:4, 82:13, 84:24
**frustrating** [1] - 35:1
**frustration** [5] - 24:10, 29:21, 34:5, 35:6, 35:10
**full** [4] - 12:21, 12:23, 64:9, 81:7
**fully** [1] - 48:23
**function** [1] - 52:5
**functioned** [1] - 28:24
**functioning** [1] - 53:23
**fund** [2] - 80:7, 80:12
**future** [1] - 24:23

**G**

**G.S** [4] - 4:15, 4:18, 4:20, 4:21
**game** [3] - 20:10, 20:11, 21:18
**gaps** [1] - 47:13
**garbage** [2] - 84:3, 84:18
**Garry** [1] - 47:7
**Gary** [10] - 6:3, 6:16, 25:14, 37:19, 48:9, 52:9, 53:25, 54:11, 56:4, 58:24
**gears** [1] - 46:21
**General** [1] - 43:21
**general** [2] - 32:13, 69:7
**generally** [3] - 41:17, 41:25, 69:5
**generic** [1] - 35:13
**gentleman** [1] - 24:11
**gentlemen** [3] - 64:5, 71:5, 71:10
**Georgia** [2] - 66:19, 76:3
**Giglio** [6] - 6:23, 12:10, 12:11, 12:14,

12:19, 12:24
**given** [8] - 18:1, 20:22, 29:13, 45:19, 69:18, 82:10, 82:13, 84:12
**goal** [2] - 33:25, 34:7
**government** [53] - 6:6, 7:9, 7:23, 8:1, 8:8, 8:11, 8:14, 8:24, 9:7, 9:8, 9:14, 9:19, 9:21, 10:15, 11:6, 11:13, 12:2, 12:9, 12:15, 13:4, 14:2, 15:7, 18:1, 20:23, 25:22, 42:6, 43:22, 64:17, 64:22, 65:7, 65:22, 66:3, 66:21, 66:24, 67:16, 67:21, 68:1, 68:17, 69:23, 74:4, 74:7, 74:13, 74:23, 75:14, 77:22, 78:1, 80:9, 81:13, 82:18, 83:8, 84:1
**Government** [2] - 18:15, 75:3
**Government's** [28] - 4:2, 25:3, 25:23, 26:9, 26:11, 26:13, 26:15, 26:17, 26:19, 26:21, 26:23, 27:1, 27:3, 27:5, 27:7, 27:9, 27:24, 41:2, 41:10, 42:7, 42:15, 42:17, 42:19, 50:24, 53:13, 56:1, 58:16, 60:12
**government's** [13] - 11:2, 11:8, 12:17, 12:18, 13:8, 68:14, 68:16, 76:24, 81:15, 81:20, 83:5, 83:20, 84:17
**grant** [1] - 7:11
**grave** [1] - 74:6
**great** [3] - 18:2, 81:10
**Greg** [8] - 25:14, 48:5, 48:8, 49:13, 59:1, 61:12, 63:13
**grew** [2] - 23:5, 24:3
**ground** [1] - 39:11
**grounds** [3] - 14:24, 19:8, 39:10
**group** [1] - 34:24
**groups** [1] - 47:3
**guess** [2] - 76:10, 76:20
**guilty** [11] - 7:22, 8:5, 11:15, 11:17, 11:24, 12:6, 12:24, 22:18, 22:22, 25:7, 76:15
**guy** [1] - 76:22

**guys** [1] - 74:1

**H**

**half** [2] - 40:6, 69:2
**half-hour** [1] - 69:2
**hallway** [2] - 73:18, 85:5
**HALVERSON** [8] - 6:7, 70:8, 70:14, 78:3, 79:13, 80:17, 82:21, 83:3
**Halverson** [10] - 6:8, 9:25, 68:13, 75:5, 77:25, 78:2, 78:16, 79:1, 79:4, 80:16
**hand** [3] - 18:3, 20:19, 36:23
**handcuff** [1] - 78:16
**handcuffed** [4] - 67:3, 70:18, 70:20, 79:3
**handcuffing** [3] - 75:16, 75:22, 76:22
**handful** [1] - 29:13
**handled** [2] - 34:20
**handling** [1] - 35:12
**hands** [1] - 21:8
**happy** [1] - 45:20
**hard** [5] - 21:10, 21:13, 21:15, 77:4, 77:7
**Hawkins** [1] - 83:20
**HCPCS** [13] - 29:2, 29:4, 29:7, 29:8, 30:24, 30:25, 31:21, 32:15, 33:22, 34:1, 34:3
**head** [1] - 51:25
**heading** [1] - 29:2
**headphones** [4] - 19:11, 20:13, 20:22, 20:25
**health** [1] - 43:23
**Health** [1] - 54:9
**healthcare** [6] - 24:13, 29:24, 29:25, 30:10, 34:8, 34:20
**Healthplash** [1] - 4:23
**Healthsplash** [13] - 4:4, 4:8, 4:18, 9:2, 22:24, 44:23, 45:6, 45:21, 60:16, 62:4, 79:19, 79:21, 79:24
**hear** [5] - 75:16, 76:11, 76:22, 76:25
**hearing** [2] - 64:8, 76:21
**hearsay** [3] - 15:1, 39:10, 39:12
**Hector** [1] - 6:16

**hedge** [2] - 80:7, 80:12
**held** [2] - 44:25, 45:1
**help** [2] - 33:20, 36:3
**helpful** [2] - 10:4, 10:23
**helping** [1] - 22:25
**high** [1] - 33:23
**highlight** [2] - 20:6, 84:16
**highlighted** [1] - 16:3
**highly** [1] - 34:2
**himself** [1] - 81:23
**HIPAA** [1] - 62:3
**Hitt** [15] - 4:11, 28:8, 36:17, 36:19, 36:20, 40:20, 40:23, 41:20, 43:17, 44:13, 45:11, 45:24, 51:4, 51:17, 54:2
**Hitt's** [1] - 43:2
**home** [1] - 23:8
**Home** [1] - 54:9
**Honor** [44] - 6:7, 6:10, 6:11, 6:15, 10:3, 13:18, 18:5, 18:12, 18:14, 18:16, 22:7, 25:18, 26:1, 26:3, 26:5, 26:8, 39:9, 39:12, 42:6, 42:11, 42:13, 64:2, 64:4, 64:11, 64:13, 65:8, 66:16, 67:11, 69:3, 70:8, 73:7, 73:10, 73:12, 73:14, 73:24, 74:3, 75:24, 76:9, 77:15, 78:3, 82:2, 82:4, 82:21, 85:4
**hope** [1] - 21:25
**hospitals** [1] - 30:3
**hour** [2] - 20:8, 69:2
**house** [4] - 36:9, 45:1, 45:3, 47:9
**housed** [1] - 47:21
**housekeeping** [1] - 17:23
**Human** [1] - 43:23
**human** [2] - 72:14, 72:15
**hump** [1] - 82:9
**hundred** [2] - 81:5, 81:8
**hundreds** [1] - 80:8
**husband** [1] - 59:15
**hustle** [1] - 13:7

**I**

**id** [1] - 38:19
**idea** [3] - 44:13, 67:12,

67:14
**identification** [1] - 41:22
**identified** [1] - 22:19
**identify** [1] - 28:25
**identifying** [1] - 29:19
**illegal** [2] - 50:3, 62:3
**image** [1] - 25:4
**images** [1] - 36:5
**impact** [1] - 52:22
**impeach** [3] - 15:24, 16:14, 17:2
**impeached** [1] - 16:24
**impeaches** [2] - 21:10, 21:16
**impeaching** [1] - 12:11
**impeachment** [5] - 15:3, 15:4, 15:22, 16:19, 21:15
**implement** [1] - 63:6
**implemented** [3] - 37:21, 57:15, 63:1
**implementing** [1] - 60:23
**important** [3] - 16:2, 16:11, 65:25
**in-person** [1] - 36:24
**inaccurate** [2] - 82:22, 82:23
**inactivate** [1] - 62:9
**inappropriate** [1] - 31:8
**include** [1] - 23:19
**including** [4] - 12:23, 28:7, 75:18, 79:22
**incoming** [1] - 34:6
**inconsistency** [2] - 12:5, 12:6
**inconsistent** [2] - 7:13, 9:20
**increase** [1] - 34:7
**INDEX** [2] - 3:1, 4:1
**indicate** [1] - 70:4
**indicated** [2] - 59:4, 67:2
**indicates** [3] - 9:13, 56:6, 56:14
**indicating** [1] - 61:6
**indication** [1] - 11:5
**indications** [1] - 66:7
**indicia** [1] - 84:12
**individuals** [1] - 54:4
**industry** [4] - 34:11, 75:17, 76:23, 77:9
**info** [2] - 33:14, 33:16
**information** [10] - 12:14, 44:4, 48:22, 56:13, 58:8, 62:2, 64:16, 65:3, 78:20,

