**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-CR-20271-DSL**

**UNITED STATES OF AMERICA**

     **v.**

**GARY COX,**

     **Defendant**.

_____/

**<u>GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING</u>**

The United States of America respectfully submits this memorandum for the Court's consideration in connection with the sentencing of Gary Cox (the "Defendant" or "Cox"), presently scheduled for December 19, 2025. For the reasons stated below, the Court should adopt the findings of the United States Probation Office ("Probation") in the Presentence Investigation Report (the "PSR"). (D.E. 299) The United States respectfully requests that the Court impose a significant prison sentence, which will provide punishment for the instant offense that is sufficient, but not greater than necessary, to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

1

## I.     PROCEDURAL AND FACTUAL BACKGROUND

On June 27, 2023, a federal grand jury returned a three-count Indictment against Cox, Brett Blackman ("Blackman"), and Gregory Schreck ("Schreck").  On February 20, 2024, a federal grand jury returned a six-count Superseding Indictment against the Defendants.  (D.E. 76).  Count 1 of the Superseding Indictment charged the same overarching health care fraud and wire fraud conspiracy as the original Indictment.  Counts 2–4 charged health care fraud, Count 5 charged a kickback conspiracy similar to that charged in the original Indictment, and Count 6 charged a conspiracy to defraud the United States and make false statements in connection with health care matters.  *Id.*

Defendant Cox was convicted following a five-week jury trial on June 3, 2025.  Cox, Blackman, and Schreck were executives of DMERx, which orchestrated a global billion-dollar conspiracy to defraud Medicare by billing for medically unnecessary orthotic braces and pain creams for hundreds of thousands of Medicare beneficiaries. Cox, Blackman, and Schreck operated the DMERx platform used by fraudulent marketing companies, telemedicine companies and doctors, durable medical equipment ("DME") supply companies, and pharmacies. (GX 156) Cox created DMERx as an online, web-based platform that telemarketers, DME suppliers, purported telemedicine companies, and telemedicine practitioners signed up to generate prescriptions for DME like orthotic braces, pain creams, and other items. The platform was designed to allow each of the players to sign in and transmit the information necessary to generate a prescription that would be billable to Medicare. Each of the participants would pay DMERx $5 for each prescription that was transmitted to a DME supplier or pharmacy through the platform. The fraud resulted in the 2019 nationwide enforcement takedown called Operation Brace Yourself.

Telemarketing companies (and a mass mail marketing company owned or operated by Blackman that routed beneficiaries to telemarketing companies) persistently targeted Medicare beneficiaries on behalf of DME supply companies and pharmacies. (2025.05.13 Tr. at 174-176; GX 1076). The beneficiaries were targeted to provide their personally identifiable information and accept braces, pain creams, and other items through misleading mailers, television advertisements, and calls from offshore call centers. (*See* 2025.5.19 Tr. at 111-13; 2025.5.13 Tr. at 122-125). DME supply companies and pharmacies instructed the telemarketing companies to solicit beneficiaries for the braces, pain creams, and other items that received the highest reimbursement from Medicare. (*See* 2025.5.19 Tr. at 109-110).

The telemarketing companies transmitted the Medicare beneficiary information to the Defendants through the DMERx platform, which was operated by Cox, Blackman, and Schreck. (2025.5.13 Tr. at 121-125) They would do so by logging into the platform and uploading datasheets showing the Medicare beneficiary information and braces or other items that the telemarketers wanted to be prescribed. (*Id.*)

The DMERx platform was designed and created by Cox. Chris Cirri testified in detail that he worked with Cox to generate false orders that withstood Medicare audits. (*See* 2025.5.12 Tr. at 173-175). Cirri and others testified that DMERx, using the Medicare beneficiary information, autogenerated false and fraudulent doctors' orders based on templates created by Cox, Blackman, and Schreck that falsely represented that medical practitioners had examined and treated the beneficiaries. Blackman, Cox, and Schreck designed the templates for the orders to maximize Medicare reimbursement, avoid audits, and conceal and disguise the scheme. (2025.5.12 Tr. at 156-58). Specifically, Cox and his co-conspirators designed the orders to defraud Medicare in the following four ways:

1) Cox and his coconspirators purposely omitted any references to telemedicine or phone conversations from the orders based on requests from co-conspirators to hide the "telemedicine" nature of the encounters that gave rise to the orders; (GX 1050, GX 1052)

2) Cox and his coconspirators added language to the orders indicating that physical knee examinations had been performed even though they knew the exams could not be performed by telephone; (2025.5.12 Tr. at 109-10; GX 1029)

