UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:23-cr-20271

UNITED STATES OF AMERICA, Plaintiff,

Vs.

BRETT BLACKMAN, Defendant.

Miami, Florida
May 11, 2026
MORNING SESSION
8:30 AM - 12:33 PM
Pages 1 to 189

---

JURY TRIAL DAY 13
BEFORE THE HONORABLE DAVID S. LEIBOWITZ
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

DARREN C. HALVERSON, ESQ.
U.S. Department of Justice
Bond Building
8th Floor
1400 New York Avenue, N.W.
Washington, DC 20005
Darren.halverson@usdoj.gov

REGINALD CUYLER, JR., ESQ.
DOJ-crm
1400 New York Avenue, N.W.
Washington, DC 20005
Reginald.cuyler.jr@usdoj.gov

\- - -

FOR THE DEFENDANT:

JENNY WILSON, ESQ.
40 NW Third Street
Ste Penthouse One
Miami, FL 33128
Jw.klughlaw@gmail.com

JULIE ERIN HOLT, ESQ.
Julie Holt Law PLLC
40 NW Third St. PH 1
Miami, FL 33128
Julie@julieholtlaw.com

_ _ _

STENOGRAPHICALLY REPORTED BY:

SHARON VELAZCO, RPR, FPR
Official Court Reporter
United States District Court
400 North Miami Avenue
9th Floor
Miami, Florida 33128
Sharon_pellvelazco@flsd.uscourts.gov

_ _ _

I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| MINDY BREITMAN | | | |
| By Mr. Halverson | 26 | | 43 |
| By Ms. Wilson | | 38 | |
| MICHAEL PETRON | | | |
| By Mr. Halverson | 48 | | |


_ _ _

E X H I B I T S
(Received in Evidence)

| No. | Page |
|---|---|
| 139 | 52 |
| 140 | 54 |
| 141 | 55 |
| 165 | 56 |
| 152 | 59 |
| 150 | 63 |
| 151 | 64 |
| 154 | 65 |
| 149 | 66 |
| 142 (Demonstrative) | 68 |
| 143 (Demonstrative) | 70 |
| 145 (Demonstrative) | 71 |
| 146 (Demonstrative) | 72 |
| 147 (Demonstrative) | 74 |
| 112 | 75 |
| 104 | 89 |
| 113 | 96 |
| 114 | 97 |
| 225 | 98 |
| 116 | 99 |
| 117 | 101 |
| 118 | 103 |
| 125 | 108 |
| 128 | 110 |
| 129 | 111 |
| 130 | 113 |
| 131 | 113 |
| 125 | 114 |
| 119 | 116 |
| 120 | 117 |
| 121 | 118 |
| 122 | 119 |
| 123 | 133 |
| 107 | 122 |
| 108 | 124 |
| 109 | 125 |

_ _ _

(Call to the order of the Court:)

THE COURT: Good morning, everybody. Please be seated.

THE COURTROOM DEPUTY: Ladies and gentlemen, court is now in session for the United States District Court, Southern District of Florida, with the Honorable United States District Judge David Leibowitz presiding.

Calling the matter of the United States versus Brett Blackman, Case No. 23-cr-20271.

Counsel, please announce your appearances for the record, beginning with the Government.

MR. HALVERSON: Good morning, your Honor, Darren Halverson and Reginald Cuyler, Jr., for the United States. With us at counsel table is paralegal specialist Thifany Braga and Special Agent Frances Szczepanski of the FBI.

THE COURT: Good morning, everybody.

He keeps leaving you out in the back. I see you there, too. He never includes you.

MR. HALVERSON: That's paralegal specialist Jack Perez.

THE COURT: Good morning to you too, sir.

MS. WILSON: Good morning, Your Honor, Jenny Wilson and Julie Holt on behalf of Brett Blackman, who is present, along with paralegal Cynthia Gilbert.

THE COURT: Ms. Wilson, Ms. Holt, good morning.

Mr. Blackman, good morning, sir.

Ms. Gilbert, I hope you had a nice weekend.

All right. Anything the parties want to take up?

MS. HOLT: Yes, Judge. Good morning.

THE COURT: Good morning.

MS. HOLT: I had filed over the weekend a renewed motion with respect to the summary exhibits from Michael Petron's testimony -- or from Mike Petron, I guess. And I guess I have sort of two issues.

One, we had addressed previously, and I renewed just to, I guess, make my record a little clearer.

And one was -- well, they were both included in our original motion regard Mr. Petron's testimony, but one had not -- with respect to the number of summary exhibits, and the number, which are about 60, coming in through him, or the Government plans to do so. So it is two-fold.

One, addressing the issue of Mr. Petron making conclusions based on other witness' testimony is something that we addressed.

And then, two, the number of summary exhibits that he is intending to introduce, and a significant portion of those are not actually summary exhibits, but just, you know, blowups of certain parts of the records.

So I can sort of dive in. I don't know if your Honor wants a moment to pull up my motion.

THE COURT: I am literally doing so as you say it.

Go ahead.

MS. HOLT: So with respect to his testimony that will be based on the testimony of other witnesses, the Government -- nine of their 20 financial summary exhibits categorize accounts from National Center for Pain, Amici Holdings, HealthMax, All-Med, and various Kyndra Blackman accounts as, quote, Blackman-controlled accounts.

And that is our objection, your Honor, because there's Mr. Petron's -- that is not a summary. Because Mr. Blackman is not on those accounts. He is -- he does not own those companies. And those facts as to whether he controls those accounts are in dispute, and Ms. Petron has no personal knowledge of that.

So testimony that Mr. Blackman controlled those accounts goes beyond summary, because he's not summarizing any records. That's an interpretation of the Government's view of the evidence.

THE COURT: All right. Well, Ms. Holt, let me stop you there. Let's deal with -- I'm going to count this one as, let's call it argument one. Okay? This is -- and I know you have many arguments.

But on argument one, before I hear from the Government -- and I will hear from the Government, I promise -- here is what I don't understand -- and I respect

the fact that you have brought this up. And I thought I dealt with it in what I called the sword/shield way.

So if somebody gets on the stand -- and I'm going to want to see the actual GX to be able to rule on Ms. Holt's argument one -- okay.

But, if someone gets on the stand with a summary exhibit -- with what they say is a summary exhibit of bank accounts, and they're just a whole bunch of bank accounts, and they have numbers, and I'm going to even give you in the hypo, none of the accounts have Mr. Blackman on them in any inferential way. Okay. If that witness is asked to aggregate the dollar values and dollar flows of those accounts, and they say, in my hypothetical, at a given point in time, the dollar flows of those accounts was a hundred million dollars. And they say that.

And then because in my hypo, there is no indication, facially or inferentially, on the face of the accounts that tie to Mr. Blackman, if the Government, to that witness, said, "Now, for purposes of your summary, did you assume that all of those accounts were, in whole or in part, controlled by Mr. Blackman?"

Now, obviously, in my hypo, that's a leading question. But, for purposes of today, that's what is asked. And the summary witness says, yes.

Just let me stop you there. What's wrong with that?

MS. HOLT: Because that is -- to have a summary and expert witness testify as to who controlled the accounts, and given that there are no facts on the records, themselves, that indicate that, is a comment on other witness' credibility and testimony and inter -- his interpretation of the testimony.

THE COURT: Okay.

MS. HOLT: And that is how -- he's -- it is obviously perfectly proper for a summary witness to aggregate as he sees fit -- as he sees fit. But, what the object is, is to identifying those accounts as Blackman-controlled accounts. He can say, this flow of money went to this group. This group includes National Center for Pain, Amici Holdings, Mr. Blackman's personal accounts, his business accounts, and that whole group includes $52 million. That is -- that's perfectly acceptable summary testimony.

But, when he takes the next step and says, "and I have identified those accounts as Blackman-controlled accounts," that's where it veers past summary testimony and is a comment on other witness' testimony and the Government's interpretation of the evidence.

THE COURT: Is he allowed -- I understand your position. I am not sure I agree with that. But let's say I do. Is he allowed in the hypo to say, I assumed for purposes of this analysis that these accounts involved DMERx and/or HealthSplash?

Is he allowed to make that statement into the record, as an assumption?

And that's what I've been doing with you. Is he allowed to do that?

MS. HOLT: I don't know that I entirely understand that one.

I think -- I think him making any assumptions that arrive at conclusions of who is controlling accounts would be improper, because then we have -- it is given the weight of not just a summary witness, but an expert witness, as well. And, essentially, it's going to be an expert witness repeating over and over to the jury, these are Blackman-controlled accounts, these are Blackman-controlled accounts.

THE COURT: Okay. So this is argument one. Again, I don't think I necessarily agree with that response. But, Ms. Holt's position, on argument one, and the two hypos that I gave her is very clear.

Mr. Halverson, what do you say to that?

MR. HALVERSON: Your Honor, may I approach with the actual exhibits?

THE COURT: Sure.

MR. HALVERSON: Your Honor, first, I am not familiar with this renewed motion posture, but it sounds a whole lot like a motion for reconsideration. Your Honor already decided this, and the Court's rulings have to have weight. And we

can't be going around in circles chasing our tails like this every time the defense decides to file a motion late on Saturday night, the night before Mother's Day.

Secondarily, the case law the defendant cites doesn't support this proposition that the Government can't infer things based on the record.

In fact, let's look at *Nguyen.* The problem in *Nguyen* was that an FBI financial analyst used inadmissible hearsay to identify someone as a coconspirator. That is far afield from what we are talking about here.

THE COURT: So that, I completely agree with the Government. But, address the core issue -- I agree with what you just said there, Mr. Halverson, about *Nguyen*, N-G-U-Y-E-N.

The core proposition is, if there are bank records that are being aggregated, and money flows that are being aggregated, can a summary witness say anything more than his assumptions?

MR. HALVERSON: Your Honor, that is all he is saying. He's saying, I am assuming these accounts are Blackman-controlled. And there's plenty of evidence in the record. The jury will get to decide for themselves whether that's true.

They'll have ample cross-examination. The problem here is that they understand that the cross-examination would fall fruitless, because there is ample information in the

record to show that he was controlling these accounts, including on Ms. Holt's cross-examination of Ms. Rogers where she said, "No, I disagree with you. Actually Mr. Blackman was controlling those accounts."

THE COURT: So let me deal with that, because I think that is the core of Ms. Holt's motion. Which is, why do they have to be called Blackman-controlled accounts at all? why can't they just be, "I have aggregated the money flows of these accounts"?

MR. HALVERSON: That is, essentially, what we have done, and we just captioned it "Blackman-controlled." It could be captioned HealthSplash-related accounts. It could be captioned something else. If they hadn't waited until the day he was going to testify, this could be potentially fixed.

MS. HOLT: This was in our motion for Mr. Petron --

MR. HALVERSON: Well, right. And we argued these motions last week, and this didn't come up. Your Honor resolved the motion. We went into the weekend thinking that this is all resolved, and now we get a last minute renewed motion, whatever that is, I don't see in the rules, but there is a renewed motion for this --

THE COURT: So if I understand Mr. Halverson's complaint, it is -- and I'm looking, for instance -- and it is really, the only thing that I see, so far -- I guess, let me do it in reverse. The only thing I see, Ms. Holt, is, for

instance, in 139, there is a header that says, "Blackman-controlled accounts." Okay?

It is only in Exhibit 139, that header that you're complaining about, right?

And take your time, because I think your answer to this is important. In other words, the rows and columns of the exhibit itself you're not objecting to. It is simply the one blue Blackman-controlled accounts. That is it. Right?

MS. HOLT: With respect to Government's Exhibit 139, yes. But then we continue to Government Exhibit --

THE COURT: So let's do 140. Do you object to Cox-controlled accounts in the green?

MS. HOLT: No.

THE COURT: Right.

So then let's do 141. Cox and Blackman-controlled accounts, that -- in orange, that is an objection, right?

MS. HOLT: With respect to -- yes, Judge, with respect to lines 1 and 2.

THE COURT: Well, wait a minute. Wait a minute.

It is just literally the "and Blackman-controlled" in orange and white. That's it, right, it is not the rows, it is not the columns, 141, right?

MS. HOLT: Correct.

THE COURT: Okay. So I'm starting to understand the objection.

There is nothing on 165.

MS. HOLT: The next one would be 148, Judge.

THE COURT: So let me look at 148.

MS. HOLT: And specifically with this one, the footnote, number 2, that says, "All-Med account 5196, has Kristina Rogers as a signatory. Assumed she transacted on behalf of Brett Blackman."

THE COURT: Yes, one moment. Okay. I'm there at 148.

MR. HALVERSON: So that's a perfect example of where we're laying bare the assumption that can be cross-examined.

THE COURT: That's right. That's right. That's -- that's the issue.

So hang on one second.

So, to be very clear, Ms. Holt's objection on 148 is only as to footnote 2; correct?

MS. HOLT: Yes, Judge.

THE COURT: Okay. Now -- and this is a very good example, footnote 2, 148, that we were doing last week that I now put to you: What case in your motion -- and I agree with the Government in large part. I don't see a case that disallows a summary witness from stating in a footnote an assumption -- and of course, that witness would be able to testify explicitly to an assumption from the stand.

So let me say it this way: I'll pad out your

objection, which is -- the footnote is, "All-Med X5196 account has Kristina Rogers as a signatory. Assumed she transacted on behalf of Brett Blackman."

And, I'll even pad it out further. She says that on direct, and she says the converse to your cross. So you would agree that if Kristina Rogers did not do that, that account could not be included, and he says right. Now, what case do you have that prevents a summary witness from stating their assumptions?

That is the question.

I agree with you that he would not be allowed to vouch for Ms. Rogers. But, what I just did, and what this exhibit clearly does, is state an assumption. And I don't see the case that you cite to this Court that disallows a summary witness from stating an assumption.

And, I will -- I will let you tell me now. If you think that there is a best case that you have in your motion. I don't see it.

MS. HOLT: Judge, there's a difference between a summary witness making certain assumptions and a summary witness making certain assumptions based on the Government's interpretation of other witness' testimony.

And that's why *Minton*, in the motion, that says, "In the due process context, we have held that expert testimony that bolsters another witness is improper and may result in

the denial of fundamental fairness to the defendant."

In *United States versus Fullwood*, plainly, the rule does not contemplate summarization of live testimony presented in court."

For a summary witness -- that's no longer summary, that's interpretation of the Government's -- that's bolstering the Government interpretation of Ms. Rogers' testimony.

THE COURT: Yeah.

MS. HOLT: And to allow the witness to do that necessarily means that in order to challenge those assumptions, I have to get into the witness about his interpretation of Ms. Rogers' testimony.

THE COURT: No, it is the reverse. And I appreciate it, Ms. Holt. But actually, the last case you cite, actually, I think, makes the difference.

So a witness that simply states their assumptions, there's no case that you've cited that prevents a witness from doing that. What you're saying is, the sword/shield problem, which is, I would never allow the Government to have the witness say, "Well, I reviewed the transcript. I even sat here during her testimony, and I find her credible. I find her testimony about control by Mr. Blackman to be logical and sensible." I would never let her do that.

But, if the defense was to get into, because it strategically decided to do so, the basis of her assumption,

of the witness' assumption, you are permitted to do that, but then you live with the answer, which is "Yes, I will explain my assumption. I reviewed the transcript of the Rogers' testimony."

So let me be very clear, to the extent I haven't already. The Government is allowed to present summary exhibits that contain assumptions within them. And that's what these do.

The Government is allowed to educe, as is the defense, those assumptions. What the Government is not allowed to do is the one thing that I agree with Ms. Holt's first argument about, which is to bolster or explain or summarize the testimony of another witness. That is not allowed, at all.

That is not the same thing as saying, "In compiling these, I assumed that Blackman controlled these accounts." That is allowed. There is no case that prevents that.

Similarly, "I assumed these were related to DMERx or HealthSplash or officers of those companies," totally allowed. That is a statement of an assumption.

So to the extent that Ms. Holt rises, quite carefully, and says, "I don't want to hear any expert witness or summary witness stating why they aggregated these accounts, why the assumption makes sense," that -- that is -- that is granted. That is totally granted in that limited extent.

But, everything else on argument one sounds like, because a summary witness is explicitly stating assumptions, either in testimony or in the summary exhibit, itself, that it is not allowed, that's denied.

You've certainly preserved argument one, Ms. Holt.

And from what I see from these exhibits, that's what the witness is doing. The witness is explicitly stating assumptions.

Now, what Ms. Holt then does -- and I want to be very clear about that, because Ms. Wilson and Ms. Holt can make strategic decisions, which is, they are allowed to say, "Why do you assume these are Blackman -controlled?"

They can do that in many ways, formulating the questions in different ways. And they are allowed to do that. That is a strategic decision by counsel as to how they wish to get at that.

I'm not going to allow, to be very clear, the Government, in any kind of sting pulling in any way, to ask that question.

What they are allowed to do is to say, "What assumptions did you make on this slide?" "I assumed that these accounts were related to the entities or the officers." That, they are allowed to do.

So to that extent, that is why I keep saying sword or shield with Ms. Holt. She is not allowed to use the law that

she rightly cites as you, are not allowed to vouch, and you are not allowed to regurgitate and summarize testimony, which is a clear shield for the defense. She is not allowed to use that as sword and say, the Government can't put on such a witness as all.

So you have my ruling on argument one, Ms. Holt.

MS. HOLT: Just for the record, as stated in the motion, that would also be -- my argument is for exhibit -- Government Exhibits 149, 151, 152, 153, 154 and 159.

THE COURT: Let me look at those. Just one second.

Say your first number, please.

MS. HOLT: 149.

And they all have the same --

THE COURT: One second.

No, this 149 is a great example of what the Court just ruled, and what Ms. Holt has no law for.

This is the statement of an assumption. He is not vouching for any witness' testimony in 149.

Now, Ms. Holt wants to carry that forward and say, as they have done in other aspects of this case, you can't use the phrase, "Blackman-controlled." That is not the law.

And the footnote also doesn't vouch for anybody.

It is a strategic decision for counsel to decide whether and how to cross. There is -- and to be very clear, and fair to Mr. Halverson, there is, in the record, by a

preponderance, evidence that supports the assumptions used by the witness for Exhibit 149.

That is an important aspect of this, as well. This is not -- but frankly -- frankly, on summary charts, I don't even think that's required. Stating an assumption by a summary witness on 149, is an assumption. It can be wrong and it can be exploded on cross.

But, to be very clear, 149 makes the point. The witness will be allowed to explain this chart and his assumption.

Let me do your next number, just to make sure that I'm looking at all the various types.

What is your next one?

MS. HOLT: 151.

THE COURT: Thank you. One second.

MS. HOLT: These ones are similar in that there is a bucket labeled Blackman-controlled accounts, with a footnote describing which accounts those are.

THE COURT: One second.

MS. HOLT: And just for the record, Ms. Rogers said clearly in her testimony that Jim Rulison controlled the National Center for Pain.

THE COURT: And you are allowed to get that from the witness. You are allowed to get that, if you strategically wish, from the witness. That is important. And that actually

proves the point, if you want to try to get that from the witness. That is a strategic decision by counsel.

And to be clear -- and this is really important, what Ms. Holt is doing -- of course, at closing, this is where the connection is entirely allowed to be argued by both sides to the jury. "So if you find Rulison controlled those accounts, ladies and gentlemen, 151 is garbage."

You, of course, are allowed to do that. And the Government is allowed to do the opposite.

So, 151 is a very good example of what I am saying again. 151 does not have Mr. Petron vouching or crediting anything. In fact, it is overly disclosing assumptions in a manner that the summary witness is allowed to shorthand for a jury.

Okay. You've made argument one.

Let's do argument two.

MS. HOLT: Argument two, the umbrella argument is that the Government -- well, argument two is that many of these, quote, summary exhibits are not, in fact, summary exhibits. And I can give examples.

So, for example, Exhibits 107 through 111, to start.

THE COURT: Let me get there. 107 through 111.

All right. I'm at 107.

Yes, Counsel.

MS. HOLT: So these -- as you can see, these are not

summaries of voluminous information. These each apply to a single beneficiary, just gathering and aggregating the claim information. That is not properly fit for summary exhibits under 1006.

Similarly, Exhibits 119, and I think --

THE COURT: Let me just do 107 for a second.

And I appreciate the care with which you are doing this, Ms. Holt.

All right. What is the Government's --

So essentially, if I understand Ms. Holt here, what she's saying is that, 107, Government Exhibit 107 is not a proper exhibit under Rule of Evidence 1006, because -- and she will correct or supplement me -- what we have here is very few documents. We have a multipage but less than ten-page doctor's order. We have some claim paperwork. Maybe there is some money that ties out of certain bank accounts.

And so I'm going to make it a little rough and crude, but it's something like. "Hey, Judge, this looks like 107 talking about what might be 15 pages of stuff."

Why is that a 1006, Mr. Halverson?

MR. HALVERSON: Well, your Honor, I have not seen any case law to suggest that even 15 pages is too few to summarize 1006. It just has to be too voluminous for the jury to easily see it.

But what this does is not what Ms. Holt is

suggesting. This actually amalgamates information from various sources. And you can see those sources listed right at the bottom. And so some of the sources are the order, itself. There is also the DMERx data, which is separate and apart from the matched Medicare data.

And so this brings those all together in a way that would simply be unwieldy to show the jury on a piecemeal basis.

We have, obviously, a number of these, it would take hours, potentially, to through all those documents and put this together in a simple fashion. And this just lays it out, you know, very simply and basically.

And again, if there is anything wrong in this, they have ample opportunity -- they have had this now for over a year.

THE COURT: Let me -- let me -- let me get a curlicue on that, because I think it is important to the record.

The source footnote -- and I'm not going to make you do this for every single one, Mr. Halverson, but I think it is important that Ms. Holt has her record.

303 -- do you know what 303 is?

MR. HALVERSON: 303 is the doctor's order.

THE COURT: Do you know what 408 is?

MR. HALVERSON: One moment.

THE COURT: That's okay. I'm not going to make you

do it for every one.

MR. HALVERSON: 408 is the Silent Hill Bracing document.

THE COURT: And what is 411 through 436, if you summarize them?

MR. HALVERSON: Those are the patient data from DMERx, all of it, all the patient data, which is basically sifted into matching the Medicare data.

THE COURT: Okay. I thank you.

And the footnotes say a little bit more than that, but, Ms. Holt, especially that last part starts to get clearly voluminous. Why isn't the Government allowed to take that summary of what those exhibits are and explain -- and by the way, it is important, and I want to make sure that Ms. Holt has her record. All of those exhibits, all of them that were just listed have been admitted into evidence. So why isn't the Government, under 1006, allowed to summarize them?

MS. HOLT: Well, first, Government's Exhibits 411 through 436 do not all apply. Only one applies, the S, the Excel file for the last name starting with S. That is the only one that applies to Mr. Session.

THE COURT: Yes.

MS. HOLT: So we are significantly limiting the amount, despite the footnote here.

With that, the information from those exhibits that

are relevant to this is simply a single line in an Excel spreadsheet.

This is a closing slide, your Honor. The Government is more than welcome to aggregate this information and present it to the jury in such a form in their closing argument.

But -- as I stated in my motion, as we argued in our original motion filed back in February about Mr. Petron's testimony.

THE COURT: So let's say for a second that I agree with that. Why -- this can clearly be admitted through this witness as an illustrative aid under Rule 107, right?

Is your objection only that Exhibit 107 is being admitted into evidence under 1006? Is that your objection?

MS. HOLT: It is --

THE COURT: Because nothing you've said would prevent the Government from using this slide as an illustrative aid under 107 to explain these exhibits that are in evidence. Right?

MS. HOLT: But, they are doing it through an expert/summary witness, and that's where they -- the rule -- the rule exists for a reason. And, as I stated in -- as we cited in our original motion against Mr. Petron, there is a risk that it becomes trial by summary exhibits. And Government is using an expert to give their closing argument from the stand.

THE COURT: No. On that -- on that, if that is part of the what we're calling argument two, that's clearly not a clear statement of the law, and the Court disagrees. Someone is allowed to testify as an expert to certain things, and then, separately from that, is allowed to testify, to explain and illustrate and summarize documents that are in evidence.

So, I don't agree with that.

What I think you might have traction on, and I will ask Mr. Halverson, is, why shouldn't 107 -- Government Exhibit 107, be admitted only as an aid to the jury to explain, as opposed to a separate piece of evidence under 1006.

MR. HALVERSON: Well, I agree with your Honor. It could be admitted under 107 -- excuse me. But your Honor, because it is aggregating voluminous information, I think it's proper that under 1006, it clearly aids the jury's review of that information, which is really the goal here, is to save the jury time.

And if there's nothing inaccurate about this, about the aggregation of data, which I haven't heard anything positive that is inaccurate about this exhibit, it should go back with the jury to aid their review of the voluminous data.

And, this is undoubtedly voluminous. These Excel files are massive. For them to sort through and try to find the rows in each of these Excel files would take -- depending

on their skill with Excel, it could take an unlimited amount of time.

But even if they are skilled with Excel, it would take them time to do that, and it is simply unnecessary, given that they are an aid to the jury, they are summarizing voluminous information, and they are entirely accurate.

THE COURT: There is no question that the Government's argument is best helped, in this Court's view, by the fact that at least part of this exhibit is derived from a voluminous Excel spreadsheet, and that you have to filter and sift to get, as Ms. Holt then says, the one line.

MR. HALVERSON: Well, your Honor, there's two -- there's at least two voluminous spreadsheets because there's 408, which is the data taken from Silent Hill, which is the DME company that billed for the claims, and then there is also the DMERx data, which would require searching through DSL files.

MS. HOLT: I don't know that this even includes the HealthSplash data, right?

The HealthSplash data does not include information about the supplier.

MR. HALVERSON: It includes the telemed organization.

MS. HOLT: What we are looking at is an order, and then Silent Hill information. And to have two documents --

THE COURT: No, no. Just because the boxes do that

does not mean that it is inaccurate for a witness to say, "and in preparing this, I reviewed the spreadsheets that are separate from the doctor's order and the Silent Hill. And, in fact, the source code says that."

Now, let me say this: Over, you know, now and a break, I think the one thing Ms. Holt has done for me is I just want to make sure that the Court understands the line between Rule 107 and Rule 1006. That doesn't change the exhibit in any way. It might change an instruction that I give to the jury about how to treat this, and whether it is just an illustrative aid or whether it's a summary to prove content. Ms. Holt has woken me up to that distinction. But, it is clearly allowed.

And just because Mr. Petron is also an expert witness does not preclude him from testifying to either in 1006 summary or an 107 illustrative aid.

Mr. Halverson, anything else to perfect this?

MR. HALVERSON: Well, I would just say that a difference would be that an illustrative aid is more about connecting ideas than raw numbers and facts the way this is --

And you can laugh in court, but that's not professional. Come on.

It's about connecting the facts taken from voluminous sources of information. And Ms. Holt said something that was incorrect. What this does use the HealthSplash data, for

instance, telemed organization, which is a vital part of our evidence is only found in the HealthSplash data, and that's for a good reason, because that was concealed from Medicare. It wouldn't be on the orders.

THE COURT: And what number Government exhibit is that, that you are pointing to right now?

MR. HALVERSON: 1007, which is confusing.

THE COURT: No, no, no. I am saying what underlying -- you just said, is only found in the HealthSplash data. What underlying exhibit is that, of 107?

MR. HALVERSON: So that's Government Exhibits 411 through 436. Ms. Holt is correct that it's one of those. It is actually one of those because each exhibit has a letter that it represents the last name of the beneficiaries. But, that's where that information comes from. It can't be found anywhere else.

THE COURT: Yes. And I think -- I think what Mr. Halverson just did -- and I'm just going to check to make sure -- I think what Mr. Halverson just did is one of the more important strands or arguments that supports this being a 1006, but let me just check that.

Anything else, Ms. Holt?

MS. HOLT: I make the same objection to Exhibits 119 through 122.

THE COURT: One second.

MR. HALVERSON: Judge, I apologize. I think these are in the order I was planning to use them.

THE COURT: That's fine. Your table of contents is very helpful. One second.

I'm just getting to 119.

All right. I'm looking at 119. Hang on.

So this is the last time I'll make you do it because I think it carries through -- yeah, this clearly carries through the others cited by Ms. Holt. 437 through 441, the underlying source material cited in the Exhibit 119, what is 437 through 441?

MR. HALVERSON: So what that is, is that's the underlying claims extract that Robin Sheehan testified to. It's a huge amount of data taken from the Medicare servers.

THE COURT: Yes. This is an excellent example because I remember those exhibits more vividly. 119 is classic 1006 because of the sheer size of 4437 through 441.

Ms. Holt, I will let you perfect it, if you wish to, but I don't see -- I don't see that it's even close to what we just did for 107.

MS. HOLT: Again, it is for -- each of these exhibits are for a single beneficiary. And, at most, the beneficiary could be in two of the exhibits between 437 and 441. Those are also arranged by last name. There are two separate extracts. So at most, each beneficiary could only be in two

of those exhibits. So we are not summarizing all of those.

For the same reasons to simply -- this isn't a summary of the voluminous information. It is simply pulling out specific information and highlighting it.

THE COURT: Yeah. So the objection on this is preserved and more exquisitely made. It is -- on 119, I can comfortable say that that's not right. 119 is very much pulling out and summarizing eight provider names, eight combinations of HCPC codes, eight aggregations of the number of orthoses, and billed amounts from specific dates of service that come from what this Court can comfortably say is a voluminous record.

And so 119 sets forth the sources, certain assumptions, and then summarizes voluminous data. It is clearly 1006. So 119 would be admissible as a 1006 exhibit.

I'm going to look carefully to see on some of these, if they are more akin to 107 illustrative aids. But to the extent otherwise stated by counsel, much of her motion because it is saying you can't offer them at all, is denied.

Anything else?

MS. HOLT: The same objection for the record just to 129, your Honor, and then, and then moving to some of the bank exhibits that are similar.

THE COURT: Let me look at 129.

So I'm just going to make the Government, so that the

record is clear, Government Exhibit 448, which is stated as the source material for Government Exhibit 129, what is 448?

MR. HALVERSON: That's the same thing, that's Robin Sheehan's matches, but except this time, it's to the part D data, which is drawn from a separate source.

THE COURT: Yeah. So on 129, it's my same ruling as just previously made. That's, that's more easily done.

All right, Ms. Holt.

MS. HOLT: Then moving to the bank records for exhibits -- Government's exhibits 142 through 147, each of these are essentially a blowup from a bank record of a single transaction.

THE COURT: Hang on one second. 142.

I'm just trying to find 142.

Mr. Halverson is probably sitting there laughing at me because he hid it.

MR. HALVERSON: Not at all, your Honor.

THE COURT: I'm kidding you. Hang on one second. 142.

MR. HALVERSON: It's toward the back.

THE COURT: In all seriousness, in a voluminous case, I appreciate the Government doing this by witness, and it's totally reasonable for the Government to do it in the order of presentation.

Okay, 142. All right. I'm there. Ms. Holt, bank

record?

MS. HOLT: Correct. Your Honor, this is not summarizing anything. This is merely a blowup of a single transaction, and the same holds true for 143, 144, 145 --

MR. HALVERSON: Your Honor, we're fine with these being under 107 demonstratives, because I agree they are just -- it's one transaction being summarized.

THE COURT: You don't have an objection on 107, right?

MS. HOLT: No, Judge.

THE COURT: Okay. So I appreciate the stipulation of the Government. Let's just state for the record very clearly what are the records that the Court will make sure to give a 107-type instruction: 142, 143, 144. Any others?

MS. HOLT: 145, 146 and 147.

THE COURT: Government concurs?

MR. HALVERSON: Just give me one moment, your Honor.

THE COURT: Yes.

MR. HALVERSON: Yes, your Honor.

THE COURT: Okay. So those six exhibits, Ms. Holt's objection is essentially resolved because they will be treated as Rule 107 illustrative aids.

Anything else?

MS. HOLT: Yes, Judge. The Government has indicated that they plan to introduce Government Exhibit 157. And I

would object to this, as this analysis is not contained in Mr. Petron's report.

THE COURT: All right. That's a pretty simply stated objection.

I'm looking at the slide. And you are just saying none of this should be allowed to come in because it's outside of the disclosure.

Mr. Halverson, your response?

MR. HALVERSON: Your Honor, just one moment.

THE COURT: Yes.

MR. HALVERSON: I would respond for two ways, Mr. Petron's disclosure is essentially cautionary. Much of what he is doing is not actually expert testimony. It's, you know, essentially mathematics. I could say that this is within the expert report because we disclose --

THE COURT: Put it on the record. What did you disclose? Take your time.

MR. HALVERSON: We disclosed that he is going to explain stratified random sampling, and how -- how he uses the data to make a statistically valid random sample.

This is part of coming to that valid sample essentially.

THE COURT: So the last line, just as an example -- I mean, the first two lines of this is a way of saying, this is what I did. The last line seems to be at the core of what

Ms. Holt is standing up about.

And Ms. Holt, why doesn't that last line, a doctor order's count with a plus/minus 5.4 percent at 95 percent confidence level, why isn't that precisely within what was disclosed?

MS. HOLT: Because what was disclosed was a very clear report about what Mr. Petron did, and what he -- what statistical analysis he did, and this is not in there.

THE COURT: Meaning, this line?

MS. HOLT: This line is not in there. I would also for the record object to this, again, this is, this should not be admitted into evidence. This particular slide, this is a closing side.

Even if the Court overrules my objection about the content of it and the testimony, the exhibit, itself, is just regurgitating the potential testimony.

THE COURT: I think you have more -- I think you have more traction on that last point. That this 157 --

MR. HALVERSON: Judge, these numbers are in the report. I don't understand these last-minute objections.

THE COURT: The first part -- I can save you time, Mr. Halverson.

The first part on the "not within the disclosure," no. You know, you read into the record what this clearly is within. The fact that this final number and confidence level

may not be precisely in there, no. The slide certainly is, and the disclosure is what that you read. So that, I certainly overruled.

Now, on Ms. Holt's -- this looks like 107, instead of 1006, what do you say to that?

MR. HALVERSON: Well, your Honor, what he is testifying about here is a voluminous task that he did to -- and I think this will be much clearer because I honestly don't understand it nearly as well as Mr. Petron can explain it to you and the jury, but what he did was essentially take a huge amount of data and randomly sample it to determine, within the parameters there, what the matching orders that were billed to Medicare was.

THE COURT: So just to put a fine point on that -- this is the last time I'm going to make you do it -- the source material for slide 157 is cited as Government Exhibit 630 at Exhibit 9. Can you explain what that is for the record?

Take your time. But it matters to the 1006 analysis.

MR. HALVERSON: He is just pointing to his report there, at which he points to a voluminous collection of -- let me see where it is --

THE COURT: Take your time. 630 is his report.

MR. HALVERSON: Exhibit 9 is this voluminous dataset. It's at, let's see -- Exhibit 9 of the Petron report.

THE COURT: Is 630, is 630 or Exhibit 9, are they admitted into evidence?

MR. HALVERSON: We have moved them into evidence. 630 is the report that Petron created.

THE COURT: Is that coming into evidence, or no?

MR. HALVERSON: No, your Honor.

THE COURT: So I think, I think in an abundance of caution, because 630 is not coming into evidence -- let me just go back to the rule.

MR. HALVERSON: Well, your Honor, under 1006, it does not have to come into evidence to be the underlying basis for an admissible slide. It has to be admissible, itself. And what he is referring to is the actual data that he is looking at, which is admissible.

THE COURT: One second.

MR. HALVERSON: And the data, itself, is actually in evidence that underlies Exhibit 9.

MS. HOLT: But the exhibit is just stating his testimony. It literally says, "Recorded account of doctor orders from samples files. Recorded doctor orders were for Medicare patients," that's his testimony. The Government can use this in closing argument, if they so desire.

But, to give exhibits that are just regurgitating witness testimony is not, does not fall under 1006. I also may be -- well, never mind.

THE COURT: Yes. One second.

So I think I actually agree with you on the first two lines. The core contention is, is that last line, which is if that is the summary of the voluminous records that cannot be conveniently examined in court, whether or not introduced into evidence, that's the -- that's the core question.

MS. HOLT: Judge, this is not a summary. His -- and again, this analysis is not in the report. But, this is not a summary of aggregating certain things. When you have a confidence interval, this is a statistical analysis that he has performed. That is very different from summarizing and aggregating information in the record.

THE COURT: Yes, I think that Ms. Holt may have some purchase here on this. I think that -- I think there is a difference. This is, this -- what I think Ms. Holt is saying, is that the doctor's order count and the plus minus and the confidence interval, that is expert. That is expert testimony. And since it's expert testimony, it is not the same thing as 1006, which is summary of underlying content that is voluminous.

Now, I think the Government's final move is to say, well, why can't an expert within his disclosure also have an 1006 exhibit?

And I think on this -- I think on this, I'm going to look at it over the break. But, I think that in an abundance

of caution, 157 -- it strikes the Court as more of either a closing slide or an illustrative aid because the line, itself -- that is the core of what Ms. Holt stands up for. That's his testimony.

To simply say it again in an admitted exhibit, I mean, first of all, on 403, that seems duplicative. But, it does seem also -- let me think about it.

But, on 157, I'm going to reserve on whether or how it comes in. Because you definitely -- you could put this in front of him and refresh him, if he went south, and he could just testify to all of this as to what he did.

And, I think it is important, although not required by the rule, that everything that has been discussed, except for 157, the underlying source material is coming into evidence. And I think that's important to avoid any perception issues. So I'm going to table 157. I made my ruling on everything else.

Ms. Holt, anything else?

MS. HOLT: Your Honor, I anticipate the Government, as they have stated, will move into evidence the voluminous bank records. I had previously made an objection to the business record certifications.

THE COURT: Sure.

MS. HOLT: So I just want to alert the Court I would be reviewing that, but just to refresh your memory as to what

that was. So --

THE COURT: That's the whole certification issue that we've addressed?

MS. HOLT: The specific dates, and I named the specific exhibits.

THE COURT: Right. Because of the certifications and subpoenas, and not tieing to specific exhibit numbers?

MS. HOLT: Correct.

THE COURT: So when you stand up and say, you know, "prior objections" or something like that, you are perfectly allowed to do that.

I'm going to give you all five minutes, and then -- we have a jury. So we will start in five minutes, okay?

See you then.

THE COURTROOM DEPUTY: All rise.

THE COURT: Thank you.

(Recess from 9:30 AM to 9:35 AM.)

THE COURT: All right, everybody ready?

MR. HALVERSON: Yes, your Honor.

MS. HOLT: Yes, Judge.

THE COURT: Let's go get the jury. Thanks.

COURT SECURITY OFFICER: All rise for the jury.

(Jury entered at 9:35 A.M.)

THE COURT: Good morning, everybody. Please be seated.

Hope everybody had a nice Mother's Day and a nice weekend.

Good morning, sir.

Hope you had a nice Mother's Day and a nice weekend. We are going to continue with our examination of this witness.

Mr. Halverson?

I remind you, ma'am, that you are still under oath.

THE WITNESS: Yes, sir.

(Witness, MINDY BREITMAN, was previously sworn.)

MR. HALVERSON: Ms. Braga, could we pull up Government's Exhibit 320 for everyone?

It has been admitted.

CONTINUED DIRECT EXAMINATION

BY MR. HALVERSON:

Q. Now, Ms. Breitman, you were testifying about this document last week. Do you recall that?

A. Yes, sir.

Q. And what is the supplier associated with this Medicare DME redetermination request form?

A. Active assist DME.

Q. And what are the braces on this form?

A. This is for a back brace and bilateral right and left wrist brace.

Q. And let's go to Page 3 of the document. And what is this document that is attached to that?

A. This is what's called a detailed written order.
Q. Why is this attached to that Medicare redetermination request form?
A. This was part of the prescription that we received, and this follows the policy Medicare request.
Q. And on this form, does it ever say that there was a telephone call that was the basis of this report?
A. Absolutely not.
Q. And why not?
MS. WILSON: Objection, lack of personal knowledge.
THE COURT: No, that's overruled.
You can answer.
THE WITNESS: Thank you, sir.
I know as from being a biller, also owning a DME, Medicare did not want phone conversations.
BY MR. HALVERSON:
Q. And after receiving this, after you submitted -- you testified last week that you submitted this form, right?
A. Yes, sir.
Q. After sending this to Medicare, was this claim paid?
A. I believe so.
Q. And why do you believe that?
MS. WILSON: Objection, 602, 702.
THE COURT: One moment.
No, overruled.

You can answer.

THE WITNESS: Thank you.

Because we did not see a denial, and we did get paid on it.

MR. HALVERSON: Now, I'm going to show just the witness what has been marked as Government's Exhibit 303.

MS. WILSON: Your Honor, I believe this was in evidence.

THE COURT: 303 is in evidence?

MR. HALVERSON: That's correct.

THE COURT: This is for everybody then.

Thank you, Mr. Halverson.

MR. HALVERSON: Thank you, your Honor.

And do you recognize this document?

THE WITNESS: Yes, sir.

BY MR. HALVERSON:

Q. And what is this document?

A. This is a Qluarant prepayment review.

Q. What's a prepayment review in your experience as a biller?

A. A prepayment review is a form that goes out as I had said last week, when you originally send claims in, everything just goes computer. And then Medicare, at that point, they select certain claims, and when they select them, they want all the information.

MS. WILSON: Objection, 602, 702, hearsay.

THE COURT: Overruled.

BY MR. HALVERSON:

Q. And why were brace suppliers that you were billing for put on prepayment review?

MS. WILSON: Objection. The same objection, 602, 702, hearsay.

THE COURT: Overruled.

THE WITNESS: Many different reasons. Too many braces that they were ordering. They got a lot of denials. High volume. Many different reasons.

BY MR. HALVERSON:

Q. Now, what's the brace supplier who you were billing for in connection with this form?

A. Silent Hill Bracing and Orthotics.

Q. And do you know where that was based?

A. Yes, sir.

Q. And where was that?

A. Down here, Bay Harbour.

Q. Is that the Southern District of Florida?

A. Yes, sir.

Q. What is the purpose of Medicare sending this letter, do you understand that?

MS. WILSON: Objection, 602, 702, speculation. Request sidebar, your Honor.

THE COURT: I'm going to overrule this as stated.

There is no need for a sidebar. The question is what is the purpose of Medicare sending this letter, do you understand that?

He is asking it in her personal understanding and experience.

To that extent, it is overruled, and you can answer.

MS. WILSON: Hearsay, as well, for the record.

THE WITNESS: Mr. Halverson, can you repeat the question?

THE COURT: Sure, you can repeat it.

BY MR. HALVERSON:

Q. In your understanding as the biller for Silent Hill, what was the purpose of this letter?

A. That Medicare wants to make sure that everything that you bill for, that you actually have that on file; that you have a prescription, you have a detailed written order, you've got a delivery ticket. They want to make sure that you've got everything you said you'd billed for.

MR. HALVERSON: Let's go to Page 2, please, Ms. Braga.

BY MR. HALVERSON:

Q. What is this part of the letter asking for?

A. This is the pieces of equipment -- pieces of the bracing, sorry, that they were requesting the documentation on.

Q. And what braces was this -- was this letter requesting

documentation for?

A. Once again, bilateral right and left wrist braces, and a back brace.

MR. HALVERSON: Let go to Page 3, please, Ms. Braga.

BY MR. HALVERSON:

Q. What is this asking for?

A. This is a kind of like the checklist, I guess you would say. It is telling you that you need a certificate of medical necessity, orders, medical records, manufacturer information. All of the different information that they are asking for, whatever you do have that is applicable to the item that you were billing for, you have to send it in.

Q. Thank you.

MR. HALVERSON: Let's go to Page 4, please, Ms. Braga.

BY MR. HALVERSON:

Q. And again, what is this part of the document?

A. Once again, this is the detailed written order.

Q. And who is the provider listed on this order?

A. The doctor is Dr. Grandstaff.

Q. Is it a doctor -- can you tell whether it is a doctor or --

A. I'm sorry, PA.

Q. And what's a PA?

A. Physician's assistant.

Q. And what does it say her practice was?
A. In Georgia, Suwanee.
Q. Do you recognize what platform created this order?
A. Absolutely.
Q. And what platform is that?
A. DMERx.
Q. How do you know that?
A. I don't want to use the word "templated," but they were identical, each and every one.
Q. And you reviewed this order before?
A. I'm sorry?
Q. Have you reviewed this order before?
A. Yes, sir.
Q. And is there any mention of telemedicine or telephone call in this order?
A. No, sir.
Q. And why is that?

MS. WILSON: Objection. Hearsay, speculation, 602.

THE COURT: No, she is being asked questions about this order.

That's overruled. She can answer.

THE WITNESS: The reason that there is no mention of telephone conversation is because in order to prescribe, you have to have a telephone conversation -- I mean, sorry -- a consultation. And if they said on here this was on the phone,

they wouldn't get paid.

MS. WILSON: Objection, 602, 702, hearsay.

THE COURT: It's overruled.

BY MR. HALVERSON:

Q. And what was the purpose of submitting this DMERx form in connection with the CMS letter?

A. To get paid.

Q. Do you know was this paid?

A. Yes, sir.

Q. How do you know that?

A. Because I had the EOBs. It was paid.

MR. HALVERSON: Let's look at Government's Exhibit 306.

Is this in evidence, Ms. Braga?

I have this as being admitted subject to connection, your Honor.

THE COURT: One moment.

MR. HALVERSON: I just want to be careful here.

THE COURT: Yes. Additional foundation may have been laid. You can do so here, if you wish.

MR. HALVERSON: So let's show the witness 306, please, Ms. Braga.

BY MR. HALVERSON:

Q. Do you recognize this document?

A. Yes, sir.

Q. And what is it generally?
A. This is also a prepayment review by an outside auditor, Qluarant.
Q. And which -- which DME or brace company was this for?
A. This, once again, was Silent Health.
Q. And that was the same as the last exhibit we just looked at?
A. Yes, sir.
Q. And where were they based?
A. South Florida.
Q. And was this a letter that you responded to, personally?
A. Yes, sir.
MR. HALVERSON: Move to admit fully Government's Exhibit 306.
MS. WILSON: Just renew the prior objections.
THE COURT: Overruled. 306 is admitted for all purposes.
MR. HALVERSON: Let's show that to the jury, please, Ms. Braga.
BY MR. HALVERSON:
Q. Now, again, what is this document?
A. This is a request for -- it is a prepayment review, and it is basically sending in a request to us for send -- or actually to the supplier, who then sent it to us, to give them the items that they want, or they won't pay it.

MR. HALVERSON: Let's look at Page 2 of that exhibit, please.

BY MR. HALVERSON:

Q. And what braces was this request related to?

A. That, once again, bilateral right and left wrists and a back brace.

Q. And how much was the submitted charges -- how much were the submitted charges for each these?

A. $525 for each wrist, and 1450 for the back brace.

Q. $1,450 for the back brace?

A. Yes, sir.

Q. And what does it mean "submitted charge"?

A. Submitted is what you actually submit to Medicare, and they have a table, which is called allowables that they pay. So we're submitting that amount, and then they pay 80 percent of what their allowable is.

MR. HALVERSON: Let's look at the next page, please, Ms. Braga.

BY MR. HALVERSON:

Q. And what was the auditor asking for here?

A. This is the -- this is the same items, the certificate of medical necessity, orders for services billed, medical records from the doctor, purchase invoices, delivery slips, progress notes.

Q. Thank you.

MR. HALVERSON: Let's look at the next page, please, Ms. Braga.

BY MR. HALVERSON:

Q. And what is this document?

A. This is the detailed written order, which would encompass the progress notes, the prescription, et cetera.

Q. Do you know who the provider of this order is?

A. Yes. Dr. Young.

Q. And where was that provider?

A. In Texas.

Q. And does it say where -- who the patient was?

A. Beth Tanos.

Q. What was her insurance?

A. Medicare.

Q. And what state was she living in?

A. Oklahoma.

Q. And do you recognize what platform created this order?

A. Yes, this was DMERx.

Q. And how do you know that?

A. It is the same as the others.

Q. So you attached this form to the Medicare request form, is that right?

A. Yes, sir. We faxed it in to them, and we would put -- we might have even mailed, I don't recall. It was years before technology, so this went back.

You put the prescription, the delivery slip, the things they are asking for in the other letter.

Q. And why would you send the DMERx order to Medicare?

A. That's your proof that you had some sort of prescription, what have you, from a physician. Otherwise, they wouldn't pay for it.

Q. And in this case, was this prescription accurate, as far as you understand it?

MS. WILSON: Objection, 602.

THE COURT: One moment.

MS. WILSON: Speculation.

THE COURT: Yes. That, I'll sustain.

BY MR. HALVERSON:

Q. Does the order say anywhere on it that it was done through a telephone call or through telemedicine?

A. Absolutely not.

Q. And why not?

MS. WILSON: Same objection, 602.

THE COURT: One moment.

Can you repeat the question, Mr. Halverson?

BY MR. HALVERSON:

Q. Does the order say on it whether it was done through a telephone call or telemedicine?

MS. WILSON: That wasn't the question, your Honor.

THE COURT: Well, that's why we have a new question

now.

Say the question one more time.

MR. HALVERSON: I'm not sure I can repeat it exactly, but I will try.

BY MR. HALVERSON:

Q. Was the order -- does it say on this order whether it was done through a telephone call?

THE COURT: You can answer.

There is no objection to that.

THE WITNESS: Oh, okay.

No, it does not.

BY MR. HALVERSON:

Q. And why not?

MS. WILSON: Same objection. 602.

THE COURT: Overruled.

THE WITNESS: It doesn't because I know -- I have seen it, that Medicare will not pay if there is a phone call.

BY MR. HALVERSON:

Q. And was this claim paid after you submitted the order?

A. Yes.

MR. HALVERSON: No further questions, your Honor.

THE COURT: Okay. Cross-examination, Ms. Wilson.

CROSS-EXAMINATION

BY MS. WILSON:

Q. Good morning, Ms. Breitman.

A. Good morning.
Q. I want to -- these two documents --
MS. WILSON: And could I please have the ELMO?
BY MS. WILSON:
Q. That we were just talking about on direct, that's Government's Exhibit 303 --
A. Okay.
Q. -- on the screen.
Did you provide this document to Government, or did they show it to you?
A. I don't recall. I -- I honestly don't recall.
Q. And what about 306?
A. I mean, I have them in my computer, but -- I would assume I would have had to have given it to them, but I'm not a hundred percent sure.
Q. Okay. Thank you.
Now, you have interviewed with the Government nearly 40 times as part of your cooperation; correct?
A. Yes, ma'am.
Q. And you testified on direct examination last week that Mr. Halverson did not prosecute you; correct?
A. Correct.
Q. Am I right that Kate Wagner was one of your prosecutors?
A. Correct.
Q. Are you aware that she is Mr. Halverson's boss?

A. No.
Q. And you were charged in what is called an Information in March of 2021, right?
A. If that's the correct date, yes.
Q. So your formal charges came then. And you had been cooperating even before that; correct?
A. Yes, ma'am.
Q. And as part of your cooperation, you waived your right to have a grand jury indict you, correct?
A. Correct.
Q. And the information had -- that you were -- your charging document had the effect of capping your maximum sentence at ten years; correct?
A. I believe -- I mean, that is above my head. I believe so.
Q. And -- but you understand that had you not cooperated, the Government likely would have charged you with much more time, correct?
A. I believe. I don't know.
Q. You were originally sentenced to 72 months in prison, right?
A. Yes, ma'am.
Q. And that was back in 2022?
A. Correct.
Q. And you have not had to surrender to prison yet? You've stayed out on bond this whole time, right?

A. Correct.
Q. And you were originally supposed to surrender in May of 2022, after your sentencing, right?
A. I don't know the dates, but -- because that has been extended several times -- a couple times.
Q. It has -- okay. But -- and if you want to look at your docket, I can -- you can refresh your recollection. But May 2022 sounds right to you?
A. Correct.
Q. And then it was continued until 2023?
A. Correct.
Q. And it was continued again from January 2023 to May 3rd of 2023, correct?
A. Date-wise, I don't know, but I know we have been extended several times.
Q. So that you could stay out and keep cooperating; correct?
A. Correct.
Q. And it was extended again until September of 2023, correct?
A. I -- once again -- I'm going to say the same. The dates, I don't remember. It has been so much. But, I know my next one is, if we want to fast-forward it, it's going to be July 1st, I believe.
Q. And it has happened since -- so now you are due to surrender July 1st?

A. Yes.
Q. And it has been extended roughly four or five times since September 2023, the last date that we talked about, right?
A. Times -- it has been extended, yes, ma'am.
Q. Okay. And that's so that you could remain out and keep testifying for the Government, and keep interviewing with the Government as part of your cooperation; correct?
A. Correct.
Q. And, if the Government decides they want you to keep cooperating in something else, they could move to extend it from July 2026 even further?
A. If you can understand, I want to get on with my life. No, for real.
Q. I don't doubt that. But, it is kind of up to the Government, right?
A. No, I am just saying it is not my -- you know.
Q. I'm not saying that either. But, the Government could say, let's push this out further and have you cooperate some more?
A. Whatever is -- whatever it is, it is. I mean --
Q. You are kind of at their disposal?
A. I'm not privy to --
Q. And you are hoping that before you ultimately have to surrender, whenever it is, that you will get a substantial sentence reduction?

A. I would hope so, absolutely.
MS. WILSON: A brief moment, your Honor.
THE COURT: Yes.
BY MS. WILSON:
Q. And just back to where we started with 303 and 306, let's see if I can put them side by side.
These two documents -- do you recognize them?
A. Yes, ma'am.
Q. These letters got sent to you as the biller; correct?
A. No, ma'am.
Q. They got sent to the DME supplier, and then they got sent to you?
A. Yes, ma'am. And they would send them to me.
Q. Okay. Thank you.
MS. WILSON: No further questions.
THE COURT: Any redirect?
MR. HALVERSON: Just briefly, your Honor.
REDIRECT EXAMINATION
BY MR. HALVERSON:
Q. Thank you, Ms. Breitman.
So you testified just now about how much you have been cooperating. Do you recall that?
A. Yes, sir.
Q. And approximately how long have you been cooperating with the Government?

A. Seven years.
Q. And you testified about Kate Wagner. Do you recall that?
A. Ms. Wagner is my prosecutor.
Q. Was I involved in any way in your prosecution?
A. Absolutely not.
Q. Was Mr. Cuyler involved in any way in your prosecution?
A. No.
Q. Now --
THE COURT: Excuse me, ma'am.
You just have to state it for the record.
THE WITNESS: I'm sorry.
No.
Sorry, your Honor.
BY MR. HALVERSON:
Q. How many people have you provided information about during your prosecution -- or during your cooperation?
THE COURT: Sustained.
BY MR. HALVERSON:
Q. Your cooperation didn't only involve this case, right?
A. Correct.
MR. HALVERSON: All right.
No further questions, your Honor.
THE COURT: Any recross?
MS. WILSON: No, your Honor.
THE COURT: All right. You can step down, ma'am.

You are excused.

[Witness Excused]

THE COURT: The Government will call its next witness.

MR. HALVERSON: Your Honor, we may need a moment to track him down, but --

THE COURT: Okay.

MR. HALVERSON: -- he should be here.

THE COURT: Okay.

Ladies and gentlemen, you can stretch. You can drink. You can talk to each other about Mother's Day. The Government has to track down its witnesses, and guess on length of examination. So we will get started again in two, three minutes.

MR. HALVERSON: The Government calls Michael Petron.

THE COURT: While the witness is coming forward, I will see counsel very briefly at sidebar.

Two minutes, ladies and gentlemen.

(Whereupon, there was a sidebar conference outside the presence of the jury, and the following proceedings were had:)

THE COURT: Okay. I just want all parties to know to keep things efficient and smooth, I'm going to overrule that Government's Exhibit 157. The slide identified by Ms. Holt is excluded. In an abundance of caution, and because that goes

more towards expert, 157 can just be educed from testimony.

MR. HALVERSON: Your Honor I will also note -- I don't think defense wrote it up, 105, I wasn't going to use 157. I think 105 is a similar slide that may rise similar concerns.

THE COURT: A while doing that, one second.

I commend the Government. 105 is excluded. That is a very, very similar slide. It has -- and I'm going to just make sure that Ms. Wilson and Ms. Holt don't want it in. I don't think they do. But 105 has the two things of what the witness did, and then has a billed number and a paid number with a confidence interval. So the Government -- excuse me, the defense would want 105 excluded, correct?

MS. HOLT: Correct, Judge.

THE COURT: And the Government, same ruling, 105 is not to be admitted. That's akin to expert testimony, and this is, as Ms. Holt would say, a closing slide.

MR. HALVERSON: So, your Honor, I will probably use this because I doubt he remembers those exact --

THE COURT: You are totally allowed to use it to refresh, and the defense can cross as they see fit. Let me also say, so that it is very clear, 142 and 143 and 144 and 145 and 146 and 147, I will give a rule of evidence 107 instruction. I just wanted to pull you all to the side because if there's anything else out there that fits these two

categories that we just did at sidebar, you should bring them to my attention. I'm going to try to be consistent, but I can only be consistent when it is brought specifically to my attention.

So you kind of have 105 and 107 that is staying out, and you have the parsing that the Court did on what gets a 107 instruction or 1006 instruction.

So now you all know that you are excellent attorneys, so you can alert the Court in that way.

MR. HALVERSON: Your Honor, I move to admit exhibits -- obviously, if they are not admitted under 1006, I will just offer them as 107.

THE COURT: All right. On the six I ruled, you have my ruling. They are only going to be 107.

On the other ones, you are going to seek to admit them under 1006, and Ms. Holt, on maintenance, then is going to say, "prior objection," but I -- just so the defense knows. That buried in these, there are some that fit these categories. That's why I called you to sidebar, because I just -- I guess I want to be attuned to something that you think fits into these categories. Thank you, Counsel.

(Whereupon, the sidebar was concluded, and the following proceedings were held within the presence of the jury:)

THE COURT: Thanks for your patience, ladies and

gentlemen.

Ms. Shotwell, you can swear the witness.

(Government witness, MICHAEL PETRON, was duly sworn.)

THE COURTROOM DEPUTY: Thank you. You may be seated.

Please state your full name for the record and spell your last name.

THE WITNESS: It is Michael Petron, P-E-T-R-O-N.

THE COURT: All right. Direct examination.

DIRECT EXAMINATION

BY MR. HALVERSON:

Q. Good morning, Mr. Petron.

How are you doing?

A. Good morning. Doing well.

Q. Can you just describe for the jury where you grew up and your background, briefly.

A. Sure. I live in Arlington, Virginia.

I went to school at George Washington University in Washington, DC, where I got a double major in Economics and Statistics. I have one Master's Degree in Statistics, and a second Master's Degree in Accounting.

Q. And what do you do for work?

A. I work at a firm named Stout, S-T-O-U-T, which is a global advisory firm. And for them, I serve two roles. I am the president of our dispute consulting group, and I'm also a managing director doing what I'm here to do today, which is

client service work.

Q. And in this instance of client service work, who is your client?

A. The Department of Justice.

Q. And what were you asked to do, just generally, in connection with this case?

A. Generally, with this case, I was asked to review a bunch of information. That information could be banking records, it could be healthcare claims data, it could be testimony, it could be other miscellaneous documents that the case has, and to present summary evidence to you all.

So I'm collecting a whole lot of information, and I'm summarizing it through a bunch of exhibits.

MS. HOLT: Your Honor, just objection to -- as to our prior discussions.

THE COURT: It is overruled. I can't really recognize what you are doing right there. But, it is overruled.

BY MR. HALVERSON:

Q. How are you compensated for your work in connection with a case like this?

A. So myself and my team -- my team supported me doing this. We are all compensated -- or at least the firm is compensated on an hourly basis for our work.

Q. And what is your hourly rate in connection with this work?

A. I believe it was $465.
Q. And do you know how much the Department of Justice has paid Stout, your company, for its services in this case?
A. For this case, around $275,000.
Q. And now, specifically, with regard to this case, what were you actually asked to do?
A. So, first, I was asked to examine a variety of files that contained orders and look at those files and create a statistically valid random sample, and do some extrapolations from that sample. That was one task.
A second task was to examine some claims data.
And then a third task was looking at financial records and summarizing movements of money.
Q. And -- thank you. And to be clear, do you know the defendant in this case?
A. I do not.
Q. You have never met the man?
A. I have not.
Q. Do you know anyone involving underlying facts case here?
A. I don't. I have only reviewed the records.
Q. Now, I think we'll take it in reverse order because I think we mentioned financials last, but you testified that you did a financial analysis in connection with this case?
A. I did.
Q. And did you review bank accounts as part of that?

A. Many.
Q. So I'm going to show the witness what been marked as Government's Exhibit 139.
Can you describe what's -- just generally what this is?
A. Generally, this is a summary of some of the bank accounts my team and I reviewed.
MR. HALVERSON: Your Honor, I'm going to move this document 139 into evidence. And also, the underlying bank accounts which are referenced on the right-hand side of the document.
THE COURT: So let me just catch up to you for a second.
So can you just lay some foundation with respect to the bank accounts?
BY MR. HALVERSON:
Q. Sir, you've reviewed the bank accounts that are listed on this document. Is that right?
A. That's right.
Q. And it what is, what information is provided on here?
A. So the information provided on this document is a summary of the account name, the bank where the account is held, the last four digits of the account number, the signatories of the bank, or the signatories of the accounts who has power on those accounts. And then finally the underlying exhibit

numbers that comprise the documents, the physical documents which are the ones that we reviewed.

Q. And what kinds of documents are generally in those accounts?

A. Those are bank account statements, largely. Though there could be, and there are sort of opening account information, as well.

Q. Okay. And how about wire -- records of wire transfers?

A. There could be records of wires. There could be check copies, you know, images of checks that people have written. So all of the underlying detail for those accounts.

Q. And what did you do to create this summary chart?

A. I merely captured all of what I felt was the relevant information for this chart, and then organized it.

MR. HALVERSON: Your Honor, move to admit 139 and the underlying exhibits that are referenced in the column to the right.

THE COURT: Yes.

Objection?

MS. HOLT: Prior objections, your Honor.

THE COURT: So those are overruled.

Exhibit 139 is received, pursuant to Rule 1006.

(Government's No. 139 was received in Evidence.)

THE COURT: So that the record is clear, the underlying exhibits referenced in 139 on the right-hand column

are admissible pursuant to prior ruling.

139 is received, and you can publish.

MR. HALVERSON: Thank you.

Can we show the jury, please?

BY MR. HALVERSON:

Q. Now, what is this a list of, Mr. Petron?

A. So this is a list of 11 bank accounts that I have put under a heading called the Blackman-Controlled Accounts. You can see that in blue at the top.

Q. And were you asked by the Government essentially to assume that those are Blackman-controlled accounts?

A. For -- yes, absolutely. For certain ones, I mean, other accounts clearly, Mr. Blackman, or someone related to Mr. Blackman, is a signatory on the account.

MR. HALVERSON: Okay. Let's look at Government's Exhibit 140, just for the witness.

BY MR. HALVERSON:

Q. And can you just explain what that chart is?

A. This is a very similar chart. But, this is directed around Mr. Cox-controlled accounts as opposed to Mr. Blackman.

Q. And you provided essentially the same information on this?

A. It is the same information.

Q. And it's based on the accounts reviewed that are listed on the column to the right?

A. That's correct.

MR. HALVERSON: Move to admit 140 and the underlying exhibits in the column to the right.

THE COURT: Ms. Holt?

MS. HOLT: No objection to 140, prior objection to the underlying exhibits.

THE COURT: So 140 is received. With respect to the Government exhibits in the right, identified in the right-hand column of 140, the objection is overruled, and they are received pursuant to prior ruling.

You can publish.

(Government's No. 140, was received in Evidence.)

MR. HALVERSON: Thank you, your Honor.

Ms. Braga, can we show the jury this list of accounts?

BY MR. HALVERSON:

Q. And just so the record is clear, what is this a list of?

A. So here, we have eight accounts that we reviewed that I have captured under other green heading for Cox-controlled accounts, you can see the account name, bank, last four of the signers, what have you, and the underlying government exhibit.

Q. Thank you, Mr. Petron.

MR. HALVERSON: Can we show just the witness, Government's Exhibit 141, please.

BY MR. HALVERSON:

Q. And what are we seeing in this -- well, the jury's not

seeing this, just to be clear, but what is this, generally?
A. This is the same general setup. These are accounts that were controlled by both Mr. Cox and Mr. Blackman.
Q. And is this the -- essentially, the same information that you summarized in the previous two charts?
A. It is.
Q. And, it's based on the bank records that your team reviewed in the right-hand column there?
A. It is.
MR. HALVERSON: Move to admit 141 and the underlying exhibits referenced in the column to right.
MS. HOLT: Prior objections, your Honor.
THE COURT: Overruled. 141 is received. The underlying exhibits referenced in the right-hand column of 141 are received pursuant to prior ruling. You can publish.
(Government's No. 141, was received in Evidence.)
MR. HALVERSON: Can we show the jury please, Ms. Braga?
BY MR. HALVERSON:
Q. And just generally, what is this summarizing here?
A. Again, the same general information for the bank accounts that we reviewed that create the basis for some of the charts to follow, and these are in gold for a combination of Mr. Cox and Mr. Blackman-controlled.
Q. And the Government essentially asked you to assume that

control; is that correct?
A. That's correct.
MR. HALVERSON: Let's show the witness Government's Exhibit 165, just for the witness, please.
BY MR. HALVERSON:
Q. This is the last one like this, I promise.
And what is being summarized here?
A. These are just two other accounts that we reviewed and that form the basis for the following charts.
Q. And it's essentially the same information that was provided on the previous three charts?
A. It is the same.
Q. Except this time, it has to do with the Government exhibits listed in this column on the right?
A. Correct.
MR. HALVERSON: Move to admit 165 and the underlying Exhibits 902 and 921.
MS. HOLT: No objection to 165, prior objections to underlying.
THE COURT: Okay. 165 is received. The underlying exhibits referenced on the right-hand column of 165, that objection is overruled.
You can publish.
(Government's No. 165, was received in Evidence.)

BY MR. HALVERSON:

Q. What are the two -- can we publish that for the jury, please.

What are the two accounts that are summarized in this chart?

A. We have US Orthopedics and STK Marketing are two additional accounts reviewed.

Q. Thank you. Now, let's go back to discussing the Blackman accounts, the Blackman-controlled accounts.

MR. HALVERSON: Can we show the witness what has been marked for identification as Government's Exhibit 131. Or sorry. Excuse me, 139. Now -- and we can actually show the jury this.

BY MR. HALVERSON:

Q. Now, it says Blackman-controlled accounts at the top, and it's identified in blue. Do you see that?

A. I do.

Q. Is that going to be true of these accounts throughout your exhibits?

A. They are. So I've attempted to create a bit of a color-coding pattern on the following exhibits so that when you see blue boxes, those would represent the Blackman-controlled accounts; green, Cox-controlled accounts; gold, joint Blackman and Cox-controlled accounts. So that it is a little hard to remember twenty-something accounts, so I

tried to make it as simple as I could.

Q. Thank you.

MR. HALVERSON: Let's go to Government's exhibit, and this one is not in evidence. It's marked for identification as Government's Exhibit 152.

BY MR. HALVERSON:

Q. Now, Mr. Petron, what are we seeing, or what is this exhibit summarizing?

A. So what I'm summarizing here is a flow of funds from DMERx and affiliated entities to the blue Blackman-controlled entities, as well as some additional "gold" controlled entities, moving to the blue entity. So it's basically a source of funds for the Blackman-controlled entities.

Q. And how voluminous are the underlying materials that you summarized into this exhibit?

A. Very. I don't know the exact number off the top of my head. It is well over 50,000 transactions that were in our database over the course of these, not certain, 25, 26, 27 accounts that we looked at. And so this is over the course of five years, thousands of transactions.

Q. And what kind of work goes into creating a summary of this nature?

A. So --

MS. HOLT: Objection, relevance.

THE COURT: Overruled.

He can answer.

THE WITNESS: So first, as we get bank statements, all of these accounts that we just looked at, we digitize those and create a database. Then there is a quality control process around that database to ensure that the database is accurately reflecting the underlying records.

Then there are situations where -- to use my own name, you can have payments going to Mike Petron and Michael Petron, and so there's process of normalization where we're ensuring that Mike and Michael are the same person.

Once we have all of that, then we can start to summarize the movement of money in a more holistic, you know, total view of the world as opposed to just transaction by transaction by transaction.

Q. Thank you.

MR. HALVERSON: Can we move to -- I'll move to admit Government's Exhibit 152 and publish to the jury.

MS. HOLT: Prior objection, your Honor.

THE COURT: Yeah. Overruled. 152 is received.

You can publish.

(Government's No. 152 was received in Evidence.)

BY MR. HALVERSON:

Q. Now, can you just walk the jury through this chart here?

A. Sure. So what we're looking at here is for the time period of January 15 through December 20. I'm summarizing all

of the activity that I can find showing the inflows into the blue Blackman-controlled accounts.

So you can see in the top left, the red box which represents the DMERx-affiliated marketers and suppliers and pharmacies, those send about $52.1 million into the Blackman-controlled accounts during this time period that is listed.

And then here on the bottom -- so these down here -- we have all of the other inflows into the Blackman-controlled accounts that represents about $6.5 million.

THE COURT: Let me stop you there.

Ladies and gentlemen, so what you've seen so far with this witness is that certain exhibits in the form of charts or slides have been admitted. And then also, there has been testimony of the underlying source exhibits. Summary testimony by a witness such as this and charts or summaries prepared have been received into evidence for the purpose of explaining facts disclosed by underlying exhibits, which have also been admitted as evidence in this case.

Of course, the best evidence is the underlying exhibits. But you are allowed under the Rules of Evidence to hear a witness summarize voluminous evidence in this way because when there are voluminous records, it could be unwieldy for a finder of fact to have to go into each one of the source exhibits.

But, to be clear, in the testimony about the summaries, about the summary charts, this witness is testifying as to summaries prepared from underlying exhibits. Those underlying exhibits actually would be and are available to you. So to the extent that questioning gets at anything involving assumptions, or how the summaries are created from the underlying exhibits, it's the underlying exhibits that is the best evidence.

So to the extent that testimony that shows that the charts in any way deviate or assume things that you don't believe are proper to be assumed or that you find deviate, it's the underlying exhibits that matter, and not the summary charts.

I just wanted to explain because it's early in the testimony, and you've already heard a couple of them, but that's what's going on here.

Mr. Halverson?

MR. HALVERSON: Thank you, your Honor.

BY MR. HALVERSON:

Q. Now, Mr. Petron, the box at the top left in red, what are those -- what is that box representing?

A. That box represents all of the entities that were affiliated in some way with DMERx. So they had things like telemedicines, pharmacies, suppliers, marketers, a lot of marketers. And so I've listed some of those there, you know,

in smaller print, the names of them. But essentially, I am capturing them all into one box.
Q. And throughout your slides, will they be reflected in red as they are here?
A. They will be.
Q. And for the purposes of making this exhibit, the Government asked you to assume that those were DMERx-affiliated, is that correct?
A. That's correct.
MR. HALVERSON: Let's look at -- and this is marked as exhibit -- Government's Exhibit 150, please, Ms. Braga. This is just for the witness.
BY MR. HALVERSON:
Q. Just generally speaking, what are we looking at here?
A. So here, we have a, again, a source of funds, but now, I'm focusing instead of on -- instead of the Blackman-controlled accounts, I'm focused on HealthSplash and Power Mobility.
Q. And during what time period is this?
A. March 2016 through December 2020.
Q. And what underlying records is this based on generally?
A. The banking records.
Q. And are those voluminous?
A. They are.
MR. HALVERSON: Move to admit Government's Exhibit 150.

THE COURT: Ms. Holt?

MS. HOLT: One moment, Judge.

No objection.

THE COURT: Okay. 150 is received.

(Government's No. 150, was received in Evidence.)

MR. HALVERSON: Can we present that to the jury please, Ms. Braga.

BY MR. HALVERSON:

Q. Can you describe what we are seeing in this exhibit?

A. So here, what I'm showing are total of $8.5 million moving into the gold HealthSplash and Power Mobility accounts during the stated period.

I've separately identified the three red boxes telemedicine, marketers, and suppliers. And then in blue, the Blackman-controlled accounts for Amici and National Center for Pain. And then there are merchant payments, and then essentially the catch-all, all other payments.

Q. What's your understanding of what the merchant payments are?

A. Those could be credit cards payments. Basically, you know, direct payments moving into HealthSplash and Power Mobility.

MR. HALVERSON: Let's look at Government's Exhibit 151, please.

This is just for the witness.

BY MR. HALVERSON:

Q. And what is this exhibit showing?

A. So the last exhibit showed the money moving into HealthSplash and Power Mobility, and now this exhibit shows the money leaving HealthSplash and Power Mobility.

Q. And generally what exhibits is this based on?

A. The bank records.

Q. Are those voluminous?

A. They are.

MR. HALVERSON: Move to admit 151.

MS. HOLT: Prior objection, Judge.

THE COURT: Overruled.

151 is received.

(Government's No. 151 was received in Evidence.)

BY MR. HALVERSON:

Q. Can you describe for the jury what you depicted in this exhibit?

A. So here, we have, over the same time period, March 16 through December 20, monies moving out of HealthSplash and Power Mobility to a variety of sources. In total, $8.4 million, or roughly the same amount we see in the "out."

And we can see the Blackman-controlled entities received $832,000; Gary and Joyce Cox received 197,000; 3.3 million to employee payroll, and so forth down the list.

Q. And how much is received by law firms?
A. $164,000.
MR. HALVERSON: Let's look at Government's Exhibit 154, please.
This is just for the witness.
BY MR. HALVERSON:
Q. What are we -- just generally, what are we looking at here?
A. So here, we're looking at funds moving into the Cox-controlled entities, from January 15 through December 2020.
Q. And what is this based on, generally?
A. This is all the underlying bank records.
Q. Are those voluminous?
A. They are.
MR. HALVERSON: Move to admit 154.
MS. HOLT: No objection.
THE COURT: 154 is received.
(Government's No. 154, was received in Evidence.)
MR. HALVERSON: Can we show the jury, please?
THE COURT: Yes.
BY MR. HALVERSON:
Q. And what is being depicted here?
A. So here, we have the flow of funds into the green Cox-controlled entities, and those source of funds -- they

total about $1.5 million. You have Amici Holdings, $250,000; HealthSplash and Power Mobility, $257,000; All-Med, PME Home Health, 35,000; and then all other.
Q. And compared to the -- the Amici, HealthSplash, and All-Med payments, how does the other -- how do the other inflows compare?
A. They are greater than the combined amounts.
MR. HALVERSON: Let's look at Government's Exhibit 149, please, just for the witness.
BY MR. HALVERSON:
Q. And what's being summarized here?
A. Here, I'm summarizing one of the Blackman-controlled accounts, National Center for Pain, and where it sends money.
Q. And what's this based on, generally?
A. The underlying bank records.
Q. Are they voluminous?
A. They are.
MR. HALVERSON: Move to admit 149.
MS. HOLT: Prior objection, Judge.
THE COURT: Yes, objection is overruled.
149 is received.
(Government's No. 149, was received in Evidence.)
MR. HALVERSON: Can we publish for the jury, please.
BY MR. HALVERSON:
Q. Can you just walk the jury through the slides.

A. Sure. This is a use-of-funds slide. So this is money leaving National Center for Pain, and showing you where it is going from this time period.

You can see $178,000 going to the DMERx-affiliated entities; 8.4 million goes to other Blackman-controlled entities. The largest single one here is the $39 million going to advertising-related entities.

Q. And can you just read what advertising-related entities are listed there?

A. Sure. We've got Suburban Mailing, Zip Mailing, Macromark, KS Marketing Research, Twilio, and Excel Marketing Group.

MR. HALVERSON: Let's show the witness Government's Exhibit 155, please.

Actually, let's -- before I get to that one, let me show you what's been marked as Government's Exhibit 142.

BY MR. HALVERSON:

Q. Can you just generally describe what's depicted on this slide?

A. So what's depicted here is just, literally, one transaction in the banking records.

MR. HALVERSON: Your Honor, I move to show this to the jury under Rule 107 as a demonstrative.

MS. HOLT: No objection to the demonstrative.

THE COURT: Okay. So 142 is received.

(Government's No. 142, was received as a

demonstrative.)

THE COURT: I gave you this instruction earlier in the case. This is different, what you are about to see. This is just being offered as an illustrative aid for the testimony. 142 is not, itself, evidence in the case, at all. It is just an aid for you to help understand this witness.

You can publish 142. This is a demonstrative aid pursuant to Rule 107.

MR. HALVERSON: Thank you, your Honor.

Can you show the jury that?

BY MR. HALVERSON:

Q. Can you describe for the jury what's being depicted here?

A. Sure. So what I'm showing you here is one particular transaction that occurred on January 3rd, 2019, between Chronos Strategies and HealthSplash. So Chronos Strategy is sending $85,900 to HealthSplash. So that's the boxes in the top. That's just showing you the movement.

The bottom is an excerpt from the underlying bank record to show you what that looks like. So you can see I've highlighted certain things here on the bottom. The transaction on 1/3/19, wire from Chronos Strategies in this amount.

Q. And if the jury wanted to find this record, how would they go about doing that?

A. So the jury could -- you all could easily go into -- I

believe this account, this Bank of America account here, this HealthSplash account, I think that's this 807, 808. You could go into that account, and you can flip to this date, and you would see this exact transaction. I mean, this is, literally, a picture from the bank statements.
Q. Thank you, Mr. Petron.
MR. HALVERSON: Let's show the witness 143, please, which is not in evidence yet.
BY MR. HALVERSON:
Q. Mr. Petron, what are we seeing in this slide?
A. This is another example of the same flow in the next month.
MR. HALVERSON: Can we show this to the jury as a 107 exhibit?
MS. HOLT: No objection.
THE COURT: Yes. It is admitted for that same purpose. This is -- when you hear me say 107 illustrative aid, it's for the same purpose as before.
Okay. 143 is admitted as an illustrative for the jury.
MS. HOLT: To be clear, Judge, with respect to all of these, I maintain my prior objection to the underlying records.
THE COURT: Yes. Yes. That's -- that is preserved and overruled.

MS. HOLT: Thank you, Judge.
THE COURT: 143 is admitted as an illustrative aid.
You can continue, Mr. Halverson.
(Government's No. 143 was received in Evidence.)
MR. HALVERSON: Thank you, your Honor.
BY MR. HALVERSON:
Q. Let's just walk the jury briefly through this transaction, Mr. Petron.
A. Sure. This is the next month, so February 7, 2019, we have Chronos Strategies sending $39,915 to HealthSplash. You can see the underlying detail here in the bank record. That is very similar to what we just looked at in the wire from Chronos to HealthSplash, for the $39,000.
MR. HALVERSON: I'd like to move Government's Exhibit 144, which is not in evidence.
BY MR. HALVERSON:
Q. What is this, generally speaking, Mr. Petron?
A. This is another singular transaction example. On September 21st, 2018, between US Orthopedics and STK Marketing.
MR. HALVERSON: Move to admit as demonstrative.
MS. HOLT: No objection to demonstrative.
THE COURT: Okay. 144 is received as a Rule 107 illustrative aid.
(Government's No. 144, was received in Evidence.)

BY MR. HALVERSON:
Q. Again, can you briefly walk the jury through this specific transaction?
A. Sure. US Orthopedics is sending $9,530 on September 21st, 2018, to STK Marketing. Here, I'm showing you basically this account, these are the -- this is what this account is. So this is the sending account, sending a wire to STK Marketing, and it is in the amount of 9,530.
Q. And I noticed the both of the boxes are in red. What's that indicating?
A. Those were DMERx-affiliated accounts; marketers, telemedicine, etcetera.
Q. Thank you.
MR. HALVERSON: And let's look at Government's Exhibit 145, please.
BY MR. HALVERSON:
Q. Again, what is this, generally speaking?
A. This is the same exact setup, just with a transaction the following month in October.
MR. HALVERSON: Move to display as an illustrative aid.
MS. HOLT: No objection to demonstrative.
THE COURT: Okay. 145 is received as a demonstrative aid.
(Government's No. 145, was received in Evidence.)

BY MR. HALVERSON:
Q. And can you walk the jury briefly through this transaction?
A. Sure. Same exact thing, US Orthopedics on October 9, 2018, for $9,200 to STK Marketing, with the underlying bank record at the bottom.
Q. And if the jury was so motivated, how would they go about finding this transaction?
A. I forget if this is 902 or 921. So I am sorry, but if you go to that Government's Exhibit 902 or 921, you would flip to this bank statement, September 29 through October 31, and you would see -- in this section, you would see these transactions, and then you would obviously be able to find that one.
Q. And how did you create this image that we're looking at, at the bottom portion of the document?
A. I just took a screenshot from the bank statement.
Q. And again, they are both depicted in red. What does that indicate?
A. They were affiliated with DMERx.
MR. HALVERSON: Let's look at Government's Exhibit 146, please.
BY MR. HALVERSON:
Q. Same thing here?
A. It is.

MR. HALVERSON: Move to admit 146 as an illustrative aid.

MS. HOLT: Objection as to foundation.

THE COURT: Foundation of what?

MS. HOLT: Of the content in --

THE COURT: In 146?

MS. HOLT: Yes, Judge.

THE COURT: All right.

Lay some foundation, Mr. Halverson.

BY MR. HALVERSON:

Q. Is this the same kind of transaction you have been describing?

A. It is. This is from STK Marketing to HealthSplash. I am showing you a record from the STK Marketing SunTrust account showing the payment to HealthSplash.

MR. HALVERSON: Move to show the jury as 146 -- Government's Exhibit 146.

THE COURT: As an aid, under Rule 107?

MS. HOLT: Same objection, your Honor.

THE COURT: Yes, that's overruled.

147 -- let me just make sure, Mr. Halverson. The underlying exhibit in the lower left-hand corner, is that in evidence?

MR. HALVERSON: Yes, your Honor.

THE COURT: It is already admitted?

MR. HALVERSON: Correct, your Honor.

THE COURT: The objection is overruled. 146 is admitted as a demonstrative aid.

You can publish.

(Government's No. 146, was received in Evidence.)

BY MR. HALVERSON:

Q. Can you briefly describe the transaction?

They can see it now.

A. So we had just seen a few transactions going into STK Marketing. This is a transaction going out of STK Marketing, on January 2nd, 2019. I've excerpted, you know, here are the bank statements, and I'm just drawing your attention to the 20,460. You can see the same day there was also 306.90 going, as well, to HealthSplash.

MR. HALVERSON: Let's look at Government's Exhibit 147.

BY MR. HALVERSON:

Q. And, generally speaking, what are we looking at in this one?

A. Again, this is another example in that month of a transaction from STK Marketing to HealthSplash.

MR. HALVERSON: And move to admit -- or move to display as an illustrative aid 147.

MS. HOLT: Objection to foundation.

THE COURT: Yes, overruled.

147 is received as a demonstrative aid for the testimony.

You can publish.

(Government's No. 147, was received in Evidence.)

BY MR. HALVERSON:

Q. Once the jury can see it, just describe this transaction.

A. Here, it is just another transaction from STK Marketing on January 23rd, 2019, for $3,230. And you can see I've again just put a copy of the bank statement down here showing you the HealthSplash transaction.

Q. Thank you, Mr. Petron.

MR. HALVERSON: Let's look at 155, Government's Exhibit 155, which is not yet in evidence.

BY MR. HALVERSON:

Q. Can you describe for the jury what this is?

A. This is a summary of the total payments from the DMERx-affiliated companies to the Blackman-controlled accounts.

Q. And what is this based on?

A. This is all based upon the bank records.

Q. And were those voluminous?

A. They are.

MR. HALVERSON: Move to admit 155.

MS. HOLT: Prior objections.

THE COURT: Yes. That is overruled.

So ladies and gentlemen, we're back into a different kind of evidence again. And I just want to make it very clear. We are leaving the demonstrative aids. Now, we are back into that summary -- summary exhibit for voluminous records.

Let me be very clear, as I was at the beginning. If you find that such summary testimony and charts correctly reflect the other evidence in the case, you may rely upon this. But if and to the extent you find that they are not, in truth, summaries of the evidence in the case, you are to disregard them.

I'm doing this because we're doing a 1006 summaries and 107 demonstratives. Okay?

We are back in summaries. And so it is the underlying evidence that has to -- has to be found by you as accurate. And to the extent that what you are about to see is not an accurate summary, you are to completely disregard it. Okay.

Thank you, Mr. Halverson.

MR. HALVERSON: Thank you, your Honor.

So can we publish that for the jury, please?

BY MR. HALVERSON:

Q. Can you describe what we are seeing here?

A. So here, from January 15, to December 20, I've summarized all of the money from the DMERx-affiliated marketers,

suppliers, and such, and how much they sent to the Blackman-controlled accounts, the Cox and Blackman-controlled accounts, and then finally in total.

So you can see that we have 52.1 million going to the blue Blackman-controlled accounts, 2.3 million going to the joint-controlled accounts, for a total of $54.4 million.

Q. Thank you, Mr. Petron.

Now, in addition to financial analysis, you also performed a matching of Medicare data. Is that --

A. I did.

Q. And I'm using a very -- my layperson's term for that, but can you describe, you know, more specifically what you did with respect to that?

A. Sure.

So there was an analysis of essentially claims data where I was looking at Medicare claims data on one hand, and matching it to individuals that were somehow affiliated with the DMERx.

Q. And actually, before I get there, do you have any specific qualifications or credentials related to statistical analysis that are applicable to your review of Medicare claims data?

A. Sure. I have an undergraduate and a Master's Degree in Statistics, two degrees in Statistics. And I have been examining Medicare and other healthcare claims data for the better part of 20 years, and in doing sampling exercises on

this data. So I have extensive experience and training in this.

MR. HALVERSON: Your Honor, I move to qualify Ms. Petron as an expert in statistical sampling and analysis of Medicare claims data.

MS. HOLT: Just maintain our prior objection.

THE COURT: Yes. So that's overruled.

Ladies and gentlemen, now, this witness is going to give you also some expert opinion testimony. You have heard me give this instruction before. For the specific purposes of statistical sampling, that you just heard the Government offer him for, as you know, when specialized knowledge or technical knowledge might be helpful to you, a person with special training or experience in the field is allowed to state opinion about the matter. But, that doesn't mean you have to accept the witness' opinion. As with any other witness' testimony, you must decide for yourself whether to rely upon the opinion.

But, for this purpose, stated a moment ago by Mr. Halverson, this witness is allowed to give you that opinion as to statistical sampling.

Mr. Halverson, you can continue.

MR. HALVERSON: Thank you, your Honor.

BY MR. HALVERSON:

Q. Now, you were testifying about matching the Medicare data

to HealthSplash data. Is that right?
A. Correct.
Q. Can you just walk the jury through that process?
A. So that process is done via a variety of different mechanisms. It can be name-matching. And there could be fuzzy name-matching. What I mean by that is Michael and Mike, right, one set of records may have Mike and another set may have Michael. So we have algorithms that track them.
We also use dates of birth, social security numbers, and other unique identification -- identifying information to try to match those records.
MR. HALVERSON: All right. I'm going show the witness what has been marked as Government's Exhibit 112.
BY MR. HALVERSON:
Q. Mr. Petron, just generally speaking, what is this?
A. So generally speaking, this is a summary of the matched Medicare data that I had, and I'm summarizing a variety of things for you. One is orthosis devices, the number of beneficiaries, and billed and paid amounts from the datasets that I had.
Q. And just to be clear, what is it matched to, what's the Medicare data matched?
A. It is matched to a database of information. And I forget it it's DMERx or HealthSplash, but it is from --
MS. HOLT: Objection to lack of personal knowledge.

THE COURT: That is overruled.

You can continue.

THE WITNESS: So the Medicare data is matched to the records of a database that I received in the case.

BY MR. HALVERSON:

Q. And it was either from HealthSplash or DMERx?

A. That's right.

Q. And are the underlying records that you used to create this voluminous?

A. Extremely voluminous.

Q. Like, how big are we talking?

A. I couldn't even -- I mean, they are databases of hundreds of thousands of records. I mean, it would be boxes -- if I printed it, it would be boxes, I mean, boxes of -- I mean, it would be -- you couldn't look at them in hard copy.

MR. HALVERSON: Move to admit Government's Exhibit 112.

THE COURT: Just one thing, since it is -- I just want to make sure the Court is clear. The bottom of Exhibit 112, on the screen, where it says, "source and notes," can you just explain what those are?

THE WITNESS: Sure. So the sources are the underlying Government exhibits.

THE COURT: That you used to create the slide?

THE WITNESS: That's correct.

THE COURT: And the notes -- what is that in connection with this exhibit?

THE WITNESS: So any time that I have notes, these are things you'll see me notate different column headings. And I'm just providing information that may sort of aid the jury in then, you know, in understanding what I did and why I did it.

THE COURT: Okay. You offer 112?

MR. HALVERSON: Yes, your Honor.

THE COURT: Any objection to 112?

MS. HOLT: One moment, Judge.

Objection to the notes, under 403, and prior objection.

THE COURT: Yes, that's overruled. 112 is received.

And to be clear, this is being offered under 1006?

MR. HALVERSON: That's correct, your Honor.

THE COURT: Okay. 112 is received.

So for this in the testimony, this is to summarize voluminous records that are also admitted in the case. So this is the instruction that there is underlying exhibits here, but this slide is offered to you as evidence because the underlying records are voluminous. So a summary, itself, as evidence is permitted so that's why you are being allowed to see this.

112 is received.

(Government's No. 112 was received in Evidence.)

MR. HALVERSON: Thank you.

Can we publish that for the jury, please, Ms. Braga.

BY MR. HALVERSON:

Q. Now, after you matched the DMERx or HealthSplash data to the Medicare data, what did you find?

A. So this chart -- everyone can see this chart?

So this chart has two different match types. The first match type is a situation where the beneficiary, from the beneficiary's history of information, had no prior claims from that doctor who was providing the prescription for the device.

MS. HOLT: Objection to lack of personal knowledge and prior objection.

THE COURT: That's overruled.

You can answer.

THE WITNESS: So the no prior relationship Level 1 is when the beneficiary got advice, and prior to that there was no evidence of any other Medicare claim from that provider.

The second one is expansive beyond that, where there could be a claim from that provider at some other point. You can see the first one is bigger than the second one.

So I am just summarizing for you here the number of devices in the second column, the number of beneficiaries, the total billed amount and the total paid amount for both of

these analyses combined.

BY MR. HALVERSON:

Q. And you determined how much was billed to Medicare in the matched data?

A. $1.06 billion.

Q. And how much did Medicare pay out?

A. 452 million.

Q. Now, I want to take a step back and talk about how you got to these figures.

MR. HALVERSON: Can we show the witness what's been marked as Government's Exhibit 102, please?

BY MR. HALVERSON:

Q. And just tell us, generally, what is a sample assignment? What is a sample assignment?

THE COURT: Counsel -- let me just see counsel at sidebar. You can take that down.

Ladies and gentlemen, stretch break. Thanks.

See you in two minutes.

(Whereupon, there was a sidebar conference outside the presence of the jury, and the following proceedings were had:)

THE COURT: Okay.

MR. HALVERSON: Judge, I will offer it as a 107 exhibit.

THE COURT: Yes. To me, I'm not precluding the

Government -- I'm not precluding the Government from anything. Yet, you have to offer stuff, and I will, of course, hear. I wanted, at the start of these, 102 is an example of a sample assignment slide. In an abundance of caution, I'm just going to ask the Government to educe testimony, akin to 102. I think that the Court is not clairvoyant, but, as I stated earlier -- and the Government did absolutely nothing wrong. I'm trying to give both sides advance notice. 105 and 157 were excluded because they were akin to just descriptions of what he did. Maybe there were also lines of ultimate conclusions that could be used to refresh. I am just telling the Government that 102 looks similar to that. It is an example of What did you do?

And, it can certainly be used to refresh, if you go south, but I am just telling the Government that.

And, of course, the Government can offer things under Rule 107, if it thinks it is appropriate to do so under the rules. But I just -- and to be fair to Mr. Halverson and give him some notice at the beginning of a set of multiple slides that have sample assignment dates similar to the Court that I have already excluded and want testimony on -- again, it is not a definitive ruling on 107, but I just wanted to be fair to both sides since it wasn't specifically identified and put in front of me by either side. I thought it would be more efficient to do it this way.

MR. HALVERSON: I highly appreciate that. Could I just ask you about 104?

Because there's a little different deal with Stratum.

THE COURT: That is a very good distinction. So -- 104 is something that is more than just What did you generally do?

This is going into the records and actually pulling numbers from the records. That's why I wanted to do this. That is the kind of thing where Mr. Halverson can't be clairvoyant. Ms. Holt can't be clairvoyant, and the Court is certainly not. So I wanted to make sure I gave some direction to you all of what to do, and I appreciate it.

MS. HOLT: We do object to 102 being shown to the witness and to the jury.

THE COURT: So I have already had it taken down, and Mr. Halverson, 102 is going to be done the old fashioned way. On 102 -- but you guys are smart. You have my direction. Thanks.

MS. HOLT: Just sort of a little context, the prior objection, my understanding is that the -- with respect to the "no prior relationship," that is not his analysis, and that was the basis of the objection.

THE COURT: You can take this up with me at the break. I don't -- I don't want to do this now. But please do it at the break. Okay?

Thanks.

(Whereupon, the sidebar was concluded, and the following proceedings were held within the presence of the jury:)

THE COURT: Thanks very much, ladies and gentlemen.

We are going to continue with our examination for about five more minutes, and then we are going to take our first morning break.

Go ahead, Mr. Halverson.

MR. HALVERSON: Thank you, your Honor.

BY MR. HALVERSON:

Q. So Mr. Petron, you've testified that the Government asked you to do a statistical analysis here, right?

A. They did.

Q. How did you determine what the sample for that analysis would be?

A. So, first, I was provided a ton of information, a ton of data. I think it was almost 700,000 records, in a -- not even in a database, just records in an electronic format.

And so once I understood what my task was, which was to try to determine how many orders were being sort of captured in all of this data, then I went through a process that I go through in all of my statistical samples and figure out what I thought was an efficient way to sample those. And I --

You know, let me just back up and say, sampling is, at its core, right, taking a small subset from a larger population.

So how do you do that efficiently? And so I went through a process in this case, and I work up all of those records by page count, because I assumed that the more pages there were in a file, in a record, the more probability or the higher probability that there would be additional orders. Right?

So there can't be two orders if there is only one page. Right? One order per page.

But, if I had ten pages, the chances are that there could be one order or two orders or three orders.

So I broke it up by page count, and then I randomly sampled from the groups that I had.

Q. And where did you get the documents from that you were sampling from?

A. From the Government.

Q. And you have testified about two extracts. Can you describe those?

A. Sure.

I got -- for two data extracts of the matched claims that I have just spoken about, I got those from an HHS, Department of Health and Human Services, analyst. And those records were basically Medicare claims records. That is

different from what I sampled.
Q. Okay. You can just describe the relationship so the jury understands what's being sampled versus the matched data that you just referred to?
A. Sure.
The matched data are historical Medicare claims data. So it is the record of what was billed, when was it billed, who referred it, how much was paid, what device it was, et cetera. It is claims data.
This other part that I sampled were files, hundreds of thousands of files of the underlying orders, the hard copy things. The things -- if you would go to the doctor and they write you up a script, the underlying information that I understood came out of this investigation.
So I had all of those. So I was sampling those.
Q. Now, I want to show you what is marked as Government's Exhibit 104.
Just generally speaking, what is this?
A. So what this is, is how I broke up the sample frame. So my totally of over 713,000 files. How I broke it up into groups. And I said I broke it into page counts, so here is the definition how --
Q. They can't see the exhibit yet.
A. Sorry.
So this is basically how I broke up the sample by

page count.

Q. And was this based on voluminous records?

A. Absolutely.

Q. How voluminous are we talking?

A. 713,000 files.

MR. HALVERSON: Move to admit Government's Exhibit 104 as a 1006 exhibit.

THE COURT: Any objection?

MS. HOLT: Yes, to the same as 102, Judge.

THE COURT: Yes, that is -- well, 102 is not in.

104 is received. That objection is overruled.

Ladies and gentlemen, we are just going to do this last exhibit, and then we will take our morning break.

Same instruction. This is a summary of voluminous records. The underlying records are the evidence, but because they are voluminous, you are allowed to consider this and this testimony.

104 is received.

(Plaintiff's Exhibit 104 was received in evidence.)

MR. HALVERSON: Can we show that to the jury, please?

THE COURT: Yes.

BY MR. HALVERSON:

Q. Can you describe what this exhibit is reflecting?

A. Sure.

So I took the 713,000 files and I broke them up into

these six groups based upon their page count. So if one file -- and we are talking about an electronic PDF file -- had one to four pages, it got put into the first bucket. If it has five to eight pages, it got put into the second bucket, and so forth, all the way down to if the file had 101 or more pages, it got put into the last file.

So you can see the number of documents in each of them. So this is what I was sampling into these groups, and then the total number of pages, right, which are in each of the respective six buckets.

So we are talking about, you know, two, three, four, you know, 4 million pages of records, which no one can really review. We would be here forever. So that's why we took a sample. And I, eventually, selected a sample of 420 files from these records.

Q. And these files are the DMERx doctors' orders?

A. These are the orders, the physical pieces of paper.

Q. And so what was the purpose of this process that you went through?

A. So the purpose of the process was to figure out how many orders there were, and the billed and the paid amounts with respect to those orders for Medicare.

MR. HALVERSON: Your Honor --

THE COURT: This is a good place to take our morning break.

Ladies and gentlemen, we will see you in about 15 minutes. Have a nice break.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exited at 10:56 A.M..)

THE COURT: All right. Mr. Petron, you can excuse yourself into the hallway, sir. We'll see you in about 15 minutes for your testimony.

[Witness Excused]

THE COURT: I will see everybody in about 15 minutes after the break. Thank you.

(Recess from 10:57 A.M. to. 11:10 A.M.)

THE COURTROOM DEPUTY: All rise.

THE COURT: As you were. Thanks.

Everybody ready for the jury?

Let's go get them. Thanks.

(Jury entered at 11:10 A.M..)

COURT SECURITY OFFICER: All rise for the jury.

THE COURT: Welcome back, everybody. Please be seated.

We'll continue with direct examination.

Mr. Halverson.

MR. HALVERSON: Thank you, your Honor.

And can we show the witness again Government's Exhibit 104?

BY MR. HALVERSON:

Q. Now, you've testified about the stratification process here.

Based on this process, were you able to determine how much, approximately, was billed to Medicare for these orders?

A. I was.

Q. And do you recall how much that was?

A. I think it was 1.05 billion.

Q. Do you remember it exactly?

A. I don't remember exactly.

Q. Is there anything I could show you that would refresh your recollection as to those numbers?

A. I have a chart on that.

MR. HALVERSON: Could I show the witness 105, please?

THE COURT: Witness, only. 105, before the witness.

BY MR. HALVERSON:

Q. Could you just review that, and when you are done reviewing it, look up at me?

A. Okay.

MR. HALVERSON: We could take down 105, please, Ms. Braga.

BY MR. HALVERSON:

Q. Mr. Petron, does that refresh your recollection as to what you were able to determine about the billed amount?

A. It is.

Q. And how much was that, approximately?

A. 1.045 --
Q. And --
A. -- billion.
Q. And how confident are you in that $1.045 billion number?
A. So that number is a statistical estimate from my sample, and it has a margin of error around it. So if you think about -- you hear polls and statistics around margins of error, that number has about a five percent margin of error around it.
Q. So now, were you also able to determine a paid amount based on your analysis?
A. I was.
Q. And what was that figure, approximately?
A. About $675 million.
Q. And how confident are you in that figure?
A. It has about the same approximate five percent range.
MR. HALVERSON: Now, let's show the Government -- the Government's Exhibit 112, which is in evidence.
BY MR. HALVERSON:
Q. So can you just explain -- you just talked about a 1.45 billion, 1.045 billion figure. Can you explain how that is different than this analysis here?
A. So, you'll recall this analysis is the raw claims data that was matched, and the billed amounts from the raw claims data is 1.062 billion. My analysis, based upon the sample of the number of orders, and then looking at the orders and

looking at the average billed amount for all of the orders came up with 1.045 billion.

So these numbers, from a statistical standpoint are very close, right? Even though they are taken from two different datasets. My number on the paid amount is 675 million, so appreciatively more than what is represented here in the data. And that's largely because this data has a particular type of Medicare claim called a Medicare Part C claim.

MS. HOLT: Objection, lack of personal knowledge.

THE COURT: Overruled.

THE WITNESS: So there is a Medicare Part C claim, which is a special provision in Medicare that -- I will try not to bore you too much here -- but the payment process on that side of Medicare would have no amounts paid because they are paid in a separate way; where my analysis is attributing the average paid amount. So my analysis is a lot more than what is represented here, because that particular subset of Medicare is zero with respect to this, to this analysis on the page.

BY MR. HALVERSON:

Q. So I just want to make sure I understand. The $452 million reflected on Government's Exhibit 112, your testimony is that doesn't include the Part C payments?

A. It doesn't include the Part C payments. It includes the

Part C billed amounts, but not the payments. And that's why my billed amount and this analysis are so close, but why the payment side is different.

Q. And is Part C the same as Medicare Advantage?

A. It is.

MS. HOLT: Objection, 702, lack of personal knowledge.

THE COURT: Overruled.

THE WITNESS: It is.

BY MR. HALVERSON:

Q. Let's show Mr. Petron what is marked as Government's Exhibit 113, please.

Can you describe generally what this chart reflects?

A. This chart is showing the Medicare data, the claims data and showing the number of orthosis devices billed on a monthly basis.

Q. And what is this based on, generally speaking?

A. This is based upon the data that was on the spreadsheet we just looked at.

Q. Is that data voluminous?

A. Extremely.

MR. HALVERSON: Move to admit Government's Exhibit 113 as a 1006 exhibit.

MS. HOLT: Objection to the notes, your Honor.

THE COURT: That is overruled. 113 is received.

(Government's No. 113 was received in Evidence.)

BY MR. HALVERSON:

Q. Can you describe -- once it is published for the jury, can you describe what the jury is seeing here?

A. Sure. So we have a monthly timeline, months on bottom, on the X axis, right, so moving from left to right, January 2016 through September 2020. And I'm showing you how many orthoses devices are billed each of those months.

So it starts at nothing and then you can see approximately the summer of 2016, the first red boxes, that grows and plateaus through the end of 2017, beginning of 2018.

And then once we get into the middle of 2018, you can see it is a dramatic increase until -- let's call it March, April of 2019, and then there is a dramatic falloff.

Q. This says at the top it is matched. What is it matched to?

A. So this is, I think, HealthSplash data matched to Medicare claims data.

Q. And how many total orthoses are in that matched data?

A. Over 1.3 million.

Q. Thank you.

Ms. Braga, could we show the witness 114?

Can you generally describe what that chart is?

A. This is the same chart. I'm substituting number of beneficiaries for the number of orthotic devices.

Q. And is this based off the voluminous data you testified about?
A. It is.
Q. Move to admit 114.
THE COURT: Ms. Holt?
MS. HOLT: Same objection to the note.
THE COURT: Yes, overruled. 114 is received.
(Government's No. 114 was received in Evidence.)
BY MR. HALVERSON:
Q. So how many total beneficiaries were matched in the bill records?
A. 346,000.
Q. Almost 347,000, right?
A. Yes.
MR. HALVERSON: Let's show the witness what's been marked as Government's Exhibit 115, please, Ms. Braga.
BY MR. HALVERSON:
Q. And again, what is this chart generally?
A. This is the same exact information, now displaying the billed amounts as opposed to the orthosis devices or the beneficiaries.
Q. And that's based on what?
A. The underlying Medicare claims data.
Q. And was that voluminous?
A. It is.

MR. HALVERSON: Move to admit 115 as under 1006?

MS. HOLT: Objection under 403 and due process.

THE COURT: Overruled as to 403.

Government's Exhibit 115 is received.

(Government's No. 225 was received in Evidence.)

MR. HALVERSON: Can we publish that for the jury, please, Ms. Braga?

BY MR. HALVERSON:

Q. What is this showing about the matched Medicare orthosis claims?

A. So this shows the total of 1.062 billion, and the month in which it was billed, but you can see all three charts have, as you would imagine, the same pattern number of devices, number of individuals, and amount billed.

MR. HALVERSON: And let's show Government's Exhibit 116, please, Ms. Braga.

BY MR. HALVERSON:

Q. What is that chart?

A. Here, we are showing the amounts paid.

Q. And is that also based on voluminous data?

A. That is the same dataset.

MR. HALVERSON: Move to admit 116.

MS. HOLT: Make objection to note, 403, and due process.

THE COURT: It is overruled. 116 is received.

(Government's No. 116, was received in Evidence.)

BY MR. HALVERSON:

Q. How much does this show is being paid by Medicare?

A. This shows 452 million. This is the reduced amount, but does not include the Part C.

Q. And when does it end?

When do these paid amounts end, roughly?

A. Call it October, 2019.

Q. Let's show what's marked as Government's Exhibit 117.

What is this chart, generally speaking?

A. So here, I'm looking at, again, the matched claims data. And I'm examining the actual device, the actual orthosis device that was billed to Medicare.

Q. And what is this based on?

A. This is the same dataset, that same dataset that adds up to 1.062 billion.

MR. HALVERSON: Move to admit 117 as a 1006 exhibit.

MS. HOLT: Objection to the note.

THE COURT: One moment.

Will you just lay foundation on the notes and assumptions made for this exhibit, Mr. Halverson.

BY MR. HALVERSON:

Q. So again, Mr. Petron, this says that these are the matched Medicare orthosis claims. What does that mean?

A. So this is the dataset where we have records from -- I

believe it was HealthSplash, and we matched to the Medicare claims history. Once those claims were matched -- shouldn't say those claims -- once those beneficiaries were matched, the examination of the underlying Medicare claims for those individuals that had no prior relationship with the referring provider.

And, I'm summarizing this based upon what is commonly referred to as a procedure code or HSPS code that just is what device did you get, what did you get and what Medicare pay for, and then I am summarizing those devices.

Q. And there's a note down there that discusses HCPC codes. Can you just explain note?

A. So the HCPC codes are sort of nationwide codes that explain in shorthand versions what is happening to a person. So --

MS. HOLT: Objection to the lack of personal knowledge, outside the scope of the expert disclosure.

THE COURT: Overruled.

You can answer. You can continue, Mr. Petron.

THE WITNESS: So these codes are the way billing in America is basically done, where providers will submit the code of what they've done or what they're billing for and then that's evaluated and adjudicated by payor and ultimately paid.

I'm merely taking the codes off the claims data and showing you what has been billed to Medicare.

MR. HALVERSON: Move to admit 117.

THE COURT: Ms. Holt?

MS. HOLT: The same objection, Judge.

THE COURT: Overruled. 117 is received.

(Government's No. 117 was received in Evidence.)

MR. HALVERSON: Publish that for the jury, please.

BY MR. HALVERSON:

Q. And, Mr. Petron, what does it say about how many back braces were in the matched data?

A. So if you -- so first, let me set up, if I can, the chart, itself.

I am showing you top ten billed codes, the first ten rows in order, and there are 68 other codes there in the 11th line that represents everything else.

I've categorized the codes by back, knee, shoulder, elbow, wrist, hand, ankle, foot, and sleeve. So if you would like to understand the back braces, we would look at this one, this one, and this one.

And the LOC60 was the highest billing code, $440 million dollars, and $172 million paid.

And you can see these other two back braces, L0648 and L0641 were much smaller amounts here.

Q. And how about for the knee braces?

Approximately how much did they represent?

A. So the knee braces have the second and the fourth most

billed amounts, $184 million and $106 million, respectively.
Q. And now you mentioned that this has the top ten and then lists the other 68. Approximately what percentage did the top ten codes account for in terms of total billed to Medicare?
A. 99 percent.
MR. HALVERSON: Let's show the witness what's been marked as Government's Exhibit 118, please.
BY MR. HALVERSON:
Q. And what is this chart, generally speaking?
A. So what I am doing here on this chart is looking at it person by person, and how many devices did each person get? You can get one, you can get five, and I'm just categorizing how many devices did each person get.
Q. Again, this is based on the matched Medicare data?
A. Correct.
Q. And what is that matched to?
A. HealthSplash records.
Q. And what is the underlying data?
A. The underlying data is the Medicare claims day.
Q. And is that voluminous?
A. Extremely.
MR. HALVERSON: Move to admit 118.
THE COURT: Mr. Halverson, could you lay foundation on the notes with the witness?

BY MR. HALVERSON:

Q. Can you just explain why you put those notes on the slide?

A. Sure. So the first note relates to what are called units in billing, and we just talked about HCPC codes. Right? The code that the thing that is billed -- there is also something called a unit, which is how many of those things get billed. So I limited this analysis to one and two, only, just to be conservative. Anything more than that, I excluded.

And the second note here is just a common note that you'll see in these charts, which I'm limiting this day to only those people that had no prior relationship with the referring provider.

Q. Thank you, Mr. Petron.

MR. HALVERSON: Move to admit 118.

MS. HOLT: Objection under 403 and due process.

THE COURT: That's overruled.

118 is received.

(Government's No. 118, was received in Evidence.)

MR. HALVERSON: Can we publish that for the jury, please?

BY MR. HALVERSON:

Q. So in these matched Medicare orthoses claims, how many beneficiaries had just one brace?

A. There were 96,880.

Q. And how many beneficiaries got three braces in the matched

claims?
A. 51,904.
Q. And how many beneficiaries got six to ten braces?
A. 55,860.
Q. And how many beneficiaries got 11 to 20 braces?
A. 15,931.
Q. I'm sorry. I have been using the term braces, but we are actually talking about orthoses?
A. Correct.
Q. What's your understanding of the difference between a brace versus an orthoses?
MS. HOLT: Objection. Outside the scope.
THE COURT: One moment.
No, that's overruled. He can explain the chart and the terms used in the chart. That's overruled.
BY MR. HALVERSON:
Q. Why did you use the word "orthosis" here instead of "brace"?
A. Because an orthosis is essentially a device of some variety that is captured with an HCPC's code. It is not necessarily a brace, itself. So there were sometimes sleeves that were put on that wouldn't technically be considered a brace, but it is an orthosis device, so I'm capturing the devices.
Q. Thank you, Mr. Petron.

How many beneficiaries got 28 or more orthoses?
A. 1,236.
Q. And what was the average number of orthoses billed per beneficiary?
A. Almost four.
Q. And that's from the matched Medicare claims data that was matched to the HealthSplash?
MS. HOLT: Objection, leading.
THE COURT: Sustained.
BY MR. HALVERSON:
Q. Did you also take a look at where in the country or where in the world beneficiaries and providers were?
A. I did.
Q. So let's look at Government's Exhibit 124.
And generally speaking, once this comes up, what is this chart showing?
A. This is what I call a heat map of the beneficiary address of those beneficiaries that got an orthosis device. So the darker the color in the country, the more people in that area or that state.
Q. And how did you determine, for the purposes of this chart, where a beneficiary was?
A. I had their address.
Q. And where did you get the address?
A. That is Medicare claims data.

Q. And is this based on that same matched underlying data?
A. It is.
MR. HALVERSON: Move to admit 124.
MS. HOLT: Objection to relevance, 403, misleading.
THE COURT: We will put this one to the side. I will reserve on 124. You can go for the next slide.
Q. Let's look at 126, please.
And just generally speaking, what is this chart reflective of?
A. So this chart compares the state where a beneficiary is versus the state of the DME provider.
Q. And not, this doesn't have anything to do with the doctor or nurse that wrote the brace order, right?
A. It does not.
Q. And what data is this based on?
A. Of the Medicare data.
Q. And it says it was matched to Medicare data. What was it matched to?
A. The HealthSplash records.
MR. HALVERSON: Move to admit 126.
THE COURT: I will reserve on 126, as well.
MR. HALVERSON: Let's look at 127.
BY MR. HALVERSON:
Q. What's this chart reflect?
THE COURT: That's all right. I will reserve on 127,

too. We will save the jury time. I will take all this up at a break.

MR. HALVERSON: 125 will be the same, your Honor?

Or I guess 125 is slightly different. Did you want me to go through --

THE COURT: One moment.

This one might be different. I can't tell. You'll have to -- you have to lay foundation.

BY MR. HALVERSON:

Q. What is 125 showing?

A. So, 125 is showing a comparison by brace type, and looking at the beneficiaries who received only one unit of a particular brace type, versus multiple units of a particular brace type.

Q. And what types of braces have multiple units in this analysis?

A. I have categorized them in three, ankle and foot, wrist and hand, and knee braces.

Q. This may seem obvious, but why would you have multiples of those braces?

MS. HOLT: Objection, outside scope, lack of personal knowledge.

THE COURT: I'll sustain that as to form.

BY MR. HALVERSON:

Q. Why are those braces the ones that are analyzed in this

chart?

MS. HOLT: The same objection.

THE COURT: No, that is overruled.

You can answer that.

THE WITNESS: Because those parts of the body you have two of versus one.

BY MR. HALVERSON:

Q. And what data is this chart based off?

A. The Medicare data.

MR. HALVERSON: Move to admit 125.

MS. HOLT: Objection under 403.

THE COURT: It's overruled as to 403.

125 is received. You can publish 125.

(Government's No. 125 was received in Evidence.)

MR. HALVERSON: Let's publish that for the jury, please, Ms. Braga.

BY MR. HALVERSON:

Q. Now, could you walk the jury through what the findings here on this --

A. Sure. So if we just focus on the top left, the ankle and foot, what I'm displaying is looking at the beneficiaries who received an ankle and foot brace, 16 percent of them got only one, one unit, where 84 percent them got more than one unit of an ankle and foot brace.

Q. And how about the knee braces?

A. For the knee braces, it was almost 50/50; 52, multiple, 48, one unit.
Q. And wrist braces?
A. The wrist and the hand were 50/50. So half the beneficiaries got one, half got more than one.
Q. As part of your review of the claims, did you also look at pharmaceutical or Part D claims?
A. I did.
MR. HALVERSON: Let's look at Government Exhibit 128 just for the witness.
BY MR. HALVERSON:
Q. Mr. Petron, what does this chart summarize?
A. So this chart is summarizing a few different types of creams that were delivered via Part D for the matched Medicare beneficiaries.
Q. And, again, what was this matched to?
A. The HealthSplash data.
Q. And what was the underlying source of the data here?
A. The Medicare claims data.
MR. HALVERSON: Move to admit 128.
THE COURT: Is 448 in?
MR. HALVERSON: Yes, it is. I believe it is, your Honor.
THE COURT: Okay. Any objection to 128?
MS. HOLT: Objection, 403, due process.

THE COURT: Overruled as to 403.

128 is received.

(Government's No. 128, was received in Evidence.)

MR. HALVERSON: You can publish for the jury, please.

BY MR. HALVERSON:

Q. And, Mr. Petron, can you just explain this chart.

A. Sure. This chart is showing you the drug type, because now we're Medicare Part D, so now we're into drug coverage as opposed to orthosis devices. So I'm showing you the pain cream, eczema cream, and all other Part D drugs.

I'm telling you how many claim lines there were associated with the matched dataset, the number of beneficiaries, and the total paid amount.

Q. And roughly, how much was the pain cream versus the other drugs?

A. I would say it's a little less than half, based upon a paid amount, but more, based upon claim lines and beneficiaries.

MR. HALVERSON: Let's show the witness what's been marked for identification as Government's Exhibit 129, please.

BY MR. HALVERSON:

Q. And what is this chart summarizing?

A. This chart is summarizing one particular beneficiary, and their claims history in the Part D data.

MR. HALVERSON: And move to admit Government's

Exhibit 129.

MS. HOLT: Prior objection and also 403 and due process.

THE COURT: One moment.

What records did you pull this from, this Slide 129, the data? What underlying record did you pull it from?

THE WITNESS: This is the same as the previous one, your Honor.

THE COURT: The objection is overruled.

129 received.

(Government's No. 129 was received in Evidence.)

MR. HALVERSON: Can we publish to the jury, please.

BY MR. HALVERSON:

Q. Now, this is for a beneficiary that you've itemized as SE; is that correct?

A. Correct.

Q. Now what -- what's this describing here?

A. So what this is showing you is, essentially, a monthly pattern where every month for a period of time, this beneficiary got both a pain cream and an eczema cream. And you can see the pattern 9/7 to 10/3, 10/30, 11/22, and so on. Each of those combinations were billed for a 30-day supply, 360 units for the most part, and then you can see the corresponding paid amounts.

So in total, this beneficiary received 6,100 units of

creams for just over $10,000 in Medicare paid amounts.
Q. And approximately how long was that period of time that they were receiving these?
A. September 18 through February 19.
Q. So about six months?
A. Correct.
Q. Did you also review claims related to a company called All-Med Health Care?
A. I did.
MR. HALVERSON: Let's show the witness Government's Exhibit 130.
BY MR. HALVERSON:
Q. What is summarized in this chart?
A. This is the summary of the All-Med Health Care data for Medicare from January 2015 through October 2017.
Q. And to be clear, this is a different dataset than we were looking at earlier?
A. Correct.
Q. And is that dataset also voluminous?
A. It is.
MR. HALVERSON: We move to admit Government's Exhibit 130.
MS. HOLT: Prior objection, your Honor, to the underlying.
THE COURT: Yes. That's overruled.

130 is received.

(Government's No. 130, was received in Evidence.)

MR. HALVERSON: Can we publish this for the jury, please?

BY MR. HALVERSON:

Q. Now can you describe to the jury what we are seeing on this slide?

A. Here I'm summarizing the All-Med data. 4,890 orthosis devices, 3,000 beneficiaries, 4.1 million billed, 1.8 million paid.

Q. And what period of time is that for?

A. January 15 through October 17.

MR. HALVERSON: Let's look at Government's Exhibit 131.

BY MR. HALVERSON:

Q. What is this generally showing?

A. This is a timeline of when those devices were billed.

MR. HALVERSON: Move to admit 131.

MS. HOLT: Objection, 403, cumulative, due process.

THE COURT: No, that is overruled.

131 is received.

(Government's No. 131 was received in Evidence.)

MR. HALVERSON: Can we show that to the jury, please?

BY MR. HALVERSON:

Q. Can you just describe what this chart is showing here?

A. This is just showing you that same data, but on a monthly basis, when, by month, those devices were billed.
Q. And when is the highest month here?
A. Looks like April 2016.
Q. And when does the data end in this exhibit?
A. It looks like October 2017.
MR. HALVERSON: Let's show the witness what's been marked as Government's Exhibit 135.
BY MR. HALVERSON:
Q. Can you tell us what this chart reflects?
A. This shows the top ten HSPS codes for the All-Med data.
Q. And again, this was based on the different set, the All-Med data set?
A. Correct.
Q. Was that voluminous?
A. It was.
MR. HALVERSON: Move to admit Government's Exhibit 135.
MS. HOLT: Same objection, 403, due process.
THE COURT: Overruled. 135 is received.
(Government's No. 135, was received in Evidence.)
MR. HALVERSON: Can we publish that for the jury, please?
BY MR. HALVERSON:
Q. And what is the highest billed device here?

A. The highest billed devices are -- is the same, the L0650 back brace, followed by the L0648 back brace.
Q. And how much were those billed for, each?
A. 2.1 million, and 900,000 respectively.
Q. And how much -- for this one, how much were the top ten HCPC codes?
A. Here the top ten represented 97 percent of the billed amounts.
MR. HALVERSON: Let's look at Government's Exhibit 137, just to the witness.
THE COURT: I will reserve on this. You can move off it.
MR. HALVERSON: Let's show the witness Government's Exhibit 119, please, Ms. Braga.
BY MR. HALVERSON:
Q. Now, what is this chart summarizing?
A. This is a chart that summaries the orthosis devices received by one particular example beneficiary.
Q. And what is this based off of? What is it summarizing?
A. The matched Medicare data for one person.
MR. HALVERSON: Move to admit Government's Exhibit 119.
MS. HOLT: Objection, 403, due process.
THE COURT: One moment.
MS. HOLT: Prior objections, too. No, just those.

And the note.

THE COURT: One moment.

No, that is overruled.

119 is received.

(Government's No. 119, was received in Evidence.)

MR. HALVERSON: Can we publish that for the jury, please, Ms. Braga?

BY MR. HALVERSON:

Q. And what are we looking at here, Mr. Petron?

A. So here, we are looking at one particular beneficiary, LC, and the dates of service in which they received devices, the referring provider of those devices, the actual devices received, the number of them in total, and total billed amount.

So this person received, between October 2016 and March 2018, 21 devices, with a billed amount of almost $16,000.

Q. And what are the referring providers -- generally speaking, what does that represent?

A. The doctor who is referring that patient for that particular device.

Q. And do you see on the third row, who is the referring provider there?

A. A Jean Wilson.

Q. And the fifth row, who is the referring provider there?

A. Sargon Audisho.

MR. HALVERSON: Let's show the jury what is marked as Government's Exhibit 120.

BY MR. HALVERSON:

Q. What are we generally seeing in this?

A. This is the same setup for a different beneficiary.

Q. And that was based on what?

A. The matched Medicare dataset.

MR. HALVERSON: Move to admit Government's Exhibit 120.

MS. HOLT: Objection, 403, due process, prior objections.

THE COURT: No. Overruled.

120 is received.

(Government's No. 120 was received in Evidence.)

MR. HALVERSON: And let's publish that for the jury, please.

BY MR. HALVERSON:

Q. What is this showing here?

A. So here, we have a second example beneficiary, SA, receiving devices from November 2018 through January 2019, on five separate occasions, for a total of 16 devices. $10,000 billed, $4,600 paid.

Q. And on the second line, who does it say was the referring provider?

A. Sargon Audisho.
Q. And third line, how many knee braces and sleeves did this beneficiary receive?
A. Four.
MR. HALVERSON: So let's look at Government's Exhibit 121.
BY MR. HALVERSON:
Q. What is this exhibit?
A. This is a third example beneficiary.
Q. And is that based on the matched data?
A. It is.
Q. And was that the Medicare data matched to?
MS. HOLT: Objection, asked and answered.
THE COURT: Yes, sustained.
BY MR. HALVERSON:
Q. Was it voluminous?
A. It was.
MR. HALVERSON: Move to admit 121.
MS. HOLT: Objection, 403, due process.
THE COURT: Overruled.
121 is received.
(Government's No. 121, was received in Evidence.)
MR. HALVERSON: Publish for the jury, please.
THE WITNESS: So we have the third example, beneficiary LM that received braces in November '17,

January '18, February '18, for 15 total devices, 9,500 billed and 5,500 paid.

BY MR. HALVERSON:

Q. And who is the referring provider on the first line?

A. Jean Wilson.

Q. How about the second line?

A. Michelle Cuttino.

MR. HALVERSON: Government's Exhibit 122.

BY MR. HALVERSON:

Q. And just generally, what is this?

A. A fourth example beneficiary.

Q. And that is based on the same matched data?

A. It is.

MR. HALVERSON: Move to admit 122.

MS. HOLT: Objection, 403, due process, prior objections.

THE COURT: It is overruled.

122 is received.

(Government's No. 122 was received in Evidence.)

MR. HALVERSON: Can we publish that for the jury, please?

BY MR. HALVERSON:

Q. Now, what is the showing on beneficiary JG?

A. So we have three different dates of service, January '18 -- January 12th, 2018, January 25th, 2018, and

February 5th, 2018, for 15 total devices. 10,800 billed, 3,500 paid.
Q. So how far apart is the first date of service to the last day of service?
A. About two weeks.
Q. And who are the referring providers on these?
A. So you have got DeCorso and Jean Wilson.
Q. Did you also review data regarding how many orders individual referring providers billed for in a day?
A. I did.
MR. HALVERSON: Let's look at Government's Exhibit 123.
BY MR. HALVERSON:
Q. Generally speaking, what does this chart summarize?
A. So what I'm looking at here are the top ten service dates by the number of orthoses billed from that matched Medicare dataset.
MR. HALVERSON: Move to admit 123.
MS. HOLT: Objection, 403, due process as to the number of exhibits.
THE COURT: I will reserve on 123.
You can move on.
MR. HALVERSON: Let's look at Government's Exhibit 107.

BY MR. HALVERSON:
Q. What is this generally showing?
A. This is a summary of information related to a beneficiary AS. And this beneficiary was listed in the indictment as Count 2.
MS. HOLT: Objection as to references to the indictment, Judge.
THE COURT: Well, I will sustain it as to form.
The jury will disregard the last portion of the answer.
Next question.
BY MR. HALVERSON:
Q. And how did you -- what sources of information did you use to construct this exhibit?
A. A variety of sources; the doctors' orders themselves, the Medicare claims data. And I thought I had one more --
Q. If you look at note 1, it says you identified by a patient list from HealthSplash. Do you see that?
A. Yes, I think those were the files. So those are the files in my mind that I was using. And then, obviously, the Medicare claims data at the bottom.
Q. And are all those records voluminous?
A. Yes, they are.
MR. HALVERSON: Move to admit Government's Exhibit 107 as a 1006 summary.

MS. HOLT: Just prior objections, Judge.

THE COURT: Overruled.

107 is received.

MS. HOLT: As a demonstrative -- excuse me. I thought these were --

THE COURT: One second.

MS. HOLT: The same objections, Judge.

THE COURT: Hang on one second.

107 is received. The Government's offering it under 1006.

MR. HALVERSON: That's correct, your Honor.

THE COURT: Your objection is preserved and overruled.

107 is received.

(Government's No. 107 was received in Evidence.)

MR. HALVERSON: Can we publish that for the jury, please?

BY MR. HALVERSON:

Q. And, Mr. Petron, could you -- once this is published, could you just review -- walk the jury through this exhibit, please?

A. Sure.

So at the top of this exhibit, we have a doctor's order from a clinician named Grandstaff in Georgia. That order was signed on August 31st, 2018. The patient

beneficiary AS is in the state of Texas, and the telemedicine or organization -- organization that was involved in this was called Integrated Support Plus in Florida. That in the order information.

And then at the bottom, we have the Medicare claims data information. September 4th, 2018, was the date service from a DME supplier, being Silent Hill Bracing and Orthopedic Supplies, with the referring provider being the same doctor as above. There's a claim number. And then finally, three different HSPS codes for a total billed amount of $2,500, and a total paid amount of $1,600.

Q. And where is Silent Hill Bracing located?
A. It is in Florida.
Q. In what county, specifically?
A. It is in Miami-Dade.
Q. And that's here in the Southern District of Florida?
A. It is.

MR. HALVERSON: And let's show the witness what's been marked as Government's Exhibit 108.

BY MR. HALVERSON:
Q. And this is -- what is this summarizing?
A. This is similar information for another beneficiary.
Q. With initials VP?
A. Correct.
Q. And that's based on what -- what underlying sources of

information?

A. So we have the underlying HealthSplash subpoena returns, the Medicare matched claims dataset. And I was going to say the indictment. That's not really a source, but I did use the indictment.

MR. HALVERSON: Move to admit 108.

MS. HOLT: Same objections, your Honor. Also objection to identification of the county.

THE COURT: No, that's overruled.

108 is received.

The witness can state his underlying sources and assumption.

108 is received.

(Government's No. 108, was received in Evidence.)

MR. HALVERSON: Let's publish that for the jury, please.

BY MR. HALVERSON:

Q. Can you walk the jury through this exhibit, please?

A. Sure.

So I have for this particular beneficiary, VP, the doctor's order at the top. I'm not sure I'm saying this right. Audisho, Sargon is the clinician in Illinois. It's signed on October 1, 2018, for the patient's state of Illinois. The telemedicine organization was Sunrise Medical here in Florida. And then the bottom, we have the Medicare --

Medicare claims information, with a date of service of October 3rd, 2018. The DME supplier was Sunrise Medical Supply in North Carolina. The referring provider is the same, the claim number, itself. And then finally, the two orthosis devices, the two HCPC codes, for a total of $833 billed and $606 paid.

Q. And Sunrise Medical was located in Florida. Do you know what county in Florida it was located in?

A. That is -- let's see. Sunrise -- was in Broward County.

Q. Is that here in the Southern District of Florida?

A. It is.

MR. HALVERSON: Let's show the witness what's been marked as Government's Exhibit 109.

BY MR. HALVERSON:

Q. What is this, generally?

A. This is, again, same information for beneficiary BT.

Q. And is that based on the same underlying sources for the last exhibit?

A. It is.

MR. HALVERSON: Move to admit Government's Exhibit 109 as a 1006 exhibit.

MS. HOLT: Prior objections, also 403, and due process.

THE COURT: It's overruled as to both.

109 is received.

(Government's No. 109 was received in Evidence.)

MR. HALVERSON: Can we publish that for the jury?

BY MR. HALVERSON:

Q. Can you walk the jury through that exhibit, please?

A. Again, same information related to this beneficiary in Count 4. Clinician's name is David Young, signed on October 3rd, '18, for a patient in Oklahoma. Telemedicine organization was Sunrise Medical, in Florida. The Medicare claim was on October 5th, 2018, with a DME supplier of Silent Hill Bracing in Florida. Same referring provider. Then we have the claim number and HSPS codes, for a total of 2500 billed and $1,600 paid.

Q. And I think Sunrise Medical was located in what county in Florida?

A. Sunrise is in Broward County, and Silent Hill was in Miami-Dade.

Q. Thank you.

MR. HALVERSON: Let's show the witness what's been marked as Government's Exhibit 110.

BY MR. HALVERSON:

Q. What is this?

A. This is similar information for an undercover beneficiary name Vernon Wheeler.

Q. Based on the same underlying data?

A. It is.

MR. HALVERSON: Move to admit 110.

MS. HOLT: The same objections, Judge, 403 and due process.

THE COURT: I will reserve on 110.

You can move on.

MR. HALVERSON: Show the witness what's been marked as Government's Exhibit 111.

THE COURT: I will reserve on 111.

MR. HALVERSON: Your Honor, I am out of exhibits, but I would like to --

THE COURT: Of course. You're going to get that chance.

Is there any other direct that you have?

MR. HALVERSON: No, your Honor.

THE COURT: Okay. Ladies and gentlemen, what we will do is we will take an earlier lunch today.

I will take up a whole bunch of stuff with the attorneys, and that way, it will stay efficient for you.

I'm going to see you at 1:15, and we will resume our testimony. An hour and 15 minutes for lunch.

Have a nice lunch.

Remember my three things, don't discuss the case or let anyone discuss it with you. You still have more evidence to hear. Keep an open mind, and don't deliberate the case. No use of research, no posting about the case.

Have a nice lunch. We will see you at 1:15.

COURT SECURITY OFFICER: All rise for the jury.

(Jury exited at 11:58 A.M..)

THE COURT: Sir, you can step out in hallway.

We will see you back here in about an hour and ten minutes to resume your testimony.

Everyone else may be seated.

[Witness Excused]

Okay. The jury and the witness have left.

Mr. Halverson, I do not doubt that on many of these, the Government may have much to say that makes them proper and admissible. I was being careful because of some differences that I saw on the records. So rather than unring a bell, I thought it best to just make sure that I'm seeing what I'm seeing, that the parties can make their record, and then you will have my rulings after lunch.

So let's do it in the order that I reserved.

123, 124, I will let the -- I mean, the defense has made their record, I will let the Government tell me, 123 and 124 and I think 126 fall into kind of a similar -- a similarity, so I will let the Government tell me their view on those.

And you can put them up on the screen if that's easier, whatever the Government wishes to do.

MR. HALVERSON: Could we put 123 up on the screen?

THE COURT: So what I understood from this, to help the Government, is that --

MR. HALVERSON: I think this one came in.

THE COURT: So the ones that I know caught my eye were location-based. Maybe this is not the right one. But, 124, 126 and 127, I think are like location-based ones.

Is 123 in?

MR. CUYLER: I don't think it is.

THE COURT: So I don't think it is either.

So I will let you make your record on 123, and then we will move to the three location-based.

MR. HALVERSON: Yes, your Honor.

123, quite simply, lays out the number of orthoses on a given date, and the number of referring providers, and how many -- the average per-provider number of orthoses they referred, which just goes to our theory of the case, which is that these providers were doing far too many orthoses in a given day, and that the defendant should have understood that because he had access to the data.

THE COURT: So it is, in essence, from what I understand from Ms. Holt, a kind of 403 objection. 21 orthoses billed per provider, tell me what that tends to show.

MR. HALVERSON: It tends to show that these doctors were doing more braces than they should have been doing in a given day, and that the defendant should have been on notice

of that.

THE COURT: What evidence is there in the record that actually supports that inference?

I'm not saying you're wrong. I'm just saying, as a matter of evidence in the record.

MR. HALVERSON: We have Dr. Hoover's testimony about how these should properly be done. We had Dr. Audisho testifying also about how these should be done and how he didn't do it properly.

We also have evidence from a number of witnesses about the fact that these were telephonic in nature and they shouldn't have been telephone. So they were able to do much more volume because of that.

THE COURT: The concern that I have is the phrase "referring provider." As a single human being, as a referring provider, I see the inference the Government is driving at. Is there any -- and because this is from voluminous data, is there any evidence in the record that a referring provider could be a group, and not just an individual?

MR. HALVERSON: Well, this slide does not refer to groups. This is individual referring providers with individual NPIs. I don't think there is anything in the record that would say that a group would be able to bill under a single NPI for a brace, the brace, as far as -- the evidence in the record is that Medicare required an individual

referring provider, either a doctor or a nurse practitioner to bill Medicare -- to refer the brace to a brace supplier to bill Medicare. So these are all individual human beings.

THE COURT: Okay. Thank you, Mr. Halverson.

Ms. Holt, I will let you perfect the record on 123.

I think I captured your 403, but maybe not.

MS. HOLT: Judge, so first, there is no testimony that -- in the record that doing 20 orthotic consultations per day is somehow violative of either a Medicare regulation or the law.

I think this slide, the fact that it is just an average, is misleading, under 403.

I think it is also a variance, arguing that somehow the fraud is related to these specific numbers, when that's not what was alleged in the indictment.

There is also no evidence that Mr. Blackman saw any of this data. This is based on Medicare claims data, as you can see down at the bottom, 437 through 441.

THE COURT: Yes, so the last two are overruled.

It is obvious that, as in 99 percent of all fraud cases, the battle is going to be what did the Government prove that Mr. Blackman knew? That does not mean that it is a basis for exclusion.

Your second-to-last objection is also overruled. It is not a variance at all. It is evidence that is within the

charged period, and is evidence that could support the charges.

The real issue is the first part of what you said. I'm not sure if there is evidence in the record along the lines, it -- along the lines as tightly as what Mr. Halverson said. If there is a human being in these records that is not part of the evidence of the case --

I guess, let me say it this way, Mr. Halverson. Can this witness exclude the possibility from these records that a human being is inside these records as a provider, and followed the rules and provided, on average, in a day, 18 braces?

Is that -- is that part of the evidentiary record, or, can this witness -- and I don't think this witness can do that, because he is just looking at claims data.

The concern is -- is that there is a code that goes to a doctor that may be pushing the line, may be doing it right, or may just never have been questioned about it, and those kind of people are inside of a dataset that includes Audisho's, and admitted -- admitted wrongful acts.

That's the concern about 403 around an average. That's the best that I can do.

MR. HALVERSON: Your Honor, I think you are certainly correct, Mr. Petron is not going to be able to say anything other than what he can see in the data.

I think the jury is properly allowed to draw the inference from the fact that these orders are signed with certification statements that said that they are true, accurate, and complete. There are multiple pages per orthosis sales ordered.

And, you know, our case is not every single act in here is, by itself, a per se violation of law. Obviously, no fraud case acts that way. What our case is, overall, all of this indicates that there -- that this is a huge red flag, essentially, that the data was showing that these doctors are ordering on average way more. And you are right, there were outliers who were worse than the average, obviously. And there are probably practitioners who were ordering less.

But, our evidence, overall, shows the entire system was created to generate this result; many, many braces per referring provider. And, that the defendant intended to set this up. And this is evidence of the -- essentially, the cumulation of his efforts to set up this result.

THE COURT: I think the Government has put it forth very succinctly. And, I'm going to allow 123.

(Government's Exhibit 123 was received in evidence.)

Your 403 objection is overruled.

There is nothing about -- there's nothing about these numbers that give a particular severe, extraordinary prejudice. The numbers can be argued. It doesn't change.

And this is why I'm glad Ms. Holt made her threefold objection.

The 403 is easier to do for the reasons stated by the Government.

The variance objection and the -- there is nothing to show Mr. Blackman knew, those are -- those are completely inappropriate objections for the admissibility of this.

This is voluminous records that show an average number of orthoses billed per provider. And the Government is right about other evidence from other witnesses -- this witness would never be allowed to do it -- about what the codes and what the process is.

And so, in essence, a 403 objection is about whether an average of 18, on a given day, is something that should be weighed in the balance.

And, on 403, I think -- actually, the Government has it right.

But, your objection is preserved and overruled on 403.

On 124, 126 and 127, that 403 objection, I just don't -- I don't see why she's wrong, Mr. Halverson.

The fact that this occurred in 17 states or two states or -- I don't -- I saw where -- at least I divined where Ms. Holt was headed on those three exhibits. So I will let you tell me why this tends to show anything.

MR. HALVERSON: Certainly, your Honor.

So the heat map, itself, this one doesn't actually -- this just kind of shows where people are in the world. It is really the following slides that would generate what I think the jury could infer.

So 126 shows that the provider and the beneficiary were in different states 94 percent time. That is showing our case. This is all done by telemedicine. It is hidden from Medicare's view. But, these people are in different places, and that is really what one thing we're trying to prove, is that the defendant set up a system whereby secretively they could link up practitioners wherever they happened to be with Medicare bennies wherever they happened to be. And this is the result, that they don't end up being in the same state as each other.

THE COURT: Make your record the same way on 127. Just explain 127 to me.

MR. HALVERSON: Sorry, I actually misspoke.

So this is about the billing. 126 is about the DME provider and beneficiary, which, actually, is almost worse because it is generally, you would go down the street to a pharmacy, right?

You are not going to go to another state to a pharmacy or a DME supplier.

So this is showing that the DME suppliers were in a

different state 94 percent of the time.

127 is the same issue, essentially, but with the doctor, the referring provider, and the beneficiary. They are in different states 47 percent of the time. Again, this is showing that they are not matched up to people that are -- that makes sense to go to.

And we had testimony about this, I believe it was from Jodi Sullivan. And I think it was Jodi Sullivan who testified that it doesn't make sense to go to a provider that is not located near you.

THE COURT: And 124 is different?

It seems to me that even on the Government's view of it, 124 is of a relatively lesser valens or inference.

MR. HALVERSON: I don't think it is a -- it's not prejudicial in any way, really. It is really just showing where they focused on identifying beneficiaries. These are the hotspots for where they were getting beneficiaries from. It just kind of gives the jury an idea of where most of these people -- most of these human beings were located.

THE COURT: Okay.

Ms. Holt, I will let you make your further record on 124, 126 and 127, to the extent that I've not made it.

MS. HOLT: With respect to 124, there is no relevance to this. I don't -- I think it is confusing as to why it would be relevant. The Government has not articulated any

relevance to how this makes it more likely that any material issue of fact occurred, that they are arguing.

With respect to 126 and 127, I think these are extremely misleading, and implicates a variance. The Government -- the implication is that somehow, it is a problem if a patient gets a DME from a supplier that is not in their state. That has nothing to do with anything. There is no requirement in Medicare that they be in the same state. There is no requirement that they somehow go in person to pick up their knee brace.

The fact that the Government is trying to create some sort of problem if a beneficiary is not in the same state as the DME supplier is, indeed, a variance. It is not charged in the indictment, and it couldn't be, because there is no requirement that that be the case. And the same goes with the patient being -- with the patient being in the same state as the provider, with the actual clinician.

And so under 403, I think these are extremely misleading. They are prejudicial. It goes with the theme that the Government has tried to pull out, these differences in state as though somehow that indicates whether there is fraud, or whether there is some Medicare regulation violation.

THE COURT: Yes. I guess, let me -- and that's very well made, Ms. Holt.

Let me just do it one last time with Mr. Halverson.

Let's look at 126.

I don't -- I think Ms. Holt keeps doing the same thing at the heart of the case. And I think that it is wrong, but I just want to make sure I understand it from the Government's view.

The Government doesn't contend that there is a rule prohibiting a DME provider in another state from providing DME to me in Florida, right?

MR. HALVERSON: That is correct, your Honor. That is not what we are alleging. We are not say there's a violation here and that this is somehow a crime.

THE COURT: Right. So then granting Ms. Holt that, because she always says that throughout the case, what then does this tend to show under 403, stipulating that there is no such rule prohibiting a DME provider giving DME to me, even though that DME provider is in another state?

MR. HALVERSON: So this tends to show that the bulk of these orders were done through telemedicine, which is one thing we have had to show. They've actually cross-examined people, well, some of this stuff was done by face to face, right? This is tending to show that that wasn't a big part of this case. The bulk of this case is telemedicine. That's what we're showing the jury. And this is an important piece of evidence showing that.

You know, if they wanted to stipulate that all of

these are done by telemedicine, fine, we don't have to prove it. But, this is one way we are proving it up.

THE COURT: Yeah, I think that's a very well done -- 126 comes in.

124, I'm going to exclude for the reasons largely stated by Ms. Holt.

Now, do that same analysis with 127.

Now, 127 is kind of more in equipoise because it's not 94 to six. It is 47 to 53.

MR. HALVERSON: Well, and we know the reason for that. There has been testimony by a number of people that they -- the coconspirators tried to match beneficiaries up by state. They didn't do the same thing with respect to DME companies, obviously, as shown by that.

But here, we are seeing, even with that attempt to match people up, they -- the bottom line was really more important, and they were going to get these orders signed, even if they weren't in the same state. And that is shown 47 percent of the time, these beneficiaries aren't even in the same state as their doctor. Which, again, goes to showing that this is done through telemedicine, not through patient -- you know, in-person physical interactions with a doctor.

THE COURT: Yes. So it is the same main point, which the Government has been -- has had to shoulder the burden to prove, not just because of their normal burden in a case, but

also the particular way that this case was tried. They have had to prove a level of telemedicine process in order to take steps towards meeting their burden of proof. That is not always the case. That is succinctly stated.

127 will be admitted.

124 will be excluded.

126 will be admitted.

(Government's No. 127, was received in Evidence.)

(Government's No. 126, was received in Evidence.)

THE COURT: I did 123, I believe, as well.

MS. HOLT: Judge, if I may, with 126, even under the Government's theory, right -- I understand our -- our objections have been overruled. But even under the Government's theory whether the DME supply company is in the same state as the patient has nothing to do with whether the consultation took place via the phone.

THE COURT: Those are all fair arguments for the jury.

What Mr. Halverson is right about is that the defense has strategically decided to do a pull-out-all-the-stops defense, which it is entitled to do.

And the Government -- I mean, Ms. Holt can't possibly gainsay what Mr. Halverson said, which is about the crosses. You strategically decided to cross witnesses and contest facts in this case that, frankly, don't go to the core dispute,

which is, by the way, after we do all of this stuff, did Mr. Blackman know?

Many of these cases are fought only on that ultimate ground. The defense has decided to fight on multiple grounds. And Mr. Halverson is right, because they have chosen to do so, there are 403 inferences that, in summary from voluminous data, does tend to push back on those, let's call it, mini-battles that the defense has strategically shown.

Otherwise, the defense's position is essentially, we get to fight everything. We get to cite rules that exist in Medicare. But, the Government can't describe its theory of case through evidence.

So I hear you. 124 is excluded. 126 and 127 are admitted.

Let me just remind myself on 123.

MR. HALVERSON: You allowed that, your Honor.

THE COURT: Is admitted.

All right. That takes us to 137.

137, let me get to it, and then I will hear the Government's view.

I think we are getting into ones where I was actually, out of an abundance of caution, divining perhaps what the defense was arguing in bulk with specific exhibits. So I was being careful.

You want 137 out, right, Ms. Holt?

MS. HOLT: Yes, Judge.

THE COURT: So hang on a second.

So, yeah, the big one on 137, among other things, is a line there that says "corrective action plan."

So I will let you make your record on the whole exhibit, but why would an exhibit with "corrective action plan" come in?

MR. HALVERSON: Your Honor, well, this is part of the core of our theory here, which is that the defendant made a contract with the ACC, knowing full well that they were committing fraud, and carried out through the corrective action -- this is actually more generous to the defendant than we could have put. We could have put the Cox email, where Cox is first told that ACC is committing fraud back, I think, in July of 2017, that is months earlier than we indicated the line in.

This is just -- we are just asking -- this is in evidence. That corrective plan email is in evidence. And Mr. Petron has no idea what that is about. He is just putting a time stamp on this email. We could have called it, you know, the Government's exhibit number, for what that is. But what this shows is that they put in a corrective action plan, it did nothing. In fact, the orders went up after the corrective action plan. And it wasn't until months later that the billing stopped, not for anything to do with the

corrective action plan, but actually that they decided to go to a different provider of fake doctors' orders.

THE COURT: Okay. Is there any other evidence in this case -- I think there is. But there is -- let's say it this way: There is nothing precluding the Government that if I don't let 137 in, that the Government can't argue this exact slide, right?

MR. HALVERSON: Your Honor, we need the data -- so the summary of this data does not exist without this slide. So we need this data to show that the bill -- you know, that these orders continued to come in -- or these encounters continued to happen through the defendant's platform after the corrective action plan and after everything that happened.

And, this is something the defense litigated aggressively. They have gone after the corrective action plan. They said everything was done appropriately. And I don't actually know why they would object to this, because they are saying, you know, the corrective action plan was put in place and it worked, according to their theory.

THE COURT: And your point is that, in -- I think your core point is, putting aside the black line, in voluminous data, there is no other way, and there hasn't been a way yet for the Government to put over 35,000 patient encounters during this timeframe in the case, and the Government has to be able to do that?

MR. HALVERSON: Correct, your Honor. This specific data and this timeline, even excluding the corrective action plan, to be able to put this timeline of the encounters in front of the jury, we need this slide to show that.

THE COURT: All right.

Ms. Holt, well, putting aside corrective action plan for a second, why don't they get 35,000 patient encounters over the period?

Why is that to be excised from the case?

MS. HOLT: Your Honor, we would object under 403 as cumulative, as veering past the appropriate amount of summary exhibits, trying -- this is turning into a closing argument through a summary witness.

THE COURT: Yes, I agree. I agree that -- let me say this: I agree with Mr. Halverson, except for the black line. I think the black line is not summary of the voluminous. It is argument. I will allow the Government -- if they want to make a slide that does not have the black line, I will allow you.

Because it is not the case -- Ms. Holt's objection, that last part, which I agree with her, the courts have to be on the lookout for closing argument through a summary witness.

But, the facts of the voluminous record are not that. That is pulling from voluminous records a number of patient encounters over a period of time.

So I am going to keep 137 out. I'm going to exclude it primarily because of what Ms. Holt said at the end of her argument, because I think it does veer too much into argument through summary witness, which I'm not going to allow.

I actually think it is close, for the reason Mr. Halverson states, but I'm going keep it out.

If the Government -- however, because this came very late, makes a slide that is anodyne on patient encounter data from the records, without an argument like corrective action plan, I will consider that.

And I know the Government is going to feel a little bit blindsided because it is so late, but, in an abundance of caution, I am not going to allow 137. That's excluded.

MR. HALVERSON: Your Honor, I understand the ruling. I think we can make one quickly.

My concern is that Mr. Petron will not know that we're -- like, we are manipulating something that he created, and I feel like we should be -- we have already done it, actually. So the exhibit can be made.

THE COURT: He is on direct. You can --

MR. HALVERSON: Can I let him know that we changed this exhibit?

THE COURT: Yes. He's on direct. You can make the exhibit, you can provide it to the defense. And he is still on direct, so you can speak to your witness.

And because this came so late, and because it is a minor change to 137 -- I mean, obviously, if you do something that is major, and it is not just taking out the black line, Ms. Holt is going to let me know. But, if it is taking out the argument like "corrective action plan," you can show that to your witness and you can call it 137A, or something close, that's totally allowed in the rules.

And, frankly, I wouldn't prejudice the Government on patient encounters because this came late.

But, just to be clear, for now, 137 is excluded.

There is two more, and then I will let you go have lunch.

110 and 111.

MR. HALVERSON: I think there was also 138, your Honor.

THE COURT: One second.

MR. HALVERSON: I didn't touch it because you had told me to move on from that topic, I thought, so --

THE COURT: Yes, one second.

MR. HALVERSON: It is on the screen now.

THE COURT: I didn't write down -- I apologize.

MR. HALVERSON: Your Honor, I just skipped this because you had said 137 --

THE COURT: Yes. To me, I was -- I was doing my best to divine Ms. Holt. And I think some things have stayed out

because of that, and I am glad I did.

But, on 138, I think I can see the difference because we have a name like Jean Wilson in there. I will let you make a quick record, Mr. Halverson, on Gill and the other names and what this 138 tends to show for 403.

MR. HALVERSON: Your Honor, what this shows is the encounters of the ACC providers. They are labeled ACC providers in the HealthSplash data, itself.

So this is just showing that HealthSplash had in its records this number of patient encounters for these practitioners.

And, again, this all goes to show HealthSplash was on notice, ACC's committing fraud, and then these are well after that notice, many of them, that these practitioners are doing an enormous number of patient encounters.

THE COURT: And so you have a 403 objection to 138, Ms. Holt?

MS. HOLT: I do, Judge, and also a due process objection.

The Government has admitted through this witness approximately 60 summary exhibits, and I think at this point, they are veering into just doing their closing argument from the witness stand with Mr. Petron.

THE COURT: No, I don't agree with that at all. And I don't think it is -- I don't think it's 60.

But, more importantly, they are entitled to educe facts through voluminous records. And, to be clear, this Court has been vigilant on a handful of these when it has gone over the line.

But, the Government is completely allowed -- there is no limit in the law to educing facts through voluminous records, under 1006, as long as you get by 403. And 138 clearly gets by the 403 balancing -- 401,402 and 403 for this Court.

So 138, I will allow.

(Government's No. 138 was received in Evidence.)

THE COURT: So let's do 110 and 111.

Oh, these are the undercovers. Why are we doing this through -- you know, these were the two where the big difference to me is these aren't -- these aren't charged. Right?

MR. HALVERSON: Your Honor, the point of doing this is essentially a couple points, to establish -- because the undercover can't establish venue for that conduct. And so this establishes venue by saying Sunrise Medical is in Broward County. It ties it together, that entire course. It shows that the records were billed to Medicare.

And, one claim that I think defense has made the argument, we don't even know, you know, what happened with those claims -- this shows, straight through the process,

straight through DMERx, DeCorso signs the order for him, without even speaking to the fake beneficiary. It goes to Myrtle DME NYC, and is billed to Medicare, and that -- that DeCorso was working for Sunrise Medical here in the Southern District of Florida when he did this.

THE COURT: Okay.

Ms. Holt, I will let you make a brief further record on 110 and 111.

MS. HOLT: Again, your Honor, these are not proper summary exhibits under 1006. This is taking specific claims data that comes from two records, the billing record and then the -- it seems they're combining it with what was in HealthSplash's spreadsheets.

So I don't believe that this encompasses -- or falls under 1006 as summarizing voluminous numerous records with respect to Vernon Wheeler.

THE COURT: That, I don't understand. I mean, I think 1006 is easier here. I thought you were going to say 403 or something like that. But on 1006, this is clearly voluminous records. Right? This is -- this includes Medicare billing data, which is clear beyond peradventure is voluminous in this case.

MS. HOLT: But it's for one beneficiary, Judge. And you can see down at the bottom, it's GX310, which is the order and the medical records that the Government -- that the

Government introduced.

So with respect to a single beneficiary, summarizing the claims data for a beneficiary is not voluminous records that cannot be conveniently examined. They can, indeed, be conveniently examined by the jury with respect to a single beneficiary.

I was getting to 403, where -- and due process.

Again, this is the Government's closing argument. I -- they can produce these four as demonstratives for their closing argument, but to present summary exhibit after summary exhibit after summary exhibit through someone they qualified as an expert for a different purpose veers past the line of 1006 and into a violation of Mr. Blackman's due process.

THE COURT: So let's deal with the last one. I don't think it is quite 403, the way she made it. But I guess, I just want to make sure, couldn't the Government do what Ms. Holt said, if this was not admitted, in the sense that you could literally, for this slide, put it up in closing and say, for each one of these, I'm pointing you towards a GX. And in this big GX, it is in Excel spreadsheet that if you do a filter for the name, Myrtle, or DeCorso, you'll be able to lock it in?

That, I think, is actually, of everything that she said, the closest to a cognizable objection that may have traction.

MR. HALVERSON: Your Honor, 1006 is all about making this information accessible to the jury. We're talking about massive Excel spreadsheets that they are going to have to sift through.

And Ms. Holt, again, mischaracterizes what that is. So it is challenging for me, because I am sort of like shadowboxing here. But, this is based on Excel spreadsheets, multiple excel spreadsheets, that the jury would have to sift through. And, it also combines the doctors' orders.

So, we could do this in front of the jury. If we had unlimited time, we could do a lot of things with this jury and show them many, many things, but --

THE COURT: Mr. Halverson, say no more. I wanted you to make the record so I was understanding it.

110 and 111 are admissible.

(Government's Exhibits 110 and 111 were received in evidence.)

Your objection is preserved and overruled.

Ms. Holt's objection is preserved and overruled.

About how much longer do you have on direct?

MR. HALVERSON: Just getting exhibits in that we just talked about.

THE COURT: Thanks very much, everybody. I will see you after lunch.

MR. HALVERSON: Thank you, Judge.

(Lunch was taken at 12:33 PM.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

May 11, 2026
DATE

/s/Sharon Velazco
SHARON VELAZCO, RPR, FPR
Official Court Reporter
United States District Court
400 North Miami Avenue
9th Floor
Miami, Florida 33128

## $

**$1,450** [1] - 49:10
**$1,600** [2] - 137:11, 140:12
**$1.045** [1] - 107:4
**$1.06** [1] - 97:5
**$10,000** [2] - 126:1, 131:22
**$106** [1] - 116:1
**$16,000** [1] - 130:17
**$164,000** [1] - 79:2
**$172** [1] - 115:20
**$178,000** [1] - 81:4
**$184** [1] - 116:1
**$2,500** [1] - 137:10
**$250,000** [1] - 80:1
**$257,000** [1] - 80:2
**$275,000** [1] - 64:4
**$3,230** [1] - 89:8
**$39** [1] - 81:6
**$39,000** [1] - 84:13
**$39,915** [1] - 84:10
**$4,600** [1] - 131:23
**$440** [1] - 115:20
**$452** [1] - 108:23
**$465** [1] - 64:1
**$52** [1] - 8:14
**$525** [1] - 49:9
**$606** [1] - 139:6
**$675** [1] - 107:13
**$832,000** [1] - 78:24
**$833** [1] - 139:5
**$85,900** [1] - 82:16
**$9,200** [1] - 86:5
**$9,530** [1] - 85:4

## '

**'17** [1] - 132:25
**'18** [4] - 133:1, 133:25, 140:7

## 1

**1** [6] - 1:8, 2:6, 12:18, 96:17, 135:17, 138:23
**1,236** [1] - 119:2
**1.045** [3] - 107:1, 107:20, 108:2
**1.05** [1] - 106:7
**1.062** [3] - 107:24, 112:11, 113:16
**1.3** [1] - 110:20
**1.45** [1] - 107:20
**1.5** [1] - 80:1
**1.8** [1] - 127:9
**1/3/19** [1] - 82:21
**10,800** [1] - 134:1
**10/3** [1] - 125:21
**10/30** [1] - 125:21
**1006** [40] - 21:4, 21:12, 21:20, 21:23, 23:17, 24:13, 25:12, 25:16, 27:8, 27:15, 28:21, 29:17, 30:15, 35:5, 35:19, 36:10, 36:24, 37:19, 37:23, 61:7, 61:11, 61:16, 66:22, 90:12, 95:15, 103:7, 109:23, 112:1, 113:17, 135:25, 136:10, 139:21, 162:7, 163:10, 163:15, 163:18, 163:19, 164:13, 165:1
**1007** [1] - 28:7
**101** [2] - 3:13, 104:5
**102** [9] - 97:11, 98:3, 98:5, 98:12, 99:13, 99:16, 99:17, 103:9, 103:10
**103** [1] - 3:13
**104** [9] - 3:10, 99:2, 99:5, 102:17, 103:7, 103:11, 103:18, 103:19, 105:24
**105** [11] - 60:3, 60:4, 60:7, 60:10, 60:13, 60:15, 61:5, 98:8, 106:13, 106:14, 106:19
**107** [44] - 3:19, 20:21, 20:22, 20:23, 21:6, 21:11, 21:18, 24:11, 24:12, 24:17, 25:9, 25:10, 25:14, 27:8, 27:16, 28:10, 29:20, 30:17, 32:6, 32:8, 32:22, 35:4, 60:23, 61:5, 61:6, 61:12, 61:14, 81:22, 82:8, 83:14, 83:17, 84:23, 87:18, 90:13, 97:23, 98:17, 98:22, 134:24, 135:25, 136:3, 136:9, 136:14, 136:15
**107-type** [1] - 32:14
**108** [7] - 3:14, 3:20, 137:19, 138:6, 138:10, 138:13, 138:14
**109** [5] - 3:20, 139:13, 139:21, 139:25, 140:1
**10:56** [1] - 105:4
**10:57** [1] - 105:11
**11** [3] - 1:5, 67:7, 118:5
**11/22** [1] - 125:21
**110** [9] - 3:14, 140:19, 141:1, 141:4, 160:13, 162:12, 163:8, 165:15, 165:16
**111** [10] - 3:15, 20:21, 20:22, 141:7, 141:8, 160:13, 162:12, 163:8, 165:15, 165:16
**112** [12] - 3:10, 93:13, 94:17, 94:20, 95:8, 95:10, 95:14, 95:17, 95:25, 96:1, 107:17, 108:23
**113** [7] - 3:11, 3:15, 3:16, 109:12, 109:23, 109:25, 110:1
**114** [6] - 3:11, 3:16, 110:22, 111:4, 111:7, 111:8
**115** [3] - 111:16, 112:1, 112:4
**116** [6] - 3:12, 3:17, 112:16, 112:22, 112:25, 113:1
**117** [7] - 3:13, 3:17, 113:9, 113:17, 115:1, 115:4, 115:5
**118** [7] - 3:13, 3:18, 116:7, 116:22, 117:14, 117:17, 117:18
**119** [16] - 3:17, 3:18, 21:5, 28:23, 29:5, 29:6, 29:10, 29:16, 30:6, 30:7, 30:13, 30:15, 129:14, 129:22, 130:4, 130:5
**11:10** [2] - 105:11, 105:16
**11:58** [1] - 142:3
**11th** [1] - 115:13
**120** [5] - 3:17, 131:3, 131:10, 131:14, 131:15
**121** [5] - 3:18, 132:6, 132:18, 132:21, 132:22
**122** [7] - 3:18, 3:19, 28:24, 133:8, 133:14, 133:18, 133:19
**123** [15] - 3:19, 134:12, 134:18, 134:21, 142:18, 142:19, 142:25, 143:7, 143:10, 143:13, 145:5, 147:20, 147:21, 154:10, 155:15
**124** [15] - 3:20, 119:14, 120:3, 120:6, 142:18, 142:20, 143:6, 148:20, 150:11, 150:13, 150:22, 150:23, 153:5, 154:6, 155:13
**125** [11] - 3:14, 3:16, 3:20, 121:3, 121:4, 121:10, 121:11, 122:10, 122:13, 122:14
**126** [16] - 120:7, 120:20, 120:21, 142:20, 143:6, 148:20, 149:6, 149:19, 150:22, 151:3, 152:1, 153:4, 154:7, 154:9, 154:11, 155:13
**127** [14] - 120:22, 120:25, 143:6, 148:20, 149:16, 149:17, 150:2, 150:22, 151:3, 153:7, 153:8, 154:5, 154:8, 155:13
**128** [6] - 3:14, 123:9, 123:20, 123:24, 124:2, 124:3
**129** [10] - 3:15, 30:22, 30:24, 31:2, 31:6, 124:20, 125:1, 125:5, 125:10, 125:11
**12:33** [2] - 1:7, 166:1
**12th** [1] - 133:25
**13** [1] - 1:10
**130** [5] - 3:15, 126:11, 126:22, 127:1, 127:2
**131** [6] - 3:16, 71:11, 127:14, 127:18, 127:21, 127:22
**133** [1] - 3:19
**135** [4] - 128:8, 128:18, 128:20, 128:21
**137** [11] - 129:10, 155:18, 155:19, 155:25, 156:3, 157:6, 159:1, 159:13, 160:2, 160:10, 160:23
**137A** [1] - 160:6
**138** [7] - 160:14, 161:2, 161:5, 161:16, 162:7, 162:10, 162:11
**139** [12] - 3:3, 12:1, 12:3, 12:9, 65:3, 65:9, 66:15, 66:22, 66:23, 66:25, 67:2, 71:12
**140** [8] - 3:3, 12:11, 67:16, 68:1, 68:4, 68:6, 68:8, 68:11
**1400** [2] - 1:16, 1:20
**141** [8] - 3:4, 12:15, 12:22, 68:23, 69:10, 69:13, 69:15, 69:16
**142** [13] - 3:7, 31:10, 31:13, 31:14, 31:19, 31:25, 32:14, 60:22, 81:15, 81:24, 81:25, 82:5, 82:7
**143** [8] - 3:8, 32:4, 32:14, 60:22, 83:7, 83:19, 84:2, 84:4
**144** [6] - 32:4, 32:14, 60:22, 84:15, 84:23, 84:25
**145** [7] - 3:8, 32:4, 32:15, 60:23, 85:15, 85:23, 85:25
**1450** [1] - 49:9
**146** [10] - 3:9, 32:15, 60:23, 86:22, 87:1, 87:6, 87:16, 87:17, 88:2, 88:5
**147** [9] - 3:9, 31:10, 32:15, 60:23, 87:21, 88:16, 88:23, 89:1, 89:4
**148** [5] - 13:2, 13:3, 13:9, 13:15, 13:19
**149** [12] - 3:7, 18:9, 18:12, 18:15, 18:18, 19:2, 19:6, 19:8, 80:9, 80:18, 80:21, 80:22
**15** [12] - 21:19, 21:22, 73:25, 79:10, 90:24, 105:2, 105:7, 105:9, 127:12, 133:1, 134:1, 141:20
**15,931** [1] - 118:6
**150** [5] - 3:5, 76:11, 76:25, 77:4, 77:5
**151** [10] - 3:6, 18:9, 19:14, 20:7, 20:10, 20:11, 77:25, 78:11, 78:14, 78:15
**152** [6] - 3:5, 18:9, 72:5, 73:17, 73:19, 73:21
**153** [1] - 18:9
**154** [6] - 3:6, 18:9, 79:4, 79:16, 79:18, 79:19
**155** [4] - 81:13, 89:12, 89:13, 89:23
**157** [11] - 32:25, 34:18, 35:16, 38:1,

38:8, 38:14, 38:16, 59:24, 60:1, 60:4, 98:8
**159** [1] - 18:9
**16** [3] - 78:19, 122:22, 131:22
**165** [8] - 3:4, 13:1, 70:4, 70:16, 70:18, 70:20, 70:21, 70:24
**17** [2] - 127:12, 148:22
**18** [3] - 126:4, 146:11, 148:14
**19** [1] - 126:4
**197,000** [1] - 78:24
**1:15** [2] - 141:19, 142:1
**1:23-cr-20271** [1] - 1:3
**1st** [2] - 55:23, 55:25

## 2

**2** [7] - 12:18, 13:5, 13:16, 13:19, 44:19, 49:1, 135:5
**2.1** [1] - 129:4
**2.3** [1] - 91:5
**20** [7] - 6:5, 73:25, 78:20, 90:24, 91:25, 118:5, 145:8
**20,460** [1] - 88:13
**20005** [2] - 1:16, 1:20
**2015** [1] - 126:15
**2016** [5] - 76:19, 110:6, 110:10, 128:4, 130:15
**2017** [4] - 110:11, 126:15, 128:6, 156:15
**2018** [15] - 84:19, 85:5, 86:5, 110:11, 110:12, 130:16, 131:21, 133:25, 134:1, 136:25, 137:6, 138:23, 139:2, 140:9
**2019** [7] - 82:14, 84:9, 88:11, 89:8, 110:14, 113:8, 131:21
**2020** [3] - 76:19, 79:11, 110:7
**2021** [1] - 54:3
**2022** [3] - 54:22, 55:3, 55:8
**2023** [5] - 55:10, 55:12, 55:13, 55:18, 56:3
**2026** [2] - 1:5, 56:11
**21** [2] - 130:16, 143:21
**21st** [2] - 84:19, 85:4
**225** [2] - 3:12, 112:5
**23-cr-20271** [1] - 4:9
**23rd** [1] - 89:8
**25** [1] - 72:18
**2500** [1] - 140:11
**25th** [1] - 133:25
**26** [2] - 2:20, 72:18
**27** [1] - 72:18
**28** [1] - 119:1
**29** [1] - 86:11
**2nd** [1] - 88:11

## 3

**3** [2] - 40:24, 45:4
**3,000** [1] - 127:9
**3,500** [1] - 134:2
**3.3** [1] - 78:25
**30-day** [1] - 125:22
**303** [7] - 22:21, 22:22, 42:6, 42:9, 53:6, 57:5
**306** [6] - 47:13, 47:21, 48:14, 48:16, 53:12, 57:5
**306.90** [1] - 88:13
**31** [1] - 86:11
**31st** [1] - 136:25
**320** [1] - 40:11
**33128** [3] - 2:3, 2:7, 2:14
**346,000** [1] - 111:12
**347,000** [1] - 111:13
**35,000** [3] - 80:3, 157:23, 158:7
**360** [1] - 125:23
**38** [1] - 2:21
**3rd** [4] - 55:12, 82:14, 139:2, 140:7

## 4

**4** [3] - 45:14, 104:12, 140:6
**4,890** [1] - 127:8
**4.1** [1] - 127:9
**40** [3] - 2:2, 2:6, 53:18
**400** [1] - 2:13
**401,402** [1] - 162:8
**403** [43] - 38:6, 95:12, 112:2, 112:3, 112:23, 117:15, 120:4, 122:11, 122:12, 123:25, 124:1, 125:2, 127:19, 128:19, 129:23, 131:11, 132:19, 133:15, 134:19, 139:22, 141:2, 143:21, 145:6, 145:12, 146:21, 147:22, 148:3, 148:13, 148:16, 148:19, 148:20, 151:18, 152:14, 155:6, 158:10, 161:5, 161:16, 162:7, 162:8, 163:19, 164:7, 164:15
**408** [3] - 22:23, 23:2, 26:14
**411** [3] - 23:4, 23:18, 28:11
**420** [1] - 104:14
**43** [1] - 2:20
**436** [3] - 23:4, 23:19, 28:12
**437** [4] - 29:9, 29:11, 29:23, 145:18
**441** [5] - 29:9, 29:11, 29:17, 29:23, 145:18
**4437** [1] - 29:17
**448** [3] - 31:1, 31:2, 123:21
**452** [2] - 97:7, 113:4
**47** [3] - 150:4, 153:9, 153:19
**48** [2] - 2:22, 123:2
**4th** [1] - 137:6

## 5

**5,500** [1] - 133:2
**5.4** [1] - 34:3
**50,000** [1] - 72:17
**50/50** [2] - 123:1, 123:4
**51,904** [1] - 118:2
**5196** [1] - 13:5
**52** [2] - 3:3, 123:1
**52.1** [2] - 74:5, 91:4
**53** [1] - 153:9
**54** [1] - 3:3
**54.4** [1] - 91:6
**55** [1] - 3:4
**55,860** [1] - 118:4
**56** [1] - 3:4
**59** [1] - 3:5
**5th** [2] - 134:1, 140:9

## 6

**6,100** [1] - 125:25
**6.5** [1] - 74:10
**60** [3] - 5:15, 161:21, 161:25
**602** [9] - 41:23, 42:25, 43:5, 43:23, 46:18, 47:2, 51:9, 51:18, 52:14
**63** [1] - 3:5
**630** [6] - 35:17, 35:23, 36:1, 36:4, 36:8
**64** [1] - 3:6
**65** [1] - 3:6
**66** [1] - 3:7
**675** [1] - 108:6
**68** [3] - 3:7, 115:13, 116:3

## 7

**7** [1] - 84:9
**70** [1] - 3:8
**700,000** [1] - 100:18
**702** [6] - 41:23, 42:25, 43:6, 43:23, 47:2, 109:6
**71** [1] - 3:8
**713,000** [3] - 102:20, 103:5, 103:25
**72** [2] - 3:9, 54:19
**74** [1] - 3:9
**75** [1] - 3:10

## 8

**8.4** [2] - 78:21, 81:5
**8.5** [1] - 77:10
**80** [1] - 49:15
**807** [1] - 83:2
**808** [1] - 83:2
**84** [1] - 122:23
**89** [1] - 3:10
**8:30** [1] - 1:7
**8th** [1] - 1:15

## 9

**9** [6] - 35:17, 35:24, 35:25, 36:1, 36:17, 86:4
**9,500** [1] - 133:1
**9,530** [1] - 85:8
**9/7** [1] - 125:21
**900,000** [1] - 129:4
**902** [3] - 70:17, 86:9, 86:10
**921** [3] - 70:17, 86:9, 86:10
**94** [3] - 149:7, 150:1, 153:9
**95** [1] - 34:3
**96** [1] - 3:11
**96,880** [1] - 117:24
**97** [2] - 3:11, 129:7
**98** [1] - 3:12
**99** [3] - 3:12, 116:5, 145:20
**9:30** [1] - 39:17
**9:35** [2] - 39:17, 39:23
**9th** [1] - 2:14

## A

**A.M** [3] - 39:23, 105:11
**A.M.** [3] - 105:4, 105:16, 142:3
**able** [12] - 7:4, 13:23, 86:13, 106:3, 106:23, 107:9, 144:12, 144:23, 146:24, 157:25, 158:3, 164:21
**absolutely** [8] - 41:8, 46:4, 51:16, 57:1, 58:5, 67:12, 98:7, 103:3
**abundance** [6] - 36:7, 37:25, 59:25, 98:4, 155:22, 159:12
**ACC** [4] - 156:10, 156:14, 161:7
**ACC's** [1] - 161:13
**accept** [1] - 92:16
**acceptable** [1] - 8:15
**access** [1] - 143:19
**accessible** [1] - 165:2
**according** [1] - 157:19
**account** [20] - 13:5, 14:1, 14:6, 36:19, 65:22, 65:23, 66:5, 66:6, 67:14, 68:19, 83:1, 83:2, 83:3, 85:6, 85:7, 87:14, 116:4
**Accounting** [1] - 62:20
**accounts** [86] - 6:6, 6:8, 6:11, 6:13, 6:16, 7:8, 7:10, 7:12, 7:14, 7:17, 7:20, 8:2, 8:10, 8:13, 8:17, 8:18, 8:24, 9:8, 9:13, 10:19, 11:1, 11:4, 11:7, 11:9, 11:12, 12:2, 12:8, 12:12, 12:16, 16:16, 16:23, 17:22, 19:17, 19:18, 20:6, 21:16, 64:25, 65:6, 65:10, 65:15, 65:17, 65:24, 65:25, 66:4, 66:11, 67:7, 67:11, 67:13, 67:20, 67:23, 68:14, 68:17, 68:19, 69:2, 69:21, 70:8, 71:4, 71:7, 71:9, 71:15,

71:18, 71:23, 71:24, 71:25, 72:19, 73:3, 74:2, 74:6, 74:10, 76:17, 77:11, 77:15, 80:13, 85:11, 89:18, 91:2, 91:3, 91:5, 91:6
**Accounts** [1] - 67:8
**accurate** [5] - 26:6, 51:7, 90:16, 90:17, 147:4
**accurately** [1] - 73:6
**act** [1] - 147:6
**action** [13] - 156:4, 156:6, 156:12, 156:22, 156:24, 157:1, 157:13, 157:15, 157:18, 158:2, 158:6, 159:9, 160:5
**active** [1] - 40:20
**activity** [1] - 74:1
**acts** [2] - 146:20, 147:8
**actual** [7] - 7:4, 9:20, 36:13, 113:12, 130:12, 151:17
**addition** [1] - 91:8
**additional** [4] - 47:19, 71:7, 72:11, 101:8
**address** [4] - 10:12, 119:17, 119:23, 119:24
**addressed** [3] - 5:10, 5:19, 39:3
**addressing** [1] - 5:17
**adds** [1] - 113:15
**adjudicated** [1] - 114:23
**admissibility** [1] - 148:7
**admissible** [7] - 30:15, 36:12, 36:14, 67:1, 142:12, 165:15
**admit** [43] - 48:13, 61:10, 61:15, 66:15, 68:1, 69:10, 70:16, 73:16, 76:24, 78:11, 79:16, 80:18, 84:21, 87:1, 88:22, 89:23, 94:16, 103:6, 109:22, 111:4, 112:1, 112:22, 113:17, 115:1, 116:22, 117:14, 120:3, 120:20, 122:10, 123:20, 124:25, 126:21, 127:18, 128:17, 129:21, 131:9, 132:18, 133:14, 134:18, 135:24, 138:6, 139:20, 141:1
**admitted** [29] - 23:16, 24:10, 24:13, 25:10, 25:14, 34:12, 36:2, 38:5, 40:12, 47:15, 48:16, 60:16, 61:11, 74:14, 74:19, 83:16, 83:19, 84:2, 87:25, 88:3, 95:19, 146:20, 154:5, 154:7, 155:14, 155:17, 161:20, 164:17
**advance** [1] - 98:8
**Advantage** [1] - 109:4
**advertising** [2] - 81:7, 81:8
**advertising-related** [2] - 81:7, 81:8
**advice** [1] - 96:18
**advisory** [1] - 62:23
**affiliated** [10] - 72:10, 74:4, 75:23, 76:8, 81:4, 85:11, 86:20, 89:17, 90:25, 91:17
**afield** [1] - 10:9
**Agent** [1] - 4:15
**aggregate** [3] - 7:11, 8:8, 24:4
**aggregated** [4] - 10:15, 10:16, 11:8, 16:23
**aggregating** [4] - 21:2, 25:15, 37:9, 37:12
**aggregation** [1] - 25:20
**aggregations** [1] - 30:9
**aggressively** [1] - 157:15
**ago** [1] - 92:19
**agree** [18] - 8:22, 9:15, 10:11, 10:12, 13:20, 14:6, 14:11, 16:11, 24:9, 25:7, 25:13, 32:6, 37:2, 158:14, 158:15, 158:21, 161:24
**ahead** [2] - 6:2, 100:9
**aid** [23] - 24:11, 24:16, 25:10, 25:22, 26:5, 27:11, 27:16, 27:19, 38:2, 82:4, 82:6, 82:7, 83:18, 84:2, 84:24, 85:21, 85:24, 87:2, 87:18, 88:3, 88:23, 89:1, 95:5
**aids** [4] - 25:16, 30:17, 32:22, 90:3
**akin** [4] - 30:17, 60:16, 98:5, 98:9
**alert** [2] - 38:24, 61:9
**algorithms** [1] - 93:8
**All-Med** [10] - 6:7, 13:5, 14:1, 80:2, 80:5, 126:8, 126:14, 127:8, 128:11, 128:13
**alleged** [1] - 145:15
**alleging** [1] - 152:10
**allow** [9] - 15:9, 15:19, 17:17, 147:20, 158:17, 158:18, 159:4, 159:13, 162:10
**allowable** [1] - 49:16
**allowables** [1] - 49:14
**allowed** [45] - 8:21, 8:23, 9:1, 9:4, 14:11, 16:6, 16:9, 16:11, 16:14, 16:17, 16:19, 17:4, 17:11, 17:14, 17:20, 17:23, 17:25, 18:1, 18:2, 18:3, 19:9, 19:23, 19:24, 20:5, 20:8, 20:9, 20:13, 23:12, 23:17, 25:4, 25:5, 27:13, 33:6, 39:11, 60:20, 74:21, 92:14, 92:20, 95:23, 103:16, 147:1, 148:11, 155:16, 160:7, 162:5
**almost** [6] - 100:18, 111:13, 119:5, 123:1, 130:16, 149:20
**AM** [3] - 1:7, 39:17
**amalgamates** [1] - 22:1
**America** [2] - 83:1, 114:21
**AMERICA** [1] - 1:4
**Amici** [5] - 6:7, 8:12, 77:15, 80:1, 80:4
**amount** [25] - 23:24, 26:1, 29:14, 35:11, 49:15, 78:22, 82:22, 85:8, 96:25, 106:23, 107:9, 108:1, 108:5, 108:17, 109:2, 112:14, 113:4, 124:13, 124:17, 130:14, 130:16, 137:10, 137:11, 158:11
**amounts** [15] - 30:10, 80:7, 93:19, 104:21, 107:23, 108:15, 109:1, 111:20, 112:19, 113:7, 115:22, 116:1, 125:24, 126:1, 129:8
**ample** [3] - 10:23, 10:25, 22:14
**analyses** [1] - 97:1
**analysis** [25] - 8:24, 33:1, 34:8, 35:19, 37:8, 37:10, 64:23, 91:8, 91:15, 91:20, 92:4, 99:21, 100:13, 100:15, 107:10, 107:21, 107:22, 107:24, 108:16, 108:17, 108:19, 109:2, 117:7, 121:16, 153:7
**analyst** [2] - 10:8, 101:24
**analyzed** [1] - 121:25
**ankle** [5] - 115:16, 121:17, 122:20, 122:22, 122:24
**announce** [1] - 4:10
**anodyne** [1] - 159:8
**answer** [12] - 12:5, 16:2, 41:12, 42:1, 44:6, 46:21, 52:8, 73:1, 96:16, 114:19, 122:4, 135:10
**answered** [1] - 132:13
**anticipate** [1] - 38:19
**apart** [2] - 22:5, 134:3
**apologize** [2] - 29:1, 160:21
**appearances** [1] - 4:10
**APPEARANCES** [1] - 1:13
**applicable** [2] - 45:11, 91:21
**applies** [2] - 23:19, 23:21
**apply** [2] - 21:1, 23:19
**appreciate** [6] - 15:13, 21:7, 31:22, 32:11, 99:1, 99:12
**appreciatively** [1] - 108:6
**approach** [1] - 9:19
**appropriate** [2] - 98:17, 158:11
**appropriately** [1] - 157:16
**approximate** [1] - 107:15
**April** [2] - 110:14, 128:4
**area** [1] - 119:19
**argue** [1] - 157:6
**argued** [4] - 11:16, 20:5, 24:6, 147:25
**arguing** [3] - 145:13, 151:2, 155:23
**argument** [31] - 6:21, 6:23, 7:5, 9:14, 9:16, 16:12, 17:1, 17:5, 18:6, 18:8, 20:15, 20:16, 20:17, 20:18, 24:5, 24:24, 25:2, 26:8, 36:22, 158:12, 158:17, 158:22, 159:3, 159:9, 160:5, 161:22, 162:24, 164:8, 164:10
**arguments** [3] - 6:22, 28:20, 154:17
**Arlington** [1] - 62:16
**arranged** [1] - 29:24
**arrive** [1] - 9:8
**articulated** [1] - 150:25
**AS** [2] - 135:4, 137:1
**aside** [2] - 157:21, 158:6
**aspect** [1] - 19:3
**aspects** [1] - 18:20
**assignment** [4] - 97:13, 97:14, 98:4, 98:20
**assist** [1] - 40:20
**assistant** [1] - 45:25
**associated** [2] - 40:18, 124:12
**assume** [7] - 7:19, 17:12, 53:13, 67:10, 69:25, 75:10, 76:7
**assumed** [8] - 8:23, 13:6, 14:2, 16:16, 16:18, 17:21, 75:11, 101:6
**assuming** [1] - 10:19
**assumption** [16] - 9:2, 13:11, 13:23, 13:24, 14:13, 14:15, 15:25, 16:1, 16:3, 16:20, 16:24, 18:17, 19:5, 19:6, 19:10, 138:12
**assumptions** [17] - 9:7, 10:17, 14:9, 14:20, 14:21, 15:11, 15:16, 16:7, 16:10, 17:2, 17:8, 17:21,

19:1, 20:12, 30:14, 75:6, 113:21
**attached** [3] - 40:25, 41:2, 50:21
**attempt** [1] - 153:15
**attempted** [1] - 71:20
**attention** [3] - 61:2, 61:4, 88:12
**attorneys** [2] - 61:8, 141:18
**attributing** [1] - 108:16
**attuned** [1] - 61:20
**Audisho** [4] - 131:1, 132:1, 138:22, 144:7
**Audisho's** [1] - 146:20
**auditor** [2] - 48:2, 49:20
**August** [1] - 136:25
**available** [1] - 75:4
**Avenue** [3] - 1:16, 1:20, 2:13
**average** [11] - 108:1, 108:17, 119:3, 143:15, 145:12, 146:11, 146:21, 147:11, 147:12, 148:8, 148:14
**avoid** [1] - 38:15
**aware** [1] - 53:25
**axis** [1] - 110:6

## B

**background** [1] - 62:15
**balance** [1] - 148:15
**balancing** [1] - 162:8
**bank** [34] - 7:7, 7:8, 10:14, 21:16, 30:22, 31:9, 31:11, 31:25, 38:21, 64:25, 65:6, 65:9, 65:15, 65:17, 65:22, 65:24, 66:5, 67:7, 68:19, 69:7, 69:21, 73:2, 78:8, 79:13, 80:15, 82:18, 83:5, 84:11, 86:5, 86:11, 86:17, 88:12, 89:9, 89:20
**Bank** [1] - 83:1
**banking** [3] - 63:8, 76:21, 81:20
**bare** [1] - 13:11
**based** [45] - 5:18, 6:4, 10:6, 14:21, 43:15, 48:9, 67:23, 69:7, 76:20, 78:7, 79:12, 80:14, 89:19, 89:20, 103:2, 104:1, 106:3, 107:10, 107:24, 109:17, 109:18, 111:1, 111:22, 112:20, 113:14, 114:7, 116:14, 120:1, 120:15, 122:8, 124:16, 124:17, 128:12, 129:19, 131:7, 132:10, 133:12, 137:25, 139:17, 140:24, 143:5, 143:6, 143:11, 145:17, 165:7
**basis** [11] - 15:25, 22:8, 36:11, 41:7, 63:24, 69:22, 70:9, 99:22, 109:16, 128:2, 145:22
**battle** [1] - 145:21
**battles** [1] - 155:8
**Bay** [1] - 43:18
**becomes** [1] - 24:23
**BEFORE** [1] - 1:11
**beginning** [4] - 4:11, 90:6, 98:19, 110:11
**behalf** [3] - 4:23, 13:7, 14:3
**beings** [2] - 145:3, 150:19
**bell** [1] - 142:13
**beneficiaries** [25] - 28:14, 93:19, 96:24, 110:25, 111:10, 111:21, 114:3, 117:23, 117:25, 118:3, 118:5, 119:1, 119:12, 119:18, 121:12, 122:21, 123:5, 123:15, 124:13, 124:18, 127:9, 150:16, 150:17, 153:12, 153:19
**beneficiary** [40] - 21:2, 29:22, 29:25, 96:9, 96:18, 119:4, 119:17, 119:22, 120:10, 124:23, 125:14, 125:20, 125:25, 129:18, 130:10, 131:6, 131:20, 132:3, 132:9, 132:25, 133:11, 133:23, 135:3, 135:4, 137:1, 137:22, 138:20, 139:16, 140:5, 140:22, 149:6, 149:20, 150:3, 151:12, 163:2, 163:23, 164:2, 164:3, 164:6
**beneficiary's** [1] - 96:10
**bennies** [1] - 149:13
**best** [7] - 14:17, 26:8, 74:20, 75:8, 142:14, 146:22, 160:24
**Beth** [1] - 50:12
**better** [1] - 91:25
**between** [7] - 14:19, 27:8, 29:23, 82:14, 84:19, 118:10, 130:15
**beyond** [3] - 6:16, 96:20, 163:21
**big** [5] - 94:11, 152:21, 156:3, 162:14, 164:20
**bigger** [1] - 96:22
**bilateral** [3] - 40:22, 45:2, 49:5
**bill** [6] - 44:15, 111:10, 144:23, 145:2, 145:3, 157:10
**billed** [53] - 26:15, 30:10, 35:12, 44:18, 49:22, 60:11, 93:19, 96:25, 97:3, 102:7, 104:21, 106:4, 106:23, 107:23, 108:1, 109:1, 109:2, 109:15, 110:8, 111:20, 112:12, 112:14, 113:13, 114:25, 115:12, 116:1, 116:4, 117:5, 117:6, 119:3, 125:22, 127:9, 127:17, 128:2, 128:25, 129:1, 129:3, 129:7, 130:13, 130:16, 131:23, 133:1, 134:1, 134:9, 134:16, 137:10, 139:5, 140:12, 143:22, 148:9, 162:22, 163:3
**biller** [4] - 41:14, 42:19, 44:12, 57:9
**billing** [11] - 43:3, 43:12, 45:12, 114:20, 114:22, 115:19, 117:4, 149:19, 156:25, 163:11, 163:21
**billion** [10] - 97:5, 106:7, 107:3, 107:4, 107:20, 107:24, 108:2, 112:11, 113:16
**birth** [1] - 93:9
**bit** [3] - 23:10, 71:20, 159:12
**black** [5] - 157:21, 158:15, 158:16, 158:18, 160:3
**BLACKMAN** [1] - 1:7
**Blackman** [59] - 4:9, 4:23, 5:1, 6:8, 6:11, 6:15, 7:10, 7:18, 7:21, 8:10, 8:17, 9:12, 9:13, 10:20, 11:3, 11:7, 11:11, 12:2, 12:8, 12:15, 12:20, 13:7, 14:3, 15:22, 16:16, 17:12, 18:21, 19:17, 67:8, 67:11, 67:13, 67:14, 67:20, 69:3, 69:24, 71:8, 71:9, 71:15, 71:23, 71:24, 72:10, 72:13, 74:2, 74:6, 74:9, 76:16, 77:15, 78:23, 80:12, 81:5, 89:17, 91:2, 91:5, 145:16, 145:22, 148:6, 155:2
**Blackman's** [2] - 8:13, 164:13
**Blackman-controlled** [34] - 6:8, 8:10, 8:17, 9:12, 9:13, 10:20, 11:7, 11:11, 12:2, 12:8, 12:15, 12:20, 18:21, 19:17, 67:8, 67:11, 69:24, 71:9, 71:15, 71:23, 72:10, 72:13, 74:2, 74:6, 74:9, 76:16, 77:15, 78:23, 80:12, 81:5, 89:17, 91:2, 91:5
**blindsided** [1] - 159:12
**blowup** [2] - 31:11, 32:3
**blowups** [1] - 5:22
**blue** [9] - 12:8, 67:9, 71:16, 71:22, 72:10, 72:12, 74:2, 77:14, 91:5
**body** [1] - 122:5
**bolster** [1] - 16:12
**bolstering** [1] - 15:6
**bolsters** [1] - 14:25
**bond** [1] - 54:25
**Bond** [1] - 1:15
**bore** [1] - 108:14
**boss** [1] - 53:25
**bottom** [14] - 22:3, 74:8, 82:18, 82:20, 86:6, 86:16, 94:19, 110:5, 135:21, 137:5, 138:25, 145:18, 153:16, 163:24
**box** [5] - 74:3, 75:20, 75:21, 75:22, 76:2
**boxes** [9] - 26:25, 71:22, 77:13, 82:16, 85:9, 94:13, 94:14, 110:10
**brace** [27] - 40:22, 40:23, 43:3, 43:12, 45:3, 48:4, 49:6, 49:9, 49:10, 117:23, 118:11, 118:18, 118:21, 118:23, 120:13, 121:11, 121:13, 121:14, 122:22, 122:24, 129:2, 144:24, 145:2, 151:10
**braces** [26] - 40:21, 43:9, 44:25, 45:2, 49:4, 115:9, 115:17, 115:21, 115:23, 115:25, 117:25, 118:3, 118:5, 118:7, 121:15, 121:18, 121:20, 121:25, 122:25, 123:1, 123:3, 132:2, 132:25, 143:24, 146:12, 147:15
**Bracing** [5] - 23:2, 43:14, 137:7, 137:12, 140:10
**bracing** [1] - 44:23
**Braga** [23] - 4:14, 40:10, 44:20, 45:4, 45:15, 47:14, 47:22, 48:19, 49:18, 50:2, 68:13, 69:18, 76:11, 77:7, 96:3, 106:20, 110:22, 111:16, 112:7, 112:16, 122:16, 129:14, 130:7
**break** [11] - 27:6, 37:25, 97:17, 99:24, 99:25, 100:8, 103:13, 104:25, 105:2, 105:10, 121:2
**Breitman** [3] - 40:15, 52:25, 57:20
**BREITMAN** [2] - 2:20, 40:9
**Brett** [4] - 4:8, 4:23, 13:7, 14:3
**BRETT** [1] - 1:7
**brief** [2] - 57:2, 163:7
**briefly** [7] - 57:17,

59:17, 62:15, 84:7, 85:2, 86:2, 88:7
**bring** [1] - 61:1
**brings** [1] - 22:6
**broke** [6] - 101:14, 102:19, 102:20, 102:21, 102:25, 103:25
**brought** [2] - 7:1, 61:3
**Broward** [3] - 139:9, 140:15, 162:20
**BT** [1] - 139:16
**bucket** [3] - 19:17, 104:3, 104:4
**buckets** [1] - 104:10
**Building** [1] - 1:15
**bulk** [3] - 152:17, 152:22, 155:23
**bunch** [4] - 7:8, 63:7, 63:13, 141:17
**burden** [3] - 153:24, 153:25, 154:3
**buried** [1] - 61:18
**business** [2] - 8:13, 38:22
**BY** [124] - 2:11, 40:14, 41:16, 42:16, 43:2, 43:11, 44:11, 44:21, 45:5, 45:16, 47:4, 47:23, 48:20, 49:3, 49:19, 50:3, 51:13, 51:21, 52:5, 52:12, 52:18, 52:24, 53:4, 57:4, 57:19, 58:14, 58:18, 62:10, 63:19, 65:16, 67:5, 67:17, 68:15, 68:24, 69:19, 70:5, 71:1, 71:14, 72:6, 73:22, 75:19, 76:13, 77:8, 78:2, 78:16, 79:6, 79:22, 80:10, 80:24, 81:16, 82:11, 83:9, 84:6, 84:16, 85:1, 85:16, 86:1, 86:23, 87:10, 88:6, 88:17, 89:5, 89:14, 90:22, 92:24, 93:14, 94:5, 96:4, 97:2, 97:12, 100:11, 103:22, 105:25, 106:15, 106:21, 107:18, 108:21, 109:10, 110:2, 111:9, 111:17, 112:8, 112:17, 113:2, 113:22, 115:7, 116:8, 117:1, 117:21, 118:16, 119:10, 120:23, 121:9, 121:24, 122:7, 122:17, 123:11, 124:5, 124:21, 125:13, 126:12, 127:5, 127:15, 127:24, 128:9, 128:24, 129:15, 130:8, 131:4, 131:18, 132:7, 132:15, 133:3, 133:9, 133:22, 134:13, 135:1, 135:12, 136:18, 137:20, 138:17, 139:14, 140:3, 140:20

## C

**cannot** [2] - 37:4, 164:4
**capping** [1] - 54:12
**captioned** [3] - 11:11, 11:12, 11:13
**captured** [5] - 66:13, 68:18, 100:22, 118:20, 145:6
**capturing** [2] - 76:2, 118:23
**cards** [1] - 77:21
**Care** [2] - 126:8, 126:14
**care** [1] - 21:7
**careful** [3] - 47:18, 142:12, 155:24
**carefully** [2] - 16:22, 30:16
**Carolina** [1] - 139:3
**carried** [1] - 156:11
**carries** [2] - 29:8
**carry** [1] - 18:19
**Case** [1] - 4:9
**case** [56] - 10:4, 13:20, 13:21, 14:7, 14:14, 14:17, 15:14, 15:17, 16:17, 18:20, 21:22, 31:21, 51:7, 58:19, 63:6, 63:7, 63:10, 63:21, 64:3, 64:4, 64:5, 64:15, 64:19, 64:23, 74:19, 82:3, 82:5, 90:8, 90:10, 94:4, 95:19, 101:5, 141:22, 141:24, 141:25, 143:16, 146:7, 147:6, 147:8, 149:8, 151:15, 152:3, 152:13, 152:22, 153:25, 154:1, 154:4, 154:25, 155:12, 157:4, 157:24, 158:9, 158:20, 163:22
**CASE** [1] - 1:3
**cases** [2] - 145:21, 155:3
**catch** [2] - 65:12, 77:17
**catch-all** [1] - 77:17
**categories** [3] - 61:1, 61:19, 61:21
**categorize** [1] - 6:6
**categorized** [2] - 115:15, 121:17
**categorizing** [1] - 116:12
**caught** [1] - 143:4
**caution** [6] - 36:8, 38:1, 59:25, 98:4, 155:22, 159:13
**cautionary** [1] - 33:12
**Center** [6] - 6:6, 8:12, 19:22, 77:16, 80:13, 81:2
**certain** [12] - 5:23, 14:20, 14:21, 21:16, 25:4, 30:13, 37:9, 42:23, 67:12, 72:18, 74:13, 82:20
**certainly** [7] - 17:5, 35:1, 35:3, 98:14, 99:11, 146:23, 149:1
**certificate** [2] - 45:8, 49:21
**certification** [2] - 39:2, 147:3
**certifications** [2] - 38:22, 39:6
**cetera** [2] - 50:6, 102:9
**challenge** [1] - 15:10
**challenging** [1] - 165:6
**chance** [1] - 141:12
**chances** [1] - 101:12
**change** [4] - 27:8, 27:9, 147:25, 160:2
**changed** [1] - 159:21
**charge** [1] - 49:12
**charged** [5] - 54:2, 54:16, 146:1, 151:13, 162:15
**charges** [4] - 49:7, 49:8, 54:5, 146:2
**charging** [1] - 54:11
**chart** [42] - 19:9, 66:12, 66:14, 67:18, 67:19, 71:5, 73:23, 96:7, 96:8, 106:12, 109:13, 109:14, 110:23, 110:24, 111:18, 112:18, 113:10, 115:10, 116:9, 116:10, 118:14, 118:15, 119:16, 119:21, 120:8, 120:10, 120:24, 122:1, 122:8, 123:12, 123:13, 124:6, 124:7, 124:22, 124:23, 126:13, 127:25, 128:10, 129:16, 129:17, 134:14
**charts** [13] - 19:4, 69:5, 69:22, 70:9, 70:11, 74:13, 74:16, 75:2, 75:10, 75:13, 90:7, 112:12, 117:10
**chasing** [1] - 10:1
**check** [3] - 28:18, 28:21, 66:9
**checklist** [1] - 45:7
**checks** [1] - 66:10
**chosen** [1] - 155:5
**Chronos** [5] - 82:15, 82:21, 84:10, 84:13
**circles** [1] - 10:1
**cite** [3] - 14:14, 15:14, 155:10
**cited** [5] - 15:17, 24:22, 29:9, 29:10, 35:16
**cites** [2] - 10:4, 18:1
**claim** [16] - 21:2, 21:15, 41:20, 52:19, 96:19, 96:21, 108:8, 108:9, 108:12, 124:11, 124:17, 137:9, 139:4, 140:9, 140:11, 162:23
**claims** [49] - 26:15, 29:13, 42:21, 42:23, 63:9, 64:11, 91:15, 91:16, 91:21, 91:24, 92:5, 96:10, 101:22, 101:25, 102:6, 102:9, 107:22, 107:23, 109:14, 110:18, 111:23, 112:10, 113:11, 113:24, 114:2, 114:3, 114:4, 114:24, 116:19, 117:22, 118:1, 119:6, 119:25, 123:6, 123:7, 123:19, 124:24, 126:7, 135:16, 135:21, 137:5, 138:3, 139:1, 145:17, 146:15, 162:25, 163:10, 164:3
**clairvoyant** [3] - 98:6, 99:10
**classic** [1] - 29:17
**clear** [28] - 9:17, 13:15, 16:5, 17:10, 17:17, 18:3, 18:24, 19:8, 20:3, 25:3, 31:1, 34:7, 60:22, 64:14, 66:24, 68:16, 69:1, 75:1, 83:21, 90:3, 90:6, 93:21, 94:19, 95:15, 126:16, 160:10, 162:2, 163:21
**clearer** [2] - 5:11, 35:8
**clearly** [14] - 14:13, 19:21, 23:11, 24:10, 25:2, 25:16, 27:13, 29:8, 30:15, 32:12, 34:24, 67:13, 162:8, 163:19
**client** [3] - 63:1, 63:2, 63:3
**clinician** [3] - 136:24, 138:22, 151:17
**clinician's** [1] - 140:6
**close** [5] - 29:19, 108:4, 109:2, 159:5, 160:6
**closest** [1] - 164:24
**closing** [14] - 20:4, 24:3, 24:5, 24:24, 34:13, 36:22, 38:2, 60:17, 158:12, 158:22, 161:22, 164:8, 164:10, 164:18
**CMS** [1] - 47:6
**coconspirator** [1] - 10:9
**coconspirators** [1] - 153:12
**code** [8] - 27:4, 114:8, 114:22, 115:19, 117:5, 118:20, 146:16
**codes** [17] - 30:9, 114:11, 114:13, 114:20, 114:24, 115:12, 115:13, 115:15, 116:4, 117:4, 128:11, 129:6, 137:10, 139:5, 140:11, 148:12
**coding** [1] - 71:21
**cognizable** [1] - 164:24
**collecting** [1] - 63:12
**collection** [1] - 35:21
**color** [2] - 71:21,

119:19
**color-coding** [1] - 71:21
**column** [12] - 66:16, 66:25, 67:24, 68:2, 68:8, 69:8, 69:11, 69:14, 70:14, 70:21, 95:4, 96:24
**columns** [2] - 12:6, 12:22
**combination** [1] - 69:23
**combinations** [2] - 30:9, 125:22
**combined** [2] - 80:7, 97:1
**combines** [1] - 165:9
**combining** [1] - 163:12
**comfortable** [1] - 30:7
**comfortably** [1] - 30:11
**coming** [6] - 5:15, 33:21, 36:5, 36:8, 38:14, 59:16
**commend** [1] - 60:7
**comment** [2] - 8:4, 8:19
**committing** [3] - 156:11, 156:14, 161:13
**common** [1] - 117:9
**commonly** [1] - 114:7
**companies** [4] - 6:12, 16:19, 89:17, 153:14
**company** [5] - 26:15, 48:4, 64:3, 126:7, 154:14
**compare** [1] - 80:6
**compared** [1] - 80:4
**compares** [1] - 120:10
**comparison** [1] - 121:11
**compensated** [3] - 63:20, 63:23
**compiling** [1] - 16:15
**complaining** [1] - 12:4
**complaint** [1] - 11:23
**complete** [1] - 147:4
**completely** [4] - 10:11, 90:17, 148:6, 162:5
**comprise** [1] - 66:1
**computer** [2] - 42:22, 53:13
**concealed** [1] - 28:3
**concern** [4] - 144:14, 146:16, 146:21, 159:16
**concerns** [1] - 60:5
**concluded** [2] - 61:22, 100:2
**conclusions** [3] - 5:18, 9:8, 98:11
**concurs** [1] - 32:16
**conduct** [1] - 162:19
**conference** [2] - 59:19, 97:19
**confidence** [5] - 34:4, 34:25, 37:10, 37:17, 60:12
**confident** [2] - 107:4, 107:14
**confusing** [2] - 28:7, 150:24
**connecting** [2] - 27:20, 27:23
**connection** [9] - 20:5, 43:13, 47:6, 47:15, 63:6, 63:20, 63:25, 64:23, 95:2
**conservative** [1] - 117:8
**consider** [2] - 103:16, 159:10
**considered** [1] - 118:22
**consistent** [2] - 61:2, 61:3
**construct** [1] - 135:14
**consultation** [2] - 46:25, 154:16
**consultations** [1] - 145:8
**consulting** [1] - 62:24
**contain** [1] - 16:7
**contained** [2] - 33:1, 64:8
**contemplate** [1] - 15:3
**contend** [1] - 152:6
**content** [4] - 27:12, 34:15, 37:19, 87:5
**contention** [1] - 37:3
**contents** [1] - 29:3
**contest** [1] - 154:24
**context** [2] - 14:24, 99:19
**continue** [8] - 12:10, 40:5, 84:3, 92:22, 94:2, 100:6, 105:20, 114:19
**CONTINUED** [1] - 40:13
**continued** [4] - 55:10, 55:12, 157:11, 157:12
**contract** [1] - 156:10
**control** [3] - 15:22, 70:1, 73:4
**Controlled** [1] - 67:8
**controlled** [50] - 6:8, 6:15, 7:20, 8:2, 8:10, 8:17, 9:12, 9:13, 10:20, 11:7, 11:11, 12:2, 12:8, 12:12, 12:15, 12:20, 16:16, 17:12, 18:21, 19:17, 19:21, 20:6, 67:11, 67:20, 68:18, 69:3, 69:24, 71:9, 71:15, 71:23, 71:24, 72:10, 72:11, 72:13, 74:2, 74:6, 74:9, 76:16, 77:15, 78:23, 79:10, 79:25, 80:12, 81:5, 89:17, 91:2, 91:5, 91:6
**controlling** [3] - 9:8, 11:1, 11:4
**controls** [1] - 6:13
**conveniently** [3] - 37:5, 164:4, 164:5
**conversation** [2] - 46:23, 46:24
**conversations** [1] - 41:15
**converse** [1] - 14:5
**cooperate** [1] - 56:18
**cooperated** [1] - 54:15
**cooperating** [5] - 54:6, 55:16, 56:10, 57:22, 57:24
**cooperation** [5] - 53:18, 54:8, 56:7, 58:16, 58:19
**copies** [1] - 66:10
**copy** [3] - 89:9, 94:15, 102:11
**core** [11] - 10:12, 10:14, 11:6, 33:25, 37:3, 37:6, 38:3, 101:2, 154:25, 156:9, 157:21
**corner** [1] - 87:22
**Correct** [1] - 137:24
**correct** [52] - 12:23, 13:16, 21:13, 28:12, 32:2, 39:8, 42:10, 53:18, 53:21, 53:22, 53:24, 54:4, 54:6, 54:9, 54:10, 54:13, 54:17, 54:23, 55:1, 55:9, 55:11, 55:13, 55:16, 55:17, 55:19, 56:7, 56:8, 57:9, 58:20, 60:13, 60:14, 67:25, 70:1, 70:2, 70:15, 76:8, 76:9, 88:1, 93:2, 94:25, 95:16, 116:15, 118:9, 125:15, 125:16, 126:6, 126:18, 128:14, 136:11, 146:24, 152:9, 158:1
**corrective** [14] - 156:4, 156:6, 156:11, 156:18, 156:22, 156:24, 157:1, 157:13, 157:15, 157:18, 158:2, 158:6, 159:9, 160:5
**correctly** [1] - 90:7
**corresponding** [1] - 125:24
**counsel** [9] - 4:10, 4:14, 17:15, 18:23, 20:2, 30:18, 59:17, 97:15
**Counsel** [2] - 20:24, 61:21
**count** [7] - 6:20, 34:3, 37:16, 101:6, 101:14, 103:1, 104:1
**Count** [2] - 135:5, 140:6
**country** [2] - 119:11, 119:19
**counts** [1] - 102:21
**county** [4] - 137:14, 138:8, 139:8, 140:13
**County** [3] - 139:9, 140:15, 162:21
**couple** [3] - 55:5, 75:15, 162:18
**course** [10] - 13:23, 20:4, 20:8, 72:18, 72:19, 74:20, 98:2, 98:16, 141:11, 162:21
**COURT** [272] - 1:1, 4:2, 4:16, 4:21, 4:25, 5:5, 6:1, 6:19, 8:6, 8:21, 9:14, 9:21, 10:11, 11:5, 11:22, 12:11, 12:14, 12:19, 12:24, 13:3, 13:8, 13:12, 13:18, 15:8, 15:13, 18:10, 18:14, 19:15, 19:19, 19:23, 20:22, 21:6, 22:16, 22:23, 22:25, 23:4, 23:9, 23:22, 24:9, 24:15, 25:1, 26:7, 26:25, 28:5, 28:8, 28:17, 28:25, 29:3, 29:15, 30:5, 30:24, 31:6, 31:13, 31:18, 31:21, 32:8, 32:11, 32:16, 32:18, 32:20, 33:3, 33:10, 33:16, 33:23, 34:9, 34:17, 34:21, 35:14, 35:23, 36:1, 36:5, 36:7, 36:15, 37:1, 37:13, 38:23, 39:2, 39:6, 39:9, 39:16, 39:18, 39:21, 39:22, 39:24, 41:11, 41:24, 42:9, 42:11, 43:1, 43:7, 43:25, 44:10, 46:19, 47:3, 47:17, 47:19, 48:16, 51:10, 51:12, 51:19, 51:25, 52:8, 52:15, 52:22, 57:3, 57:16, 58:9, 58:17, 58:23, 58:25, 59:3, 59:7, 59:9, 59:16, 59:22, 60:6, 60:15, 60:20, 61:13, 61:25, 62:8, 63:16, 65:12, 66:18, 66:21, 66:24, 68:3, 68:6, 69:13, 70:20, 72:25, 73:19, 74:11, 77:1, 77:4, 78:13, 79:18, 79:21, 80:20, 81:24, 82:2, 83:16, 83:24, 84:2, 84:23, 85:23, 87:4, 87:6, 87:8, 87:18, 87:20, 87:25, 88:2, 88:25, 89:25, 92:7, 94:1, 94:18, 94:24, 95:1, 95:8, 95:10, 95:14, 95:17, 96:15, 97:15, 97:22, 97:25, 99:4, 99:15, 99:23, 100:5, 103:8, 103:10, 103:21, 104:24, 105:3, 105:5, 105:9, 105:13, 105:17, 105:18, 106:14, 108:11, 109:8, 109:25, 111:5, 111:7, 112:3, 112:25, 113:19, 114:18, 115:2, 115:4, 116:23, 117:16, 118:13, 119:9, 120:5, 120:21, 120:25, 121:6, 121:23, 122:3, 122:12, 123:21, 123:24, 124:1, 125:4, 125:9, 126:25,

127:20, 128:20, 129:11, 129:24, 130:2, 131:13, 132:14, 132:20, 133:17, 134:21, 135:8, 136:2, 136:6, 136:8, 136:12, 138:9, 139:24, 141:4, 141:8, 141:11, 141:15, 142:2, 142:4, 143:1, 143:4, 143:9, 143:20, 144:2, 144:14, 145:4, 145:19, 147:19, 149:16, 150:11, 150:20, 151:23, 152:12, 153:3, 153:23, 154:10, 154:17, 155:17, 156:2, 157:3, 157:20, 158:5, 158:14, 159:20, 159:23, 160:16, 160:19, 160:21, 160:24, 161:16, 161:24, 162:12, 163:6, 163:17, 164:14, 165:13, 165:23
**Court** [21] - 2:12, 2:13, 4:1, 4:5, 14:14, 18:15, 25:3, 27:7, 30:11, 32:13, 34:14, 38:1, 38:24, 61:6, 61:9, 94:19, 98:6, 98:20, 99:10, 162:3, 162:9
**court** [4] - 4:4, 15:4, 27:21, 37:5
**Court's** [2] - 9:25, 26:8
**COURTROOM** [4] - 4:4, 39:15, 62:4, 105:12
**courts** [1] - 158:21
**coverage** [1] - 124:8
**Cox** [14] - 12:12, 12:15, 67:20, 68:18, 69:3, 69:23, 71:23, 71:24, 78:24, 79:10, 79:25, 91:2, 156:13
**Cox-controlled** [7] - 12:12, 67:20, 68:18, 71:23, 71:24, 79:10, 79:25
**cream** [5] - 124:10, 124:14, 125:20
**creams** [2] - 123:14, 126:1
**create** [9] - 64:8, 66:12, 69:22, 71:20, 73:4, 86:15, 94:8, 94:24, 151:11
**created** [6] - 36:4, 46:3, 50:17, 75:6, 147:15, 159:17
**creating** [1] - 72:21
**credentials** [1] - 91:20
**credibility** [1] - 8:4
**credible** [1] - 15:21
**credit** [1] - 77:21
**crediting** [1] - 20:11
**crime** [1] - 152:11
**crm** [1] - 1:19
**cross** [11] - 10:23, 10:24, 11:2, 13:11, 14:5, 18:24, 19:7, 52:22, 60:21, 152:19, 154:24
**CROSS** [2] - 2:19, 52:23
**cross-examination** [4] - 10:23, 10:24, 11:2, 52:22
**CROSS-EXAMINATION** [1] - 52:23
**cross-examined** [2] - 13:11, 152:19
**crosses** [1] - 154:23
**crude** [1] - 21:17
**cumulation** [1] - 147:18
**cumulative** [2] - 127:19, 158:11
**curlicue** [1] - 22:16
**Cuttino** [1] - 133:7
**Cuyler** [2] - 4:13, 58:6
**CUYLER** [2] - 1:19, 143:8
**Cynthia** [1] - 4:24

## D

**Dade** [2] - 137:15, 140:16
**darker** [1] - 119:19
**Darren** [1] - 4:12
**DARREN** [1] - 1:14
**darren.halverson@usdoj.gov** [1] - 1:17
**data** [111] - 22:4, 22:5, 23:6, 23:7, 23:8, 25:20, 25:22, 26:14, 26:16, 26:19, 26:20, 27:25, 28:2, 28:10, 29:14, 30:14, 31:5, 33:20, 35:11, 36:13, 36:16, 63:9, 64:11, 91:9, 91:15, 91:16, 91:21, 91:24, 92:1, 92:5, 92:25, 93:1, 93:17, 93:22, 94:3, 96:5, 96:6, 97:4, 100:18, 100:22, 101:22, 102:3, 102:6, 102:9, 107:22, 107:24, 108:7, 109:14, 109:18, 109:20, 110:17, 110:18, 110:19, 111:1, 111:23, 112:20, 113:11, 114:24, 115:9, 116:14, 116:18, 116:19, 119:6, 119:25, 120:1, 120:15, 120:16, 120:17, 122:8, 122:9, 123:17, 123:18, 123:19, 124:24, 125:6, 126:14, 127:8, 128:1, 128:5, 128:11, 128:13, 129:20, 132:10, 132:12, 133:12, 134:8, 135:16, 135:21, 137:6, 140:24, 143:19, 144:17, 145:17, 146:15, 146:25, 147:10, 155:7, 157:8, 157:9, 157:10, 157:22, 158:2, 159:8, 161:8, 163:11, 163:21, 164:3
**database** [7] - 72:18, 73:4, 73:5, 93:23, 94:4, 100:19
**databases** [1] - 94:12
**dataset** [12] - 35:24, 112:21, 113:15, 113:25, 124:12, 126:16, 126:19, 131:8, 134:17, 138:3, 146:19
**datasets** [2] - 93:19, 108:5
**date** [8] - 54:4, 55:14, 56:3, 83:3, 134:3, 137:6, 139:1, 143:14
**date-wise** [1] - 55:14
**dates** [9] - 30:10, 39:4, 55:4, 55:20, 93:9, 98:20, 130:11, 133:24, 134:15
**DAVID** [1] - 1:11
**David** [2] - 4:7, 140:6
**DAY** [1] - 1:10
**DC** [3] - 1:16, 1:20, 62:18
**deal** [4] - 6:20, 11:5, 99:3, 164:14
**dealt** [1] - 7:1
**December** [5] - 73:25, 76:19, 78:20, 79:11, 90:24
**decide** [3] - 10:21, 18:23, 92:17
**decided** [6] - 9:24, 15:25, 154:20, 154:24, 155:4, 157:1
**decides** [2] - 10:2, 56:9
**decision** [3] - 17:15, 18:23, 20:2
**decisions** [1] - 17:11
**DeCorso** [4] - 134:7, 163:1, 163:4, 164:21
**DEFENDANT** [1] - 2:1
**defendant** [10] - 1:8, 10:4, 15:1, 64:15, 143:18, 143:25, 147:16, 149:11, 156:9, 156:12
**defendant's** [1] - 157:12
**defense** [17] - 10:2, 15:24, 16:10, 18:3, 60:3, 60:13, 60:21, 61:17, 142:18, 154:19, 154:21, 155:4, 155:8, 155:23, 157:14, 159:24, 162:23
**defense's** [1] - 155:9
**definitely** [1] - 38:9
**definition** [1] - 102:22
**definitive** [1] - 98:22
**Degree** [3] - 62:19, 62:20, 91:22
**degrees** [1] - 91:23
**deliberate** [1] - 141:24
**delivered** [1] - 123:14
**delivery** [3] - 44:17, 49:23, 51:1
**demonstrative** [12] - 81:22, 81:23, 82:1, 82:7, 84:21, 84:22, 85:22, 85:23, 88:3, 89:1, 90:3, 136:4
**Demonstrative** [5] - 3:7, 3:8, 3:8, 3:9, 3:9
**demonstratives** [3] - 32:6, 90:13, 164:9
**denial** [2] - 15:1, 42:3
**denials** [1] - 43:9
**denied** [2] - 17:4, 30:19
**Department** [4] - 1:14, 63:4, 64:2, 101:24
**depicted** [6] - 78:17, 79:23, 81:17, 81:19, 82:12, 86:18
**DEPUTY** [4] - 4:4, 39:15, 62:4, 105:12
**derived** [1] - 26:9
**describe** [21] - 62:14, 65:4, 77:9, 78:17, 81:17, 82:12, 88:7, 89:6, 89:15, 90:23, 91:12, 101:20, 102:2, 103:23, 109:13, 110:3, 110:4, 110:23, 127:6, 127:25, 155:11
**describing** [3] - 19:18, 87:12, 125:17
**descriptions** [1] - 98:9
**desire** [1] - 36:22
**despite** [1] - 23:24
**detail** [2] - 66:11, 84:11
**detailed** [4] - 41:1, 44:16, 45:18, 50:5
**determine** [7] - 35:11, 100:15, 100:21, 106:3, 106:23, 107:9, 119:21
**determined** [1] - 97:3
**deviate** [2] - 75:10, 75:11
**device** [10] - 96:12, 102:8, 113:12, 113:13, 114:9, 118:19, 118:23, 119:18, 128:25, 130:21
**devices** [26] - 93:18, 96:24, 109:15, 110:8, 110:25, 111:20, 112:13, 114:10, 116:11, 116:13, 118:24, 124:9, 127:9, 127:17, 128:2, 129:1, 129:17, 130:11, 130:12, 130:16, 131:21, 131:22, 133:1, 134:1, 139:5
**difference** [7] - 14:19, 15:15, 27:19, 37:15, 118:10, 161:2,

162:15
**differences** [2] - 142:12, 151:20
**different** [30] - 17:14, 37:11, 43:8, 43:10, 45:10, 82:3, 90:1, 93:4, 95:4, 96:8, 99:3, 102:1, 107:21, 108:5, 109:3, 121:4, 121:7, 123:13, 126:16, 128:12, 131:6, 133:24, 137:10, 149:7, 149:9, 150:1, 150:4, 150:11, 157:2, 164:12
**digitize** [1] - 73:3
**digits** [1] - 65:23
**DIRECT** [3] - 2:19, 40:13, 62:9
**direct** [11] - 14:5, 53:5, 53:20, 62:8, 77:22, 105:20, 141:13, 159:20, 159:23, 159:25, 165:20
**directed** [1] - 67:19
**direction** [2] - 99:11, 99:17
**director** [1] - 62:25
**disagree** [1] - 11:3
**disagrees** [1] - 25:3
**disallows** [2] - 13:22, 14:14
**disclose** [2] - 33:15, 33:17
**disclosed** [4] - 33:18, 34:5, 34:6, 74:18
**disclosing** [1] - 20:12
**disclosure** [6] - 33:7, 33:12, 34:23, 35:2, 37:22, 114:17
**discuss** [2] - 141:22, 141:23
**discussed** [1] - 38:13
**discusses** [1] - 114:11
**discussing** [1] - 71:8
**discussions** [1] - 63:15
**display** [2] - 85:20, 88:23
**displaying** [2] - 111:19, 122:21
**disposal** [1] - 56:21
**dispute** [3] - 6:13, 62:24, 154:25
**disregard** [3] - 90:11, 90:17, 135:9
**distinction** [2] - 27:12, 99:4
**DISTRICT** [3] - 1:1, 1:2, 1:11
**District** [8] - 2:13, 4:5, 4:6, 43:19, 137:16, 139:10, 163:5
**dive** [1] - 5:24
**divine** [1] - 160:25
**divined** [1] - 148:23
**divining** [1] - 155:22
**DIVISION** [1] - 1:2
**DME** [23] - 26:15, 40:18, 40:20, 41:14, 48:4, 57:11, 120:11, 137:7, 139:2, 140:9, 149:19, 149:24, 149:25, 151:6, 151:13, 152:7, 152:15, 152:16, 153:13, 154:14, 163:3
**DMERx** [24] - 8:24, 16:18, 22:4, 23:7, 26:16, 46:6, 47:5, 50:18, 51:3, 72:9, 74:4, 75:23, 76:8, 81:4, 85:11, 86:20, 89:17, 90:25, 91:18, 93:24, 94:6, 96:5, 104:16, 163:1
**DMERx-affiliated** [6] - 74:4, 76:8, 81:4, 85:11, 89:17, 90:25
**docket** [1] - 55:7
**doctor** [17] - 34:2, 36:19, 36:20, 45:20, 45:21, 49:23, 96:11, 102:12, 120:12, 130:20, 137:8, 145:1, 146:17, 150:3, 153:20, 153:22
**doctor's** [6] - 21:15, 22:22, 27:3, 37:16, 136:23, 138:21
**doctors** [2] - 143:23, 147:10
**doctors'** [4] - 104:16, 135:15, 157:2, 165:9
**document** [17] - 23:3, 40:15, 40:24, 40:25, 42:14, 42:17, 45:17, 47:24, 48:21, 50:4, 53:9, 54:12, 65:9, 65:11, 65:18, 65:21, 86:16
**documentation** [2] - 44:24, 45:1
**documents** [12] - 21:14, 22:10, 25:6, 26:24, 53:2, 57:7, 63:10, 66:1, 66:3, 101:16, 104:7
**dOJ** [1] - 1:19
**dOJ-crm** [1] - 1:19
**dollar** [3] - 7:12, 7:13
**dollars** [2] - 7:14, 115:20
**done** [22] - 11:11, 18:20, 27:6, 31:7, 51:14, 51:22, 52:7, 93:4, 99:16, 106:16, 114:21, 114:22, 144:7, 144:8, 149:8, 152:18, 152:20, 153:1, 153:3, 153:21, 157:16, 159:18
**double** [1] - 62:18
**doubt** [3] - 56:14, 60:19, 142:10
**down** [16] - 43:18, 58:25, 59:6, 59:12, 74:8, 78:25, 89:9, 97:16, 99:15, 104:5, 106:19, 114:11, 145:18, 149:21, 160:21, 163:24
**Dr** [4] - 45:20, 50:8, 144:6, 144:7
**dramatic** [2] - 110:13, 110:14
**draw** [1] - 147:1
**drawing** [1] - 88:12
**drawn** [1] - 31:5
**drink** [1] - 59:11
**driving** [1] - 144:16
**drug** [2] - 124:7, 124:8
**drugs** [2] - 124:10, 124:15
**DSL** [1] - 26:16
**due** [19] - 14:24, 55:24, 112:2, 112:23, 117:15, 123:25, 125:2, 127:19, 128:19, 129:23, 131:11, 132:19, 133:15, 134:19, 139:22, 141:2, 161:18, 164:7, 164:13
**duly** [1] - 62:3
**duplicative** [1] - 38:6
**during** [7] - 15:21, 58:15, 58:16, 74:6, 76:18, 77:11, 157:24

**E**

**early** [1] - 75:14
**easier** [3] - 142:24, 148:3, 163:18
**easily** [3] - 21:23, 31:7, 82:25
**Economics** [1] - 62:18
**eczema** [2] - 124:10, 125:20
**educe** [3] - 16:9, 98:5, 162:1
**educed** [1] - 60:1
**educing** [1] - 162:6
**effect** [1] - 54:12
**efficient** [4] - 59:23, 98:25, 100:24, 141:18
**efficiently** [1] - 101:4
**efforts** [1] - 147:18
**eight** [5] - 30:8, 30:9, 68:17, 104:4
**either** [9] - 17:3, 27:15, 38:1, 56:17, 94:6, 98:24, 143:9, 145:1, 145:9
**elbow** [1] - 115:16
**electronic** [2] - 100:19, 104:2
**ELMO** [1] - 53:3
**email** [3] - 156:13, 156:18, 156:20
**employee** [1] - 78:25
**encompass** [1] - 50:5
**encompasses** [1] - 163:14
**encounter** [1] - 159:8
**encounters** [9] - 157:11, 157:24, 158:3, 158:7, 158:25, 160:9, 161:7, 161:10, 161:15
**end** [6] - 110:11, 113:6, 113:7, 128:5, 149:14, 159:2
**enormous** [1] - 161:15
**ensure** [1] - 73:5
**ensuring** [1] - 73:10
**entered** [2] - 39:23, 105:16
**entire** [2] - 147:14, 162:21
**entirely** [3] - 9:5, 20:5, 26:6
**entities** [13] - 17:22, 72:10, 72:11, 72:12, 72:13, 75:22, 78:23, 79:10, 79:25, 81:5, 81:6, 81:7, 81:8
**entitled** [2] - 154:21, 162:1
**entity** [1] - 72:12
**EOBs** [1] - 47:11
**equipment** [1] - 44:23
**equipoise** [1] - 153:8
**ERIN** [1] - 2:5
**error** [3] - 107:6, 107:7, 107:8
**especially** [1] - 23:11
**ESQ** [4] - 1:14, 1:19, 2:2, 2:5
**essence** [2] - 143:20, 148:13
**essentially** [24] - 9:11, 11:10, 21:10, 31:11, 32:21, 33:12, 33:14, 33:22, 35:10, 67:10, 67:21, 69:4, 69:25, 70:10, 76:1, 77:17, 91:15, 118:19, 125:18, 147:10, 147:17, 150:2, 155:9, 162:18
**establish** [2] - 162:18, 162:19
**establishes** [1] - 162:20
**estimate** [1] - 107:5
**et** [2] - 50:6, 102:8
**etcetera** [1] - 85:12
**evaluated** [1] - 114:23
**eventually** [1] - 104:14
**evidence** [68] - 6:18, 8:20, 10:20, 19:1, 23:16, 24:13, 24:17, 25:6, 25:11, 28:2, 34:12, 36:2, 36:3, 36:5, 36:8, 36:11, 36:17, 37:6, 38:15, 38:20, 42:8, 42:9, 47:14, 60:23, 63:11, 65:9, 72:4, 74:17, 74:19, 74:20, 74:22, 75:8, 82:5, 83:8, 84:15, 87:23, 89:13, 90:2, 90:8, 90:10, 90:15, 95:21, 95:23, 96:19, 103:15, 103:19, 107:17, 141:23, 144:2, 144:5, 144:10, 144:18, 144:24, 145:16, 145:25, 146:1, 146:4, 146:7, 147:14, 147:17, 147:21, 148:10, 152:24, 155:12, 156:18, 157:3, 165:17

**Evidence** [40] - 3:1, 21:12, 66:23, 68:11, 69:16, 70:24, 73:21, 74:21, 77:5, 78:15, 79:19, 80:22, 84:4, 84:25, 85:25, 88:5, 89:4, 96:1, 110:1, 111:8, 112:5, 113:1, 115:5, 117:18, 122:14, 124:3, 125:11, 127:2, 127:22, 128:21, 130:5, 131:15, 132:22, 133:19, 136:15, 138:14, 140:1, 154:8, 154:9, 162:11
**evidentiary** [1] - 146:13
**exact** [7] - 60:19, 72:16, 83:4, 85:18, 86:4, 111:19, 157:6
**exactly** [3] - 52:3, 106:8, 106:9
**examination** [11] - 10:23, 10:24, 11:2, 40:5, 52:22, 53:20, 59:13, 62:8, 100:6, 105:20, 114:4
**EXAMINATION** [4] - 40:13, 52:23, 57:18, 62:9
**examine** [2] - 64:7, 64:11
**examined** [5] - 13:11, 37:5, 152:19, 164:4, 164:5
**examining** [2] - 91:24, 113:12
**example** [17] - 13:10, 13:19, 18:15, 20:10, 20:21, 29:15, 33:23, 83:11, 84:18, 88:20, 98:3, 98:13, 129:18, 131:20, 132:9, 132:24, 133:11
**examples** [1] - 20:20
**excel** [1] - 165:8
**Excel** [11] - 23:20, 24:1, 25:23, 25:25, 26:1, 26:3, 26:10, 81:11, 164:20, 165:3, 165:7
**excellent** [2] - 29:15, 61:8
**except** [4] - 31:4, 38:13, 70:13, 158:15
**excerpt** [1] - 82:18
**excerpted** [1] - 88:11
**excised** [1] - 158:9
**exclude** [3] - 146:9, 153:5, 159:1
**excluded** [10] - 59:25, 60:7, 60:13, 98:9, 98:21, 117:8, 154:6, 155:13, 159:13, 160:10
**excluding** [1] - 158:2
**exclusion** [1] - 145:23
**excuse** [6] - 25:14, 58:9, 60:12, 71:12, 105:5, 136:4
**excused** [1] - 59:1
**Excused** [3] - 59:2, 105:8, 142:8
**exercises** [1] - 91:25
**Exhibit** [87] - 12:3, 12:9, 12:10, 19:2, 21:11, 24:12, 25:10, 29:10, 31:1, 31:2, 32:25, 35:17, 35:24, 35:25, 36:1, 36:17, 40:11, 42:6, 47:13, 48:14, 53:6, 59:24, 65:3, 66:22, 67:16, 68:23, 70:4, 71:11, 72:5, 73:17, 76:11, 76:25, 77:25, 79:4, 80:9, 81:13, 81:15, 84:15, 85:15, 86:10, 86:22, 87:17, 88:16, 89:13, 93:13, 94:17, 94:20, 97:11, 102:17, 103:7, 103:19, 105:24, 107:17, 108:23, 109:12, 109:23, 111:16, 112:4, 112:16, 113:9, 116:7, 119:14, 123:9, 124:20, 125:1, 126:11, 126:22, 127:14, 128:8, 128:18, 129:10, 129:14, 129:22, 131:3, 131:9, 132:6, 133:8, 134:12, 134:24, 135:25, 137:19, 139:13, 139:21, 140:19, 141:7, 147:21
**exhibit** [63] - 7:7, 12:7, 14:13, 17:3, 18:8, 21:12, 25:21, 26:9, 27:9, 28:5, 28:10, 28:13, 30:15, 34:15, 36:18, 37:23, 38:5, 39:7, 48:6, 49:1, 65:25, 68:20, 72:3, 72:8, 72:15, 76:6, 76:11, 77:9, 78:3, 78:4, 78:5, 78:18, 83:14, 87:22, 90:4, 95:2, 97:24, 102:23, 103:7, 103:13, 103:23, 109:23, 113:17, 113:21, 128:5, 132:8, 135:14, 136:20, 136:23, 138:18, 139:18, 139:21, 140:4, 156:6, 156:21, 159:19, 159:22, 159:24, 164:10, 164:11
**exhibits** [60] - 5:7, 5:14, 5:20, 5:22, 6:5, 9:20, 16:7, 17:6, 20:19, 20:20, 21:3, 23:13, 23:15, 23:25, 24:17, 24:23, 29:16, 29:21, 29:23, 30:1, 30:23, 31:10, 32:20, 36:23, 39:5, 61:10, 63:13, 66:16, 66:25, 68:2, 68:5, 68:7, 69:11, 69:14, 70:14, 70:21, 71:19, 71:21, 74:13, 74:15, 74:18, 74:21, 74:25, 75:3, 75:4, 75:7, 75:12, 78:7, 94:23, 95:20, 134:20, 141:9, 148:24, 155:23, 158:12, 161:21, 163:10, 165:21
**Exhibits** [8] - 18:9, 20:21, 21:5, 23:18, 28:11, 28:23, 70:17, 165:16
**exist** [2] - 155:10, 157:9
**exists** [1] - 24:21
**exited** [2] - 105:4, 142:3
**expansive** [1] - 96:20
**experience** [4] - 42:19, 44:5, 92:1, 92:14
**expert** [20] - 8:2, 9:10, 9:11, 14:24, 16:22, 24:24, 25:4, 27:14, 33:13, 33:15, 37:17, 37:18, 37:22, 60:1, 60:16, 92:4, 92:9, 114:17, 164:12
**expert/summary** [1] - 24:20
**explain** [21] - 16:2, 16:12, 19:9, 23:13, 24:17, 25:5, 25:11, 33:19, 35:9, 35:17, 67:18, 75:14, 94:21, 107:19, 107:20, 114:12, 114:14, 117:2, 118:14, 124:6, 149:17
**explaining** [1] - 74:18
**explicitly** [3] - 13:24, 17:2, 17:7
**exploded** [1] - 19:7
**exquisitely** [1] - 30:6
**extend** [1] - 56:10
**extended** [5] - 55:5, 55:14, 55:18, 56:2, 56:4
**extensive** [1] - 92:1
**extent** [11] - 16:5, 16:21, 16:25, 17:24, 30:18, 44:6, 75:5, 75:9, 90:9, 90:16, 150:22
**extract** [1] - 29:13
**extracts** [3] - 29:25, 101:19, 101:22
**extraordinary** [1] - 147:24
**extrapolations** [1] - 64:9
**extremely** [5] - 94:10, 109:21, 116:21, 151:4, 151:18
**eye** [1] - 143:4

## F

**face** [3] - 7:17, 152:20
**facially** [1] - 7:17
**fact** [15] - 7:1, 10:7, 20:12, 20:19, 26:9, 27:4, 34:25, 74:24, 144:11, 145:11, 147:2, 148:22, 151:2, 151:11, 156:23
**facts** [10] - 6:12, 8:3, 27:20, 27:23, 64:19, 74:18, 154:24, 158:23, 162:2, 162:6
**fair** [4] - 18:25, 98:18, 98:22, 154:17
**fairness** [1] - 15:1
**fake** [2] - 157:2, 163:2
**fall** [3] - 10:25, 36:24, 142:20
**falloff** [1] - 110:14
**falls** [1] - 163:14
**familiar** [1] - 9:22
**far** [7] - 10:9, 11:24, 51:7, 74:12, 134:3, 143:17, 144:24
**fashion** [1] - 22:11
**fashioned** [1] - 99:16
**fast** [1] - 55:22
**fast-forward** [1] - 55:22
**faxed** [1] - 50:23
**FBI** [2] - 4:15, 10:8
**February** [5] - 24:7, 84:9, 126:4, 133:1, 134:1
**felt** [1] - 66:13
**few** [4] - 21:13, 21:22, 88:9, 123:13
**field** [1] - 92:14
**fifth** [1] - 130:25
**fight** [2] - 155:4, 155:10
**figure** [5] - 100:23, 104:20, 107:12, 107:14, 107:20
**figures** [1] - 97:9
**file** [8] - 10:2, 23:20, 44:15, 101:7, 104:2, 104:5, 104:6
**filed** [2] - 5:6, 24:7
**files** [15] - 25:24, 25:25, 26:17, 36:20, 64:7, 64:8, 102:10, 102:11, 102:20, 103:5, 103:25, 104:14, 104:16, 135:19
**filter** [2] - 26:10, 164:21
**final** [2] - 34:25, 37:21
**finally** [4] - 65:25, 91:3, 137:9, 139:4
**financial** [5] - 6:5, 10:8, 64:12, 64:23, 91:8
**financials** [1] - 64:22
**finder** [1] - 74:24
**findings** [1] - 122:18
**fine** [4] - 29:3, 32:5, 35:14, 153:1
**firm** [3] - 62:22, 62:23, 63:23
**firms** [1] - 79:1
**first** [25] - 9:22, 16:12, 18:11, 23:18, 33:24, 34:21, 34:23, 37:2, 38:6, 64:7, 73:2, 96:9, 96:22, 100:8, 100:17, 104:3, 110:10, 115:10, 115:12, 117:3, 133:4,

134:3, 145:7, 146:3, 156:14
**fit** [5] - 8:9, 21:3, 60:21, 61:18
**fits** [2] - 60:25, 61:21
**five** [10] - 39:12, 39:13, 56:2, 72:20, 100:7, 104:4, 107:8, 107:15, 116:12, 131:22
**fixed** [1] - 11:14
**FL** [2] - 2:3, 2:7
**flag** [1] - 147:9
**flip** [2] - 83:3, 86:10
**Floor** [2] - 1:15, 2:14
**FLORIDA** [1] - 1:2
**Florida** [17] - 1:4, 2:14, 4:6, 43:19, 48:10, 137:3, 137:13, 137:16, 138:25, 139:7, 139:8, 139:10, 140:8, 140:10, 140:14, 152:8, 163:5
**flow** [4] - 8:11, 72:9, 79:24, 83:11
**flows** [4] - 7:12, 7:14, 10:15, 11:8
**focus** [1] - 122:20
**focused** [2] - 76:17, 150:16
**focusing** [1] - 76:16
**fold** [1] - 5:16
**follow** [1] - 69:23
**followed** [2] - 129:2, 146:11
**following** [8] - 59:20, 61:23, 70:9, 71:21, 85:19, 97:20, 100:3, 149:4
**follows** [1] - 41:5
**foot** [5] - 115:16, 121:17, 122:21, 122:22, 122:24
**footnote** [9] - 13:5, 13:16, 13:19, 13:22, 14:1, 18:22, 19:17, 22:18, 23:24
**footnotes** [1] - 23:10
**FOR** [2] - 1:14, 2:1
**forever** [1] - 104:13
**forget** [2] - 86:9, 93:23
**form** [15] - 24:5, 40:19, 40:21, 41:3, 41:6, 41:18, 42:20, 43:13, 47:5, 50:21, 70:9, 74:13, 121:23, 135:8
**formal** [1] - 54:5
**format** [1] - 100:19
**formulating** [1] - 17:13
**forth** [4] - 30:13, 78:25, 104:5, 147:19
**forward** [3] - 18:19, 55:22, 59:16
**fought** [1] - 155:3
**foundation** [9] - 47:19, 65:14, 87:3, 87:4, 87:9, 88:24, 113:20, 116:23, 121:8
**four** [8] - 56:2, 65:23, 68:19, 104:3, 104:11, 119:5, 132:4, 164:9
**fourth** [2] - 115:25, 133:11
**FPR** [1] - 2:12
**frame** [1] - 102:19
**Frances** [1] - 4:15
**frankly** [4] - 19:4, 154:25, 160:8
**fraud** [7] - 145:14, 145:20, 147:8, 151:22, 156:11, 156:14, 161:13
**front** [4] - 38:10, 98:24, 158:4, 165:10
**fruitless** [1] - 10:25
**full** [2] - 62:5, 156:10
**Fullwood** [1] - 15:2
**fully** [1] - 48:13
**fundamental** [1] - 15:1
**funds** [7] - 72:9, 72:13, 76:15, 79:9, 79:24, 79:25, 81:1
**fuzzy** [1] - 93:6

## G

**gainsay** [1] - 154:23
**garbage** [1] - 20:7
**Gary** [1] - 78:24
**gathering** [1] - 21:2
**general** [2] - 69:2, 69:21
**generally** [39] - 48:1, 63:5, 63:7, 65:4, 65:6, 66:3, 69:1, 69:20, 76:14, 76:20, 78:7, 79:7, 79:12, 80:14, 81:17, 84:17, 85:17, 88:18, 93:15, 93:16, 97:13, 99:5, 102:18, 109:13, 109:17, 110:23, 111:18, 113:10, 116:9, 119:15, 120:8, 127:16, 130:18, 131:5, 133:10, 134:14, 135:2, 139:15, 149:21
**generate** [2] - 147:15, 149:4
**generous** [1] - 156:12
**gentlemen** [13] - 4:4, 20:7, 59:10, 59:18, 62:1, 74:12, 90:1, 92:8, 97:17, 100:5, 103:12, 105:1, 141:15
**George** [1] - 62:17
**Georgia** [2] - 46:2, 136:24
**Gilbert** [2] - 4:24, 5:2
**Gill** [1] - 161:4
**given** [9] - 7:13, 8:3, 9:9, 26:4, 53:14, 143:14, 143:18, 143:25, 148:14
**glad** [2] - 148:1, 161:1
**global** [1] - 62:22
**goal** [1] - 25:17
**gold** [4] - 69:23, 71:24, 72:11, 77:11
**Government** [107] - 4:11, 5:16, 6:5, 6:24, 7:18, 10:5, 10:12, 12:10, 13:21, 15:7, 15:19, 16:6, 16:9, 16:10, 17:18, 18:4, 18:9, 20:9, 20:18, 21:11, 23:12, 23:17, 24:3, 24:16, 24:24, 25:9, 28:5, 28:11, 30:25, 31:1, 31:2, 31:22, 31:23, 32:12, 32:16, 32:24, 32:25, 35:16, 36:21, 38:19, 53:9, 53:17, 54:16, 56:6, 56:7, 56:9, 56:15, 56:17, 57:25, 59:3, 59:12, 59:15, 60:7, 60:12, 60:15, 62:3, 67:10, 68:7, 69:25, 70:13, 76:7, 92:11, 94:23, 98:1, 98:5, 98:7, 98:12, 98:15, 98:16, 100:12, 101:18, 107:16, 123:9, 142:11, 142:19, 142:21, 142:24, 143:2, 144:16, 145:21, 147:19, 148:4, 148:9, 148:16, 150:25, 151:5, 151:11, 151:20, 152:6, 153:24, 154:22, 155:11, 157:5, 157:6, 157:23, 157:25, 158:17, 159:7, 159:11, 160:8, 161:20, 162:5, 163:25, 164:1, 164:16
**government** [1] - 68:20
**Government's** [124] - 6:17, 8:19, 12:9, 14:21, 15:6, 21:9, 23:18, 26:8, 31:10, 37:21, 40:11, 42:6, 47:12, 48:13, 53:6, 59:24, 65:3, 66:23, 67:15, 68:11, 68:23, 69:16, 70:3, 70:24, 71:11, 72:3, 72:5, 73:17, 73:21, 76:11, 76:24, 77:5, 77:24, 78:15, 79:3, 79:19, 80:8, 80:22, 81:12, 81:15, 81:25, 84:4, 84:14, 84:25, 85:14, 85:25, 86:10, 86:21, 87:17, 88:5, 88:15, 89:4, 89:12, 93:13, 94:16, 96:1, 97:11, 102:16, 103:6, 105:23, 107:17, 108:23, 109:11, 109:22, 110:1, 111:8, 111:16, 112:4, 112:5, 112:15, 113:1, 113:9, 115:5, 116:7, 117:18, 119:14, 122:14, 124:3, 124:20, 124:25, 125:11, 126:10, 126:21, 127:2, 127:13, 127:22, 128:8, 128:17, 128:21, 129:9, 129:13, 129:21, 130:5, 131:3, 131:9, 131:15, 132:5, 132:22, 133:8, 133:19, 134:11, 134:23, 135:24, 136:9, 136:15, 137:19, 138:14, 139:13, 139:20, 140:1, 140:19, 141:7, 147:21, 150:12, 152:5, 154:8, 154:9, 154:12, 154:14, 155:20, 156:21, 162:11, 164:8, 165:16
**grand** [1] - 54:9
**Grandstaff** [1] - 136:24
**grandstaff** [1] - 45:20
**granted** [2] - 16:25
**granting** [1] - 152:12
**great** [1] - 18:15
**greater** [1] - 80:7
**green** [4] - 12:12, 68:18, 71:23, 79:24
**grew** [1] - 62:14
**ground** [1] - 155:4
**grounds** [1] - 155:4
**group** [6] - 8:11, 8:14, 62:24, 144:19, 144:23
**Group** [1] - 81:11
**groups** [5] - 101:15, 102:21, 104:1, 104:8, 144:21
**grows** [1] - 110:11
**guess** [11] - 5:8, 5:9, 5:11, 11:24, 45:7, 59:12, 61:20, 121:4, 146:8, 151:23, 164:15
**guys** [1] - 99:17
**GX** [3] - 7:4, 164:19, 164:20
**GX310** [1] - 163:24

## H

**half** [3] - 123:4, 123:5, 124:16
**hallway** [2] - 105:6, 142:4
**HALVERSON** [342] - 1:14, 4:12, 4:19, 9:19, 9:22, 10:18, 11:10, 11:16, 13:10, 21:21, 22:22, 22:24, 23:2, 23:6, 25:13, 26:12, 26:22, 27:18, 28:7, 28:11, 29:1, 29:12, 31:3, 31:17, 31:20, 32:5, 32:17, 32:19, 33:9, 33:11, 33:18, 34:19, 35:6, 35:20, 35:24, 36:3, 36:6, 36:10, 36:16, 39:19, 40:10, 40:14, 41:16, 42:5, 42:10, 42:13, 42:16, 43:2, 43:11, 44:11, 44:19, 44:21, 45:4, 45:5, 45:14, 45:16, 47:4, 47:12, 47:18, 47:21, 47:23, 48:13, 48:18, 48:20, 49:1, 49:3, 49:17, 49:19, 50:1, 50:3, 51:13, 51:21, 52:3, 52:5, 52:12, 52:18,

52:21, 57:17, 57:19, 58:14, 58:18, 58:21, 59:5, 59:8, 59:15, 60:2, 60:18, 61:10, 62:10, 63:19, 65:8, 65:16, 66:15, 67:3, 67:5, 67:15, 67:17, 68:1, 68:12, 68:15, 68:22, 68:24, 69:10, 69:17, 69:19, 70:3, 70:5, 70:16, 71:1, 71:10, 71:14, 72:3, 72:6, 73:16, 73:22, 75:18, 75:19, 76:10, 76:13, 76:24, 77:6, 77:8, 77:24, 78:2, 78:11, 78:16, 79:3, 79:6, 79:16, 79:20, 79:22, 80:8, 80:10, 80:18, 80:23, 80:24, 81:12, 81:16, 81:21, 82:9, 82:11, 83:7, 83:9, 83:13, 84:5, 84:6, 84:14, 84:16, 84:21, 85:1, 85:14, 85:16, 85:20, 86:1, 86:21, 86:23, 87:1, 87:10, 87:16, 87:24, 88:1, 88:6, 88:15, 88:17, 88:22, 89:5, 89:12, 89:14, 89:23, 90:20, 90:22, 92:3, 92:23, 92:24, 93:12, 93:14, 94:5, 94:16, 95:9, 95:16, 96:2, 96:4, 97:2, 97:10, 97:12, 97:23, 99:1, 100:10, 100:11, 103:6, 103:20, 103:22, 104:23, 105:22, 105:25, 106:13, 106:15, 106:19, 106:21, 107:16, 107:18, 108:21, 109:10, 109:22, 110:2, 111:9, 111:15, 111:17, 112:1, 112:6, 112:8, 112:15, 112:17, 112:22, 113:2, 113:17, 113:22, 115:1, 115:6, 115:7, 116:6, 116:8, 116:22, 117:1, 117:14, 117:19, 117:21, 118:16, 119:10, 120:3, 120:20, 120:22, 120:23, 121:3, 121:9, 121:24, 122:7, 122:10, 122:15, 122:17, 123:9, 123:11, 123:20, 123:22, 124:4, 124:5, 124:19, 124:21, 124:25, 125:12, 125:13, 126:10, 126:12, 126:21, 127:3, 127:5, 127:13, 127:15, 127:18, 127:23, 127:24, 128:7, 128:9, 128:17, 128:22, 128:24, 129:9, 129:13, 129:15, 129:21, 130:6, 130:8, 131:2, 131:4, 131:9, 131:16, 131:18, 132:5, 132:7, 132:15, 132:18, 132:23, 133:3, 133:8, 133:9, 133:14, 133:20, 133:22, 134:11, 134:13, 134:18, 134:23, 135:1, 135:12, 135:24, 136:11, 136:16, 136:18, 137:18, 137:20, 138:6, 138:15, 138:17, 139:12, 139:14, 139:20, 140:2, 140:3, 140:18, 140:20, 141:1, 141:6, 141:9, 141:14, 142:25, 143:3, 143:12, 143:23, 144:6, 144:20, 146:23, 149:1, 149:18, 150:14, 152:9, 152:17, 153:10, 155:16, 156:8, 157:8, 158:1, 159:14, 159:21, 160:14, 160:17, 160:20, 160:22, 161:6, 162:17, 165:1, 165:21, 165:25

**halverson** [1] - 34:22

**Halverson** [46] - 2:20, 2:22, 4:13, 9:18, 10:13, 18:25, 21:20, 22:19, 25:9, 27:17, 28:18, 28:19, 31:15, 33:8, 40:6, 42:12, 44:8, 51:20, 53:21, 75:17, 84:3, 87:9, 87:21, 90:19, 92:20, 92:22, 98:18, 99:9, 99:16, 100:9, 105:21, 113:21, 116:23, 142:10, 145:4, 146:5, 146:8, 148:21, 151:25, 154:19, 154:23, 155:5, 158:15, 159:6, 161:4, 165:13

**Halverson's** [2] - 11:22, 53:25

**hand** [11] - 65:10, 66:25, 68:7, 69:8, 69:14, 70:21, 87:22, 91:16, 115:16, 121:18, 123:4

**handful** [1] - 162:3

**hang** [6] - 13:14, 29:6, 31:13, 31:18, 136:8, 156:2

**Harbour** [1] - 43:18

**hard** [3] - 71:25, 94:15, 102:11

**HCPC** [6] - 30:9, 114:11, 114:13, 117:4, 129:6, 139:5

**HCPC's** [1] - 118:20

**head** [2] - 54:14, 72:17

**headed** [1] - 148:24

**header** [2] - 12:1, 12:3

**heading** [2] - 67:8, 68:18

**headings** [1] - 95:4

**Health** [5] - 48:5, 80:3, 101:24, 126:8, 126:14

**healthcare** [2] - 63:9, 91:24

**HealthMax** [1] - 6:7

**HealthSplash** [41] - 8:25, 11:12, 16:19, 26:19, 26:20, 27:25, 28:2, 28:9, 76:17, 77:11, 77:22, 78:5, 78:6, 78:20, 80:2, 80:4, 82:15, 82:16, 83:2, 84:10, 84:13, 87:13, 87:15, 88:14, 88:21, 89:10, 93:1, 93:24, 94:6, 96:5, 110:17, 114:1, 116:17, 119:7, 120:19, 123:17, 135:18, 138:2, 161:8, 161:9, 161:12

**HealthSplash's** [1] - 163:13

**HealthSplash-related** [1] - 11:12

**hear** [10] - 6:23, 6:24, 16:22, 74:22, 83:17, 98:2, 107:7, 141:24, 155:13, 155:19

**heard** [4] - 25:20, 75:15, 92:9, 92:11

**hearsay** [6] - 10:8, 42:25, 43:6, 44:7, 46:18, 47:2

**heart** [1] - 152:3

**heat** [2] - 119:17, 149:2

**held** [4] - 14:24, 61:23, 65:22, 100:3

**help** [2] - 82:6, 143:1

**helped** [1] - 26:8

**helpful** [2] - 29:4, 92:13

**HHS** [1] - 101:23

**hid** [1] - 31:16

**hidden** [1] - 149:8

**high** [1] - 43:10

**higher** [1] - 101:8

**highest** [4] - 115:19, 128:3, 128:25, 129:1

**highlighted** [1] - 82:20

**highlighting** [1] - 30:4

**highly** [1] - 99:1

**Hill** [10] - 23:2, 26:14, 26:24, 27:3, 43:14, 44:12, 137:7, 137:12, 140:10, 140:15

**historical** [1] - 102:6

**history** [3] - 96:10, 114:2, 124:24

**Holdings** [3] - 6:7, 8:12, 80:1

**holds** [1] - 32:4

**holistic** [1] - 73:12

**HOLT** [121] - 2:5, 5:4, 5:6, 6:3, 8:1, 8:7, 9:5, 11:15, 12:9, 12:13, 12:17, 12:23, 13:2, 13:4, 13:17, 14:19, 15:9, 18:7, 18:12, 19:14, 19:16, 19:20, 20:17, 20:25, 23:18, 23:23, 24:14, 24:19, 26:18, 26:23, 28:23, 29:21, 30:21, 31:9, 32:2, 32:10, 32:15, 32:24, 34:6, 34:10, 36:18, 37:7, 38:19, 38:24, 39:4, 39:8, 39:20, 60:14, 63:14, 66:20, 68:4, 69:12, 70:18, 72:24, 73:18, 77:2, 78:12, 79:17, 80:19, 81:23, 83:15, 83:21, 84:1, 84:22, 85:22, 87:3, 87:5, 87:7, 87:19, 88:24, 89:24, 92:6, 93:25, 95:11, 96:13, 99:13, 99:19, 103:9, 108:10, 109:6, 109:24, 111:6, 112:2, 112:23, 113:18, 114:16, 115:3, 117:15, 118:12, 119:8, 120:4, 121:21, 122:2, 122:11, 123:25, 125:2, 126:23, 127:19, 128:19, 129:23, 129:25, 131:11, 132:13, 132:19, 133:15, 134:19, 135:6, 136:1, 136:4, 136:7, 138:7, 139:22, 141:2, 145:7, 150:23, 154:11, 156:1, 158:10, 161:18, 163:9, 163:23

**Holt** [65] - 2:6, 4:23, 4:25, 6:19, 11:25, 15:14, 16:21, 17:5, 17:9, 17:10, 17:25, 18:6, 18:16, 18:19, 20:4, 21:8, 21:10, 21:25, 22:20, 23:11, 23:14, 26:11, 27:6, 27:12, 27:24, 28:12, 28:22, 29:9, 29:18, 31:8, 31:25, 34:1, 34:2, 37:13, 37:15, 38:3, 38:18, 59:24, 60:9, 60:17, 61:16, 68:3, 77:1, 99:10, 111:5, 115:2, 143:21, 145:5, 148:1, 148:24, 150:21, 151:24, 152:2, 152:12, 153:6, 154:22, 155:25, 158:6, 159:2, 160:4, 160:25, 161:17, 163:7, 164:17, 165:5

**Holt's** [10] - 7:4, 9:16, 11:2, 11:6, 13:15, 16:11, 32:20, 35:4, 158:20, 165:19

**Home** [1] - 80:2

**honestly** [2] - 35:8, 53:11

**Honor** [88] - 4:12, 4:22, 5:24, 6:9, 9:19, 9:22, 9:24, 10:18, 11:17, 21:21, 24:3, 25:13, 25:14, 26:12, 30:22, 31:17, 32:2, 32:5, 32:17, 32:19, 33:9, 35:6, 36:6, 36:10, 38:19, 39:19,

42:7, 42:13, 43:24, 47:16, 51:24, 52:21, 57:2, 57:17, 58:13, 58:22, 58:24, 59:5, 60:2, 60:18, 61:10, 63:14, 65:8, 66:15, 66:20, 68:12, 69:12, 73:18, 75:18, 81:21, 82:9, 84:5, 87:19, 87:24, 88:1, 90:20, 92:3, 92:23, 95:9, 95:16, 100:10, 104:23, 105:22, 109:24, 121:3, 123:23, 125:8, 126:23, 136:11, 138:7, 141:9, 141:14, 143:12, 146:23, 149:1, 152:9, 155:16, 156:8, 157:8, 158:1, 158:10, 159:14, 160:15, 160:22, 161:6, 162:17, 163:9, 165:1
**HONORABLE** [1] - 1:11
**Honorable** [1] - 4:6
**Hoover's** [1] - 144:6
**hope** [4] - 5:2, 40:1, 40:4, 57:1
**hoping** [1] - 56:23
**hotspots** [1] - 150:17
**hour** [2] - 141:20, 142:5
**hourly** [2] - 63:24, 63:25
**hours** [1] - 22:10
**HSPS** [4] - 114:8, 128:11, 137:10, 140:11
**huge** [3] - 29:14, 35:10, 147:9
**human** [5] - 144:15, 145:3, 146:6, 146:10, 150:19
**Human** [1] - 101:24
**hundred** [2] - 7:14, 53:15
**hundreds** [2] - 94:12, 102:10
**hypo** [4] - 7:9, 7:16, 7:22, 8:23
**hypos** [1] - 9:16
**hypothetical** [1] - 7:13

## I

**idea** [2] - 150:18, 156:19
**ideas** [1] - 27:20
**identical** [1] - 46:9
**identification** [5] - 71:11, 72:4, 93:10, 124:20, 138:8
**identified** [7] - 8:17, 59:24, 68:7, 71:16, 77:13, 98:23, 135:17
**identify** [1] - 10:9
**identifying** [3] - 8:10, 93:10, 150:16
**Illinois** [2] - 138:22, 138:24
**illustrate** [1] - 25:6
**illustrative** [16] - 24:11, 24:16, 27:11, 27:16, 27:19, 30:17, 32:22, 38:2, 82:4, 83:17, 83:19, 84:2, 84:24, 85:20, 87:1, 88:23
**image** [1] - 86:15
**images** [1] - 66:10
**imagine** [1] - 112:13
**implicates** [1] - 151:4
**implication** [1] - 151:5
**important** [12] - 12:6, 19:3, 19:25, 20:3, 22:17, 22:20, 23:14, 28:20, 38:12, 38:15, 152:23, 153:17
**importantly** [1] - 162:1
**improper** [2] - 9:9, 14:25
**in-person** [1] - 153:22
**inaccurate** [3] - 25:19, 25:21, 27:1
**inadmissible** [1] - 10:8
**inappropriate** [1] - 148:7
**include** [4] - 26:20, 108:24, 108:25, 113:5
**included** [2] - 5:12, 14:7
**includes** [8] - 4:18, 8:12, 8:14, 26:18, 26:22, 108:25, 146:19, 163:20
**including** [1] - 11:2
**incorrect** [1] - 27:25
**increase** [1] - 110:13
**indeed** [2] - 151:13, 164:4
**indicate** [2] - 8:4, 86:19
**indicated** [2] - 32:24, 156:15
**indicates** [2] - 147:9, 151:21
**indicating** [1] - 85:10
**indication** [1] - 7:16
**indict** [1] - 54:9
**indictment** [6] - 135:4, 135:7, 138:4, 138:5, 145:15, 151:14
**individual** [6] - 134:9, 144:19, 144:21, 144:22, 144:25, 145:3
**individuals** [3] - 91:17, 112:14, 114:5
**infer** [2] - 10:5, 149:5
**inference** [4] - 144:3, 144:16, 147:2, 150:13
**inferences** [1] - 155:6
**inferential** [1] - 7:11
**inferentially** [1] - 7:17
**inflows** [3] - 74:1, 74:9, 80:6
**Information** [1] - 54:2
**information** [51] - 10:25, 21:1, 21:3, 22:1, 23:25, 24:4, 25:15, 25:17, 26:6, 26:20, 26:24, 27:24, 28:15, 30:3, 30:4, 37:12, 42:24, 45:9, 45:10, 54:11, 58:15, 63:8, 63:12, 65:20, 65:21, 66:6, 66:14, 67:21, 67:22, 69:4, 69:21, 70:10, 93:10, 93:23, 95:5, 96:10, 100:17, 102:13, 111:19, 135:3, 135:13, 137:4, 137:6, 137:22, 138:1, 139:1, 139:16, 140:5, 140:22, 165:2
**initials** [1] - 137:23
**inside** [2] - 146:10, 146:19
**instance** [4] - 11:23, 12:1, 28:1, 63:2
**instead** [4] - 35:4, 76:16, 118:17
**instruction** [9] - 27:9, 32:14, 60:24, 61:7, 82:2, 92:10, 95:20, 103:14
**insurance** [1] - 50:13
**Integrated** [1] - 137:3
**intended** [1] - 147:16
**intending** [1] - 5:21
**inter** [1] - 8:5
**interactions** [1] - 153:22
**interpretation** [7] - 6:17, 8:5, 8:20, 14:22, 15:6, 15:7, 15:12
**interval** [3] - 37:10, 37:17, 60:12
**interviewed** [1] - 53:17
**interviewing** [1] - 56:6
**introduce** [2] - 5:21, 32:25
**introduced** [2] - 37:5, 164:1
**investigation** [1] - 102:14
**invoices** [1] - 49:23
**involve** [1] - 58:19
**involved** [4] - 8:24, 58:4, 58:6, 137:2
**involving** [2] - 64:19, 75:6
**issue** [7] - 5:17, 10:12, 13:13, 39:2, 146:3, 150:2, 151:2
**issues** [2] - 5:9, 38:16
**item** [1] - 45:11
**itemized** [1] - 125:14
**items** [2] - 48:25, 49:21
**itself** [15] - 12:7, 17:3, 22:4, 34:15, 36:12, 36:16, 38:3, 82:5, 95:22, 115:11, 118:21, 139:4, 147:7, 149:2, 161:8

## J

**Jack** [1] - 4:19
**January** [15] - 55:12, 73:25, 79:10, 82:14, 88:11, 89:8, 90:24, 110:6, 126:15, 127:12, 131:21, 133:1, 133:25
**Jean** [4] - 130:24, 133:5, 134:7, 161:3
**JENNY** [1] - 2:2
**Jenny** [1] - 4:22
**JG** [1] - 133:23
**Jim** [1] - 19:21
**Jodi** [2] - 150:8
**joint** [2] - 71:24, 91:6
**joint-controlled** [1] - 91:6
**Joyce** [1] - 78:24
**JR** [1] - 1:19
**Jr** [1] - 4:13
**JUDGE** [1] - 1:11
**Judge** [27] - 4:7, 5:4, 12:17, 13:2, 13:17, 21:18, 32:10, 32:24, 39:20, 60:14, 77:2, 78:12, 80:19, 83:21, 84:1, 87:7, 95:11, 103:9, 115:3, 135:7, 136:1, 136:7, 141:2, 156:1, 161:18, 163:23, 165:25
**judge** [7] - 14:19, 29:1, 34:19, 37:7, 97:23, 145:7, 154:11
**JULIE** [1] - 2:5
**Julie** [1] - 4:23
**julie** [1] - 2:6
**julie@julieholtlaw.com** [1] - 2:7
**July** [4] - 55:23, 55:25, 56:11, 156:15
**Jury** [4] - 39:23, 105:4, 105:16, 142:3
**jury** [98] - 9:12, 10:21, 20:6, 20:14, 21:23, 22:7, 24:5, 25:10, 25:18, 25:22, 26:5, 27:10, 35:10, 39:13, 39:21, 39:22, 48:18, 54:9, 59:20, 61:24, 62:14, 67:4, 68:13, 69:17, 71:2, 71:13, 73:17, 73:23, 77:6, 78:17, 79:20, 80:23, 80:25, 81:22, 82:10, 82:12, 82:23, 82:25, 83:13, 83:20, 84:7, 85:2, 86:2, 86:7, 87:16, 89:6, 89:15, 90:21, 93:3, 95:6, 96:3, 97:20, 99:14, 100:4, 102:2, 103:20, 105:3, 105:14, 105:17, 110:3, 110:4, 112:7, 115:6, 117:19, 121:1, 122:15, 122:18, 124:4, 125:12, 127:3, 127:6, 127:23, 128:22, 130:6, 131:2, 131:16, 132:23, 133:20, 135:9, 136:16, 136:20, 138:15, 138:18, 140:2, 140:4, 142:2, 142:9, 147:1,

149:5, 150:18, 152:23, 154:18, 158:4, 164:5, 165:2, 165:8, 165:10, 165:11
**JURY** [1] - 1:10
**jury's** [2] - 25:16, 68:25
**Justice** [3] - 1:14, 63:4, 64:2
**jw.klughlaw@gmail.com** [1] - 2:4

## K

**Kate** [2] - 53:23, 58:2
**keep** [9] - 17:24, 55:16, 56:5, 56:6, 56:9, 59:23, 141:24, 159:1, 159:6
**keeps** [2] - 4:17, 152:2
**kidding** [1] - 31:18
**kind** [15] - 17:18, 45:7, 56:14, 56:21, 61:5, 72:21, 87:11, 90:2, 99:9, 142:20, 143:21, 146:19, 149:3, 150:18, 153:8
**kinds** [1] - 66:3
**knee** [8] - 115:15, 115:23, 115:25, 121:18, 122:25, 123:1, 132:2, 151:10
**knowing** [1] - 156:10
**knowledge** [10] - 6:14, 41:10, 92:12, 92:13, 93:25, 96:13, 108:10, 109:7, 114:17, 121:22
**knows** [1] - 61:17
**Kristina** [3] - 13:6, 14:2, 14:6
**KS** [1] - 81:11
**Kyndra** [1] - 6:7

## L

**labeled** [2] - 19:17, 161:7
**lack** [7] - 41:10, 93:25, 96:13, 108:10, 109:6, 114:16, 121:21
**ladies** [13] - 4:4, 20:7, 59:10, 59:18, 61:25, 74:12, 90:1, 92:8, 97:17, 100:5, 103:12, 105:1, 141:15
**laid** [1] - 47:20
**large** [1] - 13:21
**largely** [3] - 66:5, 108:7, 153:5
**larger** [1] - 101:2
**largest** [1] - 81:6
**last** [38] - 11:17, 11:19, 13:19, 15:14, 23:11, 23:20, 28:14, 29:7, 29:24, 33:23, 33:25, 34:2, 34:18, 34:20, 35:15, 37:3, 40:16, 41:18, 42:21, 48:6, 53:20, 56:3, 62:6, 64:22, 65:23, 68:19, 70:6, 78:4, 103:13, 104:6, 134:3, 135:9, 139:18, 145:19, 145:24, 151:25, 158:21, 164:14
**last-minute** [1] - 34:20
**late** [5] - 10:2, 159:8, 159:12, 160:1, 160:9
**laugh** [1] - 27:21
**laughing** [1] - 31:15
**law** [10] - 10:4, 17:25, 18:16, 18:21, 21:22, 25:3, 79:1, 145:10, 147:7, 162:6
**Law** [1] - 2:6
**lay** [5] - 65:14, 87:9, 113:20, 116:23, 121:8
**laying** [1] - 13:11
**layperson's** [1] - 91:11
**lays** [2] - 22:11, 143:13
**LC** [1] - 130:10
**leading** [2] - 7:22, 119:8
**least** [4] - 26:9, 26:13, 63:23, 148:23
**leaving** [4] - 4:17, 78:6, 81:2, 90:3
**left** [9] - 40:22, 45:2, 49:5, 74:3, 75:20, 87:22, 110:6, 122:20, 142:9
**left-hand** [1] - 87:22
**LEIBOWITZ** [1] - 1:11
**Leibowitz** [1] - 4:7
**length** [1] - 59:13
**less** [3] - 21:14, 124:16, 147:13
**lesser** [1] - 150:13
**letter** [9] - 28:13, 43:21, 44:2, 44:13, 44:22, 44:25, 47:6, 48:11, 51:2
**letters** [1] - 57:9
**level** [3] - 34:4, 34:25, 154:2
**Level** [1] - 96:17
**life** [1] - 56:12
**likely** [2] - 54:16, 151:1
**limit** [1] - 162:6
**limited** [2] - 16:25, 117:7
**limiting** [2] - 23:23, 117:10
**line** [26] - 24:1, 26:11, 27:7, 33:23, 33:25, 34:2, 34:9, 34:10, 37:3, 38:2, 115:14, 131:24, 132:2, 133:4, 133:6, 146:17, 153:16, 156:4, 156:16, 157:21, 158:15, 158:16, 158:18, 160:3, 162:4, 164:12
**lines** [8] - 12:18, 33:24, 37:3, 98:10, 124:11, 124:17, 146:5
**link** [1] - 149:12
**list** [6] - 67:6, 67:7, 68:13, 68:16, 78:25, 135:18
**listed** [10] - 22:2, 23:16, 45:19, 65:17, 67:23, 70:14, 74:7, 75:25, 81:9, 135:4
**lists** [1] - 116:3
**literally** [6] - 6:1, 12:20, 36:19, 81:19, 83:4, 164:18
**litigated** [1] - 157:14
**live** [3] - 15:3, 16:2, 62:16
**living** [1] - 50:15
**LM** [1] - 132:25
**LO641** [1] - 115:22
**LO648** [2] - 115:21, 129:2
**LO650** [1] - 129:1
**LOC60** [1] - 115:19
**located** [6] - 137:12, 139:7, 139:8, 140:13, 150:10, 150:19
**location** [3] - 143:5, 143:6, 143:11
**location-based** [3] - 143:5, 143:6, 143:11
**lock** [1] - 164:22
**logical** [1] - 15:22
**look** [37] - 10:7, 13:3, 18:10, 30:16, 30:24, 37:25, 47:12, 49:1, 49:17, 50:1, 55:6, 64:8, 67:15, 76:10, 77:24, 79:3, 80:8, 85:14, 86:21, 88:15, 89:12, 94:15, 106:17, 115:17, 119:11, 119:14, 120:7, 120:22, 123:6, 123:9, 127:13, 129:9, 132:5, 134:11, 134:23, 135:17, 152:1
**looked** [5] - 48:6, 72:19, 73:3, 84:12, 109:19
**looking** [25] - 11:23, 19:12, 26:23, 29:6, 33:5, 36:13, 64:12, 73:24, 76:14, 79:7, 79:9, 86:15, 88:18, 91:16, 107:25, 108:1, 113:11, 116:10, 121:11, 122:21, 126:17, 130:9, 130:10, 134:15, 146:15
**lookout** [1] - 158:22
**looks** [6] - 21:18, 35:4, 82:19, 98:12, 128:4, 128:6
**lower** [1] - 87:22
**Lunch** [1] - 166:1
**lunch** [7] - 141:16, 141:20, 141:21, 142:1, 142:16, 160:12, 165:24

## M

**ma'am** [10] - 40:7, 53:19, 54:7, 54:21, 56:4, 57:8, 57:10, 57:13, 58:9, 58:25
**Macromark** [1] - 81:10
**mailed** [1] - 50:24
**Mailing** [2] - 81:10
**main** [1] - 153:23
**maintain** [2] - 83:22, 92:6
**maintenance** [1] - 61:16
**major** [2] - 62:18, 160:3
**man** [1] - 64:17
**managing** [1] - 62:25
**manipulating** [1] - 159:17
**manner** [1] - 20:13
**manufacturer** [1] - 45:9
**map** [2] - 119:17, 149:2
**March** [5] - 54:3, 76:19, 78:19, 110:13, 130:16
**margin** [2] - 107:6, 107:8
**margins** [1] - 107:7
**marked** [20] - 42:6, 65:2, 71:11, 72:4, 76:10, 81:15, 93:13, 97:11, 102:16, 109:11, 111:16, 113:9, 116:7, 124:20, 128:8, 131:2, 137:19, 139:13, 140:19, 141:6
**marketers** [6] - 74:4, 75:24, 75:25, 77:14, 85:11, 90:25
**Marketing** [13] - 71:6, 81:11, 84:20, 85:5, 85:7, 86:5, 87:13, 87:14, 88:10, 88:21, 89:7
**massive** [2] - 25:24, 165:3
**Master's** [3] - 62:19, 62:20, 91:22
**match** [5] - 93:11, 96:8, 96:9, 153:12, 153:16
**matched** [44] - 22:5, 93:16, 93:21, 93:22, 93:23, 94:3, 96:5, 97:4, 101:22, 102:3, 102:6, 107:23, 110:15, 110:17, 110:19, 111:10, 112:9, 113:11, 113:23, 114:1, 114:2, 114:3, 115:9, 116:14, 116:16, 117:22, 117:25, 119:6, 119:7, 120:1, 120:17, 120:18, 123:14, 123:16, 124:12, 129:20, 131:8, 132:10, 132:12, 133:12, 134:16, 138:3, 150:5
**matches** [1] - 31:4
**matching** [7] - 23:8, 35:12, 91:9, 91:17, 92:25, 93:5, 93:6
**material** [5] - 29:10, 31:2, 35:16, 38:14, 151:1
**materials** [1] - 72:14
**mathematics** [1] - 33:14
**matter** [4] - 4:8,

75:12, 92:15, 144:5
**matters** [1] - 35:19
**maximum** [1] - 54:12
**mean** [22] - 27:1, 33:24, 38:6, 46:24, 49:12, 53:13, 54:14, 56:20, 67:12, 83:4, 92:15, 93:6, 94:12, 94:13, 94:14, 113:24, 142:18, 145:22, 154:22, 160:2, 163:17
**meaning** [1] - 34:9
**means** [1] - 15:10
**mechanisms** [1] - 93:5
**Med** [10] - 6:7, 13:5, 14:1, 80:2, 80:5, 126:8, 126:14, 127:8, 128:11, 128:13
**medical** [5] - 45:8, 45:9, 49:22, 163:25
**Medical** [7] - 138:24, 139:2, 139:7, 140:8, 140:13, 162:20, 163:4
**Medicare** [92] - 22:5, 23:8, 28:3, 29:14, 35:13, 36:21, 40:18, 41:2, 41:5, 41:15, 41:20, 42:22, 43:21, 44:2, 44:14, 49:13, 50:14, 50:21, 51:3, 52:17, 91:9, 91:16, 91:21, 91:24, 92:5, 92:25, 93:17, 93:22, 94:3, 96:6, 96:19, 97:3, 97:6, 101:25, 102:6, 104:22, 106:4, 108:8, 108:12, 108:13, 108:15, 108:19, 109:4, 109:14, 110:17, 111:23, 112:9, 113:3, 113:13, 113:24, 114:1, 114:4, 114:9, 114:25, 116:4, 116:14, 116:19, 117:22, 119:6, 119:25, 120:16, 120:17, 122:9, 123:14, 123:19, 124:8, 126:1, 126:15, 129:20, 131:8, 132:12, 134:16, 135:16, 135:21, 137:5, 138:3, 138:25, 139:1, 140:8, 144:25, 145:2, 145:3, 145:9, 145:17, 149:13, 151:8, 151:22, 155:11, 162:22, 163:3, 163:20
**Medicare's** [1] - 149:9
**meeting** [1] - 154:3
**memory** [1] - 38:25
**mention** [2] - 46:14, 46:22
**mentioned** [2] - 64:22, 116:2
**merchant** [2] - 77:16, 77:19
**merely** [3] - 32:3, 66:13, 114:24
**met** [1] - 64:17
**MIAMI** [1] - 1:2
**Miami** [7] - 1:4, 2:3, 2:7, 2:13, 2:14, 137:15, 140:16
**Miami-Dade** [2] - 137:15, 140:16
**Michael** [7] - 5:7, 59:15, 62:7, 73:8, 73:10, 93:6, 93:8
**MICHAEL** [2] - 2:22, 62:3
**Michelle** [1] - 133:7
**middle** [1] - 110:12
**might** [6] - 21:19, 25:8, 27:9, 50:24, 92:13, 121:7
**Mike** [5] - 5:8, 73:8, 73:10, 93:6, 93:7
**million** [27] - 7:14, 8:14, 74:5, 74:10, 77:10, 78:22, 78:25, 80:1, 81:5, 81:6, 91:4, 91:5, 91:6, 97:7, 104:12, 107:13, 108:6, 108:23, 110:20, 113:4, 115:20, 116:1, 127:9, 129:4
**mind** [3] - 36:25, 135:20, 141:24
**MINDY** [2] - 2:20, 40:9
**mini** [1] - 155:8
**mini-battles** [1] - 155:8
**minor** [1] - 160:2
**Minton** [1] - 14:23
**minus** [1] - 37:16
**minute** [4] - 11:19, 12:19, 34:20
**minutes** [11] - 39:12, 39:13, 59:14, 59:18, 97:18, 100:7, 105:2, 105:7, 105:9, 141:20, 142:6
**miscellaneous** [1] - 63:10
**mischaracterizes** [1] - 165:5
**misleading** [4] - 120:4, 145:12, 151:4, 151:19
**misspoke** [1] - 149:18
**Mobility** [7] - 76:17, 77:11, 77:23, 78:5, 78:6, 78:21, 80:2
**moment** [20] - 5:25, 13:8, 22:24, 32:17, 33:9, 41:24, 47:17, 51:10, 51:19, 57:2, 59:5, 77:2, 92:19, 95:11, 113:19, 118:13, 121:6, 125:4, 129:24, 130:2
**money** [11] - 8:11, 10:15, 11:8, 21:16, 64:13, 73:12, 78:4, 78:6, 80:13, 81:1, 90:25
**monies** [1] - 78:20
**month** [8] - 83:12, 84:9, 85:19, 88:20, 112:11, 125:19, 128:2, 128:3
**monthly** [4] - 109:15, 110:5, 125:18, 128:1
**months** [6] - 54:19, 110:5, 110:8, 126:5, 156:15, 156:24
**morning** [18] - 4:2, 4:12, 4:16, 4:21, 4:22, 4:25, 5:1, 5:4, 5:5, 39:24, 40:3, 52:25, 53:1, 62:11, 62:13, 100:8, 103:13, 104:24
**MORNING** [1] - 1:6
**most** [6] - 29:22, 29:25, 115:25, 125:23, 150:18, 150:19
**Mother's** [4] - 10:3, 40:1, 40:4, 59:11
**motion** [19] - 5:7, 5:13, 5:25, 9:23, 9:24, 10:2, 11:6, 11:15, 11:18, 11:20, 11:21, 13:20, 14:17, 14:23, 18:8, 24:6, 24:7, 24:22, 30:18
**motions** [1] - 11:17
**motivated** [1] - 86:7
**move** [58] - 37:21, 38:20, 48:13, 56:10, 61:10, 65:8, 66:15, 68:1, 69:10, 70:16, 73:16, 76:24, 78:11, 79:16, 80:18, 81:21, 84:14, 84:21, 85:20, 87:1, 87:16, 88:22, 89:23, 92:3, 94:16, 103:6, 109:22, 111:4, 112:1, 112:22, 113:17, 115:1, 116:22, 117:14, 120:3, 120:20, 122:10, 123:20, 124:25, 126:21, 127:18, 128:17, 129:11, 129:21, 131:9, 132:18, 133:14, 134:18, 134:22, 135:24, 138:6, 139:20, 141:1, 141:5, 143:11, 160:18
**moved** [1] - 36:3
**movement** [2] - 73:12, 82:17
**movements** [1] - 64:13
**moving** [9] - 30:22, 31:9, 72:12, 77:10, 77:22, 78:4, 78:20, 79:9, 110:6
**MR** [342] - 4:12, 4:19, 9:19, 9:22, 10:18, 11:10, 11:16, 13:10, 21:21, 22:22, 22:24, 23:2, 23:6, 25:13, 26:12, 26:22, 27:18, 28:7, 28:11, 29:1, 29:12, 31:3, 31:17, 31:20, 32:5, 32:17, 32:19, 33:9, 33:11, 33:18, 34:19, 35:6, 35:20, 35:24, 36:3, 36:6, 36:10, 36:16, 39:19, 40:10, 40:14, 41:16, 42:5, 42:10, 42:13, 42:16, 43:2, 43:11, 44:11, 44:19, 44:21, 45:4, 45:5, 45:14, 45:16, 47:4, 47:12, 47:18, 47:21, 47:23, 48:13, 48:18, 48:20, 49:1, 49:3, 49:17, 49:19, 50:1, 50:3, 51:13, 51:21, 52:3, 52:5, 52:12, 52:18, 52:21, 57:17, 57:19, 58:14, 58:18, 58:21, 59:5, 59:8, 59:15, 60:2, 60:18, 61:10, 62:10, 63:19, 65:8, 65:16, 66:15, 67:3, 67:5, 67:15, 67:17, 68:1, 68:12, 68:15, 68:22, 68:24, 69:10, 69:17, 69:19, 70:3, 70:5, 70:16, 71:1, 71:10, 71:14, 72:3, 72:6, 73:16, 73:22, 75:18, 75:19, 76:10, 76:13, 76:24, 77:6, 77:8, 77:24, 78:2, 78:11, 78:16, 79:3, 79:6, 79:16, 79:20, 79:22, 80:8, 80:10, 80:18, 80:23, 80:24, 81:12, 81:16, 81:21, 82:9, 82:11, 83:7, 83:9, 83:13, 84:5, 84:6, 84:14, 84:16, 84:21, 85:1, 85:14, 85:16, 85:20, 86:1, 86:21, 86:23, 87:1, 87:10, 87:16, 87:24, 88:1, 88:6, 88:15, 88:17, 88:22, 89:5, 89:12, 89:14, 89:23, 90:20, 90:22, 92:3, 92:23, 92:24, 93:12, 93:14, 94:5, 94:16, 95:9, 95:16, 96:2, 96:4, 97:2, 97:10, 97:12, 97:23, 99:1, 100:10, 100:11, 103:6, 103:20, 103:22, 104:23, 105:22, 105:25, 106:13, 106:15, 106:19, 106:21, 107:16, 107:18, 108:21, 109:10, 109:22, 110:2, 111:9, 111:15, 111:17, 112:1, 112:6, 112:8, 112:15, 112:17, 112:22, 113:2, 113:17, 113:22, 115:1, 115:6, 115:7, 116:6, 116:8, 116:22, 117:1, 117:14, 117:19, 117:21, 118:16, 119:10, 120:3, 120:20, 120:22, 120:23, 121:3, 121:9, 121:24, 122:7, 122:10, 122:15, 122:17, 123:9, 123:11, 123:20, 123:22, 124:4, 124:5, 124:19, 124:21, 124:25, 125:12, 125:13, 126:10, 126:12, 126:21, 127:3, 127:5,

127:13, 127:15, 127:18, 127:23, 127:24, 128:7, 128:9, 128:17, 128:22, 128:24, 129:9, 129:13, 129:15, 129:21, 130:6, 130:8, 131:2, 131:4, 131:9, 131:16, 131:18, 132:5, 132:7, 132:15, 132:18, 132:23, 133:3, 133:8, 133:9, 133:14, 133:20, 133:22, 134:11, 134:13, 134:18, 134:23, 135:1, 135:12, 135:24, 136:11, 136:16, 136:18, 137:18, 137:20, 138:6, 138:15, 138:17, 139:12, 139:14, 139:20, 140:2, 140:3, 140:18, 140:20, 141:1, 141:6, 141:9, 141:14, 142:25, 143:3, 143:8, 143:12, 143:23, 144:6, 144:20, 146:23, 149:1, 149:18, 150:14, 152:9, 152:17, 153:10, 155:16, 156:8, 157:8, 158:1, 159:14, 159:21, 160:14, 160:17, 160:20, 160:22, 161:6, 162:17, 165:1, 165:21, 165:25

**MS** [142] - 4:22, 5:4, 5:6, 6:3, 8:1, 8:7, 9:5, 11:15, 12:9, 12:13, 12:17, 12:23, 13:2, 13:4, 13:17, 14:19, 15:9, 18:7, 18:12, 19:14, 19:16, 19:20, 20:17, 20:25, 23:18, 23:23, 24:14, 24:19, 26:23, 28:23, 29:21, 30:21, 31:9, 32:2, 32:10, 32:15, 32:24, 34:6, 34:10, 36:18, 37:7, 38:19, 38:24, 39:4, 39:8, 39:20, 41:10, 41:23, 42:7, 42:25, 43:5, 43:23, 44:7, 46:18, 47:2, 48:15, 51:9, 51:11, 51:18, 51:24, 52:14, 52:24, 53:3, 53:4, 57:2, 57:4, 57:15, 58:24, 60:14, 63:14, 66:20, 68:4, 69:12, 70:18, 72:24, 73:18, 77:2, 78:12, 79:17, 80:19, 81:23, 83:15, 83:21, 84:1, 84:22, 85:22, 87:3, 87:5, 87:7, 87:19, 88:24, 89:24, 92:6, 93:25, 95:11, 96:13, 99:13, 99:19, 103:9, 108:10, 109:6, 109:24, 111:6, 112:2, 112:23, 113:18, 114:16, 115:3, 117:15, 118:12, 119:8, 120:4, 121:21, 122:2, 122:11, 123:25, 125:2, 126:23, 127:19, 128:19, 129:23, 129:25, 131:11, 132:13, 132:19, 133:15, 134:19, 135:6, 136:1, 136:4, 136:7, 138:7, 139:22, 141:2, 145:7, 150:23, 154:11, 156:1, 158:10, 161:18, 163:9, 163:23

**multipage** [1] - 21:14

**multiple** [7] - 98:19, 121:13, 121:15, 123:1, 147:4, 155:4, 165:8

**multiples** [1] - 121:19

**must** [1] - 92:17

**Myrtle** [2] - 163:3, 164:21

## N

**N-G-U-Y-E-N** [1] - 10:13

**N.W** [2] - 1:16, 1:20

**name** [14] - 23:20, 28:14, 29:24, 62:5, 62:6, 65:22, 68:19, 73:8, 93:5, 93:6, 140:6, 140:23, 161:3, 164:21

**name-matching** [2] - 93:5, 93:6

**named** [3] - 39:4, 62:22, 136:24

**names** [3] - 30:8, 76:1, 161:4

**National** [6] - 6:6, 8:12, 19:22, 77:16, 80:13, 81:2

**nationwide** [1] - 114:13

**nature** [2] - 72:22, 144:11

**near** [1] - 150:10

**nearly** [2] - 35:9, 53:17

**necessarily** [3] - 9:15, 15:10, 118:21

**necessity** [2] - 45:9, 49:22

**need** [6] - 44:1, 45:8, 59:5, 157:8, 157:10, 158:4

**never** [7] - 4:18, 15:19, 15:23, 36:25, 64:17, 146:18, 148:11

**new** [1] - 51:25

**New** [2] - 1:16, 1:20

**next** [12] - 8:16, 13:2, 19:11, 19:13, 49:17, 50:1, 55:21, 59:3, 83:11, 84:9, 120:6, 135:11

**Nguyen** [3] - 10:7, 10:13

**nice** [8] - 5:2, 40:1, 40:4, 105:2, 141:21, 142:1

**night** [2] - 10:3

**nine** [1] - 6:5

**NO** [1] - 1:3

**none** [2] - 7:10, 33:6

**normal** [1] - 153:25

**normalization** [1] - 73:9

**North** [2] - 2:13, 139:3

**notate** [1] - 95:4

**note** [11] - 60:2, 111:6, 112:23, 113:18, 114:11, 114:12, 117:3, 117:9, 130:1, 135:17

**notes** [10] - 49:24, 50:6, 94:20, 95:1, 95:3, 95:12, 109:24, 113:20, 116:24, 117:2

**nothing** [12] - 13:1, 24:15, 25:19, 98:7, 110:9, 147:23, 148:5, 151:7, 154:15, 156:23, 157:5

**notice** [5] - 98:8, 98:19, 143:25, 161:13, 161:14

**noticed** [1] - 85:9

**November** [2] - 131:21, 132:25

**NPI** [1] - 144:24

**NPIs** [1] - 144:22

**number** [47] - 5:14, 5:15, 5:20, 13:5, 18:11, 19:11, 22:9, 28:5, 30:9, 34:25, 60:11, 65:23, 72:16, 93:18, 96:23, 96:24, 104:7, 104:9, 107:4, 107:5, 107:8, 107:25, 108:5, 109:15, 110:24, 110:25, 112:13, 119:3, 124:12, 130:13, 134:16, 134:20, 137:9, 139:4, 140:11, 143:13, 143:14, 143:15, 144:10, 148:9, 153:11, 156:21, 158:24, 161:10, 161:15

**numbers** [12] - 7:9, 27:20, 34:19, 39:7, 66:1, 93:9, 99:8, 106:11, 108:3, 145:14, 147:24, 147:25

**numerous** [1] - 163:15

**nurse** [2] - 120:13, 145:1

**NW** [2] - 2:2, 2:6

**NYC** [1] - 163:3

## O

**oath** [1] - 40:7

**object** [7] - 8:9, 12:11, 33:1, 34:11, 99:13, 157:17, 158:10

**objecting** [1] - 12:7

**objection** [108] - 6:9, 12:16, 12:25, 13:15, 14:1, 24:12, 24:13, 28:23, 30:5, 30:21, 32:8, 32:21, 33:4, 34:14, 38:21, 41:10, 41:23, 42:25, 43:5, 43:23, 46:18, 47:2, 51:9, 51:18, 52:9, 52:14, 61:17, 63:14, 66:19, 68:4, 68:8, 70:18, 70:22, 72:24, 73:18, 77:3, 78:12, 79:17, 80:19, 80:20, 81:23, 83:15, 83:22, 84:22, 85:22, 87:3, 87:19, 88:2, 88:24, 92:6, 93:25, 95:10, 95:12, 95:13, 96:13, 96:14, 99:20, 99:22, 103:8, 103:11, 108:10, 109:6, 109:24, 111:6, 112:2, 112:23, 113:18, 114:16, 115:3, 117:15, 118:12, 119:8, 120:4, 121:21, 122:2, 122:11, 123:24, 123:25, 125:2, 125:9, 126:23, 127:19, 128:19, 129:23, 131:11, 132:13, 132:19, 133:15, 134:19, 135:6, 136:12, 138:8, 143:21, 145:24, 147:22, 148:2, 148:5, 148:13, 148:18, 148:20, 158:20, 161:16, 161:19, 164:24, 165:18, 165:19

**objections** [17] - 34:20, 39:10, 48:15, 66:20, 69:12, 70:18, 89:24, 129:25, 131:12, 133:16, 136:1, 136:7, 138:7, 139:22, 141:2, 148:7, 154:13

**obvious** [2] - 121:19, 145:20

**obviously** [10] - 7:22, 8:7, 22:9, 61:11, 86:13, 135:20, 147:7, 147:12, 153:14, 160:2

**occasions** [1] - 131:22

**occurred** [3] - 82:14, 148:22, 151:2

**October** [12] - 85:19, 86:4, 86:11, 113:8, 126:15, 127:12, 128:6, 130:15, 138:23, 139:2, 140:7, 140:9

**OF** [2] - 1:2, 1:4

**offer** [7] - 30:19, 61:12, 92:11, 95:8, 97:23, 98:2, 98:16

**offered** [3] - 82:4, 95:15, 95:21

**offering** [1] - 136:9

**OFFICER** [4] - 39:22, 105:3, 105:17, 142:2

**officers** [2] - 16:19, 17:22

**official** [1] - 2:12

**Oklahoma** [2] - 50:16, 140:7

**old** [1] - 99:16
**once** [14] - 45:2, 45:18, 48:5, 49:5, 55:20, 73:11, 89:6, 100:20, 110:3, 110:12, 114:2, 114:3, 119:15, 136:19
**one** [128] - 5:10, 5:12, 5:13, 5:17, 6:20, 6:21, 6:23, 7:5, 9:6, 9:14, 9:16, 12:8, 13:2, 13:4, 13:8, 13:14, 16:11, 17:1, 17:5, 18:6, 18:10, 18:14, 19:13, 19:15, 19:19, 20:15, 22:19, 22:24, 23:1, 23:19, 23:21, 26:11, 27:6, 28:12, 28:13, 28:19, 28:25, 29:4, 31:13, 31:18, 32:7, 32:17, 33:9, 36:15, 37:1, 41:24, 46:9, 47:17, 51:10, 51:19, 52:2, 53:23, 55:22, 60:6, 62:19, 64:10, 70:6, 72:4, 74:24, 76:2, 77:2, 80:12, 81:6, 81:14, 81:19, 82:13, 86:14, 88:19, 91:16, 93:7, 93:18, 94:18, 95:11, 96:20, 96:22, 101:10, 101:11, 101:13, 104:1, 104:3, 104:12, 113:19, 115:17, 115:18, 116:12, 117:7, 117:23, 118:13, 120:5, 121:6, 121:7, 121:12, 122:6, 122:23, 123:2, 123:5, 124:23, 125:4, 125:7, 129:5, 129:18, 129:20, 129:24, 130:2, 130:10, 135:16, 136:6, 136:8, 143:3, 143:5, 149:2, 149:10, 151:25, 152:18, 153:2, 156:3, 159:15, 160:16, 160:19, 162:23, 163:23, 164:14, 164:19
**One** [1] - 2:3
**ones** [8] - 19:16, 61:15, 66:2, 67:12, 121:25, 143:4, 143:6, 155:21
**open** [1] - 141:24
**opening** [1] - 66:6
**opinion** [5] - 92:9, 92:15, 92:16, 92:18, 92:21
**opportunity** [1] - 22:14
**opposed** [5] - 25:11, 67:20, 73:13, 111:20, 124:9
**opposite** [1] - 20:9
**orange** [2] - 12:16, 12:21
**order** [42] - 4:1, 15:10, 21:15, 22:3, 22:22, 26:23, 27:3, 29:2, 31:23, 37:16, 41:1, 44:16, 45:18, 45:19, 46:3, 46:10, 46:12, 46:15, 46:20, 46:23, 50:5, 50:7, 50:17, 51:3, 51:14, 51:22, 52:6, 52:19, 64:21, 101:11, 101:13, 115:13, 120:13, 136:24, 136:25, 137:3, 138:21, 142:17, 154:2, 163:1, 163:24
**order's** [1] - 34:3
**ordered** [1] - 147:5
**ordering** [3] - 43:9, 147:11, 147:13
**orders** [30] - 28:4, 35:12, 36:20, 45:9, 49:22, 64:8, 100:21, 101:8, 101:10, 101:13, 102:11, 104:16, 104:17, 104:21, 104:22, 106:4, 107:25, 108:1, 134:8, 135:15, 147:2, 152:18, 153:17, 156:23, 157:2, 157:11, 165:9
**organization** [6] - 26:22, 28:1, 137:2, 138:24, 140:8
**organized** [1] - 66:14
**original** [3] - 5:13, 24:7, 24:22
**originally** [3] - 42:21, 54:19, 55:2
**Orthopedic** [1] - 137:7
**Orthopedics** [4] - 71:6, 84:19, 85:4, 86:4
**orthoses** [14] - 30:10, 110:7, 110:19, 117:22, 118:8, 118:11, 119:1, 119:3, 134:16, 143:13, 143:15, 143:17, 143:22, 148:9
**orthosis** [15] - 93:18, 109:15, 111:20, 112:9, 113:12, 113:24, 118:17, 118:19, 118:23, 119:18, 124:9, 127:8, 129:17, 139:4, 147:4
**orthotic** [2] - 110:25, 145:8
**Orthotics** [1] - 43:14
**otherwise** [3] - 30:18, 51:5, 155:9
**outliers** [1] - 147:12
**outside** [7] - 33:6, 48:2, 59:19, 97:19, 114:17, 118:12, 121:21
**overall** [2] - 147:8, 147:14
**overly** [1] - 20:12
**overrule** [2] - 43:25, 59:23
**Overruled** [1] - 78:13
**overruled** [62] - 35:3, 41:11, 41:25, 43:1, 43:7, 44:6, 46:21, 47:3, 48:16, 52:15, 63:16, 63:18, 66:21, 68:8, 69:13, 70:22, 72:25, 73:19, 80:20, 83:25, 87:20, 88:2, 88:25, 89:25, 92:7, 94:1, 95:14, 96:15, 103:11, 108:11, 109:8, 109:25, 111:7, 112:3, 112:25, 114:18, 115:4, 117:16, 118:14, 118:15, 122:3, 122:12, 124:1, 125:9, 126:25, 127:20, 128:20, 130:3, 131:13, 132:20, 133:17, 136:2, 136:13, 138:9, 139:24, 145:19, 145:24, 147:22, 148:18, 154:13, 165:18, 165:19
**overrules** [1] - 34:14
**own** [2] - 6:12, 73:7
**owning** [1] - 41:14

## P

**P-E-T-R-O-N** [1] - 62:7
**PA** [2] - 45:23, 45:24
**pad** [2] - 13:25, 14:4
**Page** [6] - 3:2, 40:24, 44:19, 45:4, 45:14, 49:1
**page** [11] - 21:14, 49:17, 50:1, 101:6, 101:11, 101:14, 102:21, 103:1, 104:1, 108:20
**Pages** [1] - 1:8
**pages** [10] - 21:19, 21:22, 101:6, 101:12, 104:3, 104:4, 104:6, 104:9, 104:12, 147:4
**paid** [34] - 41:20, 42:3, 47:1, 47:7, 47:8, 47:11, 52:19, 60:11, 64:3, 93:19, 96:25, 102:8, 104:21, 107:9, 108:5, 108:15, 108:16, 108:17, 112:19, 113:3, 113:7, 114:23, 115:20, 124:13, 124:17, 125:24, 126:1, 127:10, 131:23, 133:2, 134:2, 137:11, 139:6, 140:12
**pain** [3] - 124:9, 124:14, 125:20
**Pain** [6] - 6:6, 8:12, 19:22, 77:16, 80:13, 81:2
**paper** [1] - 104:17
**paperwork** [1] - 21:15
**paralegal** [3] - 4:14, 4:19, 4:24
**parameters** [1] - 35:12
**parsing** [1] - 61:6
**part** [27] - 7:20, 13:21, 23:11, 25:1, 26:9, 28:1, 31:4, 33:21, 34:21, 34:23, 41:4, 44:22, 45:17, 53:18, 54:8, 56:7, 64:25, 91:25, 102:10, 123:6, 125:23, 146:3, 146:7, 146:13, 152:21, 156:8, 158:21
**Part** [12] - 108:8, 108:12, 108:24, 108:25, 109:1, 109:4, 113:5, 123:7, 123:14, 124:8, 124:10, 124:24
**particular** [13] - 34:12, 82:13, 108:8, 108:18, 121:13, 124:23, 129:18, 130:10, 130:21, 138:20, 147:24, 154:1
**parties** [3] - 5:3, 59:22, 142:15
**parts** [2] - 5:23, 122:5
**past** [3] - 8:18, 158:11, 164:12
**patience** [1] - 61:25
**patient** [19] - 23:6, 23:7, 50:11, 130:20, 135:17, 136:25, 140:7, 151:6, 151:16, 153:21, 154:15, 157:23, 158:7, 158:24, 159:8, 160:9, 161:10, 161:15
**patient's** [1] - 138:23
**patients** [1] - 36:21
**pattern** [4] - 71:21, 112:13, 125:19, 125:21
**pay** [7] - 48:25, 49:14, 49:15, 51:5, 52:17, 97:6, 114:9
**payment** [3] - 87:15, 108:14, 109:3
**payments** [11] - 73:8, 77:17, 77:18, 77:20, 77:21, 77:22, 80:5, 89:16, 108:24, 108:25, 109:1
**payor** [1] - 114:23
**payroll** [1] - 78:25
**PDF** [1] - 104:2
**Penthouse** [1] - 2:3
**people** [12] - 58:15, 66:10, 117:11, 119:19, 146:19, 149:3, 149:9, 150:5, 150:19, 152:20, 153:11, 153:16
**per** [9] - 101:11, 119:3, 143:15, 143:22, 145:8, 147:4, 147:7, 147:15, 148:9
**per-provider** [1] - 143:15
**peradventure** [1] - 163:21
**percent** [15] - 34:3, 49:15, 53:15, 107:8, 107:15, 116:5, 122:22, 122:23, 129:7, 145:20, 149:7, 150:1, 150:4, 153:19
**percentage** [1] - 116:3
**perception** [1] - 38:16

**Perez** [1] - 4:20
**perfect** [4] - 13:10, 27:17, 29:18, 145:5
**perfectly** [3] - 8:8, 8:15, 39:10
**performed** [2] - 37:11, 91:9
**perhaps** [1] - 155:22
**period** [12] - 73:25, 74:6, 76:18, 77:12, 78:19, 81:3, 125:19, 126:2, 127:11, 146:1, 158:8, 158:25
**permitted** [2] - 16:1, 95:23
**person** [11] - 73:10, 92:13, 114:14, 116:11, 116:13, 129:20, 130:15, 151:9, 153:22
**personal** [10] - 6:14, 8:13, 41:10, 44:4, 93:25, 96:13, 108:10, 109:6, 114:16, 121:21
**personally** [1] - 48:11
**PETRON** [2] - 2:22, 62:3
**petron** [1] - 11:15
**Petron** [44] - 5:8, 5:17, 6:13, 20:11, 24:22, 27:14, 34:7, 35:9, 35:25, 36:4, 59:15, 62:7, 62:11, 67:6, 68:21, 72:7, 73:8, 73:9, 75:20, 83:6, 83:10, 84:8, 84:17, 89:11, 91:7, 92:4, 93:15, 100:12, 105:5, 106:22, 109:11, 113:23, 114:19, 115:8, 117:13, 118:25, 123:12, 124:6, 130:9, 136:19, 146:24, 156:19, 159:16, 161:23
**Petron's** [6] - 5:8, 5:13, 6:10, 24:7, 33:2, 33:12
**PH** [1] - 2:6
**pharmaceutical** [1] - 123:7
**pharmacies** [2] - 74:5, 75:24
**pharmacy** [2] - 149:22, 149:24
**phone** [4] - 41:15, 46:25, 52:17, 154:16
**phrase** [2] - 18:21, 144:14
**physical** [3] - 66:1, 104:17, 153:22
**physician** [1] - 51:5
**physician's** [1] - 45:25
**pick** [1] - 151:9
**picture** [1] - 83:5
**piece** [2] - 25:11, 152:23
**piecemeal** [1] - 22:7
**pieces** [3] - 44:23, 104:17
**place** [3] - 104:24, 154:16, 157:19
**places** [1] - 149:9
**plainly** [1] - 15:2
**Plaintiff** [1] - 1:5
**PLAINTIFF** [1] - 1:14
**Plaintiff's** [1] - 103:19
**plan** [14] - 32:25, 156:4, 156:7, 156:18, 156:22, 156:24, 157:1, 157:13, 157:16, 157:18, 158:3, 158:6, 159:10, 160:5
**planning** [1] - 29:2
**plans** [1] - 5:16
**plateaus** [1] - 110:11
**platform** [4] - 46:3, 46:5, 50:17, 157:12
**plenty** [1] - 10:20
**PLLC** [1] - 2:6
**Plus** [1] - 137:3
**plus** [1] - 37:16
**plus/minus** [1] - 34:3
**PM** [2] - 1:7, 166:1
**PME** [1] - 80:2
**point** [12] - 7:13, 19:8, 20:1, 34:18, 35:14, 42:22, 96:21, 153:23, 157:20, 157:21, 161:21, 162:17
**pointing** [3] - 28:6, 35:20, 164:19
**points** [2] - 35:21, 162:18
**policy** [1] - 41:5
**polls** [1] - 107:7
**population** [1] - 101:3
**portion** [3] - 5:21, 86:16, 135:9
**position** [3] - 8:22, 9:16, 155:9
**positive** [1] - 25:21
**possibility** [1] - 146:9
**possibly** [1] - 154:22
**posting** [1] - 141:25
**posture** [1] - 9:23
**potential** [1] - 34:16
**potentially** [2] - 11:14, 22:10
**power** [1] - 65:24
**Power** [7] - 76:17, 77:11, 77:22, 78:5, 78:6, 78:21, 80:2
**practice** [1] - 46:1
**practitioner** [1] - 145:1
**practitioners** [4] - 147:13, 149:12, 161:11, 161:14
**precisely** [2] - 34:4, 35:1
**preclude** [1] - 27:15
**precluding** [3] - 97:25, 98:1, 157:5
**prejudice** [2] - 147:25, 160:8
**prejudicial** [2] - 150:15, 151:19
**prepared** [2] - 74:17, 75:3
**preparing** [1] - 27:2
**prepayment** [6] - 42:18, 42:19, 42:20, 43:4, 48:2, 48:22
**preponderance** [1] - 19:1
**prescribe** [1] - 46:23
**prescription** [7] - 41:4, 44:16, 50:6, 51:1, 51:4, 51:7, 96:11
**presence** [4] - 59:20, 61:23, 97:20, 100:3
**present** [6] - 4:23, 16:6, 24:4, 63:11, 77:6, 164:10
**presentation** [1] - 31:24
**presented** [1] - 15:3
**preserved** [7] - 17:5, 30:6, 83:24, 136:12, 148:18, 165:18, 165:19
**president** [1] - 62:24
**presiding** [1] - 4:7
**pretty** [1] - 33:3
**prevent** [1] - 24:15
**prevents** [3] - 14:8, 15:17, 16:17
**previous** [3] - 69:5, 70:11, 125:7
**previously** [4] - 5:10, 31:7, 38:21, 40:9
**primarily** [1] - 159:2
**print** [1] - 76:1
**printed** [1] - 94:14
**prison** [2] - 54:19, 54:24
**privy** [1] - 56:22
**probability** [2] - 101:7, 101:8
**problem** [5] - 10:7, 10:23, 15:18, 151:5, 151:12
**procedure** [1] - 114:8
**proceedings** [4] - 59:20, 61:23, 97:20, 100:3
**process** [32] - 14:24, 73:5, 73:9, 93:3, 93:4, 100:22, 101:5, 104:18, 104:20, 106:1, 106:3, 108:14, 112:2, 112:24, 117:15, 123:25, 125:3, 127:19, 128:19, 129:23, 131:11, 132:19, 133:15, 134:19, 139:23, 141:3, 148:12, 154:2, 161:18, 162:25, 164:7, 164:13
**produce** [1] - 164:9
**professional** [1] - 27:22
**progress** [2] - 49:23, 50:6
**prohibiting** [2] - 152:7, 152:15
**promise** [2] - 6:25, 70:6
**proof** [2] - 51:4, 154:3
**proper** [6] - 8:8, 21:12, 25:16, 75:11, 142:11, 163:9
**properly** [4] - 21:3, 144:7, 144:9, 147:1
**proposition** [2] - 10:5, 10:14
**prosecute** [1] - 53:21
**prosecution** [3] - 58:4, 58:6, 58:16
**prosecutor** [1] - 58:3
**prosecutors** [1] - 53:23
**prove** [6] - 27:11, 145:21, 149:10, 153:1, 153:25, 154:2
**proves** [1] - 20:1
**provide** [2] - 53:9, 159:24
**provided** [7] - 58:15, 65:20, 65:21, 67:21, 70:11, 100:17, 146:11
**provider** [35] - 30:8, 45:19, 50:7, 50:9, 96:19, 96:21, 114:6, 117:12, 120:11, 130:12, 130:23, 130:25, 131:25, 133:4, 137:8, 139:3, 140:10, 143:15, 143:22, 144:15, 144:16, 144:18, 145:1, 146:10, 147:16, 148:9, 149:6, 149:20, 150:3, 150:9, 151:17, 152:7, 152:15, 152:16, 157:2
**providers** [10] - 114:21, 119:12, 130:18, 134:6, 134:9, 143:14, 143:17, 144:21, 161:7, 161:8
**providing** [3] - 95:5, 96:11, 152:7
**proving** [1] - 153:2
**provision** [1] - 108:13
**publish** [29] - 67:2, 68:10, 69:15, 70:23, 71:2, 73:17, 73:20, 80:23, 82:7, 88:4, 89:3, 90:21, 96:3, 112:6, 115:6, 117:19, 122:13, 122:15, 124:4, 125:12, 127:3, 128:22, 130:6, 131:16, 132:23, 133:20, 136:16, 138:15, 140:2
**published** [2] - 110:3, 136:19
**pull** [7] - 5:25, 40:10, 60:24, 125:5, 125:6, 151:20, 154:20
**pull-out-all-the-stops** [1] - 154:20
**pulling** [5] - 17:18, 30:3, 30:8, 99:7, 158:24
**purchase** [2] - 37:14, 49:23
**purpose** [11] - 43:21, 44:2, 44:13, 47:5, 74:17, 83:17, 83:18, 92:19, 104:18, 104:20, 164:12
**purposes** [7] - 7:19,

7:23, 8:23, 48:17, 76:6, 92:10, 119:21
**pursuant** [5] - 66:22, 67:1, 68:9, 69:15, 82:8
**push** [2] - 56:18, 155:7
**pushing** [1] - 146:17
**put** [29] - 13:20, 18:4, 22:10, 33:16, 35:14, 38:9, 43:3, 50:23, 51:1, 57:6, 67:7, 89:9, 98:23, 104:3, 104:4, 104:6, 117:2, 118:22, 120:5, 142:23, 142:25, 147:19, 156:13, 156:22, 157:18, 157:23, 158:3, 164:18
**putting** [3] - 156:19, 157:21, 158:6

## Q

**Qluarant** [2] - 42:18, 48:3
**qualifications** [1] - 91:20
**qualified** [1] - 164:11
**qualify** [1] - 92:3
**quality** [1] - 73:4
**questioned** [1] - 146:18
**questioning** [1] - 75:5
**questions** [5] - 17:14, 46:19, 52:21, 57:15, 58:22
**quick** [1] - 161:4
**quickly** [1] - 159:15
**quite** [3] - 16:21, 143:13, 164:15
**quote** [2] - 6:8, 20:19

## R

**random** [3] - 33:19, 33:20, 64:9
**randomly** [2] - 35:11, 101:14
**range** [1] - 107:15
**rate** [1] - 63:25
**rather** [1] - 142:13
**raw** [3] - 27:20, 107:22, 107:23
**read** [3] - 34:24, 35:2, 81:8
**ready** [2] - 39:18, 105:14
**real** [2] - 56:13, 146:3
**really** [11] - 11:24, 20:3, 25:17, 63:16, 104:12, 138:4, 149:4, 149:10, 150:15, 153:16
**reason** [5] - 24:21, 28:3, 46:22, 153:10, 159:5
**reasonable** [1] - 31:23
**reasons** [5] - 30:2, 43:8, 43:10, 148:3, 153:5
**receive** [1] - 132:3
**received** [98] - 41:4, 66:22, 66:23, 67:2, 68:6, 68:9, 68:11, 69:13, 69:15, 69:16, 70:20, 70:24, 73:19, 73:21, 74:17, 77:4, 77:5, 78:14, 78:15, 78:24, 79:1, 79:18, 79:19, 80:21, 80:22, 81:24, 81:25, 84:4, 84:23, 84:25, 85:23, 85:25, 88:5, 89:1, 89:4, 94:4, 95:14, 95:17, 95:25, 96:1, 103:11, 103:18, 103:19, 109:25, 110:1, 111:7, 111:8, 112:4, 112:5, 112:25, 113:1, 115:4, 115:5, 117:17, 117:18, 121:12, 122:13, 122:14, 122:22, 124:2, 124:3, 125:10, 125:11, 125:25, 127:1, 127:2, 127:21, 127:22, 128:20, 128:21, 129:18, 130:4, 130:5, 130:11, 130:13, 130:15, 131:14, 131:15, 132:21, 132:22, 132:25, 133:18, 133:19, 136:3, 136:9, 136:14, 136:15, 138:10, 138:13, 138:14, 139:25, 140:1, 147:21, 154:8, 154:9, 162:11, 165:16
**Received** [1] - 3:1
**receiving** [3] - 41:17, 126:3, 131:21
**Recess** [2] - 39:17, 105:11
**recognize** [6] - 42:14, 46:3, 47:24, 50:17, 57:7, 63:17
**recollection** [3] - 55:7, 106:11, 106:22
**reconsideration** [1] - 9:24
**record** [57] - 4:11, 5:11, 9:1, 10:6, 10:21, 11:1, 18:7, 18:25, 19:20, 22:17, 22:20, 23:15, 30:12, 30:21, 31:1, 31:11, 32:1, 32:12, 33:16, 34:11, 34:24, 35:18, 37:12, 38:22, 44:7, 58:10, 62:5, 66:24, 68:16, 82:19, 82:23, 84:11, 86:6, 87:14, 101:7, 102:7, 125:6, 142:15, 142:19, 143:10, 144:2, 144:5, 144:18, 144:23, 144:25, 145:5, 145:8, 146:4, 146:13, 149:16, 150:21, 156:5, 158:23, 161:4, 163:7, 163:11, 165:14
**Recorded** [1] - 36:19
**recorded** [1] - 36:20
**records** [68] - 5:23, 6:17, 8:3, 10:14, 31:9, 32:13, 37:4, 38:21, 45:9, 49:22, 63:8, 64:13, 64:20, 66:8, 66:9, 69:7, 73:6, 74:23, 76:20, 76:21, 78:8, 79:13, 80:15, 81:20, 83:23, 89:20, 90:5, 93:7, 93:11, 94:4, 94:8, 94:13, 95:19, 95:22, 99:7, 99:8, 100:18, 100:19, 101:6, 101:25, 103:2, 103:15, 104:12, 104:15, 111:11, 113:25, 116:17, 120:19, 125:5, 135:22, 142:13, 146:6, 146:9, 146:10, 148:8, 158:24, 159:9, 161:10, 162:2, 162:7, 162:22, 163:11, 163:15, 163:20, 163:25, 164:3
**recross** [1] - 58:23
**red** [8] - 74:3, 75:20, 76:3, 77:13, 85:9, 86:18, 110:10, 147:9
**redetermination** [2] - 40:19, 41:2
**REDIRECT** [2] - 2:19, 57:18
**redirect** [1] - 57:16
**reduced** [1] - 113:4
**reduction** [1] - 56:25
**refer** [2] - 144:20, 145:2
**referenced** [6] - 65:10, 66:16, 66:25, 69:11, 69:14, 70:21
**references** [1] - 135:6
**referred** [4] - 102:4, 102:8, 114:8, 143:16
**referring** [23] - 36:13, 114:5, 117:12, 130:12, 130:18, 130:20, 130:22, 130:25, 131:24, 133:4, 134:6, 134:9, 137:8, 139:3, 140:10, 143:14, 144:15, 144:18, 144:21, 145:1, 147:16, 150:3
**reflect** [2] - 90:8, 120:24
**reflected** [2] - 76:3, 108:23
**reflecting** [2] - 73:6, 103:23
**reflective** [1] - 120:9
**reflects** [2] - 109:13, 128:10
**refresh** [8] - 38:10, 38:25, 55:7, 60:21, 98:11, 98:14, 106:10, 106:22
**regard** [2] - 5:13, 64:5
**regarding** [1] - 134:8
**REGINALD** [1] - 1:19
**Reginald** [1] - 4:13
**reginald.cuyler.jr@usdoj.gov** [1] - 1:21
**regulation** [2] - 145:9, 151:22
**regurgitate** [1] - 18:2
**regurgitating** [2] - 34:16, 36:23
**related** [12] - 11:12, 16:18, 17:22, 49:4, 67:13, 81:7, 81:8, 91:20, 126:7, 135:3, 140:5, 145:14
**relates** [1] - 117:3
**relationship** [5] - 96:17, 99:21, 102:2, 114:5, 117:11
**relatively** [1] - 150:13
**relevance** [4] - 72:24, 120:4, 150:23, 151:1
**relevant** [3] - 24:1, 66:13, 150:25
**rely** [2] - 90:8, 92:17
**remain** [1] - 56:5
**remember** [6] - 29:16, 55:21, 71:25, 106:8, 106:9, 141:22
**remembers** [1] - 60:19
**remind** [2] - 40:7, 155:15
**renew** [1] - 48:15
**renewed** [5] - 5:6, 5:10, 9:23, 11:19, 11:21
**repeat** [4] - 44:8, 44:10, 51:20, 52:3
**repeating** [1] - 9:11
**report** [10] - 33:2, 33:15, 34:7, 34:20, 35:20, 35:23, 35:25, 36:4, 37:8, 41:7
**REPORTED** [1] - 2:11
**Reporter** [1] - 2:12
**represent** [3] - 71:22, 115:24, 130:19
**represented** [3] - 108:6, 108:18, 129:7
**representing** [1] - 75:21
**represents** [5] - 28:14, 74:4, 74:10, 75:22, 115:14
**request** [8] - 40:19, 41:3, 41:5, 43:24, 48:22, 48:23, 49:4, 50:21
**requesting** [2] - 44:24, 44:25
**require** [1] - 26:16
**required** [3] - 19:5, 38:12, 144:25
**requirement** [3] - 151:8, 151:9, 151:15
**Research** [1] - 81:11
**research** [1] - 141:25
**reserve** [8] - 38:8, 120:6, 120:21, 120:25, 129:11, 134:21, 141:4, 141:8
**reserved** [1] - 142:17
**resolved** [3] - 11:18, 11:19, 32:21
**respect** [20] - 5:7, 5:14, 6:3, 6:25, 12:9, 12:17, 12:18, 65:14, 68:6, 83:21, 91:13,

99:20, 104:22, 108:19, 150:23, 151:3, 153:13, 163:16, 164:2, 164:5
**respective** [1] - 104:10
**respectively** [2] - 116:1, 129:4
**respond** [1] - 33:11
**responded** [1] - 48:11
**response** [2] - 9:15, 33:8
**result** [4] - 14:25, 147:15, 147:18, 149:14
**resume** [2] - 141:19, 142:6
**returns** [1] - 138:2
**reverse** [3] - 11:25, 15:13, 64:21
**review** [17] - 25:16, 25:22, 42:18, 42:19, 42:20, 43:4, 48:2, 48:22, 63:7, 64:25, 91:21, 104:13, 106:16, 123:6, 126:7, 134:8, 136:20
**reviewed** [15] - 15:20, 16:3, 27:2, 46:10, 46:12, 64:20, 65:7, 65:17, 66:2, 67:23, 68:17, 69:8, 69:22, 70:8, 71:7
**reviewing** [2] - 38:25, 106:17
**right-hand** [6] - 65:10, 66:25, 68:7, 69:8, 69:14, 70:21
**rightly** [1] - 18:1
**rise** [7] - 39:15, 39:22, 60:4, 105:3, 105:12, 105:17, 142:2
**rises** [1] - 16:21
**risk** [1] - 24:23
**Robin** [2] - 29:13, 31:3
**Rogers** [6] - 11:2, 13:6, 14:2, 14:6, 14:12, 19:20
**Rogers'** [3] - 15:7, 15:12, 16:3
**roles** [1] - 62:23
**rough** [1] - 21:17
**roughly** [4] - 56:2, 78:22, 113:7, 124:14
**row** [2] - 130:22, 130:25
**rows** [4] - 12:6, 12:21, 25:25, 115:13
**RPR** [1] - 2:12
**Rule** [11] - 21:12, 24:11, 27:8, 32:22, 66:22, 81:22, 82:8, 84:23, 87:18, 98:17
**rule** [9] - 7:4, 15:2, 24:20, 24:21, 36:9, 38:13, 60:23, 152:6, 152:15
**ruled** [2] - 18:16, 61:13
**Rules** [1] - 74:21
**rules** [5] - 11:20, 98:18, 146:11, 155:10, 160:7
**ruling** [10] - 18:6, 31:6, 38:17, 60:15, 61:14, 67:1, 68:9, 69:15, 98:22, 159:14
**rulings** [2] - 9:25, 142:16
**Rulison** [2] - 19:21, 20:6

## S

**SA** [1] - 131:20
**sales** [1] - 147:5
**sample** [17] - 33:20, 33:21, 35:11, 64:9, 64:10, 97:13, 97:14, 98:3, 98:20, 100:15, 100:24, 102:19, 102:25, 104:14, 107:5, 107:24
**sampled** [4] - 101:15, 102:1, 102:3, 102:10
**samples** [2] - 36:20, 100:23
**sampling** [9] - 33:19, 91:25, 92:4, 92:11, 92:21, 101:1, 101:17, 102:15, 104:8
**Sargon** [3] - 131:1, 132:1, 138:22
**sat** [1] - 15:20
**Saturday** [1] - 10:3
**save** [3] - 25:17, 34:21, 121:1
**saw** [3] - 142:13, 145:16, 148:23
**school** [1] - 62:17
**scope** [3] - 114:17, 118:12, 121:21
**screen** [5] - 53:8, 94:20, 142:23, 142:25, 160:20
**screenshot** [1] - 86:17
**script** [1] - 102:13
**SE** [1] - 125:14
**se** [1] - 147:7
**searching** [1] - 26:16
**seated** [5] - 4:3, 39:25, 62:4, 105:19, 142:7
**second** [33] - 13:14, 18:10, 18:14, 19:15, 19:19, 21:6, 24:9, 28:25, 29:4, 31:13, 31:18, 36:15, 37:1, 60:6, 62:20, 64:11, 65:13, 96:20, 96:22, 96:24, 104:4, 115:25, 117:9, 131:20, 131:24, 133:6, 136:6, 136:8, 145:24, 156:2, 158:7, 160:16, 160:19
**second-to-last** [1] - 145:24
**secondarily** [1] - 10:4
**secretively** [1] - 149:11
**section** [1] - 86:12
**security** [1] - 93:9
**SECURITY** [4] - 39:22, 105:3, 105:17, 142:2
**see** [73] - 4:17, 7:4, 11:20, 11:24, 11:25, 13:21, 14:13, 14:18, 17:6, 20:25, 21:24, 22:2, 29:19, 30:16, 35:22, 35:25, 39:14, 42:3, 57:6, 59:17, 60:21, 67:9, 68:19, 71:16, 71:22, 74:3, 78:22, 78:23, 81:4, 82:3, 82:19, 83:4, 84:11, 86:12, 88:8, 88:13, 89:6, 89:8, 90:16, 91:4, 95:4, 95:24, 96:7, 96:22, 97:15, 97:18, 102:23, 104:7, 105:1, 105:6, 105:9, 110:9, 110:13, 112:12, 115:21, 117:10, 125:21, 125:23, 130:22, 135:18, 139:9, 141:19, 142:1, 142:5, 144:16, 145:18, 146:25, 148:21, 161:2, 163:24, 165:23
**seeing** [12] - 68:25, 69:1, 72:7, 77:9, 83:10, 90:23, 110:4, 127:6, 131:5, 142:14, 142:15, 153:15
**seek** [1] - 61:15
**seem** [2] - 38:7, 121:19
**sees** [2] - 8:8, 8:9
**select** [2] - 42:22, 42:23
**selected** [1] - 104:14
**send** [6] - 42:21, 45:12, 48:23, 51:3, 57:13, 74:5
**sending** [9] - 41:20, 43:21, 44:2, 48:23, 82:16, 84:10, 85:4, 85:7
**sends** [1] - 80:13
**sense** [4] - 16:24, 150:6, 150:9, 164:17
**sensible** [1] - 15:23
**sent** [5] - 48:24, 57:9, 57:11, 91:1
**sentence** [2] - 54:12, 56:25
**sentenced** [1] - 54:19
**sentencing** [1] - 55:3
**separate** [7] - 22:4, 25:11, 27:3, 29:24, 31:5, 108:16, 131:22
**separately** [2] - 25:5, 77:13
**September** [8] - 55:18, 56:3, 84:19, 85:4, 86:11, 110:7, 126:4, 137:6
**seriousness** [1] - 31:21
**serve** [1] - 62:23
**servers** [1] - 29:14
**service** [10] - 30:10, 63:1, 63:2, 130:11, 133:24, 134:3, 134:4, 134:15, 137:6, 139:1
**Services** [1] - 101:24
**services** [2] - 49:22, 64:3
**SESSION** [1] - 1:6
**session** [2] - 4:5, 23:21
**set** [9] - 93:7, 98:19, 115:10, 128:12, 128:13, 147:16, 147:18, 149:11
**sets** [1] - 30:13
**setup** [3] - 69:2, 85:18, 131:6
**seven** [1] - 58:1
**several** [2] - 55:5, 55:15
**severe** [1] - 147:24
**shadowboxing** [1] - 165:7
**SHARON** [1] - 2:12
**sharon_pellvelazco@flsd.uscourts.gov** [1] - 2:15
**Sheehan** [1] - 29:13
**Sheehan's** [1] - 31:4
**sheer** [1] - 29:17
**shield** [2] - 17:25, 18:3
**shorthand** [2] - 20:13, 114:14
**Shotwell** [1] - 62:2
**shoulder** [2] - 115:15, 153:24
**show** [63] - 11:1, 22:7, 42:5, 47:21, 48:18, 53:10, 65:2, 67:4, 68:13, 68:22, 69:17, 70:3, 71:10, 71:12, 79:20, 81:12, 81:15, 81:21, 82:10, 82:19, 83:7, 83:13, 87:16, 93:12, 97:10, 102:16, 103:20, 105:23, 106:10, 106:13, 107:16, 109:11, 110:22, 111:15, 112:15, 113:3, 113:9, 116:6, 124:19, 126:10, 127:23, 128:7, 129:13, 131:2, 137:18, 139:12, 140:18, 141:6, 143:22, 143:23, 148:6, 148:8, 148:25, 152:14, 152:17, 152:19, 152:21, 157:10, 158:4, 160:5, 161:5, 161:12, 165:12
**showed** [1] - 78:4
**showing** [38] - 74:1, 77:10, 78:3, 81:2, 82:13, 82:17, 85:5, 87:14, 87:15, 89:9, 109:14, 109:15, 110:7, 112:9, 112:19, 114:25, 115:12, 119:16, 121:10, 121:11, 124:7, 124:9, 125:18, 127:16, 127:25, 128:1, 131:19, 133:23, 135:2, 147:10, 149:7, 149:25, 150:5, 150:15, 152:23, 152:24, 153:20, 161:9
**shown** [4] - 99:13,

153:14, 153:18, 155:8
**shows** [12] - 75:9, 78:5, 112:11, 113:4, 128:11, 147:14, 149:3, 149:6, 156:22, 161:6, 162:21, 162:25
**side** [9] - 34:13, 57:6, 60:24, 65:10, 98:24, 108:15, 109:3, 120:5
**sidebar** [10] - 43:24, 44:1, 59:17, 59:19, 61:1, 61:19, 61:22, 97:16, 97:19, 100:2
**sides** [3] - 20:5, 98:8, 98:23
**sift** [3] - 26:11, 165:3, 165:8
**sifted** [1] - 23:8
**signatories** [2] - 65:23, 65:24
**signatory** [3] - 13:6, 14:2, 67:14
**signed** [5] - 136:25, 138:23, 140:6, 147:2, 153:17
**signers** [1] - 68:20
**significant** [1] - 5:21
**significantly** [1] - 23:23
**signs** [1] - 163:1
**silent** [1] - 43:14
**Silent** [10] - 23:2, 26:14, 26:24, 27:3, 44:12, 48:5, 137:7, 137:12, 140:9, 140:15
**similar** [12] - 19:16, 30:23, 60:4, 60:8, 67:19, 84:12, 98:12, 98:20, 137:22, 140:22, 142:20
**similarity** [1] - 142:21
**similarly** [2] - 16:18, 21:5
**simple** [2] - 22:11, 72:1
**simply** [11] - 12:7, 15:16, 22:7, 22:12, 24:1, 26:4, 30:2, 30:3, 33:3, 38:5, 143:13
**single** [12] - 21:2, 22:19, 24:1, 29:22, 31:11, 32:3, 81:6, 144:15, 144:24, 147:6, 164:2, 164:5
**singular** [1] - 84:18
**sitting** [1] - 31:15
**situation** [1] - 96:9
**situations** [1] - 73:7
**six** [7] - 32:20, 61:13, 104:1, 104:10, 118:3, 126:5, 153:9
**size** [1] - 29:17
**skill** [1] - 26:1
**skilled** [1] - 26:3
**skipped** [1] - 160:22
**sleeve** [1] - 115:16
**sleeves** [2] - 118:21, 132:2
**slide** [30] - 17:21, 24:3, 24:16, 33:5, 34:12, 35:1, 35:16, 36:12, 38:2, 59:24, 60:4, 60:8, 60:17, 81:1, 81:18, 83:10, 94:24, 95:21, 98:4, 117:2, 120:6, 127:7, 144:20, 145:11, 157:7, 157:9, 158:4, 158:18, 159:8, 164:18
**Slide** [1] - 125:5
**slides** [5] - 74:14, 76:3, 80:25, 98:19, 149:4
**slightly** [1] - 121:4
**slip** [1] - 51:1
**slips** [1] - 49:23
**small** [1] - 101:2
**smaller** [2] - 76:1, 115:22
**smart** [1] - 99:17
**smooth** [1] - 59:23
**social** [1] - 93:9
**someone** [5] - 7:6, 10:9, 25:3, 67:13, 164:11
**sometimes** [1] - 118:21
**sorry** [11] - 44:24, 45:23, 46:11, 46:24, 58:11, 58:13, 71:12, 86:9, 102:24, 118:7, 149:18
**sort** [11] - 5:9, 5:24, 25:24, 51:4, 66:6, 95:5, 99:19, 100:21, 114:13, 151:12, 165:6
**sounds** [3] - 9:23, 17:1, 55:8
**source** [15] - 22:18, 27:4, 29:10, 31:2, 31:5, 35:16, 38:14, 72:13, 74:15, 74:25, 76:15, 79:25, 94:20, 123:18, 138:4
**sources** [12] - 22:2, 22:3, 27:24, 30:13, 78:21, 94:22, 135:13, 135:15, 137:25, 138:11, 139:17
**south** [3] - 38:10, 48:10, 98:15
**SOUTHERN** [1] - 1:2
**Southern** [5] - 4:5, 43:19, 137:16, 139:10, 163:4
**speaking** [15] - 76:14, 84:17, 85:17, 88:18, 93:15, 93:16, 102:18, 109:17, 113:10, 116:9, 119:15, 120:8, 130:19, 134:14, 163:2
**Special** [1] - 4:15
**special** [2] - 92:13, 108:13
**specialist** [2] - 4:14, 4:19
**specialized** [1] - 92:12
**specific** [12] - 30:4, 30:10, 39:4, 39:5, 39:7, 85:2, 91:19, 92:10, 145:14, 155:23, 158:1, 163:10
**specifically** [6] - 13:4, 61:3, 64:5, 91:12, 98:23, 137:14
**speculation** [3] - 43:23, 46:18, 51:11
**spell** [1] - 62:5
**spoken** [1] - 101:23
**spreadsheet** [4] - 24:2, 26:10, 109:18, 164:20
**spreadsheets** [6] - 26:13, 27:2, 163:13, 165:3, 165:7, 165:8
**St** [1] - 2:6
**stamp** [1] - 156:20
**stand** [6] - 7:3, 7:6, 13:24, 24:25, 39:9, 161:23
**standing** [1] - 34:1
**standpoint** [1] - 108:3
**stands** [1] - 38:3
**start** [4] - 20:21, 39:13, 73:11, 98:3
**started** [2] - 57:5, 59:13
**starting** [2] - 12:24, 23:20
**starts** [2] - 23:11, 110:9
**state** [26] - 14:13, 32:12, 50:15, 58:10, 62:5, 92:14, 119:20, 120:10, 120:11, 137:1, 138:11, 138:23, 149:14, 149:23, 150:1, 151:7, 151:8, 151:12, 151:16, 151:21, 152:7, 152:16, 153:13, 153:18, 153:20, 154:15
**statement** [7] - 9:1, 16:20, 18:17, 25:3, 86:11, 86:17, 89:9
**statements** [5] - 66:5, 73:2, 83:5, 88:12, 147:3
**states** [6] - 15:16, 148:22, 148:23, 149:7, 150:4, 159:6
**STATES** [3] - 1:1, 1:4, 1:11
**States** [6] - 2:13, 4:5, 4:6, 4:8, 4:13, 15:2
**stating** [8] - 13:22, 14:8, 14:15, 16:23, 17:2, 17:7, 19:5, 36:18
**statistical** [10] - 34:8, 37:10, 91:20, 92:4, 92:11, 92:21, 100:13, 100:23, 107:5, 108:3
**statistically** [2] - 33:20, 64:9
**statistics** [1] - 107:7
**Statistics** [4] - 62:19, 91:23
**stay** [2] - 55:16, 141:18
**stayed** [2] - 54:25, 160:25
**staying** [1] - 61:5
**Ste** [1] - 2:3
**STENOGRAPHICALLY** [1] - 2:11
**step** [4] - 8:16, 58:25, 97:8, 142:4
**steps** [1] - 154:3
**still** [3] - 40:7, 141:23, 159:24
**sting** [1] - 17:18
**stipulate** [1] - 152:25
**stipulating** [1] - 152:14
**stipulation** [1] - 32:11
**STK** [11] - 71:6, 84:19, 85:5, 85:7, 86:5, 87:13, 87:14, 88:9, 88:10, 88:21, 89:7
**stop** [3] - 6:19, 7:25, 74:11
**stopped** [1] - 156:25
**stops** [1] - 154:20
**Stout** [2] - 62:22, 64:3
**STOUT** [1] - 62:22
**straight** [2] - 162:25, 163:1
**strands** [1] - 28:20
**strategic** [4] - 17:11, 17:15, 18:23, 20:2
**strategically** [5] - 15:25, 19:24, 154:20, 154:24, 155:8
**Strategies** [3] - 82:15, 82:21, 84:10
**Strategy** [1] - 82:15
**stratification** [1] - 106:1
**stratified** [1] - 33:19
**Stratum** [1] - 99:3
**Street** [1] - 2:2
**street** [1] - 149:21
**stretch** [2] - 59:10, 97:17
**strikes** [1] - 38:1
**stuff** [5] - 21:19, 98:2, 141:17, 152:20, 155:1
**subject** [1] - 47:15
**submit** [2] - 49:13, 114:21
**submitted** [7] - 41:17, 41:18, 49:7, 49:8, 49:12, 49:13, 52:19
**submitting** [2] - 47:5, 49:15
**subpoena** [1] - 138:2
**subpoenas** [1] - 39:7
**subset** [2] - 101:2, 108:18
**substantial** [1] - 56:24
**substituting** [1] - 110:24
**Suburban** [1] - 81:10
**succinctly** [2] - 147:20, 154:4
**suggest** [1] - 21:22
**suggesting** [1] - 22:1
**Sullivan** [2] - 150:8
**summaries** [9] - 21:1, 74:16, 75:2, 75:3, 75:6, 90:10, 90:12, 90:14, 129:17
**summarization** [1] - 15:3
**summarize** [11] - 16:13, 18:2, 21:22, 23:5, 23:17, 25:6, 73:12, 74:22, 95:18,

123:12, 134:14
**summarized** [8] - 32:7, 69:5, 70:7, 71:4, 72:15, 80:11, 90:24, 126:13
**summarizes** [1] - 30:14
**summarizing** [26] - 6:16, 26:5, 30:1, 30:8, 32:3, 37:11, 63:13, 64:13, 69:20, 72:8, 72:9, 73:25, 80:12, 93:17, 96:23, 114:7, 114:10, 123:13, 124:22, 124:23, 127:8, 129:16, 129:19, 137:21, 163:15, 164:2
**summary** [74] - 5:7, 5:14, 5:20, 5:22, 6:5, 6:10, 6:16, 7:6, 7:7, 7:19, 7:24, 8:1, 8:8, 8:15, 8:18, 9:10, 10:16, 13:22, 14:8, 14:14, 14:20, 15:5, 16:6, 16:23, 17:2, 17:3, 19:4, 19:6, 20:13, 20:19, 21:3, 23:13, 24:23, 27:11, 27:16, 30:3, 37:4, 37:7, 37:9, 37:19, 63:11, 65:6, 65:21, 66:12, 72:21, 74:15, 75:2, 75:12, 89:16, 90:4, 90:7, 90:17, 93:16, 95:22, 103:14, 126:14, 135:3, 135:25, 155:6, 157:9, 158:11, 158:13, 158:16, 158:22, 159:4, 161:21, 163:10, 164:10, 164:11
**summer** [1] - 110:10
**Sunrise** [9] - 138:24, 139:2, 139:7, 139:9, 140:8, 140:13, 140:15, 162:20, 163:4
**SunTrust** [1] - 87:14
**supplement** [1] - 21:13
**supplier** [12] - 26:21, 40:18, 43:12, 48:24, 57:11, 137:7, 139:2, 140:9, 145:2, 149:24, 151:6, 151:13
**suppliers** [6] - 43:3, 74:4, 75:24, 77:14, 91:1, 149:25
**Supplies** [1] - 137:8
**supply** [2] - 125:22, 154:14
**Supply** [1] - 139:3
**support** [2] - 10:5, 146:1
**Support** [1] - 137:3
**supported** [1] - 63:22
**supports** [3] - 19:1, 28:20, 144:3
**supposed** [1] - 55:2
**surrender** [4] - 54:24, 55:2, 55:25, 56:24
**sustain** [3] - 51:12, 121:23, 135:8
**sustained** [3] - 58:17, 119:9, 132:14
**Suwanee** [1] - 46:2
**swear** [1] - 62:2
**sword** [2] - 17:24, 18:4
**sword/shield** [2] - 7:2, 15:18
**sworn** [2] - 40:9, 62:3
**system** [2] - 147:14, 149:11
**Szczepanski** [1] - 4:15

## T

**table** [4] - 4:14, 29:3, 38:16, 49:14
**tails** [1] - 10:1
**Tanos** [1] - 50:12
**task** [5] - 35:7, 64:10, 64:11, 64:12, 100:20
**team** [4] - 63:22, 65:7, 69:7
**technical** [1] - 92:12
**technically** [1] - 118:22
**technology** [1] - 50:25
**telemed** [2] - 26:22, 28:1
**telemedicine** [14] - 46:14, 51:15, 51:23, 77:14, 85:12, 137:1, 138:24, 140:7, 149:8, 152:18, 152:22, 153:1, 153:21, 154:2
**telemedicines** [1] - 75:24
**telephone** [8] - 41:7, 46:14, 46:23, 46:24, 51:15, 51:23, 52:7, 144:12
**telephonic** [1] - 144:11
**templated** [1] - 46:8
**ten** [13] - 21:14, 54:13, 101:12, 115:12, 116:2, 116:4, 118:3, 128:11, 129:5, 129:7, 134:15, 142:5
**ten-page** [1] - 21:14
**tend** [2] - 152:14, 155:7
**tending** [1] - 152:21
**tends** [5] - 143:22, 143:23, 148:25, 152:17, 161:5
**term** [2] - 91:11, 118:7
**terms** [2] - 116:4, 118:15
**testified** [11] - 29:13, 41:18, 53:20, 57:21, 58:2, 64:22, 100:12, 101:19, 106:1, 111:1, 150:9
**testify** [6] - 8:2, 11:14, 13:24, 25:4, 25:5, 38:11
**testifying** [7] - 27:15, 35:7, 40:15, 56:6, 75:3, 92:25, 144:8
**testimony** [59] - 5:8, 5:13, 5:18, 6:3, 6:4, 6:15, 8:5, 8:15, 8:18, 8:19, 14:22, 14:24, 15:3, 15:7, 15:12, 15:21, 15:22, 16:4, 16:13, 17:3, 18:2, 18:18, 19:21, 24:8, 33:13, 34:15, 34:16, 36:19, 36:21, 36:24, 37:18, 38:4, 60:1, 60:16, 63:9, 74:15, 74:16, 75:1, 75:9, 75:15, 82:5, 89:2, 90:7, 92:9, 92:17, 95:18, 98:5, 98:21, 103:17, 105:7, 108:24, 141:20, 142:6, 144:6, 145:7, 150:7, 153:11
**Texas** [2] - 50:10, 137:1
**THE** [297] - 1:11, 1:14, 2:1, 4:2, 4:4, 4:16, 4:21, 4:25, 5:5, 6:1, 6:19, 8:6, 8:21, 9:14, 9:21, 10:11, 11:5, 11:22, 12:11, 12:14, 12:19, 12:24, 13:3, 13:8, 13:12, 13:18, 15:8, 15:13, 18:10, 18:14, 19:15, 19:19, 19:23, 20:22, 21:6, 22:16, 22:23, 22:25, 23:4, 23:9, 23:22, 24:9, 24:15, 25:1, 26:7, 26:25, 28:5, 28:8, 28:17, 28:25, 29:3, 29:15, 30:5, 30:24, 31:6, 31:13, 31:18, 31:21, 32:8, 32:11, 32:16, 32:18, 32:20, 33:3, 33:10, 33:16, 33:23, 34:9, 34:17, 34:21, 35:14, 35:23, 36:1, 36:5, 36:7, 36:15, 37:1, 37:13, 38:23, 39:2, 39:6, 39:9, 39:15, 39:16, 39:18, 39:21, 39:24, 40:8, 41:11, 41:13, 41:24, 42:2, 42:9, 42:11, 42:15, 43:1, 43:7, 43:8, 43:25, 44:8, 44:10, 46:19, 46:22, 47:3, 47:17, 47:19, 48:16, 51:10, 51:12, 51:19, 51:25, 52:8, 52:10, 52:15, 52:16, 52:22, 57:3, 57:16, 58:9, 58:11, 58:17, 58:23, 58:25, 59:3, 59:7, 59:9, 59:16, 59:22, 60:6, 60:15, 60:20, 61:13, 61:25, 62:4, 62:7, 62:8, 63:16, 65:12, 66:18, 66:21, 66:24, 68:3, 68:6, 69:13, 70:20, 72:25, 73:2, 73:19, 74:11, 77:1, 77:4, 78:13, 79:18, 79:21, 80:20, 81:24, 82:2, 83:16, 83:24, 84:2, 84:23, 85:23, 87:4, 87:6, 87:8, 87:18, 87:20, 87:25, 88:2, 88:25, 89:25, 92:7, 94:1, 94:3, 94:18, 94:22, 94:24, 94:25, 95:1, 95:3, 95:8, 95:10, 95:14, 95:17, 96:15, 96:17, 97:15, 97:22, 97:25, 99:4, 99:15, 99:23, 100:5, 103:8, 103:10, 103:21, 104:24, 105:5, 105:9, 105:12, 105:13, 105:18, 106:14, 108:11, 108:12, 109:8, 109:9, 109:25, 111:5, 111:7, 112:3, 112:25, 113:19, 114:18, 114:20, 115:2, 115:4, 116:23, 117:16, 118:13, 119:9, 120:5, 120:21, 120:25, 121:6, 121:23, 122:3, 122:5, 122:12, 123:21, 123:24, 124:1, 125:4, 125:7, 125:9, 126:25, 127:20, 128:20, 129:11, 129:24, 130:2, 131:13, 132:14, 132:20, 132:24, 133:17, 134:21, 135:8, 136:2, 136:6, 136:8, 136:12, 138:9, 139:24, 141:4, 141:8, 141:11, 141:15, 142:4, 143:1, 143:4, 143:9, 143:20, 144:2, 144:14, 145:4, 145:19, 147:19, 149:16, 150:11, 150:20, 151:23, 152:12, 153:3, 153:23, 154:10, 154:17, 155:17, 156:2, 157:3, 157:20, 158:5, 158:14, 159:20, 159:23, 160:16, 160:19, 160:21, 160:24, 161:16, 161:24, 162:12, 163:6, 163:17, 164:14, 165:13, 165:23
**theme** [1] - 151:19
**themselves** [3] - 8:3, 10:21, 135:15
**theory** [6] - 143:16, 154:12, 154:14, 155:11, 156:9, 157:19
**they've** [2] - 114:22, 152:19
**Thifany** [1] - 4:14
**thinking** [1] - 11:18
**thinks** [1] - 98:17
**Third** [2] - 2:2, 2:6
**third** [5] - 64:12, 130:22, 132:2, 132:9, 132:24
**thousands** [3] - 72:20, 94:13, 102:11
**three** [13] - 59:14, 70:11, 77:13, 101:13, 104:11, 112:12,

117:25, 121:17, 133:24, 137:9, 141:22, 143:11, 148:24
**threefold** [1] - 148:1
**throughout** [3] - 71:18, 76:3, 152:13
**ticket** [1] - 44:17
**tie** [1] - 7:18
**tieing** [1] - 39:7
**ties** [2] - 21:16, 162:21
**tightly** [1] - 146:5
**timeframe** [1] - 157:24
**timeline** [4] - 110:5, 127:17, 158:2, 158:3
**today** [3] - 7:23, 62:25, 141:16
**together** [3] - 22:6, 22:11, 162:21
**ton** [2] - 100:17
**took** [4] - 86:17, 103:25, 104:13, 154:16
**top** [17] - 67:9, 71:15, 72:16, 74:3, 75:20, 82:17, 110:15, 115:12, 116:2, 116:3, 122:20, 128:11, 129:5, 129:7, 134:15, 136:23, 138:21
**topic** [1] - 160:18
**total** [25] - 73:13, 77:10, 78:21, 80:1, 89:16, 91:3, 91:6, 96:25, 104:9, 110:19, 111:10, 112:11, 116:4, 124:13, 125:25, 130:13, 131:22, 133:1, 134:1, 137:10, 137:11, 139:5, 140:11
**totally** [6] - 16:19, 16:25, 31:23, 60:20, 102:20, 160:7
**touch** [1] - 160:17
**toward** [1] - 31:20
**towards** [3] - 60:1, 154:3, 164:19
**track** [3] - 59:6, 59:12, 93:8
**traction** [3] - 25:8, 34:18, 164:25
**training** [2] - 92:1, 92:14
**transacted** [2] - 13:6, 14:2
**transaction** [23] - 31:12, 32:4, 32:7, 73:13, 73:14, 81:20, 82:14, 82:21, 83:4, 84:7, 84:18, 85:3, 85:18, 86:3, 86:8, 87:11, 88:7, 88:10, 88:21, 89:6, 89:7, 89:10
**transactions** [4] - 72:17, 72:20, 86:13, 88:9
**transcript** [2] - 15:20, 16:3
**transfers** [1] - 66:8
**treat** [1] - 27:10
**treated** [1] - 32:21
**TRIAL** [1] - 1:10
**trial** [1] - 24:23
**tried** [4] - 72:1, 151:20, 153:12, 154:1
**true** [4] - 10:22, 32:4, 71:18, 147:3
**truth** [1] - 90:10
**try** [7] - 20:1, 25:24, 52:4, 61:2, 93:11, 100:21, 108:13
**trying** [5] - 31:14, 98:8, 149:10, 151:11, 158:12
**turning** [1] - 158:12
**twenty** [1] - 71:25
**twenty-something** [1] - 71:25
**Twilio** [1] - 81:11
**two** [49] - 5:9, 5:16, 5:20, 9:16, 20:16, 20:17, 20:18, 25:2, 26:12, 26:13, 26:24, 29:23, 29:24, 29:25, 33:11, 33:24, 37:2, 53:2, 57:7, 59:13, 59:18, 60:10, 60:25, 62:23, 69:5, 70:8, 71:2, 71:4, 71:6, 91:23, 96:8, 97:18, 101:10, 101:13, 101:19, 101:22, 104:11, 108:4, 115:21, 117:7, 122:6, 134:5, 139:4, 139:5, 145:19, 148:22, 160:11, 162:14, 163:11
**two-fold** [1] - 5:16
**type** [6] - 96:9, 108:8, 121:11, 121:13, 121:14, 124:7
**types** [4] - 19:12, 96:8, 121:15, 123:13

## U

**u.S** [1] - 1:14
**ultimate** [2] - 98:10, 155:3
**ultimately** [2] - 56:23, 114:23
**umbrella** [1] - 20:17
**under** [39] - 21:4, 21:12, 23:17, 24:11, 24:13, 24:17, 25:11, 25:14, 25:16, 32:6, 36:10, 36:24, 40:7, 61:11, 61:16, 67:8, 68:18, 74:21, 81:22, 87:18, 95:12, 95:15, 98:16, 98:17, 112:1, 112:2, 117:15, 122:11, 136:9, 144:23, 145:12, 151:18, 152:14, 154:11, 154:13, 158:10, 162:7, 163:10, 163:15
**undercover** [2] - 140:22, 162:19
**undercovers** [1] - 162:13
**undergraduate** [1] - 91:22
**underlies** [1] - 36:17
**underlying** [60] - 28:9, 28:10, 29:10, 29:13, 36:11, 37:19, 38:14, 64:19, 65:9, 65:25, 66:11, 66:16, 66:25, 68:1, 68:5, 68:20, 69:10, 69:14, 70:16, 70:19, 70:20, 72:14, 73:6, 74:15, 74:18, 74:20, 75:3, 75:4, 75:7, 75:12, 76:20, 79:13, 80:15, 82:18, 83:22, 84:11, 86:5, 87:22, 90:15, 94:8, 94:23, 95:20, 95:22, 102:11, 102:13, 103:15, 111:23, 114:4, 116:18, 116:19, 120:1, 123:18, 125:6, 126:24, 137:25, 138:2, 138:11, 139:17, 140:24
**understood** [4] - 100:20, 102:14, 143:1, 143:18
**undoubtedly** [1] - 25:23
**unique** [1] - 93:10
**unit** [5] - 117:6, 121:12, 122:23, 123:2
**United** [5] - 4:5, 4:6, 4:8, 4:13, 15:2
**united** [1] - 2:13
**UNITED** [3] - 1:1, 1:4, 1:11
**units** [5] - 117:3, 121:13, 121:15, 125:23, 125:25
**University** [1] - 62:17
**unlimited** [2] - 26:1, 165:11
**unnecessary** [1] - 26:4
**unring** [1] - 142:13
**unwieldy** [2] - 22:7, 74:24
**up** [43] - 5:3, 5:25, 7:1, 11:17, 27:12, 34:1, 38:3, 39:9, 40:10, 56:14, 60:3, 62:14, 65:12, 99:23, 101:1, 101:5, 101:14, 102:13, 102:19, 102:20, 102:25, 103:25, 106:17, 108:2, 113:15, 115:10, 119:15, 121:1, 141:17, 142:23, 142:25, 147:17, 147:18, 149:11, 149:12, 149:14, 150:5, 151:9, 153:2, 153:12, 153:16, 156:23, 164:18
**US** [4] - 71:6, 84:19, 85:4, 86:4
**use-of-funds** [1] - 81:1
**uses** [1] - 33:19

## V

**valens** [1] - 150:13
**valid** [3] - 33:20, 33:21, 64:9
**values** [1] - 7:12
**variance** [5] - 145:13, 145:25, 148:5, 151:4, 151:13
**variety** [6] - 64:7, 78:21, 93:4, 93:17, 118:20, 135:15
**various** [3] - 6:7, 19:12, 22:2
**veer** [1] - 159:3
**veering** [2] - 158:11, 161:22
**veers** [2] - 8:18, 164:12
**VELAZCO** [1] - 2:12
**venue** [2] - 162:19, 162:20
**Vernon** [2] - 140:23, 163:16
**versions** [1] - 114:14
**versus** [8] - 4:8, 15:2, 102:3, 118:11, 120:11, 121:13, 122:6, 124:14
**via** [3] - 93:4, 123:14, 154:16
**view** [8] - 6:17, 26:8, 73:13, 142:21, 149:9, 150:12, 152:5, 155:20
**vigilant** [1] - 162:3
**violation** [4] - 147:7, 151:22, 152:10, 164:13
**violative** [1] - 145:9
**Virginia** [1] - 62:16
**vital** [1] - 28:1
**vividly** [1] - 29:16
**volume** [2] - 43:10, 144:13
**voluminous** [59] - 21:1, 21:23, 23:12, 25:15, 25:22, 25:23, 26:6, 26:10, 26:13, 27:23, 30:3, 30:12, 30:14, 31:21, 35:7, 35:21, 35:24, 37:4, 37:20, 38:20, 72:14, 74:22, 74:23, 76:22, 78:9, 79:14, 80:16, 89:21, 90:4, 94:9, 94:10, 95:19, 95:22, 103:2, 103:4, 103:14, 103:16, 109:20, 111:1, 111:24, 112:20, 116:20, 126:19, 128:15, 132:16, 135:22, 144:17, 148:8, 155:6, 157:22, 158:16, 158:23, 158:24, 162:2, 162:6, 163:15, 163:20, 163:21, 164:3
**vouch** [3] - 14:12, 18:1, 18:22
**vouching** [2] - 18:18, 20:11
**VP** [2] - 137:23, 138:20
**vs** [1] - 1:6

## W

**Wagner** [3] - 53:23, 58:2, 58:3
**wait** [2] - 12:19
**waited** [1] - 11:13
**waived** [1] - 54:8
**walk** [10] - 73:23, 80:25, 84:7, 85:2, 86:2, 93:3, 122:18, 136:20, 138:18, 140:4
**wants** [3] - 5:25, 18:19, 44:14
**Washington** [4] - 1:16, 1:20, 62:17, 62:18
**ways** [3] - 17:13, 17:14, 33:11
**week** [6] - 11:17, 13:19, 40:16, 41:18, 42:21, 53:20
**weekend** [5] - 5:2, 5:6, 11:18, 40:2, 40:4
**weeks** [1] - 134:5
**weighed** [1] - 148:15
**weight** [2] - 9:9, 9:25
**welcome** [2] - 24:4, 105:18
**Wheeler** [2] - 140:23, 163:16
**whereby** [1] - 149:11
**white** [1] - 12:21
**whole** [9] - 7:8, 7:20, 8:14, 9:23, 39:2, 54:25, 63:12, 141:17, 156:5
**WILSON** [24] - 2:2, 4:22, 41:10, 41:23, 42:7, 42:25, 43:5, 43:23, 44:7, 46:18, 47:2, 48:15, 51:9, 51:11, 51:18, 51:24, 52:14, 52:24, 53:3, 53:4, 57:2, 57:4, 57:15, 58:24
**Wilson** [10] - 2:21, 4:22, 4:25, 17:10, 52:22, 60:9, 130:24, 133:5, 134:7, 161:3
**wire** [5] - 66:8, 82:21, 84:12, 85:7
**wires** [1] - 66:9
**wise** [1] - 55:14
**wish** [4] - 17:15, 19:25, 29:18, 47:20
**wishes** [1] - 142:24
**WITNESS** [24] - 2:19, 40:8, 41:13, 42:2, 42:15, 43:8, 44:8, 46:22, 52:10, 52:16, 58:11, 62:7, 73:2, 94:3, 94:22, 94:25, 95:3, 96:17, 108:12, 109:9, 114:20, 122:5, 125:7, 132:24
**witness** [104] - 7:11, 7:18, 7:24, 8:2, 8:8, 9:10, 9:11, 10:16, 13:22, 13:23, 14:8, 14:15, 14:20, 14:21, 14:25, 15:5, 15:9, 15:11, 15:16, 15:17, 15:20, 16:13, 16:22, 16:23, 17:2, 17:7, 18:5, 19:2, 19:6, 19:9, 19:24, 19:25, 20:2, 20:13, 24:11, 24:20, 27:1, 27:14, 31:22, 36:24, 40:5, 40:9, 42:6, 47:21, 59:4, 59:16, 60:11, 62:2, 62:3, 65:2, 67:16, 68:22, 70:3, 70:4, 71:10, 74:13, 74:16, 74:22, 75:2, 76:12, 78:1, 79:5, 80:9, 81:12, 82:6, 83:7, 92:8, 92:20, 93:13, 97:10, 99:14, 105:23, 106:13, 106:14, 110:22, 111:15, 116:6, 116:24, 123:10, 124:19, 126:10, 128:7, 129:10, 129:13, 137:18, 138:11, 139:12, 140:18, 141:6, 142:9, 146:9, 146:14, 148:11, 158:13, 158:22, 159:4, 159:25, 160:6, 161:20, 161:23
**Witness** [3] - 59:2, 105:8, 142:8
**witness'** [8] - 5:18, 8:4, 8:19, 14:22, 16:1, 18:18, 92:16
**witnesses** [5] - 6:4, 59:12, 144:10, 148:10, 154:24
**woken** [1] - 27:12
**word** [2] - 46:8, 118:17
**words** [1] - 12:6
**world** [3] - 73:13, 119:12, 149:3
**worse** [2] - 147:12, 149:20
**wrist** [7] - 40:23, 45:2, 49:9, 115:16, 121:17, 123:3, 123:4
**wrists** [1] - 49:5
**write** [2] - 102:13, 160:21
**written** [5] - 41:1, 44:16, 45:18, 50:5, 66:10
**wrongful** [1] - 146:20
**wrote** [2] - 60:3, 120:13

## X

**X5196** [1] - 14:1

## Y

**year** [1] - 22:15
**years** [5] - 50:24, 54:13, 58:1, 72:20, 91:25
**York** [2] - 1:16, 1:20
**young** [1] - 50:8
**Young** [1] - 140:6
**yourself** [2] - 92:17, 105:6

## Z

**zero** [1] - 108:19
**Zip** [1] - 81:10