**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**UNITED STATES OF AMERICA**

**v.**

**BRETT BLACKMAN,**

**Defendant.**
_______________________________________/

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, through undersigned counsel, respectfully submits this Sentencing Memorandum in advance of the sentencing of defendant Brett Blackman ("Defendant" or "Blackman"). Defendant's egregious conduct as the designer of one of the largest Medicare telemedicine fraud schemes ever brought to trial warrants a substantial prison sentence. Blackman was convicted at trial of one count of conspiracy to commit wire fraud and health care fraud in violation of 18 U.S.C. § 1349, and two counts of conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371.

## INTRODUCTION

Blackman designed this scheme from the ground up with one goal: steal as much money from Medicare as possible. He set up an operation to prey on millions of elderly people in pain to call foreign telemarketers in the Philippines and India. The shady foreign telemarketers cajoled the Medicare beneficiaries to accept numerous braces each, and then the beneficiaries' information was sent to Blackman's DMERx platform to generate fraudulent orders that telemedicine companies sold in exchange for kickbacks. The telemarketers paid Blackman for the advertising and paid the telemedicine companies to have doctors sign the orders. In turn, the telemarketers sold the orders to brace companies in exchange for kickbacks and bribes. Blackman made money

from every exchange. He charged telemarketers for the advertising, and he charged a $10 fee for every beneficiary that received an order.

The data showed the absurd results of this massive kickback scheme: over $1 billion billed to Medicare, of which over $452 million was paid, for unnecessary orthotic braces ordered through Blackman's DMERx platform. Over 346,000 beneficiaries received an orthotic, and on average each beneficiary received nearly 4 orthotics. GX 118. The evidence also showed that over 1,200 beneficiaries received at least 21 orthotics prescribed through Blackman's DMERx platform. *Id*. And Blackman profited off of each of these transactions.

Blackman flouted the law at every turn—indeed, he tried to bend the law in his favor by lying to his compliance lawyers to induce them to provide some cover for his fraud. He attempted to get approval from health care attorney Denise Leard for the scheme. But after Leard told Blackman that he would risk violating the Anti-Kickback Statute, he had attorney Randy Schultz create sham contracts that depicted a completely different business model to create the veneer of legality for the scheme.

Blackman also took pains to hide and proliferate the fraud. He personally took steps to conceal from Medicare what he was doing—authorizing the removal of the words telephone and telemedicine from the orthotic brace prescriptions created by his DMERx platform. He put his companies in the names of others and "orchestrated" the scheme from behind the scenes. But he nonetheless took in millions in profits from the orthotic brace scheme and controlled the flow of money taking in over $52 million through entities he controlled.

The total adjusted offense level 43 speaks to the severity of the offense. In fashioning a sentence from these guidelines, the Government urges the Court to consider the seriousness of this offense, the need to deter this Defendant and others who believe they are above the law, the need

to curb health care fraud in South Florida and nationwide, and the need to promote respect for the law. In the face of overwhelming evidence, Blackman continues to deny his guilt. Blackman casts blame on others who he directed and with whom he conspired for his crimes. Now, having been convicted of three conspiracies, he must face justice. The law provides a means for the Court to impose a sentence that reflects the gravity of Blackman's conduct, guards the rule of law, and—critical in a case of this magnitude—dissuades this Defendant and others from committing crimes that prey on vulnerable patients and jeopardize public programs.

## I. BLACKMAN'S CONDUCT WAS EXPANSIVE AND PERNICOUS.

Blackman's extraordinary crimes resulted in one of the largest telemedicine fraud schemes ever charged and possibly the largest criminal telemedicine fraud scheme ever tried. The Government encourages the Court to construe its 18 U.S.C. § 3553(a) analysis through this lens. *See* U.S.S.G. § 1B1.1. During the conspiracy period, Blackman's portal created fraudulent doctors' orders for over 346,000 Medicare beneficiaries, for a total of over $1 billion billed to Medicare. The scheme touched beneficiaries in nearly every state. The Court should consider the seriousness of Blackman's scheme in assessing the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense, and the need to justly punish the offense. 18 U.S.C. §§ 3553(a)(1)-(2)(a).