80:17
**initiative** [1] - 47:5
**injure** [1] - 55:14
**injury** [2] - 35:7, 35:8
**inquiries** [1] - 10:3
**inquiry** [1] - 11:14
**inside** [2] - 16:16, 49:15
**insider** [2] - 80:11
**Inspector** [1] - 43:21
**instance** [2] - 7:16, 78:7
**instances** [1] - 31:6
**instruct** [6] - 65:12, 69:16, 70:1, 72:3, 72:14, 80:25
**instructed** [2] - 69:21, 73:3
**instruction** [1] - 70:23
**insurance** [1] - 34:16
**Integrated** [1] - 4:22
**integrity** [2] - 67:22, 67:23
**intended** [1] - 65:18
**intensive** [1] - 56:17
**interact** [2] - 8:22, 23:11
**interesting** [2] - 21:7, 44:1
**interface** [1] - 47:19
**interfacing** [1] - 9:1
**internally** [1] - 50:11
**interrupted** [1] - 36:4
**introduce** [1] - 13:12
**investigate** [1] - 8:14
**investigation** [2] - 59:21, 80:10
**involve** [1] - 72:19
**involved** [6] - 8:20, 22:24, 24:15, 24:16, 25:16, 54:5
**involvement** [1] - 24:9
**involves** [1] - 34:15
**involving** [2] - 71:25, 72:10
**issue** [14] - 6:24, 16:20, 17:12, 17:16, 21:9, 51:16, 56:11, 58:5, 59:18, 60:3, 65:23, 68:12, 78:5, 81:13
**Issue** [1] - 4:14
**issues** [6] - 28:13, 34:25, 57:21, 63:20, 65:10, 77:21
**item** [2] - 32:16, 59:24
**items** [2] - 29:7, 35:5
**itself** [2] - 23:1, 53:7

## J

**J.L** [1] - 4:21
**Jacoby** [1] - 84:7
**January** [3] - 45:11, 47:14, 58:22
**Jean** [17] - 58:4, 58:12, 59:15, 59:20, 61:25, 62:5, 62:6, 62:8, 62:10, 62:18, 63:10, 63:17, 65:16, 65:17, 65:19, 67:13, 67:14
**Jennifer** [2] - 6:8, 65:8
**Jim** [1] - 33:5
**Jimmy** [1] - 6:15
**jog** [1] - 10:9
**John** [2] - 68:15
**join** [2] - 13:17, 13:18
**Joyce** [13] - 51:21, 51:25, 52:9, 54:11, 54:16, 54:17, 58:25, 61:21, 62:3, 62:12, 62:17, 63:13
**Judge** [5] - 17:15, 19:1, 20:16, 68:11, 76:25
**judge** [2] - 69:17, 73:4
**Julie** [3] - 52:2, 58:25, 63:13
**jump** [2] - 17:24, 20:17
**juror** [1] - 19:18
**Jury** [2] - 21:23, 71:12
**jury** [20] - 11:21, 18:22, 20:9, 20:12, 21:19, 21:22, 22:22, 31:17, 41:4, 45:12, 64:8, 69:21, 71:7, 71:8, 71:11, 72:4, 73:17, 81:1, 81:18, 82:5
**jury's** [2] - 19:23, 20:2

## K

**K.B** [1] - 4:10
**Karlick** [5] - 8:25, 9:1, 10:7, 10:19, 75:25
**Karlick's** [3] - 9:1, 10:14, 12:23
**keep** [1] - 14:10
**Kelley** [1] - 54:2
**Kelly** [1] - 74:15
**Kennedy** [2] - 14:3, 14:11
**kettle** [1] - 9:6
**kickbacks** [2] - 34:14, 34:19
**kids** [1] - 73:23

**kind** [3] - 9:14, 21:7, 79:9
**knee** [3] - 29:5, 32:1, 32:13
**knowing** [1] - 82:23
**knowledge** [4] - 32:9, 48:1, 63:5, 75:17
**known** [1] - 55:7
**knows** [2] - 14:17, 76:22
**Kronos** [1] - 24:2

## L

**L.J** [1] - 4:20
**lack** [1] - 29:21
**ladies** [3] - 64:5, 71:5, 71:10
**Lafon** [2] - 52:2, 58:25
**laid** [1] - 17:3
**lake** [2] - 45:1, 45:3
**Lana** [10] - 28:8, 36:17, 36:19, 36:20, 40:20, 41:20, 51:4, 52:10, 54:2, 54:16
**Lana's** [1] - 52:11
**language** [2] - 53:2, 82:25
**LANOY** [2] - 3:3, 22:8
**Lanoy** [22] - 13:10, 13:24, 14:5, 14:8, 14:14, 14:15, 20:18, 20:24, 22:13, 27:11, 28:1, 31:14, 32:22, 35:18, 39:14, 41:3, 41:11, 42:22, 51:1, 67:4, 71:16, 80:2
**large** [1] - 24:4
**largest** [1] - 23:25
**last** [10] - 10:4, 11:9, 15:19, 43:14, 45:17, 52:3, 68:16, 68:19, 82:8, 84:7
**late** [4] - 19:10, 27:18, 44:20, 44:21
**law** [4] - 15:18, 46:6, 50:6, 76:11
**lawyers** [2] - 46:11, 46:16
**lay** [2] - 21:14, 79:14
**laying** [1] - 76:17
**lead** [1] - 53:1
**Leard** [10] - 38:8, 38:9, 38:13, 38:14, 38:20, 38:22, 39:3, 39:15, 39:16, 39:18
**learned** [1] - 75:3
**least** [9] - 14:7, 16:12, 16:18, 18:4, 23:25, 29:15, 49:13, 81:13,

83:15
**leave** [3] - 67:17, 67:24, 68:10
**leaves** [1] - 14:14
**left** [7] - 11:10, 12:3, 12:21, 54:14, 65:20, 65:21, 84:3
**legal** [3] - 38:4, 38:7, 39:15
**Leibowitz** [1] - 19:2
**length** [2] - 29:22, 45:12
**less** [2] - 35:23, 35:24
**letter** [10] - 38:14, 40:8, 40:18, 43:1, 43:9, 43:18, 44:3, 44:11, 45:18, 46:1
**letting** [1] - 59:17
**level** [1] - 17:6
**liability** [1] - 30:14
**liable** [1] - 30:16
**lieu** [1] - 44:2
**life** [1] - 50:15
**light** [3] - 75:2, 81:16, 82:19
**likely** [2] - 82:15, 83:7
**limine** [2] - 13:12, 15:9
**limit** [3] - 33:20, 33:25, 65:9
**limited** [11] - 29:2, 29:8, 29:10, 29:11, 30:4, 30:15, 30:24, 31:2, 33:21, 38:16, 53:6
**line** [3] - 9:7, 11:14, 78:22
**lines** [2] - 10:19, 12:14
**list** [4] - 25:18, 68:14, 68:16, 68:18
**listed** [2] - 55:20, 55:24
**listen** [1] - 20:24
**listening** [1] - 20:24
**located** [1] - 23:7
**locations** [1] - 23:10
**log** [7] - 33:14, 33:15, 47:19, 53:22, 58:7, 62:24, 83:13
**log-in** [6] - 33:14, 33:15, 47:19, 58:7, 62:24, 83:13
**logged** [2] - 33:13, 47:20
**logging** [3] - 31:9, 62:19, 62:25
**long-winded** [1] - 17:5
**long-windedly** [1] - 12:20
**look** [5] - 17:25, 41:10, 43:5, 61:15, 62:22

**looked** [3] - 33:3, 34:23, 69:5
**looking** [3] - 30:21, 36:11, 43:6
**Louisiana** [1] - 66:23
**lunch** [6] - 20:14, 81:1, 81:3, 81:4, 81:19, 82:6