3) Cox and his coconspirators created a variety of different "narratives" that would randomly populate into the practitioners' chart notes to avoid having all the orders look the same because they knew Medicare disapproved of templated medicine and that it would trigger audits; (GX 1059; GX 1035), and

4) Cox and his coconspirators limited the brace codes a doctor could choose from in a particular doctor's order to those requested by the DME supplier or marketer that would be fulfilling that order. (2025.5.13 Tr. at 28-30; GX 626)

The Defendants recruited purported telemedicine companies to pay practitioners to sign the false and fraudulent doctors' orders on the DMERx platform. The practitioners would log in from any internet device and sign the false and fraudulent orders without regard to medical necessity and based on a brief telephone call with the beneficiary or no interaction with the beneficiary at all. Even though the Defendants knew this, the narratives they created for the doctors' orders contained language like "based on my examination of [patient] . . . " which falsely suggested a more fulsome examination took place. (GX 305 at 6).

4

Testimony and exhibits at trial demonstrated that Cox referred the telemedicine companies, telemarketing companies, and brace companies to each other to increase volume. (*See* GX 1061 (Count 5 Overt Act 3), GX 1048, 1061, GX 1070, 1120, 1123, 1127, 1130, GX 1156 (Count 5 Overt Act 6)).

DME suppliers (including one owned by Cox and sold to Blackman), pharmacies, and telemarketing companies paid the purported telemedicine companies kickbacks and bribes in exchange for signed doctors' orders.

DME suppliers, pharmacies, and telemarketing companies paid the Defendants kickbacks and bribes in exchange for signed doctors' orders obtained from DMERx. (2025.05.18 Tr. at 110).

Schreck and others entered into sham contracts that falsely concealed the kickback arrangements between and among DMERx, DME suppliers, pharmacies, telemarketing companies, and purported telemedicine companies. (2025.05.18 Tr. at 105 – 112; GX 233, GX 234 (Overt act 4), GX 246 (Count 5 Overt Act 7), GX 248 (Count 5 Overt Act 10)).

The DME suppliers and pharmacies submitted more than $1 billion in claims to Medicare for DME and prescription drugs that were medically unnecessary and procured through the payment of kickbacks and bribes. (GX 112) Medicare paid more than $450 million for these claims. (*Id.*)

## II.      THE SENTENCING GUIDELINES RECOMMEND LIFE IN PRISON

The government agrees with the Sentencing Guidelines calculation in the PSR.  That calculation properly finds that Cox's Base Offense Level is 7 because he was convicted of wire fraud with a maximum term of imprisonment of 20 years.  (D.E. 299, ¶ 90) The PSR also accurately holds Cox accountable for an intended loss of over $550 million with an increase of 30 levels.  (*Id.* at ¶ 91)  The PSR recommends enhancing Cox's Offense Level due to his use of

mass-marketing (+2) and sophisticated means (+2), and due to the fact that Cox' crime was a federal health care offense with a loss well in excess of $20 million (+4).  (*Id.* at ¶¶ 92-94).  The PSR also recommends, based on the significant evidence of Cox's management in the conspiracy, that he be deemed a leader or organizer of criminal activity. (+4).  (*Id.* at ¶ 96).  Cox's Adjusted Offense level is thus 49, with a total offense level of 43, and a recommended sentence of life in prison.

### III.    COX LED A MASSIVE $1 BILLION WIRE AND HEALTH CARE FRAUD CONSPIRACY AND SHOULD SERVE A SIGNIFICANT PRISON SENTENCE

The Court must consider the factors under Title 18, United States Code, Section 3553(a) to fashion an appropriate sentence, this Memorandum addresses the relevant factor in turn.

*1.  The Nature and Circumstance of the Offense Indicate that a Significant Prison Sentence is Warranted.*

The evidence at trial demonstrated definitively that the Defendant's crimes were colossal in scale and exploited the vulnerabilities of elderly Medicare beneficiaries to steal hundreds of millions from Medicare.  Moreover, the evidence demonstrated that Cox spent years planning and orchestrating the scheme to maximize the impact on Medicare.  The evidence further demonstrated that Cox's role was to create massive quantities of doctors' orders for unnecessary products and to make those orders avoid audits, conceal from Medicare that they were not medically necessary, and avoid detection that the orders were templated.  Cox employed sophisticated technologies to conceal his scheme, including a system of changing the orders appearance to make them appear to be individualized analyses by medical professionals, when the evidence shows that they were in fact forms routinely signed without individual consideration.