Blackman was the architect of this scheme in every sense of the term. Blackman went to attorney Denise Leard with a plan in mind: gain approval for his scheme so that he could lure other coconspirators. When Leard told him that his plan would violate the Anti-Kickback Statute, he concocted a new scheme and lied to attorney Randy Schultz to get him to draft contracts that did not at all match the scheme proposed to Denise Leard. *Compare* GX 633 (D. Leard legal opinion) *with* GX 1221 (Shultz contracts). Defendant agreed to finalize the contracts describing

HealthSplash 2.0 knowing that they were being used for DMERx. See GX 1221 ("Brett has . . . finalized and approved [the contracts]"). These contracts made it appear that the patients on his platform could choose their providers, concealing the kickback relationship between the suppliers, pharmacies, telemarketers, and telemedicine doctors. None of this was true.

Defendant and his co-conspirators knew that these contracts were false. For example, one of the first things the contracts describe is an "online patient waiting room" where patients' information was to be uploaded into a portal and then chosen by any available DMERx-enrolled provider for a telemedicine consult. *See, e.g.*, GX 228, 230, 233, 234, 236, 237 (DMERx contracts). This was a lie. Defendant's co-conspirators uniformly testified that there was no online patient room. *See* Tr. Apr. 28 (AM) at 51:13-25 ("Q. Did that patient waiting room exist in the telemedicine module in DMERx? A. [T. De Lanoy] No . . . that wording would be inaccurate."); *see also* Tr. May 4 (AM) at 147:16-148:3 ("Q. [W]hat was the online patient waiting room? . . . Did it exist? [G. Schreck] A. It did not."). Instead, the telemedicine doctors were already assigned to the patient because the marketers had already paid for the doctor's order. *See* Tr. Apr. 30 at 168:11-16 ("[W. McNeal] A. Again, there wasn't any patient waiting room which ties into the fact that the – the second part of that paragraph [in the contract], the referral service end of things. Q. What was inaccurate about the referral service language here? A. [DMERx] did, in fact, refer most of my clients to me."). This is exactly what Leard advised Defendant not to do. GX 633. These contracts, *inter alia*, show that Defendant and his co-conspirators participated in a single, massive conspiracy to buy and sell falsified doctors' orders billed to Medicare.

The uncontroverted evidence presented at trial demonstrated that Blackman was in charge of all of the conduct through the DMERx portal. Several witnesses testified that Blackman was central to the crimes committed and that he led the scheme. For instance, Kristina Rogers testified

that Blackman was the "orchestrator" of National Center for Pain ("NCP") and Amici Holdings, two companies that were a central part of the fraud. Apr. 29 PM Tr. at 94:18-95:1 (NCP) and 100:19-101:3 (Amici Holdings). Two HealthSplash executives, Gregory Schreck and Toni De Lanoy each testified that Defendant made all the decisions at HealthSplash and directed their actions in the conspiracy. May 4 AM Tr. at 116:19 – 117:11 (Schreck), April 28 AM Tr. at 116:12-14 (De Lanoy).

And Blackman led the conspiracy to a specific goal: defrauding Medicare through selling false and fraudulent orders and prescriptions. For instance, Jordan Karlick pleaded guilty to conspiring to commit health care fraud with Blackman and others and testified that he "billed Medicare for fictitious claims, around $19 million worth," Tr. Apr. 27 at 54:14-19. He also noted that the DMERx orders were "an ad-lib that you would just sign and then I would fill the order." *Id*. at 54:20-55:1. Sargon Audisho, a licensed physician whose license was later revoked, testified that the DMERx template was the same whether he had a telemedicine consultant with a beneficiary or not, and he often did not call beneficiaries before signing an order. Tr. Apr. 29 (PM) at 28:1-4. Defendant profited by a per-download fee charged on every prescription pushed through the platform. De Lanoy testified that "DMERx, HealthSplash was paid per download of the documentation for the orders," Tr. Apr. 28 (AM) at 90:18-19, and Gregory Schreck testified that "we would receive $5 per download on the telemed, and $5 per download on the DME. So we would receive $10 of revenue for each order," Tr. May 4 (AM) at 130:7-10. De Lanoy tied Blackman to this goal, saying that he "decided that pricing . . . model," Tr. Apr. 27 at 226:20-25.