## M

**M.R** [1] - 4:16
**ma'am** [1] - 73:18
**mail** [27] - 4:10, 4:11, 4:13, 4:15, 4:16, 4:18, 4:20, 4:21, 4:23, 37:17, 45:25, 51:4, 51:8, 53:25, 56:3, 56:22, 58:17, 58:18, 58:21, 59:10, 59:12, 59:17, 60:14, 61:2, 61:11, 61:20, 62:14
**mails** [7] - 4:8, 38:23, 50:22, 63:8, 79:20, 79:22
**maintain** [1] - 9:5
**maintained** [3] - 9:8, 9:22, 47:17
**maintaining** [1] - 7:22
**manipulate** [1] - 84:9
**marked** [2] - 18:5, 19:13
**marketability** [2] - 29:23, 30:4
**marketer** [1] - 59:9
**marketers** [3] - 22:25, 25:12, 36:7
**marketing** [1] - 23:24
**material** [3] - 7:6, 16:20, 64:23
**materials** [1] - 27:19
**matter** [3] - 6:2, 17:23, 21:5
**matters** [1] - 81:24
**MD** [1] - 55:12
**meal** [1] - 17:5
**mean** [16] - 15:6, 28:22, 29:10, 29:11, 30:15, 30:20, 30:23, 31:5, 34:6, 34:13, 51:5, 52:14, 53:20, 54:23, 59:23, 62:6
**means** [5] - 15:8, 15:10, 52:16, 53:10, 54:24
**meant** [1] - 34:14
**medical** [20] - 29:3, 29:12, 30:11, 31:9, 32:2, 32:3, 32:4,

32:5, 32:9, 32:17, 33:10, 34:11, 35:2, 35:4, 48:13, 49:20, 52:21, 52:24, 55:8
**Medicare** [16] - 8:21, 33:25, 34:16, 50:18, 51:16, 52:17, 54:18, 54:23, 56:12, 57:10, 59:19, 59:20, 59:21, 59:25, 60:2, 67:2
**Medicare's** [1] - 57:3
**meeting** [8] - 23:13, 23:16, 36:17, 36:24, 37:3, 37:4, 39:7, 46:19
**meetings** [3] - 23:12, 23:14, 63:8
**Melissa** [4] - 52:2, 59:1, 59:2, 63:13
**Melissa's** [1] - 52:3
**members** [1] - 76:15
**memory** [3] - 10:9, 15:23, 44:22
**mention** [1] - 46:19
**mentioned** [6] - 25:7, 33:11, 45:16, 49:13, 58:25, 74:10
**message** [9] - 5:1, 5:2, 5:3, 41:18, 42:1, 42:4, 45:10, 45:12, 45:13
**Middle** [1] - 66:22
**might** [6] - 29:6, 45:2, 67:4, 75:16, 77:17, 80:23
**millions** [2] - 80:8, 80:13
**minded** [1] - 21:4
**minute** [5] - 33:2, 58:17, 68:19, 71:14, 73:16
**minutes** [9] - 18:17, 19:1, 22:1, 64:6, 68:6, 71:9, 73:19, 81:5, 81:8
**misapprehended** [1] - 19:6
**misconstrued** [1] - 76:20
**misleading** [1] - 11:24
**missing** [2] - 29:6, 81:14
**mitigating** [1] - 10:19
**model** [16] - 34:10, 35:19, 35:21, 35:22, 36:8, 38:2, 38:13, 38:16, 39:2, 39:23, 40:11, 40:13, 46:12, 46:14, 49:12, 49:21
**Modification** [1] - 4:6

**Modifications** [1] - 28:13
**modified** [1] - 53:21
**module** [3] - 53:19, 53:21, 83:1
**moment** [7] - 8:19, 15:10, 39:13, 44:17, 46:9, 48:16, 77:25
**money** [4] - 23:22, 78:8, 79:11, 80:15
**monies** [1] - 78:18
**monthly** [1] - 23:23
**morning** [14] - 6:7, 6:10, 6:11, 6:14, 6:15, 6:18, 17:12, 18:25, 21:11, 21:24, 22:13, 22:14, 46:1, 85:10
**mortar** [3] - 30:10, 31:23, 34:8
**most** [2] - 33:23, 47:12
**mostly** [1] - 30:13
**motion** [6] - 7:8, 7:12, 13:12, 13:17, 13:25, 17:19
**motions** [1] - 14:25
**move** [1] - 64:22
**moving** [1] - 35:10
**multiple** [5] - 65:10, 65:13, 66:21, 74:12, 77:10
**Murray** [1] - 24:18

**N**

**name** [11] - 24:11, 40:16, 43:14, 52:3, 65:12, 68:22, 69:13, 70:3, 70:10, 71:19, 74:15
**narrated** [3] - 13:24, 14:1, 14:3
**narrator** [2] - 14:2, 16:18
**narrowed** [2] - 13:21, 13:22
**National** [1] - 23:21
**nature** [4] - 19:6, 75:15, 75:22, 78:22
**near** [1] - 9:6
**nearly** [1] - 82:11
**necessarily** [1] - 76:7
**necessary** [1] - 53:9
**necessity** [5] - 32:5, 32:9, 35:4, 52:22, 52:24
**need** [12] - 19:10, 31:4, 31:25, 65:11, 66:10, 70:20, 71:14,

72:17, 72:21, 81:8, 81:10, 81:22
**needed** [4] - 32:6, 55:18, 62:18, 62:21
**needs** [1] - 83:18
**negotiating** [1] - 7:23
**negotiation** [2] - 8:3, 8:15
**Network** [18] - 63:24, 64:14, 64:18, 64:21, 66:18, 66:25, 71:19, 71:25, 72:10, 72:18, 72:19, 72:20, 73:5, 74:8, 74:25, 78:9, 79:24, 80:20
**neutral** [1] - 8:21
**never** [5] - 15:9, 37:4, 49:2, 57:19, 74:16
**New** [1] - 4:7
**new** [15] - 7:11, 24:6, 25:17, 28:14, 29:22, 32:23, 34:9, 35:12, 36:8, 37:10, 53:18, 53:21, 56:13, 63:4
**next** [12] - 28:19, 30:18, 31:11, 32:20, 33:17, 34:21, 40:21, 50:16, 51:17, 61:10, 61:15, 81:5
**nice** [2] - 6:18, 21:25
**night** [3] - 10:4, 15:19, 21:25
**nobody** [1] - 10:16
**normal** [1] - 34:20
**normally** [2] - 52:4, 60:22
**note** [9] - 8:10, 9:9, 9:14, 9:18, 9:20, 9:22, 13:2, 55:6, 59:18
**notes** [13] - 7:10, 10:17, 11:3, 11:12, 15:14, 32:2, 32:17, 55:5, 55:7, 55:8, 55:9, 55:11, 55:20
**nothing** [14] - 8:7, 8:9, 9:7, 9:12, 9:13, 9:20, 9:23, 10:13, 10:20, 10:24, 10:25, 12:24, 72:1
**notice** [1] - 74:7
**notified** [1] - 68:16
**NP** [1] - 61:24
**NPI** [1] - 59:24
**number** [9] - 6:3, 13:11, 16:3, 21:2, 21:3, 59:24, 59:25, 65:23, 76:1
**numbers** [7] - 16:2, 18:6, 18:7, 24:4,

24:5, 69:10, 80:3
**nurse** [2] - 61:24

**O**

**oath** [1] - 72:17
**object** [2] - 12:2, 39:9
**objecting** [1] - 82:19
**objection** [9] - 11:19, 25:25, 26:1, 26:4, 42:9, 42:11, 81:18, 82:2, 82:4
**objective** [1] - 55:17
**obviously** [6] - 13:15, 15:7, 65:5, 75:25, 81:19, 81:22
**occasions** [1] - 66:21
**occurred** [1] - 60:23
**October** [2] - 56:4, 57:17
**offer** [2] - 15:9, 43:4
**offered** [1] - 43:5
**offers** [2] - 25:22, 42:7
**office** [2] - 39:23, 43:21
**OFFICER** [5] - 18:19, 21:22, 71:11, 73:20, 85:7
**officer** [1] - 51:13
**offices** [1] - 30:4
**often** [2] - 19:20, 79:24
**OIG** [2] - 43:19, 43:20
**omission** [1] - 84:4
**omitted** [1] - 56:21
**on-boarded** [3] - 29:12, 29:13, 31:3
**on-boarding** [2] - 25:17, 47:9
**onboard** [1] - 34:10
**once** [3] - 23:13, 48:20, 82:15
**one** [43] - 6:21, 10:10, 10:12, 10:14, 11:9, 19:11, 20:22, 23:25, 27:16, 32:16, 34:5, 35:14, 35:22, 35:24, 36:6, 36:8, 37:14, 39:6, 39:13, 40:4, 43:10, 44:10, 45:14, 53:22, 55:16, 57:6, 57:7, 64:6, 76:15, 78:5, 78:25, 79:4, 79:24, 80:1, 80:5, 80:20, 82:7, 82:8, 84:7, 85:2
**one's** [1] - 68:20
**ongoing** [1] - 27:15
**open** [8] - 6:17, 21:4, 32:10, 34:10, 71:3,