2. *The History and Characteristics of the Defendant Indicate that, While a Significant Prison Sentence is Warranted, a Variance May be Justified.*

Cox is a 79-year-old man who has, until the crimes he committed from 2015 – 2019, led an otherwise normal life.  He has recently suffered from chronic medical conditions, but otherwise appears to be healthy.  (D.E. 299 at ¶¶ 116 – 121).

To be clear, the Defendant's age indicates that recidivism is unlikely, as has been shown by data collected by the United States Sentencing Commission.  *See* USSG, *Older Offenders in the Federal System* (July 2022), at 5, available at: https://www.ussc.gov/research/research-reports/older-offenders-federal-system (noting that "[t]he recidivism rate of older offenders (21.3%) was less than half that of offenders under the age of 50 (53.4%).").  That said, the Defendant committed these crimes beginning when he was nearly 70 years old, and he was aware at the time of his crimes the seriousness of health care fraud as he had previously testified in a federal health care fraud trial in California.

While a variance may be appropriate given his age, a significant sentence is still necessary given the weight of the other sentencing factors.

3. *A Significant Sentence is Required to Reflect the Seriousness of Cox's Offense and Afford Adequate Deterrence.*

Cox and his coconspirators orchestrated one of the largest health care frauds in our nation. A significant sentence is required to show the seriousness of these crimes.  Health care fraud is on the rise nationally. For example, the United States Sentencing Commission reported that health care fraud offenses have increased 19.7% since fiscal year 2020.  *See* USSG, *Health Care Fraud Quick Facts*, available at: https://www.ussc.gov/research/quick-facts/health-care-fraud. Sophisticated frauds like the Defendant's are difficult to detect and require significant time and resources to prosecute.  Without lengthy prison sentences to deter crimes from committing these

fraud schemes, the public government health care programs will be overwhelmed by fraud, as demonstrated by the Defendant's $1 billion fraud on Medicare.

Courts across the county have noted that general deterrence is a particularly important consideration in sentencing white collar criminals. The Eleventh Circuit has noted that, "[b]ecause economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity," these crimes are "prime candidate[s] for general deterrence.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (*quoting* Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L.Rev. 721, 724 (2005)). Moreover, "[d]efendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.* Other circuits have similarly noted that white collar crimes are prime areas for deterrence due to the cool, rational though process of economic crimes. *See*, *e.g.*, *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) ("We previously have endorsed the idea that white-collar criminals act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity. They are, therefore, prime candidates for general deterrence.") (citations and internal quotations marks omitted); *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (citations and internal quotation marks omitted); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) ("Restitution is desirable but so is the deterrence of white-collar crime (of central concern to Congress), the minimization of discrepancies between white- and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail.").

For these reasons, the Court should sentence Cox to a lengthy term in prison to deter similar economic crimes, particularly with rampant health care fraud cases nationally.

> 4. *The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have been Found Guilty of Similar Conduct.*

A lengthy prison sentence is required for defendant Cox to avoid pernicious disparities with other similarly situated defendants. Defendants who commit serious fraud crimes, like this offense where the Guidelines level is 43, are routinely given lengthy prison terms. As Probation astutely notes, "[d]uring the last five fiscal years (FY2020-2024), there were 31 defendants whose primary guideline was § 2B1.1, with a Final Offense Level of 43 and a Criminal History Category of I, after excluding defendants who received a § 5K1.1 substantial assistance departure. For the 31 defendants (100%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 158 months and the median length of imprisonment imposed was 138 months." (D.E. 299 ¶ 154). While the Defendant's age may militate toward less than a Guidelines sentence, avoidance of disparities counsels toward a lengthy term in prison. Moreover, the Sentencing Commission has noted that the "overwhelming majority (80.1%) of older offenders were sentenced to prison." *See Older Offenders in the Federal System* at 5. The Court should thus sentence Cox similarly to the other defendants who committed serious fraud crimes.

9

**CONCLUSION**

For these reasons, the Government respectfully requests that the Court sentence defendant Cox to a significant term of imprisonment while accounting for his advanced age and medical condition.

Dated: December 18, 2025

Respectfully submitted,

JASON REDING QUIÑONES
UNITED STATES ATTORNEY

LORINDA LARYEA, ACTING CHIEF
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION

By:   */s/ Darren C. Halverson*
DARREN C. HALVERSON
Acting Assistant Chief
JENNIFER E. BURNS
Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
Florida Special Bar No. A5503082
Tel: (202) 880-2233
Email: darren.halverson@usdoj.gov

10

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that, on December 18, 2025, I electronically filed the foregoing

document via the Court's CM/ECF system.

> */s/ Darren C. Halverson*
> Acting Assistant Chief
> U.S. Department of Justice