Blackman solicited the bulk of the Medicare beneficiaries sent into the telemarketing call centers that fueled the scheme. He sold the deceptive mailers from NCP to DMERx's clients that urged Medicare beneficiaries to contact the telemarketers. Defendant designed these mailers to

create a false sense of urgency about limited-time Medicare coverage for the braces. GX 606 (NCP's Mailer); *see* Tr. Apr. 27 at 59:25-60:3 ("Q. And to your knowledge, who created this [GX 606]? A. [J. Karlick] . . . Mr. Blackman."); *id*. at. 61:17-19 ("Q. . . [T]o your understanding, why would that language be there? A. To create urgency, to generate a phone call."); *id*. at 62:5-20 ("A. So as a DME owner, I would be paying for one lead . . . Q. . . . where would someone be directed to upon calling that number? A. Mr. Kimble's call center in the Philippines."). Herb Kimble was Defendant's largest customer at DMERx. GX 1220a (Sheet: Orthosis Order by Supplier). Defendant solicited call centers for these mailers directly through HealthSplash, DMERx's parent company. GX 1202 (Email from Health Splash to M. Moranz); *see also* Tr. May 4 (PM) at 68:3-12 ("A. [G. Schreck] This is a marketing piece that was generated from the software to our customer base asking them if they had any need for additional marketing, so additional patients. Q. And to your understanding, what company was going to handle that? A. National Center for Pain. Q. And how . . . did that relate to generating referrals? A. That's exactly what it was."). Once the mailer duped a Medicare beneficiary into calling the number, the telemarketers then pressured them into agreeing to accept braces and pain creams. These telemarketers were trained to not take "no" for an answer. *See* GX 610 (NCP's phone intake script); GX 636 at 8 (Paddlepoint BPO Services phone intake script) ("If patient says 'No' during final agreement . . . [rebuttal] 'As you said 'no,' we won't be able to proceed. However, I'll repeat the closing statement one more time—please let me know if you agree.'"). The telemarketers would even impersonate Medicare to trick beneficiaries to agree. Special Agent Vitaly Zubry, while undercover as the fictious Medicare beneficiary Kevin Green, captured one of these calls. GX 503 ("[V. Zubry] . . . Can I ask who am I talking to? [Telemarketer]: My name is Katie. [Zubry]: Katie, and you're calling from where? Katie: Medicare shipping department. You call to this number . . . This is Medicare." GX 532-4

(call recording transcript). Unsurprisingly, the Medicare "shipping department" does not exist. Tr. Apr. 22 (PM) at 103:2-10 ("Q. Now, Agent Zubry, Katie is calling you, and now she's asking you about your insurance again after telling that you already called them. You heard that? A. Yes. Q. What, if any, sense did that make to you? A. No sense . . . there's no such thing as Medicare shipping department."). This fictitious Medicare beneficiary was cycled all the way through DMERx's portal, its telemedicine interface, and billed to Medicare without any contact with a doctor despite generating an order claiming that physical examinations were conducted. *Id*. at 103:11-13 ("Q. And she also told you that it was approved. Had you done anything in between the prior call and then? A. No, no medical professional ever examined me."); GX 111; GX 417.