75:13, 75:19, 77:4
**open-minded** [1] - 21:4
**opinion** [23] - 7:5, 38:12, 38:13, 38:14, 38:22, 39:1, 39:25, 40:1, 40:9, 40:10, 40:12, 40:18, 41:6, 43:1, 43:9, 43:18, 44:3, 44:7, 44:8, 44:11, 45:18, 45:19, 46:1
**opponent** [1] - 14:9
**option** [5] - 51:5, 51:16, 52:10, 53:2, 53:3
**options** [1] - 53:6
**order** [3] - 58:8, 59:20, 59:25
**orders** [7] - 35:2, 57:4, 57:5, 59:24, 60:2, 80:4, 80:21
**originally** [1] - 68:14
**Orlando** [1] - 6:9
**orthopedic** [1] - 36:10
**orthotic** [3] - 31:21, 31:25, 49:3
**orthotics** [2] - 29:5, 49:2
**ostensively** [2] - 13:9, 14:7
**otherwise** [2] - 11:2, 49:24
**outlining** [1] - 28:13
**outreach** [1] - 25:16
**outside** [4] - 20:8, 49:17, 64:8, 77:21
**overnight** [1] - 6:22
**overruled** [1] - 83:7
**overutilization** [1] - 33:24
**overview** [3] - 28:11, 28:14, 46:25
**own** [3] - 47:5, 47:7, 69:24
**owned** [1] - 60:19
**owners** [1] - 29:11
**owns** [1] - 54:10

**P**

**p.m** [1] - 85:9
**P.T** [1] - 4:14
**pad** [1] - 32:1
**Page** [2] - 3:2, 4:3
**page** [17] - 28:9, 28:19, 31:11, 32:20, 33:17, 33:18, 34:22, 35:17, 47:19, 50:16, 51:7, 60:25, 61:17,

61:19, 62:12, 83:13
**paid** [5] - 49:1, 49:25, 78:8, 78:18, 80:8
**pain** [2] - 35:1, 51:16
**Pain** [1] - 23:22
**pair** [2] - 20:21, 20:22
**parking** [1] - 37:2
**part** [9] - 8:2, 25:7, 33:20, 50:2, 56:9, 58:12, 78:7, 80:25, 81:17
**participant** [1] - 84:20
**participants** [1] - 19:21
**participated** [1] - 66:23
**participating** [1] - 67:1
**particular** [2] - 54:5, 78:5
**particularly** [1] - 65:25
**parties** [11] - 6:22, 13:6, 13:7, 14:25, 15:15, 20:7, 21:13, 72:2, 72:8, 82:9, 82:17
**partner** [1] - 76:4
**parts** [5] - 12:23, 25:5, 75:18, 77:10, 77:11
**party** [1] - 14:9
**patient** [5] - 32:5, 35:10, 52:20, 54:14, 56:14
**patients** [5] - 34:16, 49:25, 52:21, 60:5, 62:2
**Paul** [4] - 51:8, 51:12, 54:2, 57:16
**pause** [1] - 35:22
**pay** [2] - 46:2, 52:23
**payers** [1] - 79:24
**payments** [3] - 59:19, 78:22, 80:4
**Pellegrino** [1] - 40:16
**pending** [2] - 32:25, 33:1
**people** [15] - 14:20, 22:19, 24:20, 24:22, 24:24, 28:7, 31:7, 31:9, 47:22, 48:6, 49:15, 72:18, 73:5, 77:9, 83:25
**percent** [1] - 20:1
**percentage** [2] - 52:21, 52:24
**perfectly** [1] - 11:14
**performance** [1] - 79:21
**performers** [1] - 79:23
**perhaps** [1] - 7:17

**period** [5] - 8:15, 11:17, 16:16, 27:17, 49:22
**person** [5] - 36:24, 40:18, 69:13, 75:13, 75:17
**perspective** [1] - 34:25
**phone** [2] - 40:25, 62:24
**phrase** [1] - 19:1
**physician** [2] - 30:3, 34:9
**Physician** [10] - 63:24, 64:14, 64:18, 64:20, 65:16, 65:20, 68:8, 69:4, 74:25, 76:18
**physicians** [2] - 36:10, 58:6
**Physicians** [25] - 66:8, 66:15, 66:18, 66:25, 67:17, 67:24, 69:13, 70:3, 70:5, 70:10, 71:19, 71:25, 72:10, 72:18, 72:19, 72:20, 73:5, 74:8, 76:13, 78:8, 78:9, 79:7, 79:24, 80:20, 81:21
**Physicians'** [1] - 70:10
**piece** [1] - 81:14
**pigeonholed** [1] - 34:2
**place** [1] - 49:21
**placed** [1] - 14:20
**plan** [3] - 61:7, 63:9
**planning** [4] - 78:6, 79:17, 80:1, 80:2
**platform** [10] - 8:20, 8:22, 8:23, 31:1, 37:10, 37:11, 49:23, 63:18, 63:21, 78:10
**platforms** [3] - 8:25, 9:2, 80:21
**play** [2] - 20:2, 20:18
**played** [2] - 19:24, 20:1
**players** [3] - 8:20, 8:22, 8:23
**plea** [2] - 7:19, 7:21
**pleading** [1] - 12:6
**pled** [5] - 11:15, 11:24, 12:24, 22:18, 25:7
**Plus** [1] - 4:22
**PME** [5] - 54:7, 54:8, 54:9, 56:18
**point** [21] - 7:17, 8:16, 9:11, 9:16, 11:9, 11:23, 12:22, 13:6, 17:8, 27:16, 33:21, 35:2, 39:6, 40:4,

41:5, 60:6, 64:15, 65:9, 70:8, 78:25, 84:7
**points** [2] - 12:18, 76:23
**police** [1] - 31:4
**portal** [3] - 25:5, 25:9, 33:3
**portion** [3] - 55:13, 85:10, 85:11
**position** [3] - 67:6, 79:2, 80:23
**possess** [1] - 7:10
**possession** [4] - 7:5, 8:11, 8:24, 11:13
**possible** [1] - 60:7
**possibly** [1] - 14:8
**post** [1] - 7:8
**posture** [2] - 7:19, 7:20
**potential** [1] - 30:14
**potentially** [1] - 78:12
**PowerPoint** [12] - 4:6, 8:3, 8:9, 8:15, 9:4, 9:9, 10:11, 11:4, 12:15, 27:23, 28:3, 28:11
**practical** [1] - 54:14
**practice** [4] - 30:10, 83:20, 83:24, 84:10
**practices** [1] - 47:9
**practitioner** [2] - 61:24, 61:25
**pre** [3] - 7:19, 7:20, 7:21
**pre-plea** [2] - 7:19, 7:21
**precisely** [1] - 16:4
**preference** [1] - 56:20
**prejudice** [1] - 65:22
**prejudices** [1] - 67:8
**prepare** [2] - 27:19, 27:22
**prepared** [1] - 67:13
**prepped** [1] - 74:11
**prescribe** [2] - 32:12, 53:8
**prescribing** [1] - 52:16
**prescription** [4] - 29:17, 32:1, 32:3, 35:13
**presence** [2] - 20:8, 77:21
**present** [9] - 6:17, 10:10, 10:16, 28:4, 28:6, 37:3, 63:12, 78:6, 78:9
**presentation** [3] - 8:3, 11:4, 27:23