Blackman and his co-conspirators designed the telemarketing efforts to eliminate patient and doctor choice at each step. This enabled them to obtain the highest reimbursement from Medicare. The beneficiaries arrived in DMERx's portal already paired with the telemedicine providers and DME suppliers that pre-selected the highest-cost product to prescribe. Tr. Apr. 28 (AM) at 56:7-18 ("[T. DeLanoy] . . . the codes that were in our software were the highest reimbursed codes . . . Q. And who made the decision to only put the higher reimbursed codes into the software? A. It was a DME choice and . . . Brett [Blackman] would make the final decision."); Tr. Apr. 29 (PM) at 24:15-25-3 ("Q. [S. Audisho] And for the [Medicare beneficiaries] that you did call, would they have any idea of who you were? A. No. . . Q. So based on your understanding and your use of DMERx, would it be misleading to suggest that a patient could choose you? . . . A. Absolutely."); *Compare* GX 626 at 2 ("Problems with Current [DMERx] Workflow . . . Forced Supplier & Clinician Product Selection . . . .") *with* GX 117 ("Top 10 HCPCS Account for 99% of Billed Amount"). In fact, 93% of DMERx patients had no prior relationship with the providers that ordered their braces. Tr. Apr. 30 at 106:20-107:5. Medicare has flagged both as indicators of

fraud. GX 641 ("Fraud may take such forms as . . . Completing Certificates of Medical Necessity . . . for patients not personally and professional known by the provider [and] [p]articipating in schemes that involve collusion between a provider and a beneficiary, or between a supplier and a provider, and result in higher costs or charges to the Medicare program."). Additionally, DMERx was programmed to state that physical examinations occurred that could not be performed over the phone and that were conducted at an impossible rate. Tr. Apr. 23 (AM) at 13:1-16:18; Tr. Apr. 29 (PM) at 80:17-23 ("Q. Now, Mr. Audisho, you testified that these were approximately 100 or so orders that you signed in one day . . . how, if at all, is it possible for you to examine that many people in one day? A. That is logically impossible to do that.").

The consequences of Blackman's conduct are staggering. The claims data showed that Blackman was responsible for over $1 billion in claims to Medicare in just four years. GX 112. Blackman's egregious conduct did not just expose Medicare, a critical social safety net, to exorbitant losses. This conduct also confused vulnerable beneficiaries and sent them potentially harmful products that they did not genuinely want or need. The jury heard from Dr. Robert Hoover, a Medicare expert in orthotic bracing, who testified about how the process that Blackman designed and carried out could lead to the potential for harm. For example, Hoover testified that had beneficiaries believe they were treated for their pain "there's several potential harms they could cause, delaying treatment, not getting the right treatment, getting treated but side effects from the treatment." April 23 (PM) Tr. at 77:11-17.

The jury was shown patient orders that were copy-and-paste versions of medical records. And Dr. Hoover testified that the orders were inadequate and did not truthfully document medical necessity. April 23 PM Tr. at 78. Dr. Sullivan similarly walked the jury through four prescriptions for compound creams, GXs 316-19, and opined that the quantities and combinations of

medications were impractical and dangerous if used as prescribed. *See, e.g.*, Tr. Apr. 21 at 177:12-179:19.

Blackman created this massive fraud for one reason: greed. Michael Petron, a certified public accountant and certified fraud examiner, testified about the movement of money through numerous bank accounts. During the conspiracy, Blackman and accounts he controlled received more than $52 million from telemarketers and other companies involved in the telemedicine fraud. GX 152. Brace companies billed Medicare more than $1 billion for braces ordered through Blackman's DMERx, and they were paid more than $452 million. GX 112.

## II. THE UNITED STATES' RECOMMENDED GUIDELINES CALCULATION.

The United States recommends the following sentencing guidelines calculation, which is consistent with the guidelines calculated by Probation in the draft presentence investigation report. Defendant was convicted of three counts, which were "connected by a common criminal objective or constitut[ed] part of a common scheme or plan." U.S.S.G. § 3D1.2. As such, the counts should be grouped and the count with the highest offense level determines the guidelines calculation. U.S.S.G. § 3D1.3(a). Therefore, Count 1 which charged a conspiracy to commit health care fraud and wire fraud drives the guidelines calculation.

- **<u>Base Offense Level</u>:** the base offense level is **7** because the jury convicted on both the health care fraud and wire fraud objects. U.S.S.G. § 2B1.1(a)(1).

- **<u>Loss:</u>** The offense level should be increased by **30 levels** under U.S.S.G. § 2B1.1(b)(1)(P).