**presentations** [5] - 10:8, 10:11, 10:21, 76:1, 76:4
**presented** [3] - 28:7, 31:20, 36:12
**presenting** [1] - 24:16
**preserve** [4] - 19:23, 20:2, 67:22, 67:23
**president** [1] - 83:19
**pretrial** [1] - 7:13
**pretty** [2] - 14:15, 74:6
**previously** [1] - 22:9
**price** [1] - 45:19
**pricing** [3] - 35:19, 35:21, 35:22
**primary** [4] - 30:3, 34:9, 36:10, 59:18
**principal** [3] - 64:13, 66:17, 78:19
**principally** [1] - 7:12
**printed** [1] - 55:25
**privately** [1] - 79:8
**privilege** [5] - 65:6, 77:2, 77:5, 77:7, 78:23
**privileged** [8] - 9:5, 67:6, 75:11, 77:17, 78:19, 78:20, 79:9, 81:23
**privy** [2] - 81:20, 81:21
**probe** [1] - 66:3
**problem** [5] - 29:1, 66:10, 66:15, 67:13, 76:19
**problematical** [2] - 56:12, 56:18
**problems** [8] - 28:21, 29:19, 66:7, 66:14, 67:20, 74:21, 78:4, 78:5
**Proceedings** [4] - 6:1, 18:21, 73:22, 85:8
**proceedings** [3] - 64:7, 71:3, 85:11
**process** [7] - 12:23, 27:12, 31:7, 32:25, 62:19, 62:22, 63:1
**Process** [1] - 4:7
**product** [1] - 38:24
**Product** [1] - 30:19
**professional** [2] - 33:10, 72:12
**proffer** [3] - 66:23, 68:2, 81:22
**proffering** [1] - 68:6
**profile** [1] - 31:10
**profiles** [1] - 53:23
**projection** [1] - 9:25
**promoting** [1] - 49:19
**prong** [2] - 83:7, 84:11

**prongs** [1] - 21:14
**pronounce** [1] - 20:3
**properly** [3] - 53:24, 68:7, 75:2
**proposal** [2] - 31:15, 37:1
**proposed** [3] - 28:14, 32:24, 35:12
**Proposed** [3] - 4:5, 4:7, 28:12
**proposing** [6] - 31:16, 32:24, 35:20, 35:24, 37:18
**proposition** [1] - 7:3
**prosecuted** [1] - 66:19
**prosecutors** [1] - 76:2
**provide** [3] - 10:4, 65:3, 77:16
**provided** [3] - 10:15, 12:14, 33:14
**provider** [3] - 30:11, 58:1, 62:1
**providers** [5] - 30:6, 57:22, 63:20, 65:10, 65:13
**providing** [3] - 11:3, 44:3, 44:4
**publicly** [1] - 47:24
**publish** [2] - 26:7, 42:13
**pull** [6] - 27:24, 41:1, 41:21, 52:20, 56:1, 58:15
**punctuality** [1] - 22:4
**purchasing** [1] - 44:23
**purpose** [3] - 47:10, 48:10, 84:6
**purposes** [4] - 13:1, 15:22, 17:18, 20:12
**push** [1] - 47:8
**put** [10] - 10:1, 13:13, 14:24, 19:11, 36:17, 57:1, 78:1, 81:16, 82:12, 84:24
**puts** [1] - 80:15
**putting** [1] - 79:2

**Q**

**qualified** [1] - 32:5
**quantities** [1] - 80:4
**quarter** [2] - 82:7, 85:2
**questions** [13] - 14:22, 14:23, 21:6, 21:12, 55:14, 67:3, 67:7, 71:17, 71:22, 72:8, 72:16, 72:22, 82:14
**quickly** [1] - 72:5
**quite** [5] - 14:6, 14:10, 19:25, 49:12, 75:25

**quote** [2] - 53:22, 60:1
**quotes** [1] - 12:4

**R**

**RAFFERTY** [29] - 6:11, 17:15, 17:21, 18:5, 18:12, 20:16, 20:21, 26:1, 39:9, 39:12, 42:9, 64:2, 64:4, 64:11, 65:3, 65:18, 66:16, 67:11, 68:11, 68:24, 69:14, 69:17, 73:10, 73:24, 74:3, 75:24, 77:15, 77:20, 82:2
**Rafferty** [40] - 6:12, 6:13, 11:11, 11:20, 12:1, 12:3, 12:13, 13:4, 13:13, 13:24, 15:2, 15:10, 16:10, 16:12, 17:14, 18:3, 21:8, 25:25, 42:8, 64:10, 64:12, 66:13, 68:5, 70:18, 72:21, 75:7, 76:12, 77:5, 77:12, 78:17, 78:20, 79:2, 79:3, 79:7, 81:6, 81:8, 81:22, 81:25, 82:12, 84:8
**Rafferty's** [6] - 7:3, 8:1, 11:1, 13:11, 80:23, 84:16
**raise** [3] - 49:17, 56:15, 74:21
**raised** [7] - 13:6, 17:12, 50:10, 54:19, 57:25, 58:5, 66:14
**Randal** [1] - 61:3
**Randy** [9] - 43:10, 43:11, 43:12, 43:19, 44:14, 45:16, 45:25, 46:7, 46:15
**Randy's** [1] - 43:14
**rate** [2] - 33:20, 34:1
**rates** [1] - 33:23
**re** [9] - 4:10, 4:12, 4:14, 4:15, 4:17, 4:18, 4:20, 4:22, 4:23
**reach** [1] - 35:8
**reached** [2] - 10:6, 40:20
**reaching** [1] - 58:6
**react** [1] - 66:8
**reacted** [2] - 66:14, 76:18
**reaction** [2] - 68:8, 80:7
**read** [3] - 16:9, 25:19,

45:14
**ready** [1] - 73:23
**real** [3] - 30:21, 75:1, 84:17
**realization** [1] - 12:8
**realize** [1] - 74:17
**realized** [3] - 20:17, 67:10, 68:5
**really** [8] - 10:18, 21:5, 24:4, 30:9, 37:5, 37:7, 67:6, 83:21
**reason** [1] - 61:22
**reasons** [6] - 7:14, 12:13, 23:14, 62:3, 71:24, 84:22
**rebuts** [1] - 12:17
**received** [5] - 26:6, 39:18, 39:21, 42:12, 46:3
**receiving** [3] - 10:12, 64:1, 66:7
**recent** [2] - 35:7, 35:8
**Recess** [2] - 18:20, 73:21
**recessed** [2] - 71:12, 85:8
**recognize** [8] - 28:1, 41:11, 41:15, 41:23, 42:3, 50:25, 53:15, 60:14
**recollection** [1] - 7:21
**recommendation** [1] - 44:3
**reconfirms** [1] - 18:23
**record** [44] - 6:6, 10:2, 11:9, 12:21, 13:2, 13:3, 15:1, 15:18, 15:19, 15:21, 16:6, 17:19, 18:23, 21:12, 21:15, 21:18, 25:19, 26:10, 26:12, 26:14, 26:16, 26:18, 26:20, 26:22, 26:24, 27:2, 27:4, 27:6, 27:8, 27:10, 42:16, 42:18, 42:20, 70:21, 73:25, 77:24, 80:12, 81:16, 82:11, 82:19, 83:14, 84:5, 84:8, 84:11
**record's** [1] - 75:6
**recorded** [2] - 8:10, 13:1
**recording** [1] - 9:14
**recordings** [1] - 11:13
**records** [8] - 19:7, 32:2, 32:4, 32:17, 55:8, 80:15, 83:4
**red** [3] - 54:17, 54:23, 56:15
**redirect** [1] - 84:3