Loss is calculated as the intended loss, which is the amount billed by Blackman and his coconspirators to Medicare and Medicare Advantage. *See* U.S.S.G. § 2B1.1, Note 3(A)(ii); 3(F)(viii) ("In a case in which the defendant is convicted of a Federal health care offense involving a Government health care program, the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the

intended loss….”). At trial, the United States proved that the intended loss was over $1 billion. *See* GX 112.

- **Mass-Marketing:** The offense level should be increased by **2 levels** because of the use of mass-marketing. U.S.S.G. § 2B1.1(b)(2)(A)(ii).

The evidence at trial showed that Blackman, through NCP, solicited Medicare beneficiaries to call telemarketers to convince Medicare beneficiaries *en masse* to receive medically unnecessary orthotic braces. Examples of the call center scripts were introduced in evidence at GX 610 and 636 and the related mass mailers that advertised "Medicare approved" products used to target Medicare beneficiaries were introduced in evidence at GX 606, 669, and 1006. All told, DMERx created orders for over 346,000 Medicare beneficiaries. GX 118. The enormous volume of beneficiaries and billing—and the concomitant loss to the Medicare program—could not have been achieved without the use of large-scale call centers that funneled patients into Blackman's DMERx portal. Mass marketing was therefore part and parcel of this scheme.

Blackman's hand-selected Vice President Gregory Schreck testified to how the process worked:

> marketers w[ould] purchas[e] marketing from [NCP], they were then uploading it into DMERx. DMERx . . . then upload[ed] it into a telemed. And the telemed was then delivering it to a supplier that was owned on paper within our software, that was owned by the same marketer. So, financially, we would receive $5 per download on the telemed, and $5 per download on the DME. So we would receive $10 of revenue for each order that came through from the marketer.

May 4 AM Tr. at 129:22 – 130:10. De Lanoy also explained that NCP "was a marketing company that would send out postcards to people who were 65 and up." Apr. 27 Tr. at 240:1 – 241:14. She noted that Defendant benefited because many of the DMERx clients used NCP to attract beneficiaries who would get "pushed into our software if they expressed a desire or a need for an

orthotic device." *Id*. Generating false orders for orthotic devices was the central aspect of Defendant's fraud scheme.

- **<u>Federal health care offense involving Government program:</u>** The offense level should be increased by **4 levels** because the defendant was convicted of a Federal health care offense involving a Government health care program and the loss was more than $20 million. U.S.S.G. § 2B1.1(b)(7)(B)(iii).

- **<u>Sophisticated means:</u>** Blackman's offense level should be increased by **2 levels** because the offense involved sophisticated means. U.S.S.G. § 2B1.1(b)(10)(C).

Blackman's scheme undoubtably employed sophisticated means. The evidence at trial showed that he used shell companies, nominee owners, sham contracts, kickbacks and bribes, and false medical records to carry out the conspiracy of which he was convicted. *See id*. at Commentary n. 9(B); *United States v. Moran*, 778 F.3d 942, 977 (11th Cir. 2015) ("[Defendant's] offense conduct as a whole involved a complex scheme to defraud Medicare and to conceal the fraud. The offense involved the widespread use of kickbacks, the falsification of group therapy notes, and the laundering of proceeds from the fraud. [The biller's] billing and payroll actions alone facilitated and contributed significantly to the fraud."). Here, Defendant similarly relied on a complex scheme to conceal the fraud and employed kickbacks and falsified medical records – *i.e*., the telemedicine orders – to facilitate the fraud.

- **<u>Role:</u>** The offense level should be increased by **4 levels** because Blackman was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. U.S.S.G. § 3b1.1(a).

Many witnesses testified that Blackman was central to the crimes committed and that he led the scheme. As noted, *supra* at 4, Kristina Rogers testified that Blackman was the "orchestrator" of NCP and Amici Holdings, two companies that were a central part of the fraud. The two HealthSplash executives, Greg Schreck and Toni De Lanoy each testified that Defendant made all the decisions at HealthSplash and directed their actions in the conspiracy, *supra* at 5.