**reduce** [3] - 35:5, 57:3, 57:5
**reducing** [1] - 34:5
**reference** [5] - 70:3, 70:5, 72:9, 72:18, 73:4
**referenced** [4] - 17:19, 18:6, 19:12, 70:14
**referencing** [2] - 61:25, 72:20
**referring** [4] - 18:9, 52:12, 59:2, 60:1
**reflected** [1] - 80:3
**reflective** [1] - 64:8
**regarding** [5] - 11:4, 55:23, 56:11, 62:2, 81:21
**regardless** [1] - 11:12
**regular** [3] - 83:19, 83:24, 84:10
**regularly** [3] - 23:11, 23:12, 48:4
**reimbursement** [1] - 33:23
**Reinaldo** [2] - 59:13, 59:17
**reinaldo** [1] - 59:15
**relating** [1] - 17:16
**relation** [1] - 17:1
**reliability** [1] - 84:12
**relied** [3] - 9:19, 84:19, 84:20
**reluctant** [1] - 49:3
**remember** [4] - 22:20, 36:15, 40:23, 46:14
**remotely** [1] - 23:8
**removed** [6] - 51:5, 51:16, 52:10, 62:18, 63:16, 68:18
**removing** [3] - 53:2, 57:3, 57:8
**repeat** [1] - 37:6
**rephrase** [1] - 30:7
**report** [2] - 7:7, 10:1
**reporter** [2] - 71:15, 73:16
**reports** [1] - 50:6
**represent** [1] - 75:10
**representation** [7] - 10:23, 11:8, 12:15, 12:17, 12:19, 65:6, 68:4
**representations** [4] - 11:3, 11:4, 17:11, 24:24
**represented** [10] - 64:13, 64:18, 66:17, 68:15, 74:10, 74:17, 75:19, 76:3, 77:8, 77:10

**representing** [1] - 45:6
**represents** [1] - 78:19
**request** [4] - 12:13, 12:20, 13:3, 80:24
**requested** [1] - 71:18
**requesting** [1] - 58:7
**require** [3] - 72:9, 72:16, 72:22
**requirements** [6] - 32:5, 32:10, 35:5, 52:22, 52:25, 54:7
**requires** [2] - 35:6, 70:3
**residence** [2] - 45:2, 45:3
**resolved** [1] - 75:4
**respect** [5] - 7:3, 76:5, 77:5, 81:23, 82:10
**respectfully** [2] - 7:14, 69:20
**respond** [2] - 43:17, 45:24
**responds** [2] - 44:13, 51:17
**response** [13] - 21:5, 37:1, 43:2, 51:18, 54:21, 56:24, 56:25, 61:16, 62:16, 65:24, 70:2, 70:3, 77:16
**responses** [2] - 67:2, 71:18
**responsibility** [2] - 10:19, 12:8
**responsible** [1] - 8:22
**rest** [2] - 15:12, 70:24
**restricted** [2] - 29:23, 32:7
**resume** [3] - 82:6, 85:8, 85:11
**resumed** [1] - 71:3
**resuming** [2] - 18:21, 73:22
**retained** [1] - 38:10
**retreat** [3] - 44:24, 44:25, 45:1
**revealed** [1] - 74:23
**revenue** [1] - 36:7
**review** [7] - 32:4, 32:14, 32:18, 33:1, 51:21, 52:9, 58:9
**reviewed** [4] - 6:25, 16:1, 18:25, 83:16
**reviewing** [1] - 32:17
**revisit** [1] - 67:16
**Richard** [1] - 40:16
**Richardson** [2] - 59:1, 63:13
**rightly** [1] - 14:7
**rights** [1] - 74:18

**rise** [5] - 18:19, 21:22, 71:11, 73:20, 85:7
**road** [3] - 65:21, 67:18, 67:25
**robust** [1] - 66:4
**role** [3] - 51:9, 51:12, 83:19
**romantic** [1] - 76:3
**Ron** [1] - 24:12
**room** [1] - 71:8
**Roxy** [1] - 24:17
**royal** [2] - 63:24, 66:25
**Royal** [34] - 64:13, 64:17, 64:20, 65:16, 65:20, 66:8, 66:14, 66:18, 67:17, 67:24, 68:8, 69:4, 69:13, 70:3, 70:5, 70:10, 71:19, 71:25, 72:10, 72:18, 72:20, 73:4, 74:7, 74:25, 76:13, 76:18, 78:8, 78:9, 79:7, 79:24, 80:19, 81:21
**Rule** [1] - 16:13
**rule** [3] - 15:1, 16:4, 17:10
**ruled** [1] - 7:8
**running** [1] - 37:4
**Rxs** [3] - 59:22, 59:23, 60:1

## S

**s-c-h-u-l-t-z** [1] - 43:16
**Sales** [1] - 4:4
**Sam** [7] - 59:4, 59:5, 59:7, 59:8, 59:12, 59:17
**sampling** [1] - 52:25
**satisfy** [1] - 52:24
**Savannah** [1] - 66:20
**Schreck** [12] - 4:23, 25:14, 48:5, 48:8, 49:13, 59:1, 61:6, 63:13, 74:24, 78:11, 80:3, 80:19
**Schultz** [7] - 43:15, 43:16, 44:15, 44:18, 45:5, 46:7, 61:3
**scope** [1] - 64:9
**screen** [3] - 33:8, 33:9, 37:3
**scrutinize** [1] - 56:16
**searched** [1] - 10:12
**seated** [3] - 21:24, 71:13, 71:14
**second** [10] - 12:22, 13:6, 15:1, 17:16,

20:21, 35:22, 45:14, 78:14, 79:1, 79:11
**Second** [1] - 7:14
**secondarily** [1] - 17:23
**secondly** [2] - 12:20, 14:11
**section** [2] - 74:12, 74:15
**sections** [1] - 55:11
**SECURITY** [5] - 18:19, 21:22, 71:11, 73:20, 85:7
**see** [29] - 6:19, 8:15, 18:7, 18:17, 20:3, 20:5, 21:10, 21:13, 21:15, 33:8, 33:9, 33:10, 40:1, 41:12, 60:4, 60:9, 61:1, 61:17, 64:6, 71:9, 73:18, 74:20, 78:15, 79:2, 79:5, 81:12, 82:7, 85:2
**seek** [3] - 15:9, 38:4, 38:7
**seeking** [3] - 16:14, 39:15, 47:2
**select** [3] - 29:15, 32:16, 34:2
**selected** [1] - 31:2
**Selection** [2] - 29:2, 30:19
**selection** [1] - 30:24
**selects** [1] - 35:6
**send** [4] - 32:2, 35:14, 48:5, 48:6
**sending** [2] - 59:13, 61:6
**sends** [1] - 58:25
**sense** [2] - 23:22, 75:14
**sensitive** [1] - 81:15
**sent** [6] - 14:19, 43:19, 45:25, 48:2, 58:17, 62:24
**separate** [1] - 17:24
**September** [1] - 44:9
**serious** [2] - 52:19, 58:9
**seriously** [2] - 62:20, 77:24
**Services** [1] - 43:23
**sessions** [1] - 66:23
**set** [1] - 24:19
**setting** [2] - 31:24, 72:5
**settings** [3] - 29:24, 34:8
**several** [3] - 24:13, 28:7, 36:20

**sham** [1] - 83:9
**share** [1] - 37:3
**shared** [1] - 48:20
**Sharon** [1] - 85:11
**shifting** [1] - 46:21
**shoot** [1] - 15:17
**short** [1] - 19:25
**shoulder** [8] - 29:6, 51:10, 51:15, 51:16, 52:10, 52:16, 54:14, 54:17
**shoulders** [2] - 51:6, 54:22
**shoved** [2] - 14:18, 16:22
**show** [7] - 24:17, 24:18, 24:20, 37:14, 50:23, 53:13, 70:20
**showed** [5] - 25:3, 36:8, 49:1, 49:2, 78:22
**showing** [4] - 24:22, 35:19, 36:5, 66:2
**shown** [3] - 10:15, 16:21, 25:20
**shows** [3] - 35:21, 36:6, 56:14
**sic** [1] - 45:11
**side** [18] - 19:10, 20:6, 61:16, 61:17, 64:3, 64:7, 65:21, 67:17, 67:25, 68:10, 68:23, 72:6, 74:10, 77:2, 77:20, 78:1, 81:9
**sides** [10] - 14:16, 15:5, 15:18, 16:17, 20:12, 21:5, 51:5, 66:6, 67:19
**sign** [3] - 35:15, 62:1, 80:21
**sign-in** [1] - 62:1
**signature** [2] - 32:18, 32:19
**signed** [2] - 33:6, 33:15
**signing** [4] - 59:22, 59:23, 60:1, 60:3
**similar** [3] - 64:1, 68:12, 75:25
**simple** [2] - 14:10, 14:15
**simply** [2] - 11:21, 12:11
**sin** [1] - 76:15
**single** [1] - 78:22
**site** [7] - 19:21, 83:13, 83:15, 83:16, 83:25, 84:9
**situation** [4] - 7:2, 62:16, 63:9, 64:1