Perhaps most importantly, the evidence showed that it was Defendant who sought legal cover from two layers and used the fact that he had discussions with lawyers to lure Schreck, De Lanoy, and others into the conspiracy. *See*, *e.g*., Apr. 28 PM Tr. at 27:23-28:22 (De Lanoy testifying regarding Defendant telling her he had a legal opinion); May 4 AM Tr. at 162:18, 164:2-13 (Schreck testifying about the contracts used despite incorrectly describing the way the company was operating); GX 1221 (Defendant approving the contracts; "Brett has also finalized and approved").

Courts have consistently applied a four-point aggravating role adjustment where defendants led significant aspects of health care fraud schemes. Minal Patel was held accountable as the owner of a genetic testing laboratory that billed Medicare and Medicare Advantage plans over $487 million in fraudulent tests, with a four-point aggravating role enhancement. D.E. 557, at 30*, United States v. Patel*, 19-CR-80181 (S.D. Fla.). In overruling an objection based on the fact that Patel did not supervise his key co-conspirators, including Marc Sporn who ran his own telemedicine operation that was used in Patel's scheme, the Court noted, "it was clear to me that [Patel] had this idea from the beginning and brought in other players. So if you want to call him kind of the [hub] of the wheel, I think the evidence would support that and certainly would support the additional four point." *Id*. Marc Sporn also received an aggravated role enhancement where he owned marketing and telemedicine companies that referred thousands of medically unnecessary orders for genetic tests to several laboratories including Patel's laboratory. At sentencing, in determining that a four-level role adjustment applied to Sporn, the Court noted, "[the defendant] . . . owned these companies . . . [H]e operated them . . . I don't see how the facts as set forth both in the proffer and the PSI call for anything less than the leader or organizer four-level enhancement." D.E. 50, June 16, 2022, Sentencing Tr. 6:9-7:2, *United States v. Sporn*, 22-CR-80007 (S.D. Fla.); *see also* D.E. 129, *United States v. McKeon et al.*, 22-CR-80062 (S.D. Fla.)

(agreeing to four-level role adjustment for role as leader of marketing group that referred medically unnecessary genetic testing orders to LabSolutions). Moreover, the Eleventh Circuit has affirmed courts that have similarly applied the four-level adjustment. *See, e.g.*, *United States v. Galindo*, 798 F. App'x 524, 526 (11th Cir. 2020) (affirming lower court's application of U.S.S.G. § 3B1.1(a) role adjustment for defendant convicted of conspiring to commit health care fraud and other offenses); *United States v. Delgado*, 551 F. App'x 508 (11th Cir. 2014) (same).

* * * * *

Under the Government and Probation's proposed guidelines calculation in the draft Presentence Investigation Report, the offense level is 49, which adjusts to **<u>43</u>** (the highest offense level recognized in the sentencing table) and corresponds with a Guideline term of imprisonment of life. Defendant's maximum sentencing exposure under the three counts of conviction is 30 years in prison, and his guidelines range is therefore 360 months in prison. *See* D.E. 541 ¶ 139. The enhancements also speak to the seriousness of the offense and need for deterrence and therefore can be considered as part of the Section 3553(a) factors.

The Government further recommends that the Court order restitution, which is mandatory. In this case, restitution totals $452 million to Medicare and $564,000 to ChampVA, the amount paid to brace suppliers during the conspiracy based on Blackman's DMERx software and his fraudulent conduct. GX 112, 450. Restitution should be ordered payable as follows:

| **Restitution Amount** | **Payee** |
|---|---|
| $452 million | Centers for Medicare and Medicaid Services |
| $564,000 | ChampVA |

## III. SENTENCES IN RELATED CASES WARRANT A SUBSTANTIAL TERM OF IMPRISONMENT.

Many of Blackman's co-conspirators and others convicted in telemedicine fraud schemes have received significant jail sentences. In many of those cases, the defendants pleaded guilty, cooperated (with some already receiving credit for their cooperation), and had loss amounts and total offense levels far below Blackman's. These cases provide indicators of a starting point for Blackman's sentence; factors discussed throughout this memorandum demonstrate why Blackman should receive a term of imprisonment materially greater than that of any of these defendants.