**six** [2] - 10:8, 47:16
**size** [1] - 23:2
**skeptical** [2] - 15:17, 19:5
**SKF** [1] - 59:8
**skim** [1] - 18:4
**SKYPE** [6] - 5:1, 5:2, 5:3, 41:18, 42:1, 42:4
**slide** [3] - 9:4, 9:9, 84:15
**slides** [3] - 20:6, 80:5, 80:18
**Sloop** [1] - 24:12
**sloop** [1] - 24:12
**small** [2] - 52:25, 78:7
**so..** [3] - 37:17, 65:2, 75:4
**software** [18] - 24:6, 24:9, 24:11, 24:12, 24:16, 24:20, 24:21, 24:23, 28:15, 28:24, 29:8, 29:13, 40:6, 47:1, 48:11, 56:8, 63:4
**someone** [4] - 51:4, 58:6, 62:18, 75:18
**sometime** [2] - 36:16, 44:20
**sometimes** [1] - 57:21
**somewhere** [1] - 47:16
**soon** [3] - 13:14, 41:12, 68:15
**sorry** [10] - 22:15, 30:23, 39:11, 41:12, 49:8, 50:16, 51:10, 61:18, 70:9, 79:19
**sort** [9] - 33:2, 36:4, 48:12, 64:20, 67:3, 74:21, 75:1, 76:9, 77:16
**sound** [1] - 50:14
**sounds** [1] - 44:1
**Southern** [2] - 66:19, 76:2
**space** [1] - 48:13
**span** [1] - 62:10
**spanned** [1] - 47:12
**Special** [1] - 6:9
**specific** [8] - 14:20, 16:2, 21:2, 35:5, 44:12, 44:22, 49:6, 58:1
**specifically** [3] - 46:14, 70:20, 82:25
**specificity** [1] - 81:10
**specify** [1] - 49:9
**spent** [2] - 39:22, 75:25

**spreadsheet** [1] - 79:23
**staff** [1] - 55:12
**stage** [1] - 12:6
**stand** [3] - 12:25, 14:12, 77:25
**standard** [3] - 29:24, 29:25, 34:7
**standing** [2] - 82:18, 83:6
**start** [6] - 20:12, 22:1, 22:15, 56:18, 61:1
**started** [3] - 6:20, 36:11, 47:7
**starting** [1] - 44:18
**starts** [3] - 42:22, 43:25, 61:19
**state** [8] - 8:4, 10:24, 15:16, 16:11, 18:23, 61:22, 65:15, 84:22
**state's** [1] - 76:15
**statement** [1] - 8:10
**statements** [4] - 7:6, 7:7, 7:12, 14:9
**States** [3] - 6:3, 6:8, 16:9
**static** [1] - 31:20
**status** [2] - 33:1
**statuses** [2] - 28:15, 32:23
**stay** [1] - 72:13
**steering** [1] - 70:24
**step** [3] - 62:19, 62:22, 63:1
**still** [5] - 7:10, 7:22, 74:2, 82:18, 83:6
**stood** [1] - 8:8
**stop** [3] - 69:15, 76:17, 80:14
**stops** [1] - 76:12
**story** [1] - 65:1
**streams** [1] - 36:7
**stretch** [1] - 64:5
**strongly** [1] - 18:24
**subject** [1] - 64:23
**subjective** [1] - 55:13
**submission** [1] - 67:1
**submissions** [1] - 8:21
**submit** [1] - 32:17
**submitted** [2] - 32:14, 60:2
**substance** [1] - 10:18
**substitute** [1] - 67:21
**succeeded** [1] - 76:5
**suddenly** [1] - 27:16
**sufficient** [1] - 65:24
**suggest** [2] - 54:15, 82:1

**summaries** [2] - 78:6, 78:7
**summarize** [1] - 45:12
**summarized** [3] - 68:9, 80:5, 81:13
**summarizes** [1] - 79:23
**summarizing** [1] - 79:20
**Summary** [1] - 4:4
**summary** [5] - 70:15, 74:22, 79:11, 80:18, 81:20
**summer** [3] - 44:21, 44:24, 68:16
**supplemental** [1] - 13:11
**Supplier** [1] - 30:18
**supplier** [9] - 29:21, 30:25, 31:2, 32:14, 33:1, 33:19, 34:23, 40:15
**suppliers** [3] - 25:12, 33:21, 36:7
**support** [1] - 7:2
**Support** [1] - 4:22
**supposed** [4] - 24:20, 55:10, 55:15, 55:16
**supposedly** [1] - 58:9
**surgeons** [1] - 36:10
**surgery** [2] - 35:7, 35:8
**suspicious** [2] - 54:24, 54:25
**sustained** [2] - 11:20, 39:13
**sworn** [1] - 22:9
**system** [1] - 62:20
**systemically** [1] - 49:20

## T

**T.D.L** [7] - 4:12, 4:14, 4:15, 4:18, 4:20, 4:22, 4:23
**table** [1] - 6:9
**talks** [1] - 34:4
**targeted** [1] - 30:5
**targets** [1] - 15:17
**team** [4] - 23:17, 53:22, 60:10, 61:13
**technology** [1] - 51:13
**telehealth** [11] - 48:14, 48:25, 49:2, 49:3, 49:6, 49:10, 49:12, 49:19, 49:23, 49:24, 55:23
**telehealths** [1] - 30:13
**telemed** [7] - 55:23,

56:13, 56:14, 56:20, 57:7, 57:8, 58:1
**telemedicine** [8] - 25:12, 48:13, 57:3, 57:18, 57:19, 78:10, 80:20, 82:24
**telephone** [1] - 38:23
**ten** [2] - 19:1, 22:1
**tens** [1] - 80:13
**term** [1] - 70:12
**terrific** [1] - 17:20
**test** [3] - 53:23, 76:12, 77:3
**testified** [7] - 22:9, 22:18, 24:6, 38:1, 50:2, 66:22, 74:12
**testify** [1] - 80:19
**testifying** [1] - 78:11
**testimony** [20] - 7:13, 7:18, 8:6, 9:1, 10:25, 11:6, 16:21, 16:25, 17:3, 17:8, 20:6, 21:16, 50:10, 64:24, 66:6, 74:24, 76:8, 78:9
**testing** [5] - 53:18, 53:20, 54:5, 55:17, 84:16
**THE** [77] - 6:2, 6:13, 6:18, 10:5, 10:22, 13:20, 17:20, 18:2, 18:8, 18:13, 18:15, 18:17, 18:19, 18:22, 20:19, 21:1, 21:22, 21:24, 25:21, 25:25, 26:2, 26:4, 26:6, 39:11, 39:13, 42:8, 42:10, 42:12, 42:14, 64:3, 64:5, 64:10, 64:25, 65:5, 65:13, 65:15, 65:17, 65:20, 66:5, 66:10, 66:13, 67:10, 67:15, 68:20, 68:25, 69:7, 69:10, 69:12, 69:15, 69:25, 70:11, 70:17, 71:2, 71:5, 71:11, 71:13, 73:7, 73:8, 73:11, 73:13, 73:15, 73:20, 73:23, 73:25, 75:5, 76:10, 77:19, 77:23, 78:13, 80:6, 80:22, 82:3, 82:5, 83:2, 83:5, 85:6, 85:7
**therefore** [3] - 12:3, 80:24, 83:14
**third** [4] - 34:5, 60:25, 67:20, 67:21
**thoughts** [1] - 62:13
**three** [1] - 74:14