- *United States v. Gary Cox*, 23-cr-20271 (S.D. Fla.): Cox was Blackman's co-defendant and 79-year-old board member of HealthSplash and CEO of DMERx. He was sentenced to 15 years in prison.
- *United States v. Jean Wilson*, 20-cr-111 (D.N.J.): The owner of a telemedicine company that used Blackman's DMERx and was sentenced to 10 years in prison in connection with her guilty plea to conspiracy to commit wire fraud. The defendant's telemedicine company resulted in approximately $136 million in false bills to Medicare. Wilson received cooperation credit.
- *United States v. Reinaldo Wilson*, 20-cr-111 (D.N.J.): The owner of a telemedicine company that used Blackman's DMERx and was sentenced to 7 years in prison in connection with his guilty plea to conspiracy to commit wire fraud. The defendant's telemedicine scheme resulted in approximately $27.9 million in loss to Medicare. Wilson received cooperation credit.
- *United States v. Steven Kahn*, 19-cr-80169 (S.D. Fla.): An owner of a telemedicine company who used DMERx to generate orders and who pleaded guilty to conspiracy to

commit health care and wire fraud in connection with a $39 million telemedicine fraud scheme received 92 months. Kahn was resentenced from an original sentence of 132 months in light of his cooperation.

- *United States v. Willie McNeal*, 19-cr-146 (M.D. Fla.): McNeal was the owner of a telemedicine company that used DMERx and received a 33-month sentence following a guilty plea to conspiracy to defraud the United States and soliciting and receiving health care kickbacks in a $133.2 million telemedicine fraud scheme. McNeal's sentence reflected credit for his cooperation, and he testified during Blackman's trial.
- *United States v. Toni De Lanoy*, 20-cr-88 (S.D. Ga.): De Lanoy was an employee of Blackman's who received 30 months in prison in light of her cooperation.

In other recent health care fraud cases that went to trial in this district, defendants at or near the top of the scheme likewise received substantial jail sentences. Judge Ruiz sentenced Minal Patel in connection with a $463 million genetic testing fraud scheme to 27 years in prison. Judge Dimitrouleas sentenced Jonathan Markovich, the owner and operator of a fraudulent addiction treatment center, to 185 months in connection with a $112 million fraud scheme.[1] *United States v. Markovich*, 21-cr-60020-WPD (S.D. Fla.). This Court sentenced Dr. Agresti to 100 months in connection with a $110 million fraudulent urinalysis and addiction treatment scheme. *United States v. Agresti*, 18-cr-80124-RAR (S.D. Fla.).

Blackman committed a more prolific, lucrative fraud than any of these defendants. Remarkably, Blackman's fraud was caused more and attempted to cause more harm to Medicare than Patel, Agresti, and Markovich, <u>*combined*</u>. Blackman should be sentenced accordingly.

---

[1] Judge Dimitrouleas reduced the loss amount during sentencing, but this was the alleged amount billed to insurance companies.

## IV. DEFENDANT'S SENTENCE MUST PROVIDE SPECIFIC AND ACTUAL DETERRENCE.

As this Court is aware, it must consider deterrence—both specific deterrence of the Defendant, and general deterrence—to keep others from committing similar offenses. In determining how much weight to give this factor, the Court can consider the Defendant's "complete lack of remorse and unwillingness to accept responsibility." *United States v. Joseph*, 700 F. App'x 918, 923 (11th Cir. 2017) (affirming defendant's 660-month sentence). While Blackman will no doubt strenuously argue that he is unlikely to re-offend, his unwillingness to express remorse or to accept responsibility supports the notion that a substantial jail sentence is warranted. Indeed, throughout the trial and still in his post-conviction pleadings, Defendant casts blame on others (chiefly his lawyers, co-conspirators, and employees).