**threshold** [1] - 60:5
**throughout** [2] - 8:19, 23:12
**title** [4] - 28:12, 34:4, 36:22, 60:16
**titles** [1] - 36:20
**TO** [2] - 3:1, 4:1
**today** [4] - 9:5, 17:1, 22:15, 30:17
**together** [1] - 36:17
**Toman** [3] - 51:8, 54:3, 57:16
**Toman's** [1] - 51:12
**TONI** [2] - 3:3, 22:8
**toni.delanoy@ healthsplash.com** [1] - 58:19
**took** [3] - 17:17, 29:22, 69:19
**tool** [1] - 36:3
**top** [13] - 28:21, 28:25, 33:3, 33:5, 42:23, 45:13, 53:25, 56:24, 58:17, 62:14, 79:23, 79:25
**topic** [1] - 30:18
**topical** [1] - 70:12
**total** [2] - 37:5, 37:7
**totally** [3] - 14:16, 72:25, 80:6
**touch** [1] - 74:25
**touched** [1] - 50:17
**touchtone** [1] - 83:21
**toward** [1] - 30:5
**towards** [2] - 14:24, 52:25
**trade** [2] - 24:17, 24:18
**trading** [2] - 80:11
**traditional** [1] - 48:13
**train** [2] - 47:2, 48:8
**trained** [2] - 35:3, 35:4
**training** [4] - 13:12, 46:25, 48:2, 48:10
**trainings** [2] - 48:3, 48:7
**transaction** [1] - 50:3
**transpired** [1] - 45:18
**transpires** [1] - 52:20
**trial** [13] - 7:5, 7:8, 7:10, 7:11, 7:13, 9:12, 66:22, 67:18, 67:23, 69:20, 77:10, 80:11
**triangle** [3] - 25:4, 56:9, 76:24
**tried** [1] - 44:16
**trigger** [3] - 51:6, 52:11, 52:14
**Triumph** [5] - 6:24,

6:25, 9:11, 9:17, 9:19
**true** [3] - 7:9, 11:20, 76:16
**trustworthiness** [5] - 83:7, 84:11, 84:13, 84:18, 84:19
**trustworthy** [1] - 83:10
**truth** [2] - 72:17, 83:10
**truthful** [4] - 70:2, 72:9, 72:16, 72:20
**try** [5] - 10:7, 11:15, 12:9, 52:7, 72:13
**trying** [4] - 27:17, 49:21, 61:25, 72:23
**turn** [3] - 11:7, 35:16, 60:12
**turned** [3] - 9:22, 68:13, 76:15
**turning** [1] - 48:15
**tutorial** [3] - 13:12, 19:2, 82:10
**tutorials** [1] - 83:12
**twice** [1] - 74:13
**two** [20] - 10:11, 14:24, 29:15, 32:23, 36:4, 52:16, 57:6, 62:19, 62:22, 63:1, 64:18, 65:14, 65:15, 66:22, 74:13, 78:13, 78:14, 78:16, 79:4, 79:14
**two-step** [3] - 62:19, 62:22, 63:1
**type** [11] - 30:10, 30:11, 31:21, 33:8, 33:9, 40:17, 47:18, 52:19, 55:20, 55:24, 60:23
**types** [3] - 30:5, 34:11, 47:3
**typically** [3] - 23:13, 31:24, 52:20

**U**

**U.S** [1] - 23:10
**ultimately** [2] - 38:24, 62:14
**under** [2] - 59:21, 72:17
**unfortunately** [1] - 50:8
**unintentionally** [1] - 69:4
**United** [3] - 6:2, 6:8, 16:9
**unless** [1] - 81:2
**up** [39] - 6:20, 8:8,

18:3, 19:10, 20:14, 21:8, 24:19, 27:24, 30:16, 31:6, 32:10, 33:2, 33:15, 34:10, 41:1, 41:21, 44:15, 45:2, 52:23, 56:1, 56:15, 57:21, 58:15, 63:20, 64:17, 65:24, 67:19, 68:11, 68:12, 69:4, 69:7, 69:22, 72:25, 73:4, 74:9, 74:17, 77:17, 77:25, 79:15
**update** [1] - 10:4
**upset** [2] - 41:4, 41:5
**Urgent** [1] - 4:17
**urgent** [3] - 30:3, 34:8, 36:9
**user** [5] - 31:9, 40:6, 40:17, 47:3, 47:19
**users** [6] - 25:8, 33:11, 34:11, 36:7, 48:1, 84:13
**utilization** [1] - 34:7

**V**

**valor** [2] - 80:25, 81:17
**various** [4] - 23:10, 23:14, 29:7, 75:18
**Velazco** [1] - 85:11
**verification** [3] - 62:19, 62:22, 63:1
**verify** [1] - 58:18
**version** [1] - 24:23
**versions** [2] - 20:23, 57:6
**versus** [2] - 6:3, 16:9
**vice** [1] - 83:19
**video** [6] - 13:9, 14:23, 19:1, 19:2, 19:13, 47:18
**videos** [44] - 13:7, 13:12, 13:13, 13:24, 14:1, 14:3, 14:5, 14:9, 14:11, 14:14, 14:15, 14:17, 15:13, 15:23, 16:1, 16:3, 16:17, 16:20, 17:1, 17:9, 17:16, 17:24, 19:2, 19:6, 19:16, 20:11, 21:8, 46:22, 46:25, 47:2, 47:8, 47:10, 47:11, 47:17, 47:25, 48:2, 48:16, 49:4, 49:7, 49:8, 82:10, 82:23
**view** [5] - 11:22, 13:8, 82:17, 83:9, 83:11
**viewed** [1] - 82:22

**Vimeo** [4] - 14:20, 47:21, 47:22, 47:23
**violating** [3] - 77:1, 77:5, 77:7
**virtual** [1] - 36:25
**virtually** [1] - 37:3
**visit** [1] - 34:17
**volume** [4] - 69:5, 69:8, 80:3, 80:4
**volumes** [1] - 80:4

**W**

**wait** [3] - 37:9, 37:10, 71:7
**waiting** [1] - 63:4
**walk** [1] - 28:18
**walked** [1] - 68:22
**walks** [1] - 69:12
**Walters** [1] - 74:15
**wants** [3] - 17:25, 62:4, 67:21
**watching** [1] - 20:12
**ways** [1] - 19:19
**web** [1] - 8:20
**website** [8] - 8:23, 8:25, 14:21, 47:21, 76:18, 78:18, 80:8, 80:13
**week** [3] - 23:12, 23:13, 45:17
**weeks** [4] - 39:22, 66:22, 74:13, 74:14
**weigh** [2] - 68:3
**whereas** [1] - 21:10
**whispering** [1] - 72:6
**whole** [1] - 83:8
**wide** [2] - 23:13, 23:16
**Wilson** [13] - 58:4, 58:12, 59:13, 61:25, 62:8, 63:10, 63:17, 65:16, 65:17, 65:19, 66:7, 67:13, 67:14
**Wilson's** [1] - 59:15
**Wilsons** [1] - 60:19
**winded** [1] - 17:5
**windedly** [1] - 12:20
**wish** [1] - 26:7
**wishes** [1] - 17:13
**witness** [44] - 7:12, 7:19, 9:18, 11:16, 12:11, 14:8, 14:16, 15:9, 15:19, 16:7, 16:14, 16:20, 17:4, 17:7, 19:3, 19:11, 20:13, 21:5, 21:20, 22:5, 41:2, 64:20, 65:2, 65:12, 66:20, 68:7, 68:14, 68:16, 68:18, 68:22, 69:3,

69:21, 75:14, 76:17, 78:5, 79:5, 79:6, 79:10, 79:11, 79:13, 85:4
**WITNESS** [1] - 73:7
**Witness** [2] - 3:2, 13:10
**witness'** [1] - 15:23
**WITNESSES** [1] - 3:1
**word** [5] - 49:3, 49:4, 49:6, 57:8, 64:1
**workable** [1] - 30:9
**Workflow** [2] - 4:5, 28:13
**workflow** [11] - 27:12, 28:14, 28:22, 28:23, 31:15, 31:19, 32:7, 32:11, 32:24, 35:12
**works** [1] - 76:14
**worried** [1] - 69:24
**worth** [1] - 19:1
**wrist** [1] - 29:6
**write** [3] - 32:1, 32:8, 35:13
**writes** [1] - 54:7
**writing** [1] - 40:24
**written** [12] - 38:12, 38:13, 38:24, 39:1, 39:25, 40:1, 40:9, 40:10, 40:12, 41:6, 44:7, 44:8
**wrongdoing** [1] - 60:23

**Y**

**year** [1] - 40:5
**year's** [1] - 52:22
**years** [3] - 10:8, 40:5, 74:11
**yesterday** [13] - 6:21, 8:8, 8:14, 8:16, 9:5, 9:15, 11:6, 11:18, 16:25, 22:16, 23:21, 24:6, 25:3
**yesterday's** [1] - 10:24
**yourself** [3] - 54:3, 55:14, 60:10

**Z**

**zero** [2] - 35:24, 36:1
**Zoom** [1] - 23:15