The Court should also sentence Blackman in a manner that deters other telemedicine scams, which is no doubt a booming fraud-business. As the Court is aware from observing the evidence at trial, and as the above-cited related cases make clear, the United States is replete with telemarketing and telemedicine schemes designed to bilk Medicare. This scheme was driven by people, like Blackman, who seek money above all else. This greed and indifference to using others for personal gain is what drives these schemes. Blackman found a unique way to defraud Medicare: a system of creating fake prescriptions for orthotics and pain creams *en masse*. Defendant had no regard for the hundreds of thousands of beneficiaries who received no care but whose Medicare benefits were billed to the tune of $1 billion. The Court must deter future telemarketing and telemedicine fraud schemes that can uniquely unlock fortunes from the Medicare trust fund.

As the Eleventh Circuit has noted, post-*Booker*: "[E]conomic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,'' and thus these

crimes are "prime candidate[s] for general deterrence.'" *United States v. Martin,* 455 F.3d 1227, 1240 (11th Cir. 2006) (citing Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L.Rev. 721, 724 (2005)). Indeed, the *Martin* court noted that the legislative history of Section 3553 showed that Congress viewed deterrence as "particularly important in the area of white collar crime . . . . even where [the defendant] might themselves be unlikely to commit another offense." *Id.* (emphasis added) (citing S. Rep. No. 98-225, at 76, 91-92 (1983)). The Court in *Martin* held that "[d]efendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.*, 455 F.3d at 1240. Indeed, the evidence at Blackman's trial demonstrated that Defendant and his co-conspirators communicated regarding the enforcement action that ultimately led to his convictions here as it was happening. *See, e.g.*, GX 601 (Chintan Anjaria texting another co-conspirator regarding the nationwide law enforcement action noting that, "That back brace was HUGE . . . Even the telemed companies ain't responding.")

Furthermore, the Eleventh Circuit has made clear that general deterrence is especially important in white collar offenses where greed is the motive. In *United States v. Hayes*, 762 F.3d 1300 (11th Cir. 2014), the Court of Appeals rejected a probationary sentence for a white-collar defendant – even though the government had filed a 5K1.1 substantial assistance motion because: "general deterrence is an important factor in white-collar cases, where the motivation is greed . . . we have set aside sentences of little or no imprisonment because they do not constitute just punishment for the offense, do not promote respect for the law, and will not do much to deter similar criminal activity by others." *Id.* at 1308. The Court went on to say that the low sentence imposed conveys the message "that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty," and accordingly was not

just. *Id*. at 1310-11. Second, too low of sentences do not provide for general deterrence because "[t]he threat of spending time on probation simply does not, and cannot, provide the same level of deterrence as can the threat of incarceration in a federal penitentiary for a meaningful period of time." *Id.* at 1310-11.

More specifically, in a health care fraud case, the Eleventh Circuit delved deeper into the background of the § 3553(a) factors, in particular the general deterrence factor, and wrote:

> the Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white-collar criminals, even where those criminals might themselves be unlikely to commit another offense. We stated that because economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence. Our basis for this determination was that defendants in white collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment.

*United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) (internal quotations and brackets omitted). The guidance from *Hayes* and *Kuhlman* squarely applies in full force to Blackman; this was, at bottom, a crime of greed and convenience.

## CONCLUSION

For the foregoing reasons, the United States requests that the Court adopt the above guidelines calculation, with a total adjusted offense level of 43. The United States further requests that the Court sentence Blackman to a substantial, guidelines range jail sentence and order restitution in the amount of $452 million payable as described herein.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

COLIN M. MCDONALD
Assistant Attorney General
National Fraud Enforcement Division
U.S. Department of Justice

By: *<u>/s/ Darren C. Halverson</u>*
Darren C. Halverson
Florida Special Bar No. A5503082
Assistant Deputy Chief
Reginald Cuyler Jr.
Florida Bar No. 0114062
Trial Attorney
U.S. Department of Justice
Fraud Division, Health Care Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
Tel: (202) 880-2233 (Halverson)
Tel: (202) 202-7438 (Cuyler)
Darren.Halverson@usdoj.gov
Reginald.Cuyler.Jr.@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 11, 2026, I served and filed the foregoing document with the Clerk of the Court via ECF.

By: *_/s/ Darren Halverson